UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


JOE BURGOS VEGA                 :
                                :              PRISONER
        v.                      :      Case No. 3:04CV1215(DFM)
                                :
THERESA LANTZ, et al.[1]        :


RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS
───────────────────────

        Plaintiff Joe Burgos Vega ("Vega") filed this civil rights

action pro se pursuant to 28 U.S.C. § 1915.[2]  He alleges that the

───────────────────────

        [1]The named defendants in Plaintiff's First Amended
Complaint, filed November 8, 2005, are Theresa Lantz, Jack
Tokarz, Anthony J. Bruno, Abdul-Majid Karim Hasan, Joe LoCasto,
Robert J. Deveau, Mark Strange, Mike Lewis and Frederick
Levesque.  Included in the original complaint but omitted from
the amended complaint are Deputy Warden Dion, Angel Quirros,
Emmanuel and Edward Arcouette.  The court considers all claims
against these latter four defendants to be withdrawn.

        [2]Joe Burgos Vega included a number of other inmates as
plaintiffs on the original complaint:  Peter Gonda, Luis
Almedina, Jr., Khalid Ibrahim, Naji Muhammad, Michael Johnson,
Duan Amos, Anthony Marshall, Juan Torres, Donnie J. McDaniel,
Abdullah Shabbazz and Lewis Dinkins.  The case was opened with
Vega as the only plaintiff because he was the only prisoner to
sign the complaint and submit an application to proceed in forma
pauperis and a prisoner authorization form.  By order filed on
August 11, 2004, the purported plaintiffs were afforded thirty
days to file an amended complaint and submit all other required
documents.  They were informed that if any prisoner did not
comply with the order all claims asserted by him would be
dismissed.  If that happened, the inmate could file his own
lawsuit.  (See Doc. #5.)  No inmate timely responded.  On
November 29, 2004, the court dismissed all claims except those

defendants violated his right to free exercise of his religion.
The defendants have filed a motion for judgment on the pleadings.
For the reasons that follow, the defendants' motion is granted in
part.

I.   <u>Standard of Review</u>

The Rule 12(c) standard for judgment on the pleadings is
essentially the same as that applied to a motion to dismiss under
Fed. R. Civ. P. 12(b)(6).  <u>See</u> <u>Burnette v. Carothers</u>, 192 F.3d
52, 56 (2d Cir. 1999).  <u>See also</u> <u>Sheppard v. Beerman</u>, 18 F.3d
147, 150 (2d Cir.), <u>cert. denied</u>, 513 U.S. 816 (1994).  The court
accepts as true all factual allegations in the complaint and
draws inferences from these allegations in the light most
favorable to the plaintiff.  <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232,
236 (1974); <u>Flores v. Southern Peru Copper Corp.</u>, 343 F.3d 140,
143 (2d Cir. 2003).  Dismissal is inappropriate unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief.  <u>See</u>
<u>Davis v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 654 (1999);
<u>Sweet v. Sheahan</u>, 235 F.3d 80, 83 (2d Cir. 2000).  The purpose of
a motion for judgment on the pleadings "'is merely to assess the
legal feasibility of the complaint, not to assay the weight of
the evidence which might be offered in support thereof.'"

_____

asserted by Vega.  (<u>See</u> Doc. #11.)

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)).  In its review of a motion for judgment on the pleadings, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

II.  Facts

     The court assumes that the following allegations, taken from the amended complaint, are true.

     A.  The Plaintiff

     The plaintiff, incarcerated since January 8, 1996, has been a "Sunnah practicing Muslim" for twelve years.

     B.  High Security Classification

     In July 2000, the plaintiff was classified as "High Security Status 1, Assault on Staff" after being found guilty of a disciplinary infraction.  He was housed in administrative segregation in high security facilities where his activities and privileges were severely restricted.  On July 9, 2001, the plaintiff learned that defendant Levesque had falsified information in his records to support the classification.  The plaintiff's August 2001 request to have the classification

removed, submitted to then Commissioner of Correction John
Armstrong, was denied by defendant Deputy Commissioner Jack
Tokarz.  The plaintiff was removed from High Security Status on
January 11, 2002, and, in September 2002, requested a transfer to
the MacDougall Correctional Institution ("MacDougall").  He was
transferred to MacDougall in December 2004.

    C.   Request for Circumcision

On August 13, 2001, the plaintiff requested that he be
circumcised.  The medical department at Corrigan Correctional
Institution denied this request on August 15, 2001.  The
following day, the plaintiff submitted a line grievance.[3]  A
chaplain was asked to evaluate the request and on September 6,
2001 the grievance was marked "compromised."  Defendant Imam
Hasan met with the plaintiff on September 27, 2001 to discuss the
request for circumcision.  In December 2001, the plaintiff wrote
to defendant Hasan requesting a written decision on his request
for circumcision.  Defendant Hasan did not respond to the
request.

On January 2, 2002, defendant Hasan again met with the
plaintiff to continue his evaluation of the request for
circumcision.  On March 3, 2002, the plaintiff asked defendant

---

[3]Prisoners may submit two types of grievances, health
grievances dealing with medical treatment and line grievances
dealing with all other conditions of confinement.

Father Bruno for a written disposition regarding his request for circumcision and, on March 7, 2002, he filed a second line grievance seeking circumcision.  Shortly after March 7, 2002, defendant Lewis rejected the line grievance because the plaintiff's previous line grievance had been compromised on September 6, 2001, when Imam Hasan was asked to investigate and evaluate the request.

On May 1, 2002, the plaintiff filed a level 2 grievance appealing the August 2001 line grievance.  Defendant Lewis rejected the appeal on May 28, 2002 for two reasons.  First, the appeal was untimely; the initial grievance had been compromised on September 6, 2001, so any appeal should have been submitted within the proper appeal time after that date.  Second, defendant Lewis informed the plaintiff that circumcision was a medical issue not a line issue.

In November 2002, the plaintiff wrote to the Director of the New England Islamic Council regarding circumcision.  The director reported that his Imam had advised him that Muslims must undergo circumcision.  In December 2002, the plaintiff filed a health grievance requesting circumcision.  The grievance was compromised pending approval of the procedure by the Utilization Review Committee.  In January 2003, the plaintiff appealed the compromised grievance.  Defendant Bruno denied the appeal because

5

defendant Hasan stated that circumcision was optional for adult male converts to Islam and because circumcision is not performed by an Imam.

      D.   <u>Commissary Items</u>

In January 2002, the plaintiff submitted a request to defendants Tokarz, Bruno and Hasan that the Commissary sell different Islamic prayer oils, because the oils then available were too expensive, had little scent and contained mostly mineral oil.  On March 8, 2002, defendant Tokarz denied the request.

In response to a Freedom of Information request, the plaintiff learned that defendant Hasan approved the Muslim oils sold in the commissary.  Although advertised as containing no alcohol, the labels indicated that the oils contain dehydrated alcohol and other chemicals.  No competitive bidding was conducted on the contract to provide Muslim oils for the commissary.

In December 2003, the plaintiff wrote to defendant LoCasto, requesting different Islamic oils.  Defendant LoCasto forwarded the request to defendant Bruno, the Department of Correction Director of Religious Services.  Defendant Bruno denied the request.  The plaintiff then filed a grievance, which was denied. In February 2004, defendant Strange denied the grievance appeal.

E.   <u>Handling the Quran</u>

In October 2002, the plaintiff wrote a letter to defendant Hasan, complaining that correctional staff were tossing his Quran on the cell floor during cell inspections and touching it with their bare hands while in his cell and when he was en route to the chapel for Islamic services.

F.   <u>Halal Meat</u>

As a Muslim, the plaintiff may eat only Halal food, which consists of fruits, vegetables, seafood and meats from herbivorous animals such as cows and chickens that are properly slaughtered, processed and packaged.  The Department of Correction provides a Common Fare menu for all inmates with religious objections to foods on the regular menu.  <u>See</u> Department of Correction Administrative Directive 10.18(3)(A), <u>www.ct.gov./doc/LIB/doc/PDF/AD/as1018.pdf.</u>  In accordance with the administrative directives, Muslim, Jewish and Rastafarian inmates all receive the Common Fare menu.

Despite the requirements that Kosher and Halal foods be kept separate from the foods used for regular meals, the Common Fare meals have been served from the same serving line as regular meals and the trays used for Common Fare meals are neither kept separate nor used only for Common Fare meals.  When the plaintiff was working in the kitchen at Garner Correctional Institution, he

informed a kitchen supervisor of the cross-contamination of meals.  The plaintiff was asked not to return to his job in the kitchen.

On October 9, 2002, the plaintiff, who is not a vegetarian by choice, sent a letter to defendant Hasan stating that he was forced to become a vegetarian because the common fare menu did not include Halal meat.  In July 2003, the plaintiff asked for Halal meats once or twice per week.  Defendant Deveau denied the request, stating that the Department of Correction did not provide Halal meat and that all items on the Common Fare menu satisfied Kosher requirements.  In August 2003, the plaintiff filed a grievance seeking Halal meat meals, which was denied.  In September 2003, defendant Strange denied the grievance appeal.

H.   Inmate Assistant Chaplains and Congregate Daily Prayer

Prior to December 2002, while he was confined at the Corrigan Correctional Institution, the plaintiff assisted the Imam.  When the Imam could not be present for congregate services, he would leave instructions with the institution's religious coordinator to permit the plaintiff to read from the Quran and conduct a prayer to meet the minimal devotional needs. The plaintiff conducted approximately twenty services.

In December 2002, however, the Department of Correction implemented a revised Administrative Directive 10.8 regarding

8

religious services.  The revision prohibited any inmate from conducting religious services or serving as a chaplain or religious leader.  As to Muslims, this prohibition has been applied strictly, but inmates of other faiths continue to assist their chaplains or religious leaders during religious services.

The plaintiff and other Muslim inmates were not able to complete the required prayer at the conclusion of the Feast of Ramadan in 2002 because the Islamic chaplain was not present and no Islamic volunteer was found to lead the prayer.  The defendants did not permit the plaintiff or any other inmate to lead the congregate prayer.  The plaintiff's grievance of the lack of required prayer and appeal were denied in early 2003.

Also, on various occasions, some Islamic chaplains have provided incorrect information regarding the beginning of Islamic holidays to enable them to celebrate the holidays with their own communities rather than with the Muslim inmates.

In November 2003, prior to the commencement of Ramadan, the Imam anticipated that he would be absent for several weeks. Generally, Islamic chaplains do not seek religious volunteers to assist them in performing congregate prayers or to act as substitutes in the chaplain's absence.  This failure results in the deprivation of congregate services for Muslim inmates.

The plaintiff spoke with the religious coordinator about the

lack of religious services.  The religious coordinator explained that one Friday service was cancelled because the institution was locked down and two other Friday services were cancelled because no Imam could be scheduled.  He also told the plaintiff that institutional policy prohibited any inmate from conducting religious services.  Despite this prohibition, however, the plaintiff observed inmates of other faiths leading inmates in prayer.  In January 2004, the plaintiff filed a line grievance challenging Administrative Directive 10.8.  The grievance and appeals to levels 2 and 3 were denied.

The plaintiff is not permitted to perform five daily congregate prayers.  Instead, these prayers must be said individually.  Although the plaintiff states that five daily congregate prayers are mandatory, defendant Hasan has advised the defendants that individual prayer satisfies the daily prayer requirement.

III. <u>Discussion</u>

The plaintiff raises fourteen issues in his amended complaint:  1) the plaintiff's classification to high security status, (2) denial of five daily congregate prayers, (3) lack of Jumah services if an Islamic chaplain is not available, (4) no timely prayer at the end of Ramadan in December 2002, (5) insufficient calories in the diet offered during Ramadan, (6)

inability to purchase essential Islamic items such as oils, toothsticks, incense, leather socks, a compass, Halal toothpaste and other toiletries, (7) no Halal meats on the common fare menu, (8) the denial of inmate chaplains, (9) the denial of the plaintiff's request for circumcision, (10) improper handling of the Quran by correctional officers, (11) physical and psychological discrimination because of the plaintiff's faith, (12) improper transfers between two unsanitary and unsafe county jails, (13) discarding of the plaintiff's personal property by correctional staff without notice and (14) refusal to comply with the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq.  He seeks declaratory and detailed injunctive relief as well as an award of $6,500,000.00 in punitive damages.  He does not specify any compensatory damages.

The defendants filed their motion in April 2005.  In November 2005, the plaintiff amended his complaint and, in March 2006, filed his response to the motion for judgment on the pleadings.  The defendants have filed a reply brief tailoring their arguments to the amended complaint.  The court considers the motion for judgment on the pleadings[4] as applied to the

---

[4]Although the plaintiff recites the appropriate standard of review in his memorandum in opposition to the defendants' motion, he includes various documentary evidence, an affidavit and a

amended complaint.

The plaintiff includes discrete allegations against defendants Levesque, Lewis, Strange, LoCasto and Tokarz.  The defendants move for judgment on the claims against these five defendants.  Allegations against the remaining defendants, Lantz, Bruno, Hasan and Deveau, encompass many claims.  The defendants have not addressed all of these claims on the merits.  Instead, they have raised affirmative defenses to some of the claims.  The court will address the discrete allegations against defendants Levesque, Lewis, Strange, LoCasto and Tokarz and then take up the remaining claims and affirmative defenses raised in the motion for judgment on the pleadings.

A.   Defendants Levesque, Lewis, Strange, LoCasto and Tokarz

The defendants move for judgment on the pleadings as to all claims against defendants Levesque, Lewis, Strange, LoCasto and Tokarz.

---

document entitled "Local Rule 12(c) Statement."  The court assumes from these submissions that the plaintiff is attempting to convert the motion for judgment on the pleadings into a motion for summary judgment.

On June 5, 2006, the court informed the parties that it did not intend to convert the motion for judgment on the pleadings to a motion for summary judgment.  (See Doc. #86.)  Accordingly, when ruling on the defendants' motion, the court considers only the facts as alleged in the amended complaint or in documents of which the court can take judicial notice.

1. <u>Security Classification - Defendant Levesque</u>

The plaintiff challenges his classification as a high security inmate and contends that defendant Levesque assigned him this classification because he is a Muslim.  The defendants argue that this claim is precluded because the plaintiff challenged his classification in a state habeas corpus action.

The doctrine of res judicata bars a party from litigating a claim more than once.  Under the doctrine, a final judgment on the merits of an action precludes the parties from relitigating claims that were or could have been raised in that action.  <u>See</u> <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980); <u>Chase Manhattan Bank, N.A. v. Celotex Corp.</u>, 56 F.3d 343, 345 (2d Cir. 1995).  To prevail on res judicata as an affirmative defense, the defendants must show that the prior action was a final judgment on the merits, involved the same parties or their privies and the claims asserted in the current action were or could have been raised in the prior action.  <u>See</u> <u>Monahan v. New York City Dep't of Corrections</u>, 214 F.3d 275, 285 (2d Cir. 2000).

The court takes judicial notice of the decision of the state court in <u>Vega v. Commissioner of Correction</u>, No. CV000341150 (CT Super. Ct. May 6, 2002).  (<u>See</u> Defs.' Reply Mem., Doc. #91, Ex. A).  The state court considered the merits of the plaintiff's claims challenging the May 2000 disciplinary charge which

13

resulted in his high security classification.  The court
determined that the plaintiff failed to meet his burden of proof
and dismissed the petition.  Thus, the state habeas action was a
final judgment on the merits.

The second requirement is that the two actions involved the
same parties or their privies.  Privity is required to ensure
that the interests of the party against whom res judicata is
being asserted were adequately represented in the prior action.
See Fink v. Magner, 988 F. Supp. 74, 78 (D. Conn. 1997).  Inmate
Vega was the petitioner in the state court action and is the
plaintiff here.  As to the defendants, the courts have held that
privity exists between officers of the same government.  See
Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-403
(1940); Cullen v. Paine Webber Group, Inc., 689 F. Supp. 269, 278
(S.D.N.Y. 1988).  The Commissioner of Correction was the
respondent in the state action and is one of the defendants here.
The remaining defendants are correctional officials employed by
the Connecticut Department of Correction.  The court concludes
that privity exists between the defendants in the two cases.
Thus, the second requirement is satisfied for both parties.

The last requirement is that the claims sought to be
dismissed were raised or could have been raised in the prior
action.  Res judicata will apply even though the facts essential

14

to the second suit are not the same as the fact essential to the first suit.  See Waldman v. Village of Kiryas Joel, 207 F.3d 105, 110 (2d Cir. 2000).  The important consideration is that the facts essential to the second suit were present in the first suit.  See Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 369 (2d Cir. 1997), cert. denied, 523 U.S. 1106 (1998).

The plaintiff challenged the May 2000 disciplinary finding in the state habeas action.[5]  The disciplinary finding was the reason that defendant Levesque classified the plaintiff as a high security inmate.  Thus, at the time he litigated his state habeas action, the plaintiff had been classified as a high security inmate.  The court concludes that the facts essential to the plaintiff's claim against defendant Levesque were present in the state suit and that the plaintiff could have litigated his classification in that action.  Accordingly, the plaintiff's challenge to his high security classification is barred by res

_____

[5]The Connecticut courts permit inmates to raise claims in habeas corpus actions that do not challenge the inmate's conviction or lead to the inmate's release.  The state courts have entertained habeas petitions concerning conditions of confinement, First Amendment issues and visitation.  See Lozada v. Warden, 223 Conn. 834, 841-42, 613 A.2d 818,823 (1992) (citing cases); see also Sherbo v. Corrigan C.I., 2003 WL 21267776, at *1 (Conn. Super. Ct. May 13, 2003) (state habeas petition challenging security classification and medical care); Hinton v. Warden, 2002 WL 2005769, at *1 (Conn. Super. Ct. July 25, 2002) (state habeas petition challenging disciplinary findings that led to classification as Security Risk Group and Security Risk Group Safety Threat Member).

judicata.  The defendants' motion for judgment on the pleadings
is granted as to this claim.

In addition, even if the challenge to his classification
were not precluded, the claim is not cognizable.  Inmates have no
protected liberty interest in their classification.  Thus, a
claim of improper classification is not cognizable in a civil
rights action.  See Taylor v. Levesque, No. 3:03cv1347(HBF), 2005
WL 3050973, at *3-*4 (D. Conn. Nov. 10, 2005) (granting
defendant's motion for judgment on the pleadings on claim of
improper classification) (citing cases).  Because all of the
plaintiff's allegations about defendant Levesque relate to this
claim, the defendants' motion for judgment on the pleadings is
granted and all claims against defendant Levesque are dismissed.

2.   Defendants Lewis and Strange

The court now turns to the claims against defendants Lewis
and Strange.

The plaintiff alleges that defendant Lewis, grievance
coordinator at the Corrigan-Radgowski Correctional Institution in
Uncasville, Connecticut, rejected a grievance requesting
circumcision because the issue already had been compromised and
rejected his appeal of a line grievance because circumcision was
a medical issue, not a line issue.  The plaintiff also alleges
that, on September 12, 2003, defendant Strange denied a level 2

grievance seeking Halal meats and, on February 4, 2004, denied a level 2 grievance seeking permission to purchase Islamic oils. There are no other allegations regarding defendants Lewis and Strange.

The only possible claim the court can discern against defendant Lewis is that he failed to comply with the institutional grievance procedure.  This court has held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983 unless the action caused the denial of a constitutionally or federally protected right.  <u>See Harris v. Armstrong</u>, No. 3:02cv665(DFM), 2006 WL 861023, at *11 (D. Conn. Mar. 31, 2006); <u>see also</u> <u>Pocevic v. Tung</u>, No. 3:04cv1067(CFD), 2006 WL 680459, at *8 (D. Conn. Mar 14, 2006).

The plaintiff alleges only that defendant Lewis referred his grievance to the medical department for consideration and denied one grievance because the issue had been compromised when defendant Hasan was asked to meet with the plaintiff to investigate and evaluate the request for circumcision.  The plaintiff has alleged no facts suggesting that defendant Lewis' actions resulted in the denial of any constitutionally or federally protected right.  Thus, the plaintiff fails to fall within the exception and his claim against defendant Lewis is not

17

cognizable in this action.  The defendants' motion for judgment on the pleadings is granted as to all claims against defendant Lewis.

The only allegation against defendant Strange is that he denied two grievance appeals.  "[T]he fact that a prison official in the prison 'chain of command' affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official" in a claim that the denial that gave rise to the grievance deprived the plaintiff of a constitutionally protected right.  Ramsey v. Goord, No. 05-CV-47A, 2005 WL 2000144, at *8 (W.D.N.Y. Aug. 13, 2005) (citing cases).  That defendant Strange followed departmental policies and affirmed the denial of the plaintiff's grievance appeals is insufficient to support a claim against defendant Strange.  Accordingly, the defendants' motion for judgment on the pleadings is granted as to all claims against defendant Strange.

### 3.   Defendants LoCasto and Tokarz

The court next addresses the possible claims against defendants Tokarz and LoCasto.

Defendant Tokarz was the Deputy Commissioner of Correction.  In March 2003, defendant Tokarz signed the document denying the plaintiff's request that the commissary sell different Islamic oils.  The plaintiff goes on to allege, however, that although

defendant Tokarz communicated the denial, the request actually
was denied by defendant Bruno after consultation with defendant
Hasan.  (See Am. Compl., Doc. #62 at ¶¶ 44, 49.)  Defendant
LoCasto is the Supervisor of Commissary Operations for the
Department of Correction.  The plaintiff alleges that in December
2003 he asked defendant LoCasto to sell a different brand of
Islamic oils in the commissary.  Defendant LoCasto forwarded the
request to defendant Bruno who denied it.  (See Am. Compl., Doc.
#62 at ¶ 121.)

The court cannot discern any constitutionally protected
right that defendants Tokarz and LoCasto violated.  The plaintiff
alleges that defendant Bruno denied both requests for different
Islamic oils after consulting with an Islamic chaplain.
Defendants LoCasto and Tokarz only communicated the denials to
the plaintiff.  Any claim that the Islamic oils currently sold in
the commissary do not meet the plaintiff's religious requirements
is properly a claim against the person who denied the request for
a different brand of Islamic oils.  The defendants' motion for
judgment on the pleadings is granted as to the claims against
defendants Tokarz and LoCasto.

B.   Defendants Lantz, Bruno, Hasan and Deveau

The remaining claims involve defendants Lantz, Bruno, Hasan
and Deveau, the only remaining defendants.  The defendants have

19

not addressed each of the remaining claims.  Instead, they argue
that the plaintiff fails to state a claim for improper transfer
among correctional institutions and, as to all the claims, raise
several affirmative defenses, including Eleventh Amendment
immunity, qualified immunity, lack of personal involvement and
collateral estoppel.

### 1.   Transfer Among Correctional Facilities

The court now turns to the plaintiff's claim for improper
transfer.  The plaintiff alleges that he was transferred among
correctional institutions for two years.  The defendants move for
judgment on this claim because the plaintiff has no
constitutionally protected right to be housed in any particular
correctional facility.  In response, the plaintiff states that he
is not challenging the transfers themselves, but contends that
the transfers were retaliatory.  (See Pl.'s Mem., Doc. #74, at
4.)

To state a claim for retaliation, the plaintiff must allege
facts demonstrating "first, that he engaged in constitutionally
protected conduct and, second, that the conduct was a substantial
or motivating factor for the adverse actions taken by prison
officials."  Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003).
Because of the "ease with which claims of retaliation may be
fabricated," however, the court "examines prisoners' claims of

20

retaliation with skepticism and particular care." <u>Colon v.</u>
<u>Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995).  "[A] complaint which
alleges retaliation in wholly conclusory terms may safely be
dismissed on the pleadings alone." <u>Flaherty v. Coughlin</u>, 713
F.2d 10, 13 (2d Cir. 1983).

The plaintiff does not identify any protected conduct in the
section of his amended complaint where he describes his transfer
among correctional institutions.  In his memorandum, he states
generally that a transfer made in response to bringing litigation
or exercising other constitutional rights is improper.  The
plaintiff, however, sets forth no facts which support his
conclusory statement.[6]  He states only that he was repeatedly
transferred while classified as High Security, a classification
that ended in January 2002, long before the plaintiff commenced
this action.  Thus, there are no facts set forth from which the
court can glean a retaliatory motivation for the plaintiff's
transfers.

The Second Circuit repeatedly has held that "complaints
relying on the civil rights statutes are insufficient unless they

_____

[6]Nor does the plaintiff allege any facts supporting a
contention that he was transferred for any reasons connected to
his religion.  The only reference to religion is his conclusion
that he was transferred in violation of his rights under the
First, Eighth and Fourteenth Amendments.  (<u>See</u> Am. Compl. at ¶
165.)

contain some specific allegations of fact indicating a deprivation of rights." Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987) (citations omitted); see also Clark v Levesque, No. 3:03cv795(DFM), 2006 WL 691999, at *9 (D. Conn. Mar. 17, 2006). Because the plaintiff fails to allege any facts showing that he was transferred because he is a Muslim, or for any other protected reason, he fails to state a cognizable claim. Because the plaintiff concedes that he has no constitutionally protected right to remain in any correctional facility, and fails to state claims that his transfer was retaliatory or discriminatory, the defendants' motion for judgment on the pleadings is granted as to the claim of improper transfer.

2.   Eleventh Amendment

The first affirmative defense raised by the defendants is Eleventh Amendment immunity.  They contend that all claims against them for damages in their official capacities are barred by the Eleventh Amendment.  The court agrees.

The Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacity.  See Kentucky v. Graham, 473 U.S. 159 (1985).  A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury.  See Pennhurst State

Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 n.11 (1984).

In the amended complaint, the plaintiff names all defendants in their official and individual capacities.  He does not indicate in which capacity he seeks damages.  In opposition to the motion, the plaintiff does not oppose this argument.  He states only that he can get damages from the defendants in their individual capacities.

Thus, the defendants' motion for judgment on the pleadings is granted absent objection as to all claims for damages against the defendants in their official capacities.

> 3.   Qualified Immunity

The second affirmative defense is qualified immunity.  The defendants argue that they are protected by qualified immunity as to all remaining claims.  To evaluate this defense, the court considers the defense as it applies to the twelve remaining claims:  denial of daily congregate prayer, denial of Jumah services if no Islamic chaplain is present, no timely prayers at the conclusion of Ramadan in 2002, insufficient calories in the meals provided during Ramadan, inability to purchase Islamic items, no Halal meats, no inmate chaplains, denial of request for circumcision, improper handling of the Quran, discrimination, discarding personal property and violation of RLUIPA.

The defendants argue that all claims for damages against

them in their individual capacities should be dismissed because
they are protected by qualified immunity.

The doctrine of qualified immunity "shields government
officials from liability for damages on account of their
performance of discretionary official functions 'insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'" Rodriquez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995)
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

> [I]f a violation could be made out on a
> favorable view of the parties' submissions,
> the next, sequential step is to ask whether
> the right was clearly established.  This
> inquiry, it is vital to note, must be
> undertaken in light of the specific context
> of the case, not as a broad general
> proposition.

Saucier v. Katz, 533 U.S. 194, 201 (2001).

Inmates have a clearly established right to a diet
consistent with their religious scruples, see Kahane v. Carlson,
527 F.2d 492 (2d Cir. 1975), and to participate in religious
activities.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).
Absent a legitimate penological justification, these rights must
be accommodated.  The defendants argue that, in denying the
plaintiff's requests, they were entitled to rely on previous
decisions of this court and the opinions of the department's
chaplains.  Caselaw suggests, however, that defendants' argument

24

is premature.

The Free Exercise Clause of the First Amendment[7] provides that the government cannot adopt laws designed to suppress religious beliefs or practices.  See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 523 (1993).  Although this protection applies to prisons, the application of the law is limited by considerations of institutional safety and security with due deference being afforded decisions by the prison administration.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987) (holding that prison regulation limiting First Amendment rights is valid if reasonably related to legitimate penological interests). This limitation is not eliminated under RLUIPA.[8]  The Supreme Court has acknowledged that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and

---

[7]The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."  It applies to the states via the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

[8]RLUIPA protects the religious exercise of institutionalized persons by prohibiting the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution ⋯" 42 U.S.C. § 2000cc-1(a).

discipline, consistent with consideration of costs and limited resources.'" Cutter v. Wilkinson, ___ U.S. ___, 125 S. Ct. 2113, 2123 (2005) (citation omitted).

In Ford v. McGinnis, 352 F.3d 582 (2d Cir. 2003), the district court had granted a motion for summary judgment on qualified immunity grounds in a case involving free exercise of religion by an inmate.  The district court had determined that the actions of correctional officials were objectively reasonable because the officials relied on the opinions of religious authorities.  See id. at 597.  The Second Circuit reversed the decision because the district court failed to determine whether the inmate's religious "belief was sincerely held and 'in his own scheme of things, religious.'"  Id. at 598.  The court did "not suggest that religious authorities can never be employed in assisting prison officials in making that determination, but the religious authorities' opinions that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' conduct reasonable."  Id.

When reviewing a motion for judgment on the pleadings, the court must assume the truth of the allegations in the amended complaint and cannot consider other evidence.  The defendants do not address whether the plaintiff's claims are based on sincerely held religious beliefs.  In addition, the current record does not

26

the reasons underlying the departmental policies.[9]  At this time, the court cannot determine either whether the plaintiff's requests reflect sincerely held religious beliefs or whether defendants' denial of the requests are based on legitimate penological interests.  Thus, the court cannot determine whether the defendants are protected by qualified immunity on any claim regarding religious diet or practices.[10]  The defendants' motion

---

[9]Although the defendants refer the court to prior decisions from this district indicating, for example, that providing Halal meat would be prohibitively expensive, the plaintiff has alleged contrary facts.  Thus, at this time, the court cannot evaluate properly the underlying penological interests.

[10]The only remaining claim that does not relate to religious diet or practices is the plaintiff's claim that correctional staff discarded items of his personal property without affording him prior notice and a hearing.  The plaintiff alleges no facts stating what items were discarded or when the incident occurred. The court considers this claim as a claim for violation of due process.  Although the defendants do not specifically address this claim in their motion, the court concludes that the plaintiff fails to state a claim for deprivation of personal property without due process.

The Due Process Clause is not violated where a prison inmate loses personal belongings due to the negligent or intentional actions of correctional officers, if the state provides an adequate post-deprivation compensatory remedy.  See Hudson v. Palmer, 468 U.S. 517, 531 (1984); Parratt v. Taylor, 451 U.S. 527, 543 (1981).  The State of Connecticut provides an adequate remedy.  See Conn. Gen. Stat. § 4-141 et seq. (providing that claims for payment or refund of money by the state may be presented to the Connecticut Claims Commission).  This state remedy is not rendered inadequate simply because the plaintiff may anticipate a more favorable remedy under the federal system or it may take a longer time under the state system before his case is resolved.  See Hudson v. Palmer, 468 U.S. at 535.

To state a claim cognizable in federal court, the plaintiff must show that he has been denied due process of law, *i.e.*, that

for judgment on the pleadings is denied without prejudice as to the claim that the defendants are protected by qualified immunity.

### 4.   Personal Involvement

The defendants' third affirmative defense is lack of personal involvement.  They contend that the plaintiff has failed to demonstrate their personal involvement in the incidents underlying his claims.  The defendants also state that defendant Hasan no longer is employed by the Department of Correction but is used as a consultant and religious expert for litigation and that the defendant Deveau is not a supervisory official.

The plaintiff alleges that he is prevented from freely exercising his religion by Administrative Directive 10.8 and

---

he was denied an opportunity to attempt to redress this alleged wrong through legal procedures.  See Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 473 (S.D.N.Y. 1998) (where state law provides adequate remedy, claims for loss of personal property not cognizable under section 1983); see also Hiramramzdn v. Haskins, No. 3:03cv1897 (JBA) (D. Conn. July 12, 2004) (dismissing sua sponte Fourteenth Amendment due process claim because prisoner plaintiff had presented claims to Connecticut Claims Commission). In addition, the plaintiff must show more that correctional staff acted with more than negligence with regard to the loss of his personal property.  See Daniels v. Williams, 474 U.S. 327, 330-31 (1986) (mere negligence on part of state official cannot work a constitutional deprivation of property).  The plaintiff has not satisfied either requirement.  Thus, any claim for deprivation of personal property without prior notice and a hearing is dismissed pursuant to 28 U.S.C. § 1915 (e)(2)(B)(ii) for failure to state a claim upon which relief may be granted.

other departmental policies.  He states that the defendants were
the persons who promulgated these policies and that he placed all
of them on notice of the effect of the policies and directive on
his ability to exercise his religion.

All of the defendants are described by the plaintiff as
supervisory officials.  "A supervisor may not be held liable
under section 1983 merely because his subordinate committed a
constitutional tort."  Leonard v. Poe, 282 F.3d 123, 140 (2d Cir.
2002).  Section 1983 imposes liability only on the official
causing the violation.  Thus, the doctrine of respondeat superior
is inapplicable in section 1983 cases.  See Blyden v. Mancusi,
186 F.3d 252, 264 (2d Cir. 1999); Prince v. Edwards, No. 99 Civ.
8650(DC), 2000 WL 633382, at *6 (S.D.N.Y. May 17, 2000)
("Liability may not be premised on the respondeat superior or
vicarious liability doctrines, ... nor may a defendant be liable
merely by his connection to the events through links in the chain
of command.")(internal quotations and citation omitted).

> [A] supervisor may be found liable for his
> deliberate indifference to the rights of
> others by his failure to act on information
> indicating unconstitutional acts were
> occurring or for his gross negligence in
> failing to supervise his subordinates who
> commit such wrongful acts, provided that the
> plaintiff can show an affirmative causal link
> between the supervisor's inaction and [his]
> injury.

Leonard, 282 F.3d at 140.

As stated earlier, when reviewing a motion for judgment on the pleadings, the court may consider only the allegations in the complaint or information of which the court may take judicial notice.  While the defendants' contentions about the status of defendants Hasan and Deveau may be true, they have not identified any statement in the amended complaint or any document of which the court can take judicial notice to support their contentions. In addition, in light of the plaintiff's allegations that he placed the defendants on notice of the violations of his rights, the court concludes that the plaintiff should be afforded the opportunity to present evidence of the notice provided.

The defendants' motion for judgment on the pleadings on the ground of no personal involvement is denied without prejudice as to defendants Lantz, Bruno, Hasan and Deveau.

5.   Collateral Estoppel

The defendants's final affirmative defense is collateral estoppel.  They argue that the plaintiff should be collaterally estopped because correctional officials previously have litigated many of the issues in this case.  The plaintiff states that he was not a party to any of the previous cases.

The doctrine of collateral estoppel, or issue preclusion, "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and

30

actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." Epperson v. Entertainment Express, Inc., 242 F.3d 100, 108 (2d Cir. 2001) (quoting United States v. Hussein, 178 F.3d 125, 129 (2d Cir. 1999) (internal quotation marks and citation omitted)).  Mutuality of parties is not required for invocation of the doctrine of collateral estoppel.  The only requirement is that the party against whom the doctrine is applied must have had the opportunity to litigate the merits of the issue in the prior action.  See Blonder-Tongue Labs., Inc. v. University of Ill. Found., 402 U.S. 313, 329 (1971).  The court is not required to permit "repeated litigation of the same issue as long as the supply of unrelated defendants holds out."  Id.

Courts have acknowledged both offensive and defensive collateral estoppel.

> Offensive use of collateral estoppel occurs
> when a plaintiff seeks to foreclose a
> defendant from relitigating an issue the
> defendant has previously litigated
> unsuccessfully in another action against the
> same or a different party.  Defensive use of
> collateral estoppel occurs when a defendant
> seeks to prevent a plaintiff from
> relitigating an issue that the plaintiff
> previously has litigated unsuccessfully in
> another action against the same or a
> different party.

United States v. Mendoza, 464 U.S. 154, 159 n.4 (1984) (citing

31

Parklane Hosiery Co. v. Shore, 429 U.S. 322, 326 n.4 (1979)).

The defendants state that they seek to apply nonmutual defensive collateral estoppel.  They are not, however, trying to prevent the plaintiff from relitigating issues he litigated in other cases.  Instead, the defendants argue that, because they previously litigated these issues, they are entitled to rely on the decisions in the previous cases and should not be required to relitigate the issues in this case.  While it is true that mutuality of parties is no longer a prerequisite for the application of collateral estoppel, research has revealed no cases in which the court applied collateral estoppel against a party who was not involved in the prior litigation.

The defendants contend that the holding in United States v. Mendoza supports their argument.  In Mendoza, a Filipino citizen living in the United States applied for citizenship based upon military service during World War II.  The district court applied collateral estoppel to preclude the United States from litigating the constitutionality of a decision to withdraw a naturalization examiner from the Philippines in 1945.  The application of collateral estoppel was based on the government's withdrawal of an appeal of a similar action filed by a different Filipino national.  See 464 U.S. at 155.  The Supreme Court reversed and held that nonmutual offensive collateral estoppel does not

32

operate against the government.  See 464 U.S. at 574.

The defendants urge this court to extend to the state Commissioner of Correction the Supreme Court's holding that offensive collateral estoppel cannot be used against the federal government.  The defendants contend that, like the federal government, the Commissioner would be unduly burdened by having to relitigate the same issues.  The defendants' argument is misguided.

The Supreme Court has not held that the federal government can use collateral estoppel to preclude actions filed by persons who were not parties to prior litigation.  Instead, the Court held that a litigant cannot bind the federal government to a previous decision.  "A rule allowing nonmutual collateral estoppel against the government ... would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue."  Id. at 160.  In the absence of any authority applying collateral estoppel against a litigant who was not a party to the prior action, the defendants' motion for judgment on the pleadings is denied on this ground.

        6.  Claims for Denial of Religious Requirements

Finally, the defendants contend generally that the plaintiff has no constitutional right to Halal meat, daily congregate

33

prayer, specific religious oils or various other items he has requested. They refer the court to several decisions from this district.

As stated above, the record currently is insufficient for the court to evaluate the sincerity of the plaintiff's religious beliefs and the penological interests underlying the departmental policies. In addition, the referenced decisions do not consider the effect of RLUIPA on religious requests. Accordingly, the defendants' motion for judgment on the pleadings is denied without prejudice as to the arguments that the plaintiff has no constitutional right to any of the items or practices he has requested.

IV. Conclusion

The defendants' motion for judgment on the pleadings [**doc. #32**] is **GRANTED** as to all claims against defendants Levesque, Lewis, Strange, LoCasto and Tokarz. The motion also is granted as to all claims for damages against any defendant in his or her official capacity and the claims for improper classification and improper transfer among correctional facilities. The motion is **DENIED** in all other respects. The claim for deprivation of personal property without notice and hearing is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The case will proceed as to defendants Lantz, Bruno, Hasan and Deveau on the remaining

34

claims.  These claims are:  denial of daily congregate prayer, denial of Jumah services if no Islamic chaplain is present, no timely prayers at the conclusion of Ramadan in 2002, insufficient calories in the meals provided during Ramadan, inability to purchase Islamic items, no Halal meats, no inmate chaplains, denial of request for circumcision, improper handling of the Quran, discrimination and violation of RLUIPA.

The parties shall conclude discovery in this case within **sixty (60)** days from the date of this order.  Any motions for summary judgment shall be filed within **ninety (90)** days from the date of this order.  Any memorandum in opposition to a motion for summary judgment shall be filed within **twenty-one (21)** days from the date the motion is filed.

This is **not** a recommended ruling.  The parties consented to the exercise of jurisdiction by a magistrate judge and the case was transferred to the undersigned for all purposes including the entry of judgment on June 14, 2005.  (<u>See</u> Doc. #27).

**SO ORDERED** this 26th day of September, 2006, at Hartford, Connecticut.

/s/ Donna F. Martinez
DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE