## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA | : | NO. 3:04CV1215(DFM) |
| | : | |
| VS. | : | |
| | : | |
| THERESA LANTZ, ET AL. | : | JANUARY 11, 2008 |

### DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT OF  MATERIAL FACTS

Introduction – Parties

A. Plaintiff

1.      The plaintiff, Joe Burgos Vega, (plaintiff or Vega)  is a Connecticut state prisoner DOC presently incarcerated at MacDougall Walker Correctional Institution (MWCI) serving a 60 year total effective sentence having been  convicted of two counts of assault in the first degree  in violation of General Statutes § 53a-59  and one count of kidnapping in the second degree in violation of General Statutes § 53a-94. See State v. Vega, 259 Conn. 374, 376-377, 788 A.2d 1221 (2002); Vega v. Commissioner of Correction, 103 Conn. App. 732; 930 A.2d 75 (2007)(dismissal of habeas petition affirmed; reciting remarks of sentencing judge as to brutality and "almost appalling barbarianism" of plaintiff's crimes for which he is convicted). See Vega deposition, 7/11/07 at 17:15-17;

2.      Plaintiff's crimes of assault first degree and kidnapping were committed in 1996. Vega depo 7/11/07 at 16:22. At his deposition Vega admitted that the victim testified at his criminal trial, but he denied that he committed any crime. The details of the crime include the following facts recited by the Connecticut Appellate and Supreme Courts:

> a reasonable sentencing judge who would have had the opportunity to view the [victim's] scars and disfigurement, as well as the photographs of the injuries, all evidence to which this court was not privy. A sentencing judge would have also evaluated the presentation, demeanor and credibility of all of the witnesses,

including the . . . victim and the petitioner. Here, the victim testified that the petitioner had carved his name, 'Joey,' on her chest, sliced the nipple off her breast and then forced her to eat it. Medical doctors testified that the petitioner left a hole the size of a silver dollar where her right nipple used to be. Refusing her pleas to go to the hospital and thus still bleeding profusely, the petitioner took her to a hotel, forced her to smoke crack with him and then had sex with her just before the police arrived and arrested him. While in the transcript, the record of this evidence reveals a brutality and cruelty that defies description, it undoubtedly cannot compare to the effect on the sentencing court of experiencing live testimony from the victim and other witnesses…

Vega v. Commissioner of Correction, 103 Conn. App. 732 at 735.

3.      The plaintiff's sentence of sixty (60) years was confirmed upon review by the Sentence Review Division. Vega depo at 18:19-25 19:1-2.

4.      Prior to committing the crimes for which plaintiff is presently incarcerated, plaintiff was arrested and convicted for crimes committed in Allentown, Pennsylvania, and he was incarcerated in the Lehigh County Jail for possession of stolen property and unsworn falsification, or giving false information. Vega depo 7/11/07 at 11:24-25 – 12: 1-14.

5.      Vega claims he converted to Islam in 1992-1993 while he was incarcerated in Pennsylvania. Vega depo at 6:11-12. He claims that in 1992 or 1993 he took his "Shahada" or declaration of faith as a Muslim. Id at 6:15-25.

6.      Vega was released from incarceration in Pennsylvania in 1995, and in 1996 he was arrested on the Connecticut assault and kidnapping charges for which he stands convicted and for which he is presently incarcerated. Vega depo at 16:7-22.

7.      In 1997, while incarcerated in Connecticut on the state charges, he was arrested for federal crimes of  possession of narcotics with intent to distribute. Vega was convicted of the federal crimes and was sentenced to 150 months to be served concurrently with his state sentence. Vega depo at  18:2-11.

**B. Defendants**

8.      **Theresa C. Lantz** is the Commissioner of Correction, with more than 30 years of correctional experience. Lantz depo 4/24/07 at pp. 9-25. Commissioner Lantz was appointed Commissioner in March 2003. Id at 25:12-13. Commissioner Lantz prepared and submitted an expert report in this case. See deposition Exhibit 38, attached hereto as Exhibit J.

9.      Commissioner Lantz began her career in corrections as a front line correctional officer in the Washington, D.C. prison system in 1976. During that assignment she became the first woman correction officer in that department to work inside the maximum-security men's housing unit. After 12 years with the District of Columbia corrections system, she accepted a national position with the United States Department of Justice, National Institute of Corrections Academy in Boulder, Colorado, as a Correctional Program Specialist from January 1988 through June of 1989. In this role she developed and coordinated training for executive and management correctional personnel for the purpose of improving the operation of state correctional systems.  See Lantz resume attached to expert report; Lantz Deposition at pp.9-25; see also DOC website http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265500;   Exh. J & N.

10.      Commissioner Lantz began her tenure with the Connecticut Department of Correction in July of 1989 as the Director of Training and Staff Development. In subsequent assignments she also served as the Department's Deputy Commissioner for Administrative Services, and as Warden at three high security facilities: York Correctional Institution (newly constructed 550 bed multi-classification institution for women offenders which she opened in 1994); New Haven Community Correctional

Center (high security detention center for 780 male, pre-trial and sentenced inmates); Corrigan Correctional Institution (high security facility for 830 male, pre-trial and sentenced inmates). http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265500

11.     Commissioner Lantz has earned an Associates Degree in Law Enforcement, a Bachelors Degree in Criminal Justice, and a Masters in Criminal Justice. She is an adjunct instructor at Tunxis Community College, and has provided expert testimony for the U. S. Department of Justice and the New York Department of Corrections. Commissioner Lantz is affiliated with the Connecticut Criminal Justice Command Institute as an instructor, and is on the Institute's Board of Directors. She served as the President of the Board of Directors for Families in Crisis, Inc. from 1999-2000, and is a Criminal Justice Advisory Board Member for Tunxis Community College. http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265500

12.     **Reverend Anthony J. Bruno** is the Director of Religious Services for the Connecticut Department of Correction, and as of August 2006 he is also the President of the American Correctional Chaplains Association. See Bruno deposition 7/12/07at 21:18-19; http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265570. Exhibit D; Exh. Q & R.

13.     Father Bruno was ordained on May 23, 1968 for the Archdiocese of Hartford. A graduate of St. Thomas Seminary in Bloomfield, CT and St. Mary's Seminary in Baltimore, MD., he served in leadership roles (Director of Religious Education, School Director, Cemetery Manager, Parish Administrator) in several parishes of the Archdiocese of Hartford prior to joining the Connecticut Department of Correction as an institutional Chaplain in January, 1987. He subsequently served the Department of Correction as a Supervising Chaplain, with increasing responsibilities extending to

several institutions, until being named Director of Religious Services in April 1999. http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265570

14.     Father Bruno was a United States Army Reserve Chaplain from 1975 – 1996. He graduated the U.S. Army Chaplain Officer Basic Course in 1978, Chaplain Officer Advanced Course in 1981 and from the U.S. Army Command and General Staff College in 1991. He retired from the Army Reserve in 1996, his last position being that of Division Chaplain of the 76th Training Division, USAR, with the grade of Lieutenant Colonel. http://www.ct.gov/doc/cwp/view.asp?a=1503&q=265570

15.     Father Bruno began his career in the Connecticut DOC as a Chaplain at Somers in 1987. His duties included not only Somers State Prison (now known as Osborn CI), but also Enfield CI and Carl Robinson CI. See Bruno depo 7/12/07 at 16:8-11.  Exh. Q & R.

16.     Father Bruno transferred to the MacDougall Correctional Institution (MWCI) when it opened in 1993 and remained at MWCI until he became Director of Religious Services in 1999. Bruno depo at 17:15-19. Father Bruno has provided an expert report in this case. See Exhibit D.

17.     **Imam Abdul Majid Karim Hasan** recently, on August 7, 2007, earned his doctorate in Islamic Studies, based upon 25 years of research in the field of education and Islamic studies. Hasan depo 10/30/07 at pp.87:22-25 – 88:15-18. Imam Hasan's formal educational training includes, but is not limited to two years Bachelor's of Science and Human Services,  two years in a Master's of Science degree at New Hampshire College, three years studying for a Master's of Arts in Islamic Studies at Hartford Seminary. Hasan depo at 85:20-23. Exhibits A, B & L.

18.     Imam Hasan prepared and submitted an expert report in this case. Hasan depo at 91:18-21; Deposition Exhibit 71. In connection with that report Imam Hasan did extensive research and provided plaintiff's counsel with copies of all the documents to which he refers in his expert report. See Hasan depo 86:19-25 -87:1-9.  Exh. L.

19.     Imam Hasan is retired. He presently works as a consultant to the DOC. He provides advice about the Muslim religion and Islamic issues based on the Quran and the life example of the prophet Muhammad. Imam Hasan does not make nor does he have any authority to make any of the rules and regulations of the DOC. Hasan depo at 94:4-21.

20.     Imam Hasan has been the resident Imam of the Muhammad Islamic Center in New Haven since 1971. Hasan depo 8/6/07 at47:2-8; 48:7-14. Imam Hasan studied Quran since 1975 when he bagan classes in Chicago. Hasan 8/6/07 at 46:14-16. Exh. A & L.

21.     Imam Hasan started with the DOC as a volunteer chaplain  in 1978 at a place then called Somers or Somer State Prison (now known as Osborn CI).   Imam Hasan started volunteering with the DOC and had been on contract as a chaplain for the federal government in Danbury FCI in 1971.   When Imam Hasan came to the DOC in Connecticut, he had already had prior correctional   experience as a chaplain in the corrections for the   federal government. Hasan depo 8/6/07 at 53:10-18. Exh. L.

22.     Imam Hasan became a full time Islamic chaplain for the DOC on August 1, 1980. Hasan dep. 8/6/07 at 68:18-21. In 1980 Imam Hasan's major responsibility was to establish Islamic programs and services in the DOC on the same reasonably comparable basis as other major faith groups. He  began going around the state teaching and recruiting, looking at the Islamic program for inmates for the state, working on behalf of the Islamic faith in terms of Ramadan, the Jumah prayer, which at that time did not exist.

DOC  had none of that then.  Imam Hasan assisted the DOC  to establish the Jumah prayer,  to establish Ramadan,  to  establish the Eids, the Islamic study classes, and many  other things.  In 1980 DOC didn't have any of that.  It was through the cooperation and the willingness of  the State of Connecticut to do the same thing for Islamic inmates that they were doing for Christians and  Jews, it was parity. Hasan depo 8/6/07 at 68:25-69:1-11.  Exh. A, B & L.

23.     Imam Hasan was a  full time Islamic Chaplain for the DOC from  1980 until his retirement March 31, 2001. During that time he served for a time as Director of Islamic Services. He presently  is on  contract  as  a  consultant and   provides expert  advice regarding questions concerning Islamic inmates, staff and related issues, as to which he performs research, provides the scholarly references in support of his research and other expert consultative services. Hasan depo 8/6/07 at 75:20-25 – 76:1-12; see also Hasan expert report. Exh A, B & L.

24.     **Robert DeVeau, RD** is a licensed Registered Dietician. Mr. DeVeau does not have any personal involvement in any of Mr. vega's issues. He does not have authority to change the DOC menu, or to change or implement policy. Functionally, he is a regional district food  service  manager,  with  an  office  at  Webster  CI  in  Cheshire  CT.  His  only involvement  in  the  dietary  matters  raised  by  the  plaintiff  in  this  case  is  to  use  his expertise as a licensed Registered Dietician to provide an affidavit to the court in this and other similar cases with facts concerning his nutritional analysis of the Master Menu and Common Fare Menu. Mr.DeVeau has analyzed these menus at the direction of his former supervisor, Mr. Robert Frank, Chief of Food Services which is a function within

the scope of Mr. DeVeau's employment and the discharge of his duties. See DeVeau

answer  #23 to plaintiff's first set of interrogatories, Exh E; DeVeau deposition, Exh. K.

**C. Defendants' additional expert witnesses[1]** – Deputy Commissioner Brian Murphy,

Dr. Peter Leitner, and Robert Frank

25.    **Brian K. Murphy** is the Deputy Commissioner for Operations of the DOC. He began

working as a correction officer July 1981. See Murphy deposition 8/2/07 at 9:6. See

Murphy expert report and resume attached thereto; see also Murphy affidavit filed 12-

26-2006, Doc. # 110-2; ¶2. During his career, Deputy Commissioner Murphy served in

a variety of positions, to include the DOC's Director of Security, interim Commissioner,

Complex Warden of five correctional facilities in the northern part of the state, and the

Lead Warden of the MacDougall-Walker Correctional Institution (MWCI). Id. ¶3. Exh.

S; Murphy deposition, Exh M.

26.    Mr. Murphy's accomplishments include the development of the Department's policy on

managing gangs, telephone monitoring, and policy and procedures for the Department's

Internal Affairs Unit.   He  also authored the Department's Security Administrative

Directives and Emergency Plans. Id.¶4. Exh. S

27.    Deputy Commissioner Murphy also been trained as an emergency response team leader.

He was responsible for all the CERT teams at one point in his career, which is the

Correctional Emergency Response  Teams.   He has been trained by the National

Institute of Corrections in management of gangs and deviant groups, and  in emergency

---

[1] The only persons qualified as  experts to give  opinions in this case on Islamic issues are those persons who have filed expert reports, including  but not limited to the defendants Lantz, Murphy Fr. Bruno and  Imam Abdul Majid Karim Hasan, Mr. Robert Frank and Dr. Peter Leitner. [Ruling of the Court that only persons who are disclosed as experts and who provide reports may give opinions in this case.] See accompanying motion in limine to preclude opinions from non-experts. Dr. Leitner's report and attachments is filed electronically herewith.

procedures.  He has  also been trained by the Department of Justice, NIC Division, on leadership courses for  deputy commissioners, having attended three  weekly sessions, each of which  was 40 hours of training on management and contemporary issues in corrections. Exh M, Murphy deposition; Exh S – Murphy expert report.

28. **Dr. Peter Leitner** is an expert in Islamic Issues and counterterrorism. He is president of the Higgins Counterterrorism Research Center, where he helped totrain over 7,500 law enforcement, first-responder, military, FBI, and CIA personnel in the following courses: Intelligence Analysis & Source Development, Islamic Terrorism, Muslim Brotherhood, Clandestine Cell Operations, Dark Sun Exercise/Simulation, Weapons of Mass Destruction, and Arab and Islamic culture. He is also the president of the Washington Center for Peace & Justice, a non-profit organization providing assistance to victims of terrorism and their families. In this capacity, he has been involved in eight federal civil lawsuits, and the center has won every case. He also holds the power of attorney for the family and estate of John O'Neill, the former head of counterterrorism for the FBI who was killed in the collapse of the World Trade Center. He is managing three major 9/11 cases in the federal court in New York on behalf of the O'Neills. He has also assisted children and parents victimized by child abductions to Saudi Arabia by former spouses, and  helped victims obtain legal counsel and personally represented their cause in the United Nations, the U.S. Congress, and other national and international fora. **E-filed.**

29. In April 2007, Dr. Leitner was the keynote speaker on the issue of Islamist prison radicalization before the joint annual convention of the Pennsylvania Prison Warden Association and the North American Association of Wardens and Superintendents. He is also program chairman of the National Intelligence Conference, known as INTELCON

by the intelligence community. From April through July of this year, Dr. Leitner toured the Connecticut DOC, including MWCI, spoke to numerous staff including Commissioner Lantz, Deputy Commissioner Murphy, FartherBruno, Imam Hasan and many other, as well as reviewed hundreds of documents in connection with preparing his report in this case. Dr. Leitner has completed more than 30 years of federal service in a variety of national security positions, including 20 years in the Department of Defense where a significant portion of his time has been spent supporting counter-terrorism efforts. Dr. Leitner has testified several times before House and Senate committees on topics such as Chinese economic espionage, technology transfer, and the Law of the Sea treaty.  Dr. Leitner  holds a doctorate from the University of Southern California and four Master's degrees as well. He has appeared on numerous national news outlets, including Fox News, CNN, 60 Minutes, and 20/20, etc. See Leitner expert report at 29-30. **E-filed. (Dr. Leitner report, CV and attachments are e-filed)**

30. **Robert Frank**,  prior to his retirement, was the chief of correctional food service for the State of Connecticut, Department of Correction. Frank deposition at 6-7.  Exh C, H, O & P.

31. Mr. Frank has more than 35 years experience in corrections, starting back in 1971 with the New York State Department of Correctional Services when he served as a facility cook at a facility called Coxsackie, New York.  From that point on he was a cook,  a head cook,  an assistant manager,  a manager,   assistant administrator,  an administrator, a   regional coordinator, and finally retired as a regional   coordinator from New York in August of 2001.   Mr. Frank   started with the State of Connecticut on September 10th, 2001. Frank depo at 7. Exh O & P.

32.     Mr. Frank's experience in dealing with Islamic dietary issues includes in his career as a regional coordinator, when he was acting as assistant director for the NY DOCS  under the director Mr. Howard Dean, and at one time NY DOCS was  going to set up a slaughter house for the Muslim meals.  Mr. Frank also dealt with, for a number of years, the full holy month of Ramadan coordinating the Muslim inmates' menu   and all of their needs for the menu.  A number of Muslim special events such as the Eid-ul-Fitr, the Eid-ul-Adha,  were taken care of by Mr. Frank's  office along with the chaplain's office in Albany, New York. Frank deposition at 7-8; Exh O & P.

33.     Mr. Frank participated in Islamic training with the Imams beginning in 1979 when he was assigned to the Sing Sing Correctional Facility in Ossining, New York. Mr. Frank lived down there throughout the week and  attended seven or eight different classes on the holy creed for the Muslim faith.  Mr. Frank was trained about   food service, what food services staff was supposed to do  for Muslim dietary needs. Throughout the seven, eight classes in the Muslim faith taught by their Imam, who trained  or taught Mr. Frank, he learned about  the different items that Muslims could eat, and what they couldn't do. One of the main things Mr. Frank learned was the specifics about Muslim food preparation. Frank deposition at 8-9. Exh O & P.

34.     Mr. Frank learned how tight Muslim dietary requirements are with regard to sanitary conditions; he learned what Muslims held were sanitary conditions, proper methods of cooking, proper methods of slaughtering animals, proper methods of preparing and serving.  For example, something  that one who was not observant of Muslim dietary laws would just put in a sheet pan, to be prepared strictly by Halal and the Halal ways of

making food, one should use a wax or parchment paper  that  is put down on the pans first, similar to the Jewish faith.  Frank deposition at 9. Exh. O & P.

**D.   DOC Policy – Administrative Directive 10.8**   (Exh.  F) - Collective  Prayer  Must  Be Supervised  by  Chaplain  or  DOC  Authorized  Volunteer;  Individual  Prayer  Is  Acceptable  for Muslims

35.    Administrative Directive 10.8 is the policy of the Commissioner of Correction for the DOC governing Religious Services. Lantz depo. at pp. 63-65. It is the policy of the DOC that collective religious activities shall be made available on an equitable basis at least once a week. Lantz depo at 65:1-25; 66 Exh. F; Exh. N (Lantz deposition)

36.    Department of Correction Administrative Directive 10.8., Religious Services Program Directives,   Paragraph 6.B is the paragraph that governs collective religious activities, regardless of location.  Paragraph E refers to individual prayers by an inmate in his cell or bed area. [See A.D. 10.8 ¶6.B] Lantz depo at 66:11-15. Paragraph 6 B states: "all collective  religious  activities  shall  be  conducted  and  supervised  by  a  department authorized  chaplain  or  volunteer  who  professes  the  same  reliegion  as  the  group gathering together." [See A.D. 10.8 ¶6.B] Lantz depo at 66:11-15. Exh. N.

37.    Imam Hasan was employed by the Connecticut Department of Correction (DOC) as an Associate Chaplain.  Previously, he was Senior Chaplain, and his duties were, in part, to be Director Islamic Services for the Department of Correction.  Imam Hasan's last DOC position was the Religious Services Coordinator at the New Haven Correctional Center. He is presently retired from DOC after more than twenty years of state service. Imam Hasan retired on April 1, 2001, as a full time employee. Since that date he has provided consultant services to the DOC, and has been qualified by an expert by the District

Court and has  provided expert testimony with regard to ongoing court cases involving Muslim inmates. Hasan affidavit  11-15-06, ¶1. Doc. #110; Exh B. & L.

38.     Imam Hasan has recently received a Doctorate in Islamic Studies. His education, training and experience are described in his resume attached hereto, and incorporated herein by reference.  His education  includes, in addition to the Doctorate, in part, a Masters Degree in Human Services, and an MA from the Hartford Seminary in Islamic-Christian Relations.  Imam Hasan  worked with the Department of Correction on a full-time basis, since 1980.  He has contracted with the Federal Bureau of Prisons, and continue to contract with DOC as a part-time consultant.  In total, he has been involved with providing Islamic services or consulting in prisons for more than twenty-five years, as more fully set forth in his resume. Hasan aff.¶ 2; see  Resume attached. Exh A & B.

39.     As part of his  professional experience and expertise, Imam Hasan has become involved in several lawsuits, concerning Islamic religious issues in the Department of Correction. See, e.g. Staples v. Robinson and Hasan, H-81-209 (JAC)(FOE) (D. Conn. Oct. 17, 1983); see also Johnson v. Rowland, et.al. 3:95CV2645.  Anderson v. Strange,  CITE Imam Hasan been qualified on more than one occasion as an expert witness in the District Court for the District of Connecticut. Hasan affidavit. Doc #110; Exh A & B.

40.     In Imam Hasan's 25 plus years of experience with the Department of Correction, collective daily prayer by Muslim inmates has not been allowed in the housing units or in recreational areas, such as the yard or gymnasium.  Imam Hasan has also consulted for other jurisdictions, including the Federal Bureau of Prisons and the New York State Department of Correction, and is not aware of any jurisdiction which permits daily congregational prayer five times per day. Hasan affidavit. Doc. #110; Exh A & B.

41.     Indeed, to allow such a practice in a correctional institution would obviously interfere with the smooth and orderly functioning of the daily activities of a correctional institution, such as work call, meals, unit recreation in the day room, visitation, sick call, and other daily activities. Such a prohibition on collective prayer five times a day does not substantially burden the rights of Muslim inmates, who can pray individually. [Hasan affidavit; Murphy expert report; Murphy deposition at 29, 32-35, 37-40, 43-46, 52-54, 68-70, 73.] Exh A, B, L, M & S

42.     Although daily prayer is an important part of being a practicing Muslim, an individual's prayer obligation can be satisfied by individual prayer. Hasan affidavit; Exh B & L.

43.     Although one may prefer that daily prayer is practiced in congregation with other inmates, it is not absolutely essential in terms of satisfying the daily prayer obligation. The five daily prayers can be said individually, and if a prayer is missed, it can be made up later on in the day. Indeed, even if an inmate is unable to attend Jumu'ah for reasons over which he has no control, for example, if there is a lock down, or if the Islamic Chaplain is absent due to illness, and Jumu'ah is canceled, the Jumu'ah prayers can be made  by an individual in an individual fashion, and a missed prayer can be made up at a time later in the day, or at the next available opportunity. Hasan affidavit and deposition. Exh. B & L.

44.     It does not substantially burden a Muslim inmate's free exercise of religion to be required to pray individually on a daily basis. Hasan affidavit Doc #110; Exh B & L.

45.     In Imam Hasan's expert report he notes that according to Muhammad Yusuf Islahi and Abdul Aziz Kamal, the Quran and Sunnah (the example of Muhammad the Prophet) have laid great stress on the congregational prayer in  describing its unique excellence,

which  shows that the Fard Prayer is meant to be offered collectively, and no one in the Islamic Community should even think of observing it individually unless one has to do so <u>on account of genuine reason</u>.  (Everyday Fiqh Vol. 1, Chapter 19, Para. 1). [Expert Report of Imam Hasan, p. 2, "Hasan Report"] Exh B & L

46.    The genuine reason which excuses collective prayer for an inmate in a Department of Correction (DOC) facility is that the law of the land has convicted the inmate of breaking the law.  The penalties for breaking such laws are to be put behind bars, to restrict, to detain, to lose one's independence or be put in the guardhouse, which puts one in a situation where one is  under the control of another authority, and is not free to do as one wishes. [Hasan Report, p. 2] Exh. B & L

47.    The five prayers are, have been demanded by God, and explained to us by Muhammad the Prophet, it is five prayers a day that should be done before dawn, before noon, in the afternoon, at sunset, and after the sun sets at night.  These five prayers are obligatory on a male and female whether they're in congregation or whether they're not. Hasan depo at 100:15-21. Exh B & L.

48.    Individual prayer is acceptable. Hasan affidavit Doc. #110; Hasan expert report; Exh. B. In his deposition, Imam Hasan explained, "there are adjustments that we can make in religion in  terms of you can't do one thing, you can do something else.  So there are things that are allowed for certain  situations, you see.  If you can't pray at the stated time, say for instance, if you can't pray before noon,  you can make that prayer up some time during the day as a late prayer, because there are certain conditions of  prayer.  You cannot pray on wet ground, you can't pray  in a dirty place, you can't pray where water, et    cetera, will contaminate your prayer rug and so forth,  you cannot pray at certain

times in terms of the rising  or setting of the sun, so there are many stipulations     that we have in religion which we can pray and times  which we cannot pray or should not pray. Exh. B & L and Dr. Leitner report (efiled).

49.  Muslims are told in the Holy Quran "Oh you who believe!  Obey Allah and, obey his Apostle and those charged with authority among you.  If you differ in anything among yourselves, refer it to Allah and his Apostle, if you do believe in Allah and the last day. That is best and most suitable for final determination."  (Holy Quran 4:59).  [Hasan report, p. 2] Thus, there is scriptural support for the requirement that Muslims must follow A.D. 10.8, which is the legal authority governing DOC operations. [Hasan deposition at 93:19-23.] In this verse we are told that the Religion of Islam makes no sharp division between sacred and secular affairs.  It expects ordinary governments to lean toward righteousness and stand in the place of a righteous Imam, and Muslims must respect and obey such authority.  Otherwise there will be no order or discipline. Temporal, secular or worldly authorities are to be obeyed in these matters, while religious authorities must be obeyed in religious matters. Thus, A.D. 10.8 must be followed in order to assure that there is no chaos, no anarchy. [ Hasan deposition; Hasan Report at 2] Exh B & L.

50.  A.D. 10.8 the religious services directive specifies what can be done and what cannot be done, and such provisions are not a denial of religious services. Rather the policy constitutes the law or rules and regulations of the Department of Corrections, which Imam Hasan has not found to be un-Islamic. Hasan deposition at 93:19-23. Exh B & L

51.  To be clear, there is no substantial burden on religion caused by A.D. 10.8. There is nothing "un-Islamic" or discriminatory animus in A.D. 10.8. [Hasan deposition] For

clarity, what should Muslims do in case they have to live under non-Muslim authority? In such case, Muhammad the Prophet's (AS) own example in his relationship to the government of Abyssinia, is a sufficient guide.  About one hundred of Mohammed the Prophet's (AS) companions were advised by the Prophet (AS) to seek shelter in the Christian Kingdom of Abyssinia, where they lived for approximately ten years, subject to the laws of their land.  The rule is laid down in clear words "When one is commended to disobey Allah, he shall not hear or obey the authorities."  (Holy Quran 4:59, Maulana Muhammad Ali Translation, FN. 593; also Sahid Al-Bukari 56:108). [Hasan Report at 3] Exh. B & L

52.     The words "ulu-l-amr", meaning those in authority have a broad significance, so that in different matters relating to the life of man, different persons would be in authority, so the commander of a section of the army, etc., was considered as one in authority.  (Sahid Al-Bukari 65:4 and 11). Thus, Muslim inmates are required to follow A.D. 10.8, the rules of the facility, and the orders given to them by correctional officers. [Hasan Report at 3; Hasan deposition] Exh. B & L

53.     Muslim inmates are required to be obedient to the rules of the institution and to follow orders of DOC staff. This is based in part on the judgments of our historical great Imams, are acceptable only the contents of the Holy Quran and the life example of Muhammad the Prophet (AS).  Our great Imam Abu Hanifah is reported to have said "Give up my words, for the words of Allah, and give up my words for the words of the Messenger of Allah".  In regard to secular authority the rules are laid down in Hadith that "the authority of those entrusted with it should not be disputed, unless as the Prophet, (AS) added, you see an act of open disbelief in which you have a clear

argument from Allah".   (Sahid Al-Bukari 93:2). [Hasan Report at 3; Hasan deposition] Exh B & L

**Muslims Offering Prayers Individually:**

54.  Many authentic reports states that offering prayers in congregation carries as much as twenty seven times of a greater reward than offering prayers alone or individually. (Everyday Fiqh 6:  Sahid Al-Bukari  p. 175 #2).  [Deposition of Hasan} Exh B & L

55.  Although daily congregational prayers are important and part of being a practicing Muslim, our individual prayer obligation can be satisfied by praying alone.   Aisha (RAA) reported Allah's messenger as saying "Prayer said in congregation is twenty-five degrees more excellent than pray said by a single person."  (Sunan Nasa'i Vol. 1, p. 509 #842).  [Deposition of Hasan] Hasan expert report at 4-5. Exh B & L.

56.  The basis for concluding that individual prayer is acceptable is based on the life example of Muhammad the Prophet (AS), who said "the person who performs his Wudu (Washing) well, then went to the Mosque with the intention of offering the prayer in congregation and found the prayer to have been performed already, he will get the same rewards from Allah (SWA) as those who attended and observed the prayer in congregation without any decrease in their reward.  (Everyday Fiqh pp. 182 and 183, Abu Dawad and Nasa'i).   Thus, one who is unable to make congregate prayer is required to make individual prayer, which person will get "the same rewards from Allah (SWA)." [Depositions of  Hasan, Hasan Report at 5] Exh B & L

57.  The fact that individual prayer is acceptable is also supported by the following scholarly text and commentary: Ibn Abbas (RAA) reports that Muhammad the Prophet (AS)  said "Who so hears the announcement (for prayer) and then does not come to it (for prayer)

has not observed the prayer except that (he has) some (valid) excuse." (Sunan Ibn-1-Majah Vol. 1, p. 436 #793). [Hasan Report at 5] Exh B & L.

58.     Individual prayer was performed by Abraham the Prophet (AS). The Quran says of Abraham the Prophet (AS) "I will pray to my Lord for your forgiveness." (Quran 19:47).

59.     Muhammad the Prophet (AS) and the Muslims were instructed to pray while they were alone. "Stand (to Prayer) by night but not all night. Half of it or a little less, or a little more, and recite the Quran in slow, measured Rhythmic tones. (Holy Quran 73:2 to 4).

60.     Again the Quran says: "I (Allah SWA) listen to the prayer of every suppliant, when he calls on me." (Holy Quran 2:186), and again "Behold he cried to his Lord in secret (or alone)." (Holy Quran 19:3). Individual Prayer in the other places in Quran are: (12:34) (10:88) (28:16 and 17) (28:21) (14:40). Other individual Prayers are the Shaf and Witr prayer (Prayer and Al-Islam p. 196). The Tahajjud Prayer (ibid p.. 197); the Duhn Prayer (ibid p.. 197); and the Tarawih Prayer (ibid p.. 196). As already stated the Religion of Islam allows dispensing, or making adjustment or providing alternatives in times of hardship. [ Hasan Report at 5] Exh B & L.

**61.     Allowing Muslim inmates to engage in communal prayer five times per day is not a religious requirement but is rather a demand emanating from a misunderstanding of the tenets of Islam or an intentional political gambit by inmates. In either case, permitting inmates to gather in such a manner would be inherently dangerous to peace and order and enhance the likelihood that political radicalization will occur. In addition, there is no religious basis in any variant of Islam to justify inmate-led *jumu'ah* services, particularly when a trained imam is available, or to exclude an**

**Islamic chaplain from such services. Nor does Islam require privacy in worship or isolation from the larger community. To accede to such a demand would be inherently dangerous to peace and order and enhance the likelihood that political radicalization will occur.** Leitner expert report p. 1. (efiled)

62.     Five times each day, Muslims are obliged to bow down to Allah in prayer. The reason for such a regular and frequent prayer requirement is to ensure that the faithful are constantly reminded of the presence of God as well as the subservience of the faithful to God. This is strictly an obligation of the individual and is a key religious obligation. However, like most requirements, there are exceptions such as where circumstances or illness prevent an adherent from being able to pray. Engaging in a pilgrimage to Mecca is a "requirement," but an adherent is excused if such a journey is prevented by illness or if doing so would create an undue burden on one's family. Leitner report at 22.(efiled)

63.     Of all requirements in Islam, individual prayer to maintain a direct conversation with God is perhaps the most important. The individual and deeply personal nature of this conversation is intended to be a solitary event. There is absolutely no requirement that it should or must be done with other "believers" or in a communal manner. The social practice of hearing the adhan, the call to prayer, announced five times a day by a muezzin via loudspeakers in Muslim countries is intended to be a reminder for the individual to pray. The social practice of praying in a grand mosque is not a religious obligation but rather a convenience if available. In fact, the concept of a mosque is interesting as it is at its most basic simply a place to pray. Any location is potentially a mosque – a spare room, a stairwell, the rear of an airplane, an office, etc. It is simply a

place where one can place a barrier on the floor – such as a prayer rug, sheet of plastic, planks of wood, or a drop cloth – to raise oneself above the dirty floor and pray to God. Such are the simple requirements to worship properly in Islam. There is no requirement in Islam for the daily prayer regime to be engaged in with others present. Of course, it is always nice to observe rituals with co-religionists, but it is in no way mandated in order to be a good Muslim. In fact, to do so would violate an important feature of Islam – maintaining a direct conversation with God. As a result, the demand for congregant prayer five times a day is wholly without merit and, in fact, contrary to the spirit and intent of Islam. Again, the motives behind such demands are very likely political or, at best, a manifestation of ignorance as to what Islam requires of its adherents. Leitner expert report at 22-23. (efiled)

64.    If you cannot pray in congregation because of some restriction, because of some hardship, you don't have to pray in congregation, you pray individually. Hasan depo at 113:17-19. Exh. L

65.     National organizations, such as the Department of Justice, NIC (National Institute of Corrections) have put out national standards and training materials on Islam in the Correctional Environment which also support a national standard in corrections that individual prayer is acceptable. See Murphy depo at 69:1-10; see also copy of DOJ, NIC DVD, copy provided to court and to opposing counsel. Exhibit M; Exhibit V (DOJ DVD).

66.    Incarceration is always a hardship on an individual.  It is some type of hardship.  You're not  free.  You can't exercise your religion like you should, you can't exercise other things like you   should, and this is why many of the scholars in this religion say that

inmates cannot be imams, because they can't perform the duties and obligations that an imam should.  You can't go and visit the sick, you can't go and give spiritual counseling, you can't go and provide  information that you need to  provide because you're confined to a certain area.  Not only that, if you are   convicted of a crime, you are convicted by the courts of a crime, there is evidence against you, the government has convicted you, then you are not lawfully  fit to be the type of person that should be  administering to others on religion, because one of the qualifications for imam-ship is good morals.

Hasan depo at 114:1-17. Exh. L

**All Options and Alternatives Were Considered and Found Contrary to the Compelling Interests of Safety and Security; A Brief Hisotry of Violent Incidents Involving Muslim Activities**

67.    Commissioner Lantz looked at and considered whether or not collective prayer could be done even once per day and she concluded it was impossible. Lantz depo at 83:1-8. There are resource and staff issues, serious security and operational issues, and the Commissioner will not allow inmates to be leaders. Id. at 83:7-11. Among the operational issues is that such daily prayer would interfere with school, visits, vocational education programs, recreation, and it would simply be impossible in light of the many functions set forth in the daily operational schedule of MWCI. Id. at 84:11-25; 85:12. Murphy depo at 68-69 Exh M & S; See also Exh T, WWCI schedule

68.    Such daily prayer would deny to other inmates the use of common areas and other areas to congregate. Lantz depo at 86:16-18; 87:4-6;   Daily congregate prayer would be disruptive to the orderly operation of the unit, and would be disruptive to the other inmates as well. Lantz depo at 88:11-22. 92:18-25;  Exh M & N

69.     There are well over 2000 inmates in the MacDougall-Walker Correctional Institution. Lantz depo at 100:19-20. There are over 19,000 inmates inccarcerated statewide at any time. In any given year there are 30,000 or more admissions and 30,000 or more releases of inmates. It would be impossible to provide Islamic chaplains to cover congregate prayers in all of the DOC facilities with these kinds of numbers of inmates. Murphy expert report at 1-2. Exh. S

70.     The Commissioner looked at and considered the use of recreational space for possible prayer and concluded that it would interfere with recreation and would diminish the seriousness and respect due to the prayer if it was allowed during recreation or at the same time as recreation. Lantz depo 102:13-25. Exh J & N

71.     The Commissioner is concerned that allowing Muslim inmates to congregate would create a perception of favoritism. Inmates live in a closed environment and are very astute as to differences in treatment. Lantz depo at 106:8-18; Inmates watch and  see who gets out and who doesn't. Inmates must believe that what is being done is fair and just and consistent. When you give one group of inmates an advantage, other inmates are not appreciative of that advantage. In order to have a safe, secure and orderly environment inmates must be treated fairly and even handedly with a structure. This is what promotes safety and order. Lantz depo 107:11-20; Murphy depo at 68-69; Exh J. M, N ,and S

72.     Deputy Commissioner Murphy is also extremely concerned from a safety and security point of view with the potential for a proliferation of various Muslim sects in Connecticut's DOC facilities. He is also extremely concerned about religious groups meeting on their own without appropriate Chaplain supervision, and the potential

security risks posed by inmate leaders or inmate Imams or Ministers. These groups tend to generate an alternate authority structure within the prison system. These concerns are based on a significant past history of violence involving differing Muslim sects, including one event at Ramadan at Osborn CI in which a correctional officer had his throat cut nearly ear to ear by a Muslim who was trying to enter the chow hall during Ramadan, and other Muslin inmates, claiming to be "gatekeepers," were attempting to keep some inmates out. Murphy affidavit ¶6; Murphy expert report at 2; Lantz depo at 111:4-14; Exh J. M, N, S, & T

73.   The bottom line here, whether it be a gang or religion or school, DOC does not allow leadership of inmates by other inmates. DOC history has shown us that it is a recipe for running unsecured facilities. It jeopardizes everyone's safety and security. Murphy depo at 77:8-12 Exh M, S & T.

**74.   Allowing Muslim inmates to congregate five times per day for prayer would be severely detrimental to the safety and security of an institution. Similarly, allowing congregate Jumu'ah services absent an Islamic chaplain, or allowing inmate-led congregate prayer, would be severely detrimental to the safety and security of an institution. Murphy and Lantz expert reports at 1. Exh. M & N.**

75.   Experience within the DOC has shown that religious groups, meeting on their own, without appropriate Chaplain supervision, pose a significant safety and security risk to the facility. Specifically, experience within the DOC has shown that permitting inmates to congregate for religious reasons, absent appropriate staff supervision, allows various inmates to emerge as inmate leaders or inmate Imams/Ministers. These groups tend to generate an alternate authority structure within the prison system. These

concerns are based on a significant past history of violence involving differing Muslim sects, including one event, at Ramadan, at Osborn CI in which a correctional officer had his throat cut nearly ear to ear by a Muslim who was trying to enter the chow hall during Ramadan.    The violence occurred when other Muslim inmates, claiming to be "gatekeepers," or security, were attempting to keep some inmates out.  Another incident occurred at Cheshire CI.  Correctional officers were attempting to clear a dining hall, but inmates were lined up in paramilitary formation doing physical exercises in response to a Muslim inmate leader who was directing the other inmates. When staff came in the room, the inmates disobeyed the direct orders of staff and instead followed the direction of the inmate leader.   See Murphy expert report at 2; See also video of inmates refusing to leave dining hall at Cheshire CI, lined up in military formation, obeying orders from an inmate leader and doing push ups as ordered by the inmate leader. Copy of DVD provided to Court and opposing counsel. Exhibits M, S, T, and W.

76.    As recently as 2007, Muslim inmates at MWCI organized and attempted to instigate an uprising at two DOC facilities and used Muslim activities to recruit other Muslims to get involved with the planned disturbances, which intended to include assaults on staff.  Ongoing surveillance and other investigative methods uncovered the plot which resulted in certain inmates having to be moved out of MWCI. See Summary of Investigation, Exhibit  T; copies attached.

77.    The DOC is seeing some crossover from gangs, which have been prohibited, to religious groups, which have legal protection to meet. In other words, gangs use the cover of religious groupings to conduct gang activities. This is being seen across the nation, not just in Connecticut, that a lot of the serious gang members are gravitating to the  Muslim

faith because of the social and political ideologies of some of the radical elements of Muslim faith. Murphy depo at 77:16-21.Exhibit M, N, S, & T; Leitner report (efiled)

78.     The purpose for requiring that congregate worship be supervised by a chaplain is obviously for safety and security reasons. The defendants have a compelling interest for all inmate populations that DOC supervises to provide a safe and secure environment. A trained chaplain or religious volunteer, whatever the denomination is should with their training and experience be able to decipher what is appropriate materials and what is not appropriate materials. Whether it be written or a sermon that would jeopardize the safety and security of our basic mission to protect the public, to protect the staff, and to protect other inmates. Murphy deposition 29-33; 36-40; 43-46; 52-54;68-70; 73. Exh. M & S; Exh. T

79.     The DOC has considered all options regarding congregate prayer, including whether Muslims can pray once per day in congregate fashion. Indeed, the DOC has considered \all options, including whether one additional time per week, in addition to Jumuah and Taleem is an option. All options have been considered and rejected due to reasons of safety, security and order. [Murphy Deposition p. 29; 73] [Lantz expert report; Lantz deposition 72-82] Exh J, M, N, S & T

80.     There is DOC documentation on which Deputy Commissioner Murphy based his conclusion that collective prayer, even once per day or once extra per week would threaten safety, security and order. Facilities were reporting that inmates were attempting to gather in day rooms or general common areas to conduct their own religious services and it was brought to the attention of the Deputy Commissioner and who considered whether Muslim inmates could pray collectively one time a day or

several times a day. [Murphy depo p. 30] [Lantz expert report; Lantz deposition 72-82] Exh J, M, N, S & T.

81.    Deputy Commissioner Murphy put out a memo to wardens of how to respond to demonstrative group prayer in days rooms, common rooms, and other areas, such as recreation yard.   The memo reminded wardens of the policy which  did not allow any groups of inmates to congregate   for religious prayer activities in common areas that are used by the general inmates and that is basically within the    housing units of facilities, recreation areas, or any of  those other places without a supervisor chaplain or DOC authorized religious volunteer.   Murphy deposition 30-31. A.D. 10.8 Exh F, M

82.    When groups of inmates meet on their own, without religious staff supervision, usually one individual kind of takes over the show. Based on many years of experience, whether it involves a  Bible or the Koran or some other religion, and someone, an inmate is starting to take a lead in it. Murphy deposition at 31. Exh M. : Doc #110-2; Exh T.

83.    Requiring a  staff chaplain or authorized volunteer  is obviously for safety and security reasons.   The defendants  have a compelling interest for all   populations that DOC supervises to provide a   safe and secure environment.  A trained chaplain or religious volunteer, whatever the denomination is, should with their training and experience, be able to decipher what are appropriate materials and what are not  appropriate materials, whether it be written or a   sermon that would jeopardize the safety and security of DOC's basic mission to protect the public, to protect the   staff, and to protect other inmates. [Murphy deposition at 32] Exh M, S & T.

84.    The incident reports and other documents concerning violent events  or other threats to safety, security and order in Muslim religious activities is based on   a demonstrable

history of when inmates   are not supervised by chaplaincy staff,    these types of disruptions, threats and violent acts have happened and will happen.  Inmates cannot be leaders   over other inmates. In the 26 years of experience of Deputy Commissioner Murphy, based on the    historical perspective that he reviewed, that bad things  happen when inmates are allowed to lead groups and to    conduct sermons that are not conducive to providing the   mission that DOC provides.  And again, that is to protect the public, protect the staff, and make sure there is a    safe and secure and orderly operation of the facilities. [Murphy deposition at 33]. Exh M, S & T

85.    The materials demonstrate through the decades the same theme comes through when things aren't  supervised.  DOC has had staff injuries.   DOC has  had   inmate injuries.  DOC has  had derogatory statements against certain races and religions.  DOC has had basically  insecurity  of  or  destabilization  of   institutional safety and security.   The changes DOC has   made, for example in A.D. 10. 8 and A.D. 6.14, the structure that DOC presently provides, the services that  DOC  provides, provide an opportunity for inmates to    practice their religion in that safe and secure environment. [Murphy deposition at 33] Exh M, S & T

86.    When  you jeopardize safety  and  security,  for  example  by  allowing  inmates  to congregate in groups on their own, regardless of what facet of corrections, if you don't have the basic needs of the   people, food, shelter, safety and security, any program whether it be religious, educational, addiction     services, is fruitless.  It really is.  If people cannot  be safe and secure then no one in a correctional facility safely practice their religion. [Murphy deposition at 34] Exh M, S & T

87.     Correction officers and non-religious services staff cannot handle the supervision of group prayer because they're not trained as religious facilitators, whether it be a volunteer or a contract   individual for an employee of ours.  Correction officers  have a multitude of other functions that they have to      perform to uphold the DOC mission statement.  Again, to      protect the public, protect the staff, and the inmates.  That includes tours of the unit to make sure no illicit activities are going on such as assaults, such as rape, such as escapes, such as people hanging.  They're busy.  They don't have time to sit there and monitor a group in the unit and make sure that they're talking about things that aren't radical or that could jeopardize the safety   and security of a facility. [Murphy deposition 36-37] Exh M, S & T.

88.     DOC statistics have shown that incidents involving any group are significantly reduced and have been significantly      reduced, based on the requirement that congregate activities, including religious activities, be supervised. [Murphy deposition at 37]. Exh M S & T.

89.     In DOC, the Muslim group has a high tendency along with security risk groups of having     violent and dangerous incidents of prison   radicalizations.  There are more agendas going on in Muslim groupings than religious agendas.  When talking about national   security and radicalization of Muslims by utilizing prisons, these are things that prisons are basically required to do and watch for.  All of those things have  a higher probability with Muslims, especially if  unmonitored by   trained experts. These Muslim groups pose a greater threat than those other groups or denominations mentioned by plaintiff. [Murphy deposition at 38-39] Exh M S & T.

90.     DOC's experience with  the SRGs (Security Risk Groups or gangs)  has shown before
        we had a     policy, A.D. 6.14, to manage them, nearly all of our major incidents were
        predominantly involving security risk groups.  As to all     other major incidents, there
        was a high probability  that they involved some radical Muslim inmates.   This happens
        when inmates are allowed to gather for prayer groupings,  unsupervised    unmonitored.
        The activities of religious groups of Muslims is parallel  with the activities of  security
        risk groups. [Murphy deposition at 40].[Lantz deposition 122-128] Exh M & N; S & T

91.     Gangs use religious  services to conduct their business and conduct their   meetings.  If
        gone unsupervised and unchecked, that is    not what that service is for, and if plaintiff's
        demand for an injunction were to allow groups of Muslim inmates to congregate to pray
        5 times a day or even one time a day,  it would be allowed to    flourish, and again,
        jeopardize the safety and security,   and the orderly operation of the facility. [Murphy
        deposition at 43]. [Lantz deposition 122-128] Exh. M & N; S & T

92.     There was a Muslim disturbance in the  chow hall at Osborn CI during a  Ramadan
        service in April of 1990.   Three correction officers were stabbed and had their throats
        slashed  some inmates were allowed to co-control the group.  Some staff   people  and
        also inmates were seriously hurt  during that disturbance. [Murphy deposition at 43-44].
        [Lantz deposition 122-128]; Exh. M & N; S & T

93.     Due to the lack of the presence of a chaplain in Osborn CI, DOC had   inmates escape
        from the chapel because they were    unsupervised.  Two inmates who happened to be of
        the    Muslim faith.  But again, no supervision and allowed to   monitor themselves, so
        to speak led to this serious security breach. [Murphy deposition at 44]. [Lantz deposition
        122-128]; Exh. M & N, S & T.

94.     At Cheshire CI in 1993, Muslim inmates were   allowed to meet in the dining hall. This
is on video tape.  The inmates are seen doing  military drills. When correctional staff
moved in to try to move them they refused to listen to the orders of the correction
officer. Instead they listened to the inmate who was giving them     commands. This
threatens the safety, security and order of DOC facilities and undermines the authority
of the correctional staff. [Murphy deposition at  44]. [Lantz deposition 122-128]; Exh M
& N. Exhibit W (DVD of Cheshire Dining Hall)

95.     In  early  2007  at  MacDougall/Walker,  DOC  investigators  obtained  very  good
information concerning Muslim inmates who were planning disruptions  and assaults on
the     staff based on various policy changes that the inmates disliked. These policy
changes included a change in the Imam as MacDougall and a prohibition on hand
holding during contact visiting at MacDougall CI. Muslim inmates attempted to use
their influence to plan orchestrated attacks at two different DOC facilities. [Murphy
deposition at  44-45]. Exh M, S, & T.

96.     There was even a disturbance in 1972  in the big yard in Somers, and in  that day there
was a radio station at Somers. There     was a Muslim minister whose tape was allowed
to be played in     the radio room and broadcast to the inmates that talk    about pick up
your arms and fight our aggressors, pick     up your bats, pick up your sticks, pick up
and fight  against the aggressors.  That day in the recreation yard  at Somers CI (now
Osborn CI), staff members were spread out and beat with     baseball bats by Muslim
inmates.  Deputy Commissioner Murphy thinks one person   died and other people were
severely beaten.  [Murphy deposition at 46]; Exh M, S, & T. Exh M, S, & T.

97.     In Deputy Commissioner Brian Murphy's professional opinion, based on more than 26 years experience, it would actually be negligent  DOC to allow inmates to congregate in prayer groupings without appropriate Chaplain supervision,  having the knowledge of the threat that is     posed to institutional safety and security by inmates if they were allowed such prayer opportunities unsupervised and unmonitored  by a chaplain or volunteer. [Murphy deposition at 46-47].  Exh M, S, & T.

98.     "Inmate Imams or prayer leaders     become 'big wheels' in prison, who increase their status    and influence and thus enhance their ability to persuade     other prisoners to engage in disruptive behavior." [Murphy expert report; deposition at 52] Exh M, S, & T.

99.      Many inmate imams become looked upon by other inmates as leaders. Deputy Commissioner Murphy points to Cheshire where the officer entered and the officer is telling the Muslim inmates to do  things and they're not listening.  All those inmates are listening to is that leader.  They are not listening to   anybody else.  And obviously that is a negative security     implication for  DOC.  Inmate imams are influential individuals. One of the people  Deputy Commissioner Murphy mentioned who was involved in the most recent MacDougall/Walker issue is a very influential inmate, and claimed to be an imam.   A couple of the inmates who were interviewed in the recent MacDougall security investigation  stated, if   so-and-so [an inmate leader or imam] goes, meaning if he is going to do something, we're all going to follow him.  So inmate imams get to be the  power brokers. [Murphy deposition at 53] Exh M, S, & T.

100.    Experience has shown DOC that allowing inmates to pray in the housing units or other group locations at MacDougall won't work. There have been incidents in which one of the    inmates had an altercation with an officer because they   were not allowed to get

cleaning supplies out of the  closet to clean the floor before the service.  So they   are very particular.  It is a major tenet in the Muslim    religion about sanitation and what goes on and even when     you go to a mosque, you take off your shoes.  There are certain things they have in organized prayer that take     place. Basically plaintiff's demand for congregate prayer in the day rooms or quiet rooms at MacDougall  would limit the access to that area.  It would give the perception of specialized treatment to this Muslim group over  other groups. Such prayer groups for Muslims would not allow the inmates who maybe want to do legal work, who maybe want to watch the    TV, or who maybe want to read a book, or who maybe just want to have a chat with other inmates while this is  occurring would be disruptive.  And our experience has  shown that basically you will create a security problem and a safety problem  for all those individuals. [Murphy deposition at 67-68] Exh M, S, & T.

101.      It is the Commissioner's understanding and the understanding of Deputy Commissioner Murphy that based on consultation with defendants' experts    that this daily prayer,  -- obviously Muslims have to do prayer five times a day -- This prayer is an individual activity.  It is not a group activity as the Commissioner and Deputy Commissioner are advised by defendants'  experts.  And when you look at the other tape,  put out by NIC, they basically say the     same things.  And these prayers can be made up when situations dictate.  This is what I have been advised    our experts and what I have seen on NIC tape, which documents national standards for correctional administrators. [Murphy deposition at 69].  Exh M, S, & T.

**102.**    The other issue which prohibits congregate prayer daily is the  facility schedule.  We have a multitude of functions MacDougall CI has  to carry out in a day.  The

correctional    environment is very structured.  DOC needs structure to    maintain the safety and security for everybody.  But DOC has  to feed people, we have to recreate people, DOC has   to educate people, to send them to various  groups, programs, school, to allow inmates visits; DOC has  to give  medical services, we have to  feed inmates three times a day. The MacDougall facility and DOC has to provide other activities, for example,  attorney visits, special visits, special events.  A prison  is  a community. There are  a lot of things that our inmate    population, all our inmate population  expect to happen in a normal day.  If there are incidents, the facility must lock down.  If there are security issues, DOC must   lock down.  A couple of times a year DOC will lock down at certain facilities based on the directive to do  annual shakedowns.  But pretty much this is a norm and  MacDougall CI has a lot of functions to do. If you look at MacDougall/Walker's activity schedule, it is enormously   complex.  MacDougall is a high  security level 4 facility.     Many inmates come out of Northern and go to MacDougall, which is a very  structured environment for safety and security reasons. The  defendants have   a compelling reason why the DOC cannot do as plaintiff demands.[Murphy deposition at 69-70] Exh M, S, & T.

**Denial Of Jumah Services If No Islamic Chaplain Is Present:**

103.     According to  Abdul-Aziz Kamal, under  the section Regulations concerning  the Congregational Prayer, he states "The Friday (Jumah Prayer) and the Eid Prayers are conditioned  upon  congregation,  i.e.  these  Prayers  cannot  be  held  without  a congregation."  (Everyday Fiqh p. 177 no. 2.). [Hasan Report at 5] Exh. B.

104.     Imam W. Deen Mohammed states "Jumah is an obligatory congregational prayer, which cannot be offered alone.   An Imam is necessary to lead this prayer service."

(Prayer and Al-Islam, p.. 242). [Hasan Report at 5; Hasan depsotion] Inmates cannot be Imams. [See A.D. 10.8; Hasan deposition; Murphy Expert Report pp.1-7; Murphy deposition pp. 41-49] Exh. B, L, M & S.

105.    The Administrative Directive under the title Religious Services Policy states "The practice of religion by inmates in accordance with the provisions of this directive shall be consistent with the compelling governmental interest of preventing inmate conduct, which threatens security, safety and order."  (Admin. Directive no. 10.8, p. 1, No. 1, dated 1-31-2005).  This directive also states under "Provisions applicable to inmates with no disqualifying custody conditions." "All  collective religious activities shall be conducted and supervised by a department authorized Chaplain or religion volunteer who professes the same religion as the group gathering together.  An inmate may not conduct a collective religious activity under any circumstances."  (A.D. 10.8, No. 6B, at p.4), and again "An inmate may assist a department authorized Chaplain or religious volunteer who is conducting a collective religious activity.  An inmate can never be authorized to serve as a Chaplain or religious leader.  An inmate can never exercise any authority over any inmate."  (ibid no. 6, D.). [See A.D. 10.8; Hasan deposition; Murphy Expert Report pp.1-7; Murphy deposition pp. 41-49] Exh. B, F, L, M, & S.

106.    Collective worship requires a leader or Imam and because inmates are not given that authority as stated in the evidence above, no inmate can lead a collective worship service, i.e.:  Jumah, Eid Prayers, classes  without an authorized Chaplain or Volunteer present. If an inmate is unable to attend Jumah for reasons over which he has no control, for example, if there is a lock down, or if the Islamic Chaplain is absent due to illness, and Jumah is canceled, the Jumah prayers can be made  by an individual in an

individual fashion. A missed prayer can be made up at a time later in the day, or at the next available opportunity. Allowing Muslim inmates to engage in communal prayer five times per day is not a religious requirement but is rather a demand emanating from a misunderstanding of the tenets of Islam. Further, such groupings would jeopardize safety and security by promoting inmate leaders or inmate "imams" and would foster rivalries among the inmates in the Muslim community, all of which is avoided by the weekly communal Jumah prayer led by the facility Islamic chaplain. [Hasan Report at 6.n.2; Hasan deposition; Murphy Report pp.1-7 and Murphy Deposition, pp. 41-49] Exh. B, F, L, M, & S. Dr. Leitner report (efiled)

107.     Allowing inmate imams is dangerous to safety and security.  Inmates have threatened the authority of staff chaplains and have challenged their leadership, attempting to set up an alternate hierarchy within the inmate Islamic community. Whenever two or more Muslims gather to pray, one must be a leader and another a follower. The requirement which prohibits inmates from being leaders is consistent with sound correctional practice and promotes security and order in the Muslim service, and in the facility. Inmate leaders can threaten the physical safety of staff and others by influencing inmates to carry out their orders or instructions. Moreover, staff supervision is critical to avoid intrafaith conflicts. [Hasan Report at 6-7; Hasan deposition; Murphy Report pp.1-7 and Murphy Deposition, pp. 41-49; 66-72] Exh. B, F, L, M, & S. Dr. Leitner report (efiled)

108.     The role of imam or prayer leader, within prisons in particular, has proven to be an extraordinarily sensitive position that the Department of Corrections personnel have approached very carefully. This caution is well founded and documented and arises

36

from many instances where some Muslim chaplains and imams working within the U.S. penal system – both civilian and military – have been found to be engaging in seditious behavior and have been actively recruiting and radicalizing inmates rather than simply helping them practice their faith. See Dr. Leitner's expert report at 24; see also Attachments C and D to Leitner report which document many of the problems uncovered within the prison systems. Exh. B, F, L, M, & S. Dr. Leitner report (efiled)

109.    Deputy Commissioner Murphy expressed the issue at his depositions as follows: "Prisons are microcosms of society, you realize that, right.   So if there are gang problems on the street,  there are gang problems inside the prison.  Now,   obviously I will explain to you what actions we take to    prevent that with communication.  If there is racial,   political, and governmental tensions on the outside due   to the Iraqi war, Al Qaeda, those elements also probably  exist and do exist on the inside.  And it is our job in corrections to provide the Constitutionally protected    programs in religions and freedom of speech as long as     it does not infringe upon the compelling government interest of safety  and  security  and  orderly  operations  of  those  facilities.  It is  an extremely complex issue and today's    events with Muslim extremists obviously you watch this   very closely.  And we have to live by certain security     tenets that we won't let go of and it all goes back    again, sir, to providing a safe and secure environment   to every inmate that is entrusted to our care. Murphy deposition at 79:1-20. Exh. M

110.    As a result of the dangerous penetration of American prisons by religious figures promoting an extremely volatile and subversive political message, Connecticut officials have been proceeding in a cautious manner to ensure that inmates are not exposed to seditious,  revolutionary,  and  violent  concepts.  Such  concepts  and  individuals

masquerading as religion or religious mentors must be kept out of the prison environs. Such messages and people are entirely political in nature and are intended to recruit, radicalize, and mobilize potentially violent individuals against the American political system and its core values. This outcome is not just a potential but a reality that can clearly be seen in an American terror cell called the New Folsom Prison Jihadists that was recently disrupted by law enforcement officials. The New Folsom Prison Jihadists, also known as Jam'iyyat Ul-Islam Is-Saheeh or the Assembly of Authentic Islam, carried out or planned criminal operations in 11 California cities and listed a membership of 120. Interestingly, while the group's recruitment focused primarily on African-Americans, it was also successful in enlisting Hispanics and Arabs, as well as criminal gang members, including Bloods and Crips. The attraction of violent street gang members into an anti-American, anti-Semitic, Islamist criminal organization is a disturbing development that parallels MS-13 members being successfully recruited into Islamist criminal cults as well. These developments make the cautious, security-oriented approach taken by the Connecticut Department of Corrections all the more important and commendable. Permitting inmates to minister to one another by leading congregant prayer services in lieu of an approved religious mentor would be both reckless and dangerous public policy. In addition, allowing an inmate who has demonstrated an ignorance of many of the major tenets of Islam and who acts in a decidedly political manner to lead such prayer services would be extraordinarily irresponsible. Leitner expert report at 26-27. Exh. B, F, L, M, S & T.. Dr. Leitner report (efiled)

111.     Allowing congregant religious services to be conducted without the presence of prison officials would also be extraordinarily irresponsible. Officials have a duty to maintain

peace and order and to guard against prisoners who engage in seditious and political speech. In addition, the demand for privacy in congregant worship services is not supported by religious requirements. In fact, Islam allows non-believing visitors to attend and even participate in religious services in the mosque or anywhere else deemed appropriate. In fact, as a proselytizing religion, Islam encourages observation of its religious services in the hope of attracting converts. Given the preceding facts, there is no religious merit or basis for the plaintiff's demand for unobserved private congregant prayer services. In sum, the policies and actions taken by officials of the Connecticut Department of Corrections are reasonable, prudent, and fair. Their concern for the health and safety of the entire inmate population is in the forefront of their decision-making. This was demonstrated in the various meetings Dr. Leitner had with Corrections Department officials serving in a range of capacities. Leitner report at 28.

**No Timely Prayer At The Conclusion Of Ramadan At Corrigan Correctional Center In 2002:**

112.     According to  Imam W. Deen Mohammed, the religion of "Al-Islam has two great festivals of profound significance for all Muslims.  Both go under the name Eid.  Eid Al-Fitr and Eid Al-Adha.  Eid Al-Fitr comes directly after Ramadan and, Eid Al-Adha falls on the tenth day of Dhu-l-Hijjah, the last month of Muslim year, following the completion of the course of Hajj or pilgrimage to Mecca.  (Prayer and Al-Islam p. 147). At the conclusion of both Eids, a prayer with the congregation is said.  According to Hammudah Abdalati "the time of the Eid prayer is anytime after sunrise and before noon.  (Islam in Focus p.75, no. 2). [Hasan Report at 7] Exh. B & L.

113.    The Islamic Chaplain or a religious volunteer is authorized by the Department of Correction to perform this religious function for the inmates.   This Chaplain is supervised by the Associate Chaplain.   The Associate Chaplain is supervised by the Director of Religious Services. All institutional programs are to be coordinated with the correctional facility authorities for dates and times of these functions. Thus, the responsibility to arrange for the Eid prayer was that of the Corrigan facility chaplain, and none of the defendants interfered with or was involved in any way with those particular arrangements. See Hasan Report at 7-8; Hasan deposition; Bruno deposition]

114.    The Eid prayers according to Abdalati "can be done on the second or third day" after the Eid Festival begins.   (Islam in Focus p. 76). If a collective prayer cannot be done for a genuine reason, as stated above, then one should pray individually and the individual prayer is acceptable. Hasan Report at 8; Hasan deposition at 177:13-21. Exh. B & L.

115.    If there is a problem with safety and security in terms of Eid-ul-Adha or Eid-ul-Fitr on a particular day, maybe there is a lockdown one of the ids, the prayer, then we can find the next best day, and if not the next best day, and then we perform that s soon as possible.   We're never denied that we're not going to have that.   It may not happen on the day it is  required, but it happens some time that day or that  week. Hasan deposition at 177:13-21. Exh. B & L.

116.    Both Eids are the same.   You can do them up to three days after the established date.   For an example, if Eid-ul-Fitr or Eid-ul-Adha falls on a Monday, we can either do it Monday, Tuesday or Wednesday, which falls into the regulations of the Islamic festival criteria.   If it can't be done Monday, Tuesday or Wednesday, then we wait until Thursday, or  even Friday or Saturday. Hasan report at 177-178:1-7.

117.    The same safety and security concerns which apply to daily congregate prayer and Jumu'ah prayer without having a chaplain present, e.g. the dangers associated with inmate leaders, apply with equal force to the Eid collective prayers. There must be adequate chaplain supervision. See Lantz and Murphy depositions. Expert reports of Lantz. Murphy and Leitner. Exh J, M,N S & T; Leitner report (efiled)

**Insufficient Calories In The Meals Provided During Ramadan:**

118.    The Ramadan meals have been approved by registered dieticians since the early 1980's and most recently the breakfast meals have been increased, as have the evening meals. The caloric intake has been reviewed by dietary experts, and   meet all required nutritional requirements  as in the past. [DeVeau interrogatories and deposition; Frank deposition; memo from DeVeau to Frank]; Exh C, E & H

119.    Plaintiff has no expert evidence or evidence of any kind to support his assertions about the nutritional adequacy of the diet. [DeVeau interrogatories and deposition; Frank deposition; memo from DeVeau to Frank] Exh C, E, H, O & P.

120.    Fasting is a principal of practice in the Islamic faith.  The Quran states "oh you who believe!  Fasting is prescribed to you, as it was prescribed to those before you, that you may learn self restraint."  (Quran 2:183). A Muslim is excused from fasting if his health or medical reasons do not allow for such daily fasting. [Hasan Report at 8] Exh. B

121.    The Quran states "but if any of you is ill, or on a journey, the prescribed number (should be made up) from days later."  (Quran 2:184).  Abdul Aziz Kamal, elaborates further that there are ten valid reasons why one should not fast.  They are: 1)     Being   on   a journey; 2)    Sickness; 3) Pregnancy; 4)     Suckling; 5) Intensity of hunger and thirst; 6)Weakness and old age; 7)Risk of life; 8)  Jihad; 9)Un-consciousness; and, 10)Insanity.

(Everyday Fiqh, Vol. 2, p. 91).  If one falls into one of these categories one is permitted not to fast. [Hasan Report at 8] Exh. B; Leitner report

122.     During the month of Ramadan, for security reasons , DOC  can't mix the general population with the Muslim population  mainly because their food is different.  They get lots of times double portions; it is just prepared different.  If you put general population and the Muslim inmates participating in Ramadan in the same dining hall, DOC would have a riot. Frank deposition at 11. Exh O & P

123.     In preparations of the Ramadan food, the Muslims can't eat until sundown, so it is prepared later in the day.  The  serving lines, utensils are totally different from the regular utensils that the general population uses, all of their pans are separate, and this is why under our theory we use the common fare, because everything is  totally different and separate from the general population menu.  Frank deposition at 11. Exh O & P.

124.     Mr. Frank has been in a  dining hall when there has been a riot.  It started, believe it or not, over a half of  a hot dog. Mr. Frank was struck with  a pan of mustard.   This riot involved 800 people who decided to go each and every way and yell and scream and fight all over food, and   start throwing food and everything all over.  Fear was a big part of that. To restore order and security, we had to throw tear gas just to get it stopped. Frank deposition at 11. Exh O & P.

125.     Providing meals in a large inmate dining  hall absolutely is a particularly sensitive operation which poses high security risks in a correctional facility. Frank deposition at 12. Exh O & P.

126.     In an inmate dining hall, you have a bunch of inmates standing against the wall waiting to be fed, you've got inmates sitting down in the dining room.  If something goes wrong,

a meal that isn't brought out correctly, they'll start throwing it.  Once one person starts

something, you'll  have a lot more just cutting in on it to help them or just to start

commotions. Frank deposition at 12. Exh O & P.

127.    The meals provided by the DOC to Muslim inmates during the Ramadan month of

fasting are sufficient in calories and meet religious requirements.     Bruno expert report

at 9. Exhibit D.

128.    The Ramadan menu was reviewed by a registered dietician, and the nutritional content

is acceptable.  Fasting is a voluntary reduction in caloric intake, and a person is excused

if his health does not allow fasting.  This past year, 939 DOC inmates across the state, in

all facilities, successfully completed in Ramadan. Bruno expert report at 9. Exhibit D.

129.     During Ramadan, the DOC provided a bagged breakfast meal so that inmates can eat

before sunrise, and an evening meal after sunset.  Specifically, additional portions of

fish are added to the month-long Common Fare evening meal menus.   The bagged

breakfast meals for this past Ramadan included 2 Frosted Flakes cereals, ¾ ounces of

peanut butter, 2 slices of wheat bread, 2 pieces of fruit, 2 milks and cake.   It was

reported to me by Food Services that the resulting additional food cost alone to the DOC

was more than $20,000. Bruno expert report at 9. Exhibit D.

130.    Additionally, because the Ramadan month took place from September 23, 2006 to the

evening of October 22, 2006, in order to accommodate the meal after sunset, the DOC

changed schedules for mealtimes and required food service staff to work additional

hours.   This  incurred  significant  costs  for  overtime  (approximately  $110,000  for

overtime alone) and other staffing issues, as reported to Fr. Bruno. Bruno report at 9-10

131.     Although almost 1,000 inmates began the Ramadan fast and more than 900 inmates successfully completed the fast, there were no major issues or complaints regarding Ramadan.  To the contrary, the Ramadan meals and the feast of Eid-ul-Adha were well received.  Inmates and imams who participated appreciated the increase in food and the type of meals served.  Fr Bruno has received written notes of appreciation from an Imam and from inmates. Bruno expert report at 10. Exhibit D.

**Common Fare Is Nutritionally Adequate and Provides Foods Which Are Permissible (Halal) for Muslim to Eat; There are No Halal Meats; Halal Meat Is Available in Commissary**

132.     The plaintiff's claims and demands regarding halal meat and religious paraphernalia are typical manifestations of an incomplete understanding of what the Islamic religion requires of its devotees combined with an apparent political agenda on the plaintiff's part to establish himself as a leader among he inmate population. This classic combination of ignorance and ambition is commonplace and is effectively used by radical recruiters and organizers around the world. Dr. Leitner expert report at 17

133.     Prison-based Muslim converts and devotees are often culturalist Muslims, who identify with Islam based upon certain appealing cultural values, messages, and symbols but lack an intimate understanding of the religion per se. They are able to seize upon distinct cultural artifacts associated with, but secondary to, the religion and often construct a political agenda that depends on a list of grievances that they attribute to religious discrimination. This is not a new phenomenon. Doing so usually betrays the extent of ignorance of the tenets, doctrine, and core belief system of the religion being so zealously guarded by its advocates. It is a sad paradox for those who honestly think they are champions of the faith but fail to differentiate cultural trappings from the core values

of religion that they end up doing a disservice to fellow *self-styled* believers. This appears to be most commonplace among prison populations as ill-conceived ideas, thoughtless behavior and the lack of self-discipline contributed toward placing them behind bars in the first place. Unfortunately, this same pattern appears to present itself even when these people adopt a new, or renewed, religious identification. Dr. Leitner expert report at 17-18 (efiled)

134.   One of Mr. Frank's objectives as a chief of food service, and when he was chief of food service for the Department of Corrections, in terms of providing and administering inmate meals, was uniformity, keeping it as much as possible the same.  In our case here in Connecticut, food service was much better than what we did in New York due to the fact  that we have two style menus, either common fare  or general population.  Frank deposition at 12. Exh O & P.

135.   According to Mr. Frank, DOC prepares and administers two separate menus.  A general population menu and a common fare menu.  The common  fare is a meatless entrée because it is acceptable for the Muslim faith, the Jewish faith, the Rastafarians and the vegetarians. Frank deposition at 14. There is fish on Common Fare as fish is Halal. See Hasan affidavit and deposition. Even on the regular menu DOC does not in any way cook or otherwise handle any port products. Pork will never touch the DOC steam kettles, grills, ovens or any DOC kitchen site in the state. Frank deposition at 45. Frank affidavit, Dec. 2006, at ¶ 11; Doc. # 110; Exh H; O & P.

136.   The common fare has been reviewed by Jewish and Muslim clergy, and  they accept it. It is a diet that is totally adequate for them, meets the calorie intake, and meets all the guidelines of the regular diet.  The DOC dietitian, Mr. Robert DeVeau, a defendant in

this case, has analyzed the Common Fare menu and it meets or exceeds the dietary

allowance by our national standards. It meets the ACA Standards. For the most part in

all the tours, Mr. Frank toured all of the facilities in this state two, three times a year,,

and to his knowledge there have been very few complaints. Frank deposition at 15. Exh

H, O & P.

137.    The only difference between the regular general population menu and Common Fare is

when there is a meat item. For instance, if we're serving, the general population a

hamburger or a ground beef with macaroni, then the common fare menu, will be either

a soybean product with tomato sauce, or a plain tomato sauce. However, nutritionally,

there is no difference in the nutrient value, the caloric value and the adequacy of the

Common Fare diet. From a religious point of view, all the foods on Common Fare are

acceptable for Muslims to eat. Frank deposition at 16; DeVeau affidavit, memo and

nutritional analysis; Hasan affidavit and deposition. Exh. H, O & P.

138.    Common Fare meals are prepared completely separately after boiling and sanitizing the

steam kettles in accordance with guidance provided by the Rabbi and the Imam. Every

night when the production kitchen closes up, right before closing the last thing DOC

kitchen staff does is completely fill the kettles with boiling water. Staff let it boil for a

period of time, and then drain it through not only spouts of the kettle, but through all of

our hoses that are used to pump the food to our pump station. DOC has pump stations

that pump it in through the bags. All of the boiling water goes through those stations,

and then to the drain. That sanitizes those pieces of equipment every day. That

sanitation process meets religious requirements for Muslim inmates. This process has

been reviewed and approved by the imams themselves. They come in and they have

gone through DOC practices and procedures, have watched it, and have told us it is

acceptable. Frank deposition at 39-40. Exhibit H,O & P.

139.     Common Fare meals are produced first, directly after the kettles are boiled and

sanitized. The Common Fare meals are pumped into cryovac bags, which are sanitary.

The bags are  sent to the York production kitchen sealed; staff open them, put them on a

pump station, fill the bag, and then   each bag is clipped and stored. The common fare

items remain  separate and distinct throughout the distribution process. Every bag has a

sticker on it marked common fare with all the ingredients and everything. The Common

Fare bags are  put in separate bins, and the bins are marked common fare, and then put

in the cooler. Frank deposition at 40-41. Exhibit H,O & P.

140.     When a food truck pulls into MacDougall,  staff  opens the back door of the trucks,

take the  temperatures of the food items; the food is pushed out and received at  the rear

door by their food service staff.  The common fare is put on one wagon, marked, and it

is  taken into their separate coolers. Frank deposition at 41. Exhibit H,O & P.

141.     Common Fare meals are   assembled and then placed in  individual trays so that it

remains separate.      After it is taken out of the cooler in the morning it is  reheated.

Staff have separate pans set aside for common fare; staff have separate utensils  set

aside.  Once the water is boiling, staff does not take the product out of the bags, but

rather the entire sanitized bag with the product inside is placed in the water, heated to its

temperature of 180 degrees, or anywhere from 148 degrees up.  If it is a dining room

setting, staff heat all of it to be at 180 degrees.  At this point, staff is still not    taking it

out of the bag, but rather folding the bag, putting a     thermometer in the center of it to

read the  temperature.  After the temperature is up to the required heat per health and

safety codes,  then the bags are opened and the common fare food items are placed   into a hotel pan that is utilize  only for common fare. The pans are  marked.  Staff then put the  food in the pans which are put into a hot unit, a hot box, or steamer to keep hot. When it is time to serve portions and assemble the individual trays, staff then take it to the serving  line marked common fare and served. Frank deposition at 41-42 Exhibit H, O & P.

142.　　Common fare trays assembled in a  particular order  to keep them, separate from the regular general population meals and to eliminate the chance of cross contamination. All common fare normally is done at one time. It is done for   two reasons, to get them all through so you don't have   to keep changing from one to another, and also lack of bin space.  Even if  DOC did have the bin space, staff wouldn't mix the two types of meals in the assembly  line, because to assure separation it is necessary to have the same Common Fare meals going through the line at the  same time, the same product. Frank deposition at 42 Exhibit H, O & P.

143.　　This method of Common Fare tray assembly absolutely eliminates the risk of cross contamination because the other food are not even present on the line. Frank deposition at 43. Exhibit H, O & P.

144.　　DOC food service has a quality assurance program in which regular audits are conducted. There are five food service managers who are  in facilities during the meal times at least  two times a month, sometimes three and four times a month overseeing the food service operation. They do site visit reports.  We also have a full annual audit that we do that we score them and that is done once a year.  Mr. Frank himself and the present Food Service Director, Mr. Bibens are   in and out of facilities. They send

different management teams in to   check the different areas to make sure DOC does not have any  compliance problems, making sure that food service staff are following the rules that DOC sets forth.  These management teams do site visits at least two times a month, sometimes three and four times a month overseeing, they do site visit reports. DOC  also has Father Bruno's group who do audits;  DOC has religious people touring, coming in to see the food service operation, coming down to the cook-chill plant; they're in there quite often just checking to make sure that what  we're telling them we're doing. Frank deposition at 43. Exhibit H,O & P.

145.   Mr. DeVeau is not only a dietitian, but he  is one of the regional food service managers. His responsibility is  four facilities that he has to go in there two times, once, twice, three times a month checking, making sure the procedures that DOC has set forth they're following, such as the procedure for common fare.    Mr. DeVeau has no authority or personal involvement at MacDougall and he has no authority delegated by the Commissioner of Correction with regard to the overall design and implementation of the food service operation for the Department of Corrections. Frank deposition at 44.  Exh. H, O & P; Exh E & K

146.   Both New York and the Connecticut DOC conducted studies of the feasibility of providing Halal meat. The conclusion of that extensive study was that the Halal meat and Halal slaughterhouse operation was  not cost effective, indeed, prohibitively expensive.  At present, despite numerous inquiries and due diligence in investigating the availability of Halal meat,  I am unaware of any steady, available supply of Halal meat, available at the same per diem costs which have been appropriated to the DOC for food service.  Frank affidavit, Dec. 2006, ¶7. Doc. # 110; Exh H.

147.     Even if there were a ready, available supply of Halal meat, there is no present kitchen
in DOC capable of separately handling, storing, and preparing such meat.  If the
Connecticut DOC had to keep such a "halal" operation completely separate, it would
require the construction of a separate Halal or Kosher kitchen at a cost of approximately
$5,500,000.00,  five and one half million dollars.  This would just be for the cost of the
construction of the kitchen building.  In addition, the cost of fitting the kitchen with
proper equipment, fixtures, and other necessary improvements would cost another three
million dollars, approximately.  The funds for such an operation are not within any
budget option or within the present appropriation of the DOC.  These funds would have
to be bonded, and would not, in my opinion, result in an improved food service
operation.  Instead, it would likely lead to dramatic administrative burdens, likely
increased confusion and mix-ups in ordering, and delivering meals, which would have
to be delivered in separate trucks, not included in the above costs, and would be
completely counter productive to the simplified and efficient, as well as cost effective,
food service operation presently utilized by DOC.  Frank affidavit, Dec. 2006, ¶8. Frank
deposition 96-97 [ testifying there is no present space for storage or production of Halal
meat]; Exh. H, O & P; Exh E & K

148.     The cost of Halal meat is significantly more than regular meat. For example, with regard
to chicken, with the cost of Halal chicken about double the cost of regular chicken.
Costs vary and when costs were low, a regular portion was 26 cents and a Halal portion
was 52 cents. When costs were high, regular chicken was 47.4 cents and Halal chicken
was 91.6 cents. In any event, there is no money in the budget for such Halal meat, and
there is no practical way in terms of staff, production time, freezer and storage  space,

preparation space, separate pans and utensils to produce separate Halal meals with Halal chicken. Frank deposition at 116-122. Exh. H, O & P;

149.     At the time when DOC was investigating the cost of Halal chicken, DOC learned that a Halal chicken patty cost 2 to 3 times higher than a regular chicken patty. Moreoever, visually, there is no visible difference between such a Halal item and a regular item. The chance for confusion, mix-ups, confusion  and cross contamination is much greater if such a similar looking product is used. Frank deposition at 230 -231 Exh. H, O & P;

150.     DOC provides over one and one half million meals, closer to one million eight hundred thousand meals every month. When producing meals at this volume, the costs of adding Halal meat products becomes cost prohibitive. Moreover, the Common Fare meals have been well accepted by the inmate population for more than ten years, perhaps as many as fifteen or more  years, with very few, minor complaints. When considering that the Common Fare meals are hot, nutritionally equivalent to the regular menu and consistent with religious scruples of both Muslim inmates and Jewish inmates, it has been a very successful food service operation, which is both consistent with safety and security, and superior to the cold Kosher meals which are served in NY DOCS. See Frank deposition at pp. 237-239. According to Mr. Frank, what DOC does under Common Fare is the best system for delivering meals to inmates who wish to keep Kosher and maintain Halal dietary standards. Frank deposition at 239-240. Exh. H, O & P;

151.     To Mr. Frank, who had 30 years experience in NYDOCS, the Common Fare food program is "the best route, the best way to go." Frank deposition at 240.   This conclusion is based on the fact that Common Fare has been institutionalized for more than ten years and is very well accepted by the inmate population. Id. It uses easily

available food sources which keep costs in line with the DOC's budgetary constraints, and provides the same equivalent nutrition to the regular menu, while at the same time avoiding all foods which are religiously unacceptable. Accordingly, Mr. Frank concludes that Common Fare "is the best way to go." Id. Exh. H, O & P;

152.   Mr. DeVeau is not only a dietitian, but he  is one of the regional food service managers. His responsibility is  four facilities that he has to go in there two times, once, twice, three times a month checking, making sure the procedures that DOC has set forth they're following, such as the procedure for common fare.    Mr. DeVeau has no authority or personal involvement at MacDougall and he has no authority delegated by the Commissioner of Correction with regard to the overall design and implementation of the food service operation for the Department of Corrections. Frank deposition at 44. [2] Exh H, O & P; E & K

153.   It is clear that in the Religion of Islam, meat is eaten.  Muslims are told to eat meat which is Halal.  "Halal" means permissible or lawful. "Haram" means not permissible or unlawful. The Holy Quran tells us as Muslims "Oh you who believe!  Eat of the good things that we have provided for you, and be grateful to god, if it is he you worship." (Quran 2:172). [Hasan Report at 9] Exh. B; Leitner report

154.   Common Fare provides food items which are all permissible for Muslims to eat. There is nothing on Common Fare which is religiously offensive. The Common Fare diet is Consistent with Islamic principles set forth in the following scriptural passages: "Oh

---

[2]  It is the defendants' position that Mr. DeVeau was incorrectly named as a defendant in this case. He has no personal involvement in any decision concerning  Common Fare, other than to assess the nutritional adequacy of the diet when requested to do so by his superiors. He has not held any significant position in management since 1999. See DeVeau deposition at 16:21-25-17:1-4. Thus he lacks the requisite personal involvement to be liable in this case.

you people. Eat of what is on earth lawful and good." (Quran 2:168). Again "Lawful unto to are (all) things good and pure." (Quran 5:5). Again "this day are (all) things good and pure and made lawful unto you." (Quran 5:6). Again "thus have we made animals subject to you, that you may be grateful." (Quran 22:36). The Quran states further that "It is not their meat nor their blood that reaches god. It is <u>your piety</u> that reaches him. He has thus made them subject to you, that you may glorify Allah for his guidance to you and proclaim the good news, to all who do right". (Quran 22:37). Hasan Report at 9; Hasan affidavit and deposition. Exh B & L; Leitner report

155.    Fish is also Halal or lawful. The Quran says "Lawful to you are the pursuit of water-game and its use for food-for the Benefit of yourselves and those who travel." (Quran 5:99). Fish, according to Noah Ha Him Keller:  "It is permissible to eat any aquatic game except frogs and crocodiles."   (Reliance of the Traveler p. 363, J 16.4). Depositions of Vega, "5 Islamic Chaplains," and  Hasan; Exh B & L; Leitner report.

156.    Common Fare provides fish and all permissible foods. This is based on textual support as follows: Keller says again "It is not permissible to eat any animal until it has been properly slaughtered, the only exceptions to which are fish and locust which are permissible to eat even when they die unslaughtered." (P. 364 No. J17.1). Maulana Muhammad Ali supports this view, reporting that "Imar said (RAA) "the game of the sea is that which has been hunted and its food (ta' ām) is that which is cast forth ….. and Ibn Abbas (RAA) said, eat of the game of the sea, whether it is (killed) by a Christian or a Jew or a Magian. (Sahid Bukari 72.12; Manual of Hadith P. 349). Water game or the game of the sea includes rivers, streams, lakes and ponds. [Hasan Report at 9; Hasan

deposition and affidavit; Frank and DeVeau depositions] ;Exh. B, H, L O &P; Leitner report.

157.     Islam is at its heart a simple paradigm that holds that any human being can, and should, engage in a direct conversation with God. There is no need for intermediaries ,interpreters, idols, or statues to be a good and faithful Muslim. In fact, such artifacts are expressly discouraged as a matter of religion. Nor is there is a requirement to lead the life of an ascetic – replicating the daily life, diet, garb, or practices of Muhammad. Islam was born in the sixth century in an area of the world where life was, and still to some extent is, austere, isolated, and nomadic. But Islam has been introduced into and found adherents into many non-Bedouin cultures in part because it has been able to be interpreted to fit within pre-existing cultural milieus. Islam does not require its believers to live as if it were still the cusp of the seventh century. Literalist interpretation that persuades one to live exactly as the Prophet lived stems from one of two paths: 1) A conscious choice to replicate the past in the manner of an ascetic; or 2) A self- or externally imposed fundamental misunderstanding of the religion. The halal meat and miswaak issues fall into this latter category of fundamental (intentional or unintentional) misunderstanding of the religion. For instance, Islam does not command one to eat halal meat. Islam says that if one is to consume meat, it must conform to the halal requirements. In fact, Islamic scholars have stated that Muslims can be vegetarians if they so choose and that vegetarianism is halal -- but they should not regard eating meat as prohibited. Similar dietary requirements are set for Jews in the practice of their considerably older faith. Jews are not commanded to eat kosher meat but rather advised that if meat is to be eaten then it should conform to strict guidelines and practices. As a

result, the demand for halal meat to be served to inmates on the twoIslamic holidays, Eid il Fitr and Eid il Adha,  is without merit from a religious standpoint. Also without merit from the standpoint of religion is the plaintiff's statement that Muslims are not vegetarians, because some are and the religion allows faithful Muslims to be vegetarians. Dr. Leitner expert report at 18-19 (efiled)

**Lack of Personal Involvement**

158.    Robert DeVeau has not held any managerial position of authority with regard to developing or implementing dietary policy in the DOC since 1999, five years prior to the filing of this lawsuit. DeVeau deposition at 16:21-25 – 17:1-4 Exh E & K

159.    Mr. DeVeau is functioning as a district food service manager and he has no role in policy making since 1999. Id. Exh E & K

160.    Mr. DeVeau's one single interaction with plaintiff was his response to a single inmate inquiry  answered July 17, 2003, which took Mr. DeVeau maybe one half minute to respond to. De Veau deposition at pp. 20- 24; Exh E & K; Exhibit  G.

161.    Mr. DeVeau has no authority to change the DOC menu or to change or implement policy with regard to the DOC menu. DeVeau depo at 29:19-25. Exh E & K

**Inability To Purchase Islamic Items For Example, Miswak, Halal Personal Hygiene Products Such As Toothpaste, Soap, Etc.**

162.    The  "General Population Commissary Order Form" notes Halal products and Kasher products .According to this commissary form under food items, there are thirteen entries, including a Halal meat sausage,  that are available for use or purchase by Muslim or Jewish inmates.  Under the Candy section, there are ten entries listed for Muslims and Jewish purchase.  Under Beverage entries, there are thirteen entries

available for Muslim and Jewish purchase.  Under the Cake and Pastry Section, there are eight entries for Muslim and Jewish purchase.  Listed under Cookies and Crackers, there are eight entries for Muslim and Jewish purchase.  Under Chips and Cereal entries, there are three entries.  According to this listing there are a total of thirty-one entries under Food items, of which thirteen can be used.  Under Candy, there is a total of twenty listed, ten can be used.  Under Beverages, there is a total of seventeen listed of which thirteen can be used.  Under Cake and Pastry, there is a total of ten listed of which eight can be used, and Chips and Cereal, there is a total of seven listed of which three can be used. See Commissary Order Form and Hasan Report at 10-11. Exh. B.

163.　　Items such as soap, dental, shave and deodorant, hair care, and skin care products available in the Commissary can be used by Muslims and Jews. Hasan affidavit Commissary Order form; Doc# 110; Exh B & L; Leitner report

164.　　As for Khuffs, or Islamic leather socks,  according to Fazlul Karim, "the Holy Prophet (AS) recommended to use of shoes…because it is most solacing or comfortable to the foot, nevertheless everybody should walk barefooted." (Al Hadis, Book 1, p. 619). It is lawful to use socks, and there is some concession in Wudu or washing when a man has socks on. Rubbing over the socks is sufficient for wudu for three days and three nights for a traveler, and one day and one night for a resident. [Hasan Report at 11} The denial of Khuffs does not in any way burden the practice of Islam. Hasan affidavit and deposition. Exh B & L; Leitner report

165.　　Ibn Boraidah reported from her father that Negus presented the Prophet (AS) two plain black sock, which he afterwards put on." (Ibn Mazah and Tirmizi, Al-Hadis, p. 621). Again, Mughirah-B-Shu'bah reported: "I assisted the Prophet (AS) in performing his

'wudu' act at the Battle of Tabuk. He wiped the top and the bottom of the socks." Abu Daud, Tirmizi, and Ibn Mijah, Al-Hadis, p. 723. Again, some reported " I saw the Holy Prophet wiping the upper part of his socks." (Tirmizi and Ibn Daud, ibid. p. 723) Again "the Prophet (AS) made wudu, and wiped over his stocking and shoes." (Ahmad, Tirmizi, Abu Daud and Ibn Majah, ibid. p.733 no. 184). <u>There is no mention of Muhammad the Prophet (AS) wearing leather socks</u>. There are other reports such as Noah Ha Mim Keller, who reports that footwear does include other materials. Keller states " whether they are leather, felt layers of rags, including thick, heavy wool sock,…" (Reliance of the Traveler, p. e6.3). It is permissible to pray bare footed; it is permissible to pray with socks on, and also permissible to pray with your shoes on in certain situations. [Hasan Report at 11-12; Hasan deposition] Exh B & L; Leitner report.

166.     As to plaintiff's claim for a silver  ring,  the denial of such ring does not in any way burden his practice of Islam. According to Fazl Karim, "Ornaments of all kinds are haram or (unlawful) for males except seal-rings…and the seal of the Holy Prophet (AS) was of silver, and its lining was made thereof." (Al Hadis, Book 1, pp. 621 and 624, no. 76). Again Anas B. Malik reported, "I saw one day in the hand of Allah's messenger (AS) a silver ring; so the people also got silver rings and wore them. Then Allah's messenger (AS) discarded his ring, and the people also discarded their rings." (Sahid Muslim, Vol III. B, p. 400, no. 2093). Some scholarly opinions are, that as far as the silver ring is concerned, wearing it is permissible, but other scholars say that it is not desirable because the Holy Prophet (AS) wore it as a necessity, since he used it as a seal, for the letters he sent to non-Arab kings and Emperors, as we find in many Hadiths. That is why Muhammad the Prophet (AS) forbade his followers to engrave

their rings like that of his. His was an official seal and the Muslims were prohibited to imitate its patterns.  [Hasan Report at 12; Hasan deposition]; Exh. B, L & Leitner report

167.   Another explanation is that the Prophet (AS) had been wearing a gold ring, and he discarded it, and wore a silver ring instead. The people came to know that the use of a silver ring was permissible, and they therefore discarded the gold rings. In another explanation, is that the Holy Prophet (AS) stopped wearing the silver ring so that the people may not get accustomed to wearing it. [Hasan Report at 13; Hasan deposition]

168.   What we learn from these reports are, that these Hadiths pertaining to the use of gold and silver, are that according to Sahid Muslim, "are things of luxury, the use of which is prohibited in Islam, especially for men." (ibid. p. 401). The Holy Prophet (AS) used the ring with the words " Muhammad Rasul Allah" upon it. The Prophet's (AS) followers by using his example decorated their fingers by wearing silver rings. Sahid Muslim states, "The Holy Prophet (AS) did not approve, as it was a matter of necessity, or expediency, because he didn't want the ring to be used as an article of luxury." (ibid. p. 401). [Hasan Report at 13; Hasan deposition]; Exh B. & L

169.   The Prophet (AS) therefore took the ring off his fingers, in order to show them, that it was not something cherished by him, and the Muslims, having learned his attitude, pulled off their rings. Sahid Muslim states again, " It should be made clear that the use of the ring is no doubt permissible, for men, but keeping in view, the spirit of the Shariah, or Islamic law, it is not something commendable." (ibid. p. 401) [Hasan Report at 13; Hasan deposition] Exh. B & L.

**Oils And Fragrances, And Miswak:**

170.    The oils that are available in the commissary for use by inmates are oils which are permissible for Muslim use.  These oils do not contain any ingredients which are not permitted, and have been reviewed and approved not only by me, but also by Islamic Authorities outside of the Department of Correction.  See Memos dated February 21, 2001 and April 28, 2006, of Imam Rushdan, previously provided. [See Hasan Report at 13-14; Rushdan affidavit;].Exh. I;  Doc. #110; Exh B, L & Leitner report

171.    The wearing of oils or the use of the Miswak (toothstick) is permissible, if it is available. Such use is optional and the denial of such items does not substantially burden the practice of Islam. This conclusion is based on textual references as follows: Abu Sa'id Al-Khudri (RAA) narrated that the messenger of Allah (SWA) said "taking a bath on Friday, using the Siwok (tooth stick) and wearing the available perfume are duties of every adult."  (Sahid Al-Bukari, Vol. 1, p. 237, no. 405).  The Prophet's wife Aisha narrated (RAA) "I use to perfume Allah's Messenger (SWA) with the best scent available, till I saw the shine of the scent on his head and beard".  (Sahih Al-Bukari, Vol. 1, P. 430, no. 5923).  The Prophet's wife in another report narrated "I use to perfume the Prophet (SWA) before his assuming the state of Ihram, with the best scent available.  (Sahih Bukarr, Vol. 1, P. 431, no. 5928) Abu Said reports "I hear witness to the Messenger of Allah (AS) saying "It is incumbent on every one who has attained to property that he should take a bath on Friday and that he should use the tooth-brush and that he should use scent, if he can get it".  (Sahid Al-Bakari 11:3, Miulana Muhammad Ali, Manual of Hadith, P. 162, no. 8. The last four references states, "If he can get it," and "the available perfume", the obvious question is, "Does it make you less of a

Muslim if you wear the oils or not wear the oils?  The obvious answer is, not wearing the oils will not make you a lesser Muslim. The same applies to miswak. It is permissible if it is available, but not using a miswak does not make one a lesser Muslim. [Hasan Report at 13-15] Exh. I;  Doc. #110; Exh B, L & Leitner report

172.    The Department of Correction, State of Connecticut has satisfied the request of the Muslim inmates by making these oils available prior to February 21, 2001. See Memos dated February 21, 2001 and April 28, 2006, of Imam Rushdan, previously provided. [See Hasan Report at 15; Rushdan affidavits]  Exh. I;  Doc. #110; Exh B, L & Leitner report

173.    The plaintiff's demands to have access to miswaak oral hygiene sticks also lack a significant religious basis. The miswaak, depicted in Figure 1 in Dr. Leitner's report, is a natural toothbrush made from the twigs of the Salvadora persica tree. Other tree types that are used are the arak tree, peelo tree, olive, walnut, and other trees with bitter roots. See Figure 1 in Dr. Leitner's Report. The use of the miswaak is referred to many times in the personal hygiene portions of the Koran as a dentifrice that affords the user many important personal hygiene and health benefits. There are no documented benefits accruing to the use of the miswaak in place of a standard contemporary toothbrush or toothpaste. The miswaak simply represented state-of-the-art oral care technology in the fifth and sixth centuries and was simply the best available to inhabitants of the Arabian deserts at that time. In fact, dental care technology has progressed significantly in the ensuing 1,500 years. While using the miswaak in that era was sound medical advice and part of a long series of recommendations in the Koran on how to live well, it is entirely optional to those with access to many better alternatives in the modern world. This is not

a religious issue unless one is attempting to live a truly ascetic -- a personal choice that the prison system is in no way obligated to support. The disingenuous and hypocritical nature of such demands stands out starkly when the proponents enjoy the use of televisions, CD players, audiotapes, modern medical procedures, eyeglasses, air conditioning, and other modern conveniences not described in the Koran. Facilitating a prisoner's ability to purchase these items is not the responsibility of the prison managers and if allowed is tantamount to recognition of their religious importance. The next lawsuit would be an inmate demand for the taxpayer to furnish these non-religious or religious trappings free of charge. Leitner report at 20-21. Exh. I;  Doc. #110; Exh B, L & Leitner report

174.　　The oils plaintiff claims are unavailable for purchase through the DOC are optional items used to practice the Islamic faith, and are not requirements of that religion. Many Muslims do not use oils.  There is no "must" requirement in the religion regarding the use of oils, but rather an individual option or choice.  DOC commissaries provide oils that are alcohol free and free of animal by-products, and that have been reviewed and approved by Islamic authorities. The DOC has obtained affidavits of purity and acceptance with regard to the oils sold in commissary from Imam Wali W. Rushdan, Sr., who certifies that the manufacturing procedures and products for the DOC vendor have been approved, and that strict quality control procedures are maintained during all phases of production.  Further, the Imam has determined that the oils do not contain alcohol or animal by-products, and contain both natural and chemical ingredients .[3]

---

[3] In attempting to identify alternate vendors, and inquiring about ingredients, we were often told that the products sold are exclusive and patented, and that the FDA considered the formulas to be trade secrets not required to be disclosed.

Although Imams do not provide oils at Jumah to inmates, inmates who have not

purchased oils are not excluded from Jumah.  However, inmates who wish to use oils

may do so by purchasing them in the commissary. Hasan expert report at 10-11. Exh. I;

Doc. #110; Exh B, L & Leitner report

**Improper Handling Of Quran And Other Sacred Books:**

175.     It is incorrect to claim that only Muslims can touch the Koran. [Hasan deposition] The

Quran speaks of itself as: that this is indeed a Quran most Honorable In a Book well

guarded; which none shall touch but those who are Clean a Revelation from the Lord of

the worlds.(The Holy Quran. Chapter 56, Verses 77 to 80). Yusuf Ali writes, "the Quran

is a revelation described by four characteristics:

> It is most honorable and it confers great favor on those who receive it;
>
> It is well guarded, precious in itself and well preserved in its purity;
>
> None but the clean shall touch it, clean in body, mind, thought, intention and soul:  only such ones can achieve real contact with its full meaning;
>
> It is a revelation from the Lord of the worlds."(FN.5260)[Hasan Report at 15-16]

176.     Other scholars say that the Quran is a well preserved book and only those believers who

are pure at heart can have access to its spiritual treasures.  Others say that the Quran is

preserved in the nature that Allah has bestowed upon man, and the human nature is

based upon fundamental truths and has been endowed with the faculty to arrive at right

judgment.  A person who honestly calls human nature into action can easily recognize

the truth of the Quran.  Commentaries stress that only the lucky ones, by leading

righteous lives, achieve purity of heart and are granted true understanding and insight

into the real meaning of the Quran of which the impure at heart are denied access. [Hasan Report at 16; Hasan deposition]. Thus, the plaintiff's extreme, literal reading of the requirements for handling the Quran are incorrect, as demonstrated below:

177.   We are told on a personal level that we should not touch the Holy Quran or read it, if we are not physically clean.  We are advised, not to eat or drink over the Quran, to respect the Quran more so than any other book, to say,  "I seek refuge in Allah from the rejected enemy Satan," before reading it, and place it in the highest part of the our highest shelf in our homes, so that we have to reach up to it. Hasan Report at 16 and deposition; Exh B & L; Leitner report

178.   This 56 Chapter and 79the verse is understood to mean, that only the pure at heart of the believers can reach its meaning.  This is the spiritual meaning. It is very different to accept that it is referring to people who physically touch the book, because according to Ibu Kathir "In this life the impure Zoroastrian and the filthy hypocrites touch it"  (Tafir Ibn Kathir Vol. 9, p. 449, Para 6). Hasan Report at 16-17; Hasan deposition. Exh B & L.

179.   We cite these truths, and it is obvious that non-Muslims handle the Quran, based on the following: - the Abdullah Yusuf Ali's translation of the Quran was published by the Islamic Center in Washington, DC and printed in the United States.

180.   The Glorious Quran, translated by Muhammad Marmaduke Pichthall is distributed by the Muslim World League, UN Office, in New York, New York.

181.   The Holy Quran, published by Tahrike Tarsile Quran Inc., second edition 1983 was published in Elmhurst, N.Y.

182.   The Holy Quran, published by the London Mosque, was printed in Great Britain at the Alden Press, Oxford, England, and

183.    The Reliance of the Traveler by Noah Ha Mim Keller, of which some of them were published in Evanston, Illinois.

184.    Islam in Focus, by Hammudah Abdalati was published in Takoma Park, MD (1977)

185.    The Manual of Hadith, by Maulana Muhammad Ali, published by the First Olive Branch Press, in Brooklyn, NY (1988)

186.    Tafsir Ibn Kathir, Volumes 1 through 9, some of them published in Houston, TX.

187.    All of these books and more are sold, handled and can be ordered through Barnes and Noble, through computer sources, other bookstores, and all of the person involved in the publishing, packing, shipping, etc, are handling these Qurans and holy books and they are not all Muslims or believers in Islam. [Hasan Report at 17-18] Exh. B.

188.    Ibn Kather continues in this report of the Quranic verse "which none touches but the pure ones," because this is "the book that is in heaven," and again he says "which none touches but the pure ones " and that the pure ones means, "the Angels." – Tafsir Ibn Kathir, p. 449, para. 4 and 5.  Many Muslims believe that there is no physical, tangible book in heaven, and the Book that is referred to is the speech of Allah, or the words of Allah. As stated above, this does not mean that someone should handle the Quran with dirty hands or with hands that contain some type of residue. With respect to any property that belongs to someone else, it should be handled with care and respect. Muhammad the Prophet (AS) has said… Surely Allah has made sacred to you, your blood, and your property and your honor…" Sahid Bukari 25:132, Manual of Hadith p. 380, no. 15. Muslims believe that the Holy Quran is the word of G-d, and should be respected above all other words. [Hasan Report at 18] Exh. B. & L.

**Circumcision**

189. The general definition of circumcision is said to mean to cut off the excess flesh or foreskin of the male genital organ with a razor or other sharp instrument. This circumcision was promoted with a view to remove uncleanliness and impurities that may lay hidden under the cover of this excess flesh of the organ. According to Hughes, "circumcision is not once alluded to in the Quran." The omission is remarkable and Muslim writers do not attempt any explanation of it. It is held to be Sunnah or founded on the customs of Muhammad the Prophet (AS) and dating its institution from the time of the Prophet Abraham. There is no authentic account of the circumcision of Muhammad, but it is asserted by some writers that he was born circumcised." (A Dictionary of Islam, p. 57) This is, however, denied by other scholars. In Sahid al Bukari, a short chapter is devoted to the subject of circumcision, in which there are three traditions. [Hasan Report at 18-19]; Exh B & L; Leitner report

190. The three traditions are described as follows:Hughes continues "Abu Hurairah relates that the Prophet said, one of the observances of Fitrah is circumcision. Hurairah further states that the Prophet said Abraham was circumcised when he was eighty years old. Sa'id Ibn Jubair relates that it was asked of Ibn Abbas, How old were you when the Prophet died? He said I was circumcised in the days when it occurred. And Jubair says, they did not circumcise in those days until men were full grown." Ibid. p. 57. Hasan Report at 19; Exh B & L; Leitner report

191. It is optional for adult male converts to be circumcised. This is based on scholarly texts including the following: Glasse reports that circumcision " is a custom rather than a legal obligation. In Southeast Asia it is called simply "Sunnah," or custom…"

Circumcisions are the occasion for the sacrifice of a sheep or another animal in Africa or the Middle East, and for other festivities elsewhere. However, because of the expense of the procedure and festivities, circumcision is sometimes simply not performed on the poor. Because it is Sunnah, it is not required by the Shariah." (The Concise Encyclopedia of Islam, p. 87).Circumcision is recommended to be performed on a boy between the ages of seven and twelve but it is lawful to circumcise a child seven days after his birth. Hughes states, "In the case of a convert to Islam, from some other creed, for whom the operation may be an occasion for great suffering, it can be dispensed with although it is considered expedient and proper for all new converts to be circumcised. In all cases, an adult is expected to circumcise himself, as it is a shame for an adult person to uncover himself to another." Ibid. p. 57.  Hasan Report at 19-20; Exh B & L; Leitner report.

192.    Glass on this same point states that "Circumcision is not obligatory upon converts." (p. 87). For the young boys, the barber is generally the person employed for this operation. To add to previous mentioned reports "Yahya B. Sayeed reported that he heard Sayeed-B-Musayyeb say: (RAAH) that Abraham the friend of the Merciful was the first man who entertained guests, and the first man who underwent circumcision…" Al Hadis, Vol. 1, pp. 737 and 738 #216.  Hughes states "According to several Muhammadan doctors, there were seventeen of the Prophets born in a circumcised state, namely: Zakariya, Shis, Idris, Yusuf, Hanzalah, Isa, Musa, Adam, Nuh, Shuaih, Sim, Lut, Salih, Sulaiman, Yahya, Hud and Muhammad. (p. 57). Hasan Report at 20; Exh B & L; Leitner report.

## **DISCRIMINATION**

193.　　There is no evidence of purposeful discrimination. In conclusion, when Imam Hasan began in 1978 there were only four hours of volunteer services for Muslims. There was virtually nothing in the Department of Correction (DOC) for Muslims. Over time there are now a variety of programs, including but not limited to weekly Jumah, Taleem study classes, Arabic classes, Muslim newspapers, religious books, tapes and CD's, individual prayer rugs, institutional changes in the DOC to provide large rooms for Jumah, with large prayer rugs provided by DOC, Halal food items and Muslim articles such as kufis and prayer shirts in the commissary, a Common Fare food program, a month of Ramadan with DOC changing daily schedules to permit feeding after sunset, and bagged meals before dawn, Eid holiday meals and other accommodations for Muslims. Overall there are broad opportunities to practice the Muslim religion in the DOC and to the extent that DOC policies prevent or burden certain practices, none of the burdens alleged in this lawsuit are substantial burdens on the practice of the religion of Islam. Rather than an atmosphere of discrimination, there is an atmosphere of diversity and respect for all religions on a reasonably comparable basis. The religion of Islam has grown enormously in DOC and the DOC has provided resources, practices, policies and procedures which has promoted such growth, while at the same time providing rules for discipline, safety, security and order which are necessary to promote a safe environment so that religious programs and practices can be held safely for everyone. Exh. B, D, L , M, N, Q & R

194.     Prison-based Muslim converts and devotees are often culturalist Muslims, who identify with Islam based upon certain appealing cultural values, messages, and symbols but lack an intimate understanding of the religion per se. They are able to seize upon distinct cultural artifacts associated with, but secondary to, the religion and often construct a political agenda that depends on a list of grievances that they attribute to religious discrimination. This is not a new phenomenon. Doing so usually betrays the extent of ignorance of the tenets, doctrine, and core belief system of the religion being so zealously guarded by its advocates. It is a sad paradox for those who honestly think they are champions of the faith but fail to differentiate cultural trappings from the core values of religion that they end up doing a disservice to fellow *self-styled* believers. This appears to be most commonplace among prison populations as ill-conceived ideas, thoughtless behavior and the lack of self-discipline contributed toward placing them behind bars in the first place. Unfortunately, this same pattern appears to present itself even when these people adopt a new, or renewed, religious identification. Dr. Leitner expert report at 17-18

**195.     The opportunities of Muslim inmates to worship and receive ministry compare more favorably to other faith groups within the Connecticut Department of Correction.  See  Bruno expert report at 1. Exhibit D.**

The ratio of Islamic chaplaincy minutes to the number of Muslim inmates demonstrates that Muslim inmates receive more direct ministry attention than many other faith groups within the Department of Correction, including the Catholic, Protestant, Native American and Jehovah's Witness faiths.  As of March 15, 2007, the following breakdown applied:

|            | CHAPLAIN HOURS PER WEEK | CHAPLAIN MINUTES | NUMBER OF INMATES | MINUTES PER INMATE |
|------------|--------------------------|------------------|-------------------|---------------------|
| Protestant | 712 x 60                 | 42,720/          | 8061              | 5.29                |
| Catholic   | 560 x 60                 | 33, 600/         | 5077              | 6.61                |

| Islamic | 421 x 60 | 25, 260 | 1541 | 16.39 |
| Native American | 53 x 60 | 3, 180/ | 573 | 5.54 |
| Jewish | 35 x 60 | 2,100/ | 114 | 18.42 |

196.     Each Muslim inmate receives an average of 16.39 chaplaincy minutes per week from DOC Islamic chaplains.  This is in excess of the average chaplaincy minutes per week received by inmates of the Catholic, Protestant, Native American and Jehovah's Witness faiths.  Although the ratio of chaplain minutes is higher for Jewish inmates, this is due to the significantly fewer number of Jewish inmates within the system.  Indeed, there are 1,427 more Muslim inmates within the DOC, and only a difference of approximately 2 minutes in chaplain time.  Further, the working chaplain minutes for the DOC's rabbi include time commuting among facilities, during which direct ministry does not take place.  Because there are more Islamic chaplains, each facility has an Islamic chaplain assigned, and their chaplain minutes represent direct ministry. Bruno expert report at 2. Exh. D.

197.     Contrary to plaintiff's allegations that Muslim inmates are subject to discrimination regarding religious practices, the data clearly demonstrates the contrary.  Indeed, the opportunities of Muslim inmates to worship and receive ministry compare more favorably to many other faith groups within the Connecticut Department of Correction. Bruno expert report at 2. Exh. D.

198.     **Safety and security policies concerning inmate worship are applied equally and consistently to all faith groups within the Connecticut Department of Correction.** Plaintiff claims that Muslim inmates should be allowed collective prayer five times daily.  However, staff chaplains are unavailable five times per day in any institution, and no collective religious activity is permitted without a chaplain or approved religious

69

volunteer.   Chaplains or authorized volunteers assure that the group maintains a legitimate religious focus and is not assembled for some other purpose which violates facility rules and/or presents a danger to safety and security, such as gang activities. This demand for collective prayer five times a day would disrupt the orderly operation of our facilities.   There is a policy and provision for individual, private prayer. Bruno expert report at 2-3. Exh. D.

199.     The DOC does not allow inmate chaplains because this leads to major security problems. These groups tend to generate an alternate authority structure within the prison system, which disrupts the power dynamics.   Allowing inmates to assume positions of authority would inevitably lead inmates to disregard staff, disrespect staff authority, and follow their own inmate religious leader.   The prohibition on inmate-led prayer applies across the board for all religious denominations.   Paragraphs, 6b, 6d, 6e of DOC Administrative Directive 10.8 (attached) apply to all faith groups, and are provisions for the safe, secure and orderly functioning of facilities.   They do not discriminate based on religion.  Bruno expert report at 3. Exh. D.

200.     Although plaintiff claims that Muslim inmates are discriminated against because a collective Jumah service is not allowed absent an Islamic chaplain, or Imam, that rule is the same for every faith group.  For example, if the Catholic priest is ill or on vacation and a substitute cannot be found, then Catholic Mass will be canceled.  The same is true for Protestant worship, Native American worship, Jewish worship and the Jehovah Witness weekly service.  Plaintiff particularly points to Native American smudging as an example of collective religious activity allowed by DOC absent staff leadership. This claim, however, is incorrect because smudging is not a collective activity.  Native

American smudging is individual, and is the equivalent of individual prayer for a Muslim in his cell.  Because smoking and fire materials are not permitted inside the building, Native American inmates individually smudge outside once per day.  In fact, certain Native American inmates had filed a lawsuit demanding seven daily smudgings, and that was reduced to once per day for reasons related to safety, security and order.  There is no inmate leadership involved with smudging – which is the critical issue.  Whenever Islamic persons gather for collective prayer, there is always a "leader" and the "leader" is always the Imam.  We do not allow inmate Imams for the safety and security reasons outlined.  Bruno expert report at 3-4. Exh. D.

**There Is No Discrimination Regarding Holiday Meals**

201.   Providing Muslim inmates with Halal meat, either donated or on the Common Fare diet poses safety, security and health risks.  Bruno expert report at 5 Exh. D.

202.    Allowing donated Halal meat without appropriate safeguards would present a safety, security and health risk to the facilities as has been the case in the past.  See discussion below.  Further, plaintiff's claim that Halal meat is necessary under the Islamic religion is incorrect.  The foods provided on the Common Fare diet are acceptable for Muslim inmates who wish to meet the dietary obligations of their religion. Bruno expert report at 5. Exh. D.

203.   All inmates of a particular religious denomination in the DOC should receive the same foods during religious observances.  Otherwise there is the appearance of favoritism, and inmates in one institution would feel they are being treated unfairly compared to those in another institution.  It is a matter of equity.  This is particularly so because

appearance of favoritism is a volatile issue in an institutional environment, which can lead to inmate unrest.  Bruno expert report at 6. Exh D.

204.   Further, DOC Food Services maintains rigorous health and safety standards in cooking and serving meals for inmates.  The risk of illness to inmates attributed to contaminated food is minimized if all food comes through our food services unit.  Fr. Bruno has been advised by Mr. Robert Frank, Chief of Food Service, that donating foods violates food safety standards, and is inconsistent with state requirements for institutional food service, commonly known as HACCP (Hazardous Analysis Critical Control Points). All food served through our Food Services Unit has been procured through appropriate sources, and has met all levels of inspection and approval by the Connecticut Health Department and other responsible agencies.   Furthermore, all foods necessary for Chaplains to conduct their essential worship services or programs can be provided through DOC's Food Services Unit.        The current policy, effective January 1, 2006, provides that all food necessary for all essential worship services and programs will be provided through the DOC's Food Services Unit only.  The food served will meet religious dietary requirements. Bruno expert report at 6. Exh D

205.   Non-approved food brought into a facility is considered to be contraband.  A Chaplain was dismissed in 2005 because he attempted to bring a large amount of contraband food into a facility.  The unauthorized items were not properly sealed, there was no assurance that they had been properly stored and prepared, or kept at safe temperatures. Moreover, he was found guilty of undue familiarity in contacting inmate families to provide funds for the food, and in meeting with them several times.  This undue familiarity is a serious safety and security concern. Bruno expert report at 6-7. Exh D

206.    By way of another example, several years ago, prior to 1999, all the food that the Islamic Chaplain at Walker Correctional Institution attempted to bring into the facility for the Eid feast was rejected.  I worked at MacDougall Correctional Institution at the time, but supervised the Walker Islamic Chaplain.  As Fr. Bruno recalls, the food was not properly sealed and there was no quality assurance.  The food services unit rightfully refused to serve it, concerned about spoilage, food contamination, and potential food poisoning.  Bruno expert report at 7. Exh D

207.    In 2004, this same Chaplain was given a five-day suspension for conveying unauthorized food into that same facility for an inmate.  This was in conjunction with Black History Month.  This same Chaplain also attempted to include soda or punch with the items he wanted to bring into the Carl Robinson Correctional Institution for the Eid-ul-Fitr, this year.  The Warden did not allow the items into the facility.  There would be no attempt to bring unauthorized food into an institution, if there was no food coming in at all from outside sources.  Bruno expert report at 7; Exh D

208.    Further, having all food come from DOC sources frees security staff for other duties more in line with their job requirements.  They are not required to "escort" food from the gatehouse to the kitchen.  Food services staff would not become entangled in the preparation of meats for which there is no record of adequate storage, refrigeration, and quality, and for which there would be tremendous liability if the food caused illness on a large scale. Bruno expert report at 7; Exh D

209.    Contrary to plaintiff's claim, the Common Fare diet is religiously acceptable for Muslim inmates even absent certified Halal meats.  On January 11, 2006, Fr. Bruno met with Imam Hasan and Mr. Robert Frank and his staff and was assured by Imam Hasan that

fish is "Halal," and therefore completely permissible for Muslims to eat for the Eid-il-Adha meal and the Common Fare menu.  For many, many years, as long as Fr. Bruno can recall in his experience in the DOC, Muslim inmates in all DOC facilities have been provided holiday meals for the Eid-il-Fitr and Eid-il-Aha, and have been provided fish and other food, all of which are permissible for Muslims to eat. Bruno expert report at 7

210.   Plaintiff's claim that the Common Fare menu violates the dictates of the Islamic religion because it does not include certified Halal meat has no merit.  There is nothing on the Common Fare menu that an Islamic person can not eat.[4]  For example, the Common Fare menu often features fish.  Halal means "permissible"—fish is permissible and thus "Halal."  Indeed the Common Fare menu has already been found acceptable in prior proceedings.  Moreover, many Halal food items (over 40) are available through the Commissary. Bruno expert report at 8; Exh D

211.   As to the claim that the Eid feast <u>must</u> have Halal meat, Eid meals have been celebrated for years in every institution without Halal meat, conducted by competent and faithful Islamic Chaplains.  Fish – among other Halal/permissible items --  is served at Eid meals.  Indeed, Fr. Bruno received a thank you from one of the DOC Imams for wonderful 2006 Eid-ul-Adha meal. Bruno expert report at 8; Exh D

212.    Because of DOC's policy of fair, firm and consistent treatment, all institutions must be provided with the same meal items.  Otherwise, as discussed above, it creates favoritism and security problems if inmates at MacDougall-Walker, CI, for example, are having Halal roast beef, while inmates at other facilities are having fish.  Under some limited circumstances, DOC will allow donated Halal meat.  There must, however, be enough

---

[4]  By way of comparison, the Federal Bureau of Prisons (BOP) does not provide <u>certified</u> Halal meat, either.

donated Halal meat for every Muslim inmate, and the meat must comply with all state

health and safety codes. Bruno expert report at 8-9; Exh D

**The Connecticut Department Of Correction Is A National Leader In Providing Religious Services To Inmates.**

213.     Fr. Bruno is the current President of the American Correctional Chaplains Association

("ACCA").  In that role, he has had the opportunity to learn about, and has recently

surveyed, other correction departments nationally.  The May 9, 2007 survey

demonstrated that Connecticut ranks first in the amount of Islamic ministry coverage for

all reporting states (20 states responded), including larger systems such as New York,

Texas, Michigan and Pennsylvania.  The Connecticut DOC is the clear leader on Islamic

Chaplain to Islamic inmate ratio -- one full time chaplain per every 147 Islamic inmates.

214.     The five highest ratios are:   Connecticut     1/147 Islamic inmates

|  |  |  |
|---|---|---|
|  | New Jersey | 1/197 Islamic inmates |
|  | New York | 1/223 Islamic inmates |
|  | Pennsylvania | 1/475 Islamic inmates |
|  | Maryland | 1/533 Islamic inmates |
| The five lowest ratios are: | Indiana | 1/690 Islamic inmates |
|  | Wisconsin | 1/794 Islamic inmates |
|  | Michigan | 1/931 Islamic inmates |
|  | Arkansas | 1/1031 Islamic inmates |
|  | Texas | 1/1850 Islamic inmates |

Bruno expert report at 11. Exh D

215.     In fact, several state correction systems have no staff chaplains for Islamic inmates,

although they have chaplains for other denominations, for example, Arizona, (1040

Islamic inmates), Virginia (3630 Islamic inmates), Tennessee (400 Islamic inmates),

West Virginia (72 Islamic inmates), Wyoming (12 Islamic inmates), and Maine (8

Islamic inmates).  Indeed, Colorado, South Dakota, Hawaii and Vermont have <u>no</u> paid

chaplains for any denomination.   Three of these states report that they have Islamic inmates:   Colorado (566 Islamic inmates); Vermont (30 Islamic Inmates); Hawaii (12 Islamic inmates).  Exh D

216.    Further, the Connecticut DOC is the clear leader with regard to the amount of time available weekly to Islamic chaplains to minister to Islamic inmates -- 16.39 minutes of Islamic Chaplain time per Islamic inmate.

| The five highest ratios are: | **Connecticut** | **16.39 minutes** |
|---|---|---|
| | New Jersey | 12.26 minutes |
| | New York | 10.78 minutes |
| | Pennsylvania | 5.06 minutes |
| | Maryland | 4.50 minutes |

| The five lowest ratios are: | Indiana | 3.47 minutes |
|---|---|---|
| | Wisconsin | 3.02 minutes |
| | Michigan | 2.57 minutes |
| | Arkansas | 2.32 minutes |
| | Texas | 1.29 minutes |

217.    Further, the Connecticut DOC is the clear leader with regard to the amount of time available weekly to Islamic chaplains to minister to Islamic inmates -- 16.39 minutes of Islamic Chaplain time per Islamic inmate.

218.    The five highest ratios are:

| | **Connecticut** | **16.39 minutes** |
|---|---|---|
| | New Jersey | 12.26 minutes |
| | New York | 10.78 minutes |
| | Pennsylvania | 5.06 minutes |
| | Maryland | 4.50 minutes |

| The five lowest ratios are: | Indiana | 3.47 minutes |
|---|---|---|
| | Wisconsin | 3.02 minutes |
| | Michigan | 2.57 minutes |

|              |              |
|--------------|--------------|
| Arkansas     | 2.32 minutes |
| Texas        | 1.29 minutes |

219.    The current ACCA standard is that there is one full time correctional chaplain in facilities having an average daily inmate population of 500 inmates.  That is, facilities having an average daily inmate population of 500 inmates must have, at least, one full-time chaplain (or the equivalent thereof).  The Connecticut clearly DOC meets this standard.  However, the new standard being advocated by ACCA would require one full time correctional chaplain for every 500 inmates, i.e. a facility having 1000 inmates would require 2 chaplains, 1500 inmates would require 3 chaplains, etc.  This would be a significantly higher standard, if adopted.  Only two states of those responding to the survey already easily meet, and actually exceed, the proposed new ACCA standard -- Connecticut and New York.

The five highest ratios are:    New York        1/423 inmates
                                **Connecticut   1/426 inmates**

                                Pennsylvania   1/606 inmates
                                Arkansas        1/632 inmates
                                Indiana         1/729 inmates

The five lowest ratios are:     Wisconsin       1/766 inmates
                                Virginia        1/932 inmates
                                Tennessee       1/1214 inmates
                                Michigan        1/1256 inmates
                                Texas           1/1515 inmates

If all Chaplains were able to devote all their time strictly to direct ministry to inmates, Connecticut is the clear leader.  If all Chaplain hours were converted into minutes, then Chaplains would have this many minutes per inmate in each of the following correction agencies:

The five highest ratios are:    **Connecticut   5.63 minutes**
                                West Virginia  4.34 minutes

|  | Pennsylvania | 3.95 minutes |
|--|--|--|
|  | Arkansas | 3.79 minutes |
|  | Wyoming | 3.73 minutes |
| The five lowest ratios are: | Maryland | 2.88 minutes |
|  | Virginia | 2.57 minutes |
|  | Tennessee | 1.98 minutes |
|  | Michigan | 1.91 minutes |
|  | Texas | 1.58 minutes |

The DOC also spends a considerable amount in yearly compensation for its staff chaplains.  The most recent annual amount of compensation for staff chaplains involved in direct ministry totals $2,864,915.00.  In addition, the DOC spent $37,393.00 in contractual chaplains.  Thus, the total expenditure was $2,902,308.00 to ensure that DOC inmates receive appropriate and ample pastoral care.

Bruno expert report at 11-13. Exh D.

DEFENDANTS
THERESA C. LANTZ, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, Connecticut 06105
Tel. (860) 808-5450
Fax: (860) 808-5591
Fed. Bar #ct01211
E-mail: steven.strom@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing memorandum in support of summary judgment was filed electronically and served by mail on anyone not able to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System. Copies of the documents submitted pursuant to the Notice of Manual filing were mailed this 11th day of January, 2008, to

William K. Piotrowski
McCarter & English-Htfd
185 Asylum St.
36th Fl.
Hartford, CT 06103-3495

_____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct01211
E-Mail:  steven.strom@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591