UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOE BURGOS VEGA,             :
                                  :
      Plaintiff,         :
                                  :
      v.                 :        CASE NO. 3:04CV1215(DFM)
                                  :
THERESA LANTZ, ET AL.,    :
                                  :
      Defendants.       :

<u>RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

The plaintiff, a prisoner, brings this action against officials of the Connecticut Department of Corrections ("DOC") under the Free Exercise Clause of the First Amendment, the Equal Protection clause and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. He alleges that the defendant prison officials restricted him from practicing his religion. Pending before the court is the defendants' Motion for Summary Judgment, doc. #146.[1] For the reasons that follow, the motion is granted in part and denied in part.

I.   <u>Procedural Background</u>

The plaintiff commenced this action in July 2004, representing himself *pro se*. He filed the operative Amended Complaint, doc. #62, on November 8, 2005.

The plaintiff, a practicing Muslim, is incarcerated at MacDougall Walker Correctional Institution, in Suffield,

---

[1]Also pending are four motions to preclude certain evidence. Because the court finds that none of this disputed evidence is required for a ruling on the instant summary judgment motion, the motions to preclude (docs. #150, 154, 169, 171) are denied without prejudice to refiling at the time of trial.

Connecticut.  (Def's Local Rule 56(a)(1) Statement of Material
Facts, doc. #149, ¶1.)  The remaining defendants are: Theresa
Lantz, the Commissioner of the DOC[2]; Reverend Anthony Bruno, the
DOC's Director of Religious Services; Robert DeVeau, the DOC's
Director of Food Services; and Imam Abdul-Majid Karim Hasan, a
contract chaplain for the DOC.

In September 2006, the court partially granted the defendants'
Motion for Judgment on the Pleadings, dismissing claims as to
several defendants and reducing the scope of claims as to the
remaining defendants. (Doc. #95.)  Among other things, the court
dismissed all of plaintiff's official capacity damages claims.
(Doc. #95 at 22-23, 34-35.)  Plaintiff's claims for injunctive or
declaratory relief against the defendants in their official
capacity survived the Motion for Judgment on the Pleadings, as did
his individual capacity damages claims.

In November 2006, the court appointed counsel for the
plaintiff.  The parties have consented to trial before a magistrate
judge pursuant to 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.  (See
doc. #27.)

II.  Plaintiff's Claims

The plaintiff brings a series of religious exercise claims
under the First Amendment, RLUIPA and the Equal Protection clause.
He alleges that all of the defendants refused to provide him with

---

[2]Since the filing of the lawsuit, Theresa Lantz has retired.
Brian K. Murphy is now the acting Commissioner of the Department of
Correction.

Halal[3] meat as part of his diet (Am. Compl., Seventh Count).  He
alleges that defendants Lantz, Bruno and Hasan also (1) failed to
provide or permit congregational prayer five times daily and did
not allow him to lead other inmates in prayer (id., Second Count
and Eighth Count); (2) regularly cancelled weekly Muslim congregate
prayer service (known as Jumah[4])(id., Third Count); (3) denied his
religiously-motivated request to be circumcised (id., Ninth Count);
(4) permitted correctional officers to mishandle inmates' copies of
the Quran[5] (id., Tenth Count); (5) deprived him of timely Eid-ul-
Fitr congregational prayer during Ramadan[6] in 2002 (id., Fourth

---

[3]Halal is a "Quranic term used to indicate what is lawful or
permitted."  The Oxford Dictionary of Islam, 105 (John L. Esposito
ed., 2004).  When used in the context of dietary restrictions, the
word often refers to "the meat of permitted animals that have been
ritually slaughtered, hunted game over which the name and praise of
God have been recited, and fish and marine life." (Id.) Halal food
is contrasted with prohibited, or "haram," foods, which include
"pork, blood, alcoholic beverages, scavenger animals, carrion and
improperly sacrificed permitted animals." (Id.)

[4]"Salat al-Jumah" is the "Friday congregational prayer."  It
"is held in the mosque and performed in straight lines."  The
Oxford Dictionary of Islam, 276 (John L. Esposito ed., 2004).

[5]The Quran is "the book composed of writings accepted by
Muslims as revelations made to Muhammad by Allah and as the
divinely authorized basis for the religious, social, civil,
commercial, military and legal regulations of the Islamic world."
Webster's Third New International Dictionary (Unabridged) 1255,
1868 (1993).

[6]Ramadan is "the 9th month of the Muhammadan year observed as
a sacred month on each day of which strict fasting is practiced
from dawn to sunset."  Webster's Third New International Dictionary
(Unabridged) 1878 (1993).  The Eid-ul-Fitr, also spelled Id-ul-
Fitr, is "[t]he Feast of breaking the Ramadan Fast, or Lesser
Bairam, celebrated on the 1st of the month of Shawwl: one of the
two major festivals in Islam." Oxford English Dictionary (2d Ed.
1989), available at http://dictionary.oed.com.

Count); (6) failed to provide sufficient calories in Ramadan meals (id., Fifth Count); and (7) effectively denied the purchase or possession of certain religious items conforming to Islamic requirements, such as a toothstick, prayer oils, a prayer clock, leather socks and a silver Islamic ring. (Id., Sixth Count).[7]

III. Factual Background

The following facts are undisputed.  Prison policy requires that collective religious activity be "conducted and supervised by a Department authorized Chaplain or religious volunteer who professes the same religion as the group gathering together." (Administrative Directive 10.8 ("A.D. 10.8" ¶6(B), attached as ex. F to doc. #149.)  Inmates are not permitted to lead collective religious activities and "can never exercise any authority over any other inmate."  (Id., ¶¶ 6(B), 6(D).)  Inmates may not engage in "demonstrative public individual prayer that would disrupt the

_____

[7]The complaint also alleges that the defendants "intentionally, systematically and discriminatorily physically and psychologically abused the Plaintiff because of his faith and his Islamic religion." (Id., Eleventh Count.) The plaintiff's memorandum does not list this as one of his claims or point to evidence in support of it. This claim is dismissed in light of the plaintiff's *in forma pauperis* status. See Barr v. Abrams, 810 F.2d 358, 363 (2d Cir.  1987)("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights"); Clark v. Levesque, 2006 U.S. Dist. LEXIS 25917 (D. Conn. Mar. 17, 2006)(28 U.S.C. § 1915(e)(2)(B)(ii) requires the court to dismiss at any time allegations that fail to state a claim upon which relief may be granted), aff'd Clark v. Levesque, No. 06-2046-pr, 2009 U.S. App. LEXIS 14981 (2d Cir. July 8, 2009); Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009)("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face")(internal citations omitted).

orderly operation of the institution, such as in the work or school area, recreation area, day room, etc." (Id., ¶6(E).) Instead, "[a]ll such prayer must be done privately in one's cell or by one's bed." (Id.)

Congregate prayer is permitted once a week. Prison policy provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations." (Id., ¶6(A).) There is a weekly chaplain-led Jumah prayer for Muslim inmates, but it has frequently been cancelled due to the unavailability of a chaplain or volunteer to oversee it.

The DOC offers various opportunities to Muslim inmates to practice and study their religion. They may attend Islamic study classes and Arabic language classes, and they have access to books and other study materials. Muslim inmates who choose to fast during the month of Ramadan are accommodated with meals served after sunset. Muslim inmates are able to attend two annual feasts known as the Eids. Inmates may purchase certain religious items such as prayer rugs in the commissary, which also offers more than forty Halal food items, including Halal meat sausage.

The plaintiff receives what is known as the "Common Fare" diet, an alternative to the regular prisoner diet. Common Fare includes no meat, meets the nutritional requirements of prisoners and does not contain items that are forbidden by Islam. It is available to members of other religions with dietary restrictions.

It includes fish, cheese and other non-meat sources of protein, and DOC staff follow special preparation, storage and cleaning procedures to ensure that there is no cross-contamination with non-Common Fare foods.  The DOC does not offer Halal or Kosher meat as part of any menu.

IV.  <u>Standard of Review</u>

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "A party opposing a . . . motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'"  <u>Amnesty Am. v. Town of W. Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002) (quoting <u>Celotex</u>, 477 U.S. at 324).

The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.  <u>See</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000).  Moreover, because the plaintiff's Amended Complaint was filed while he represented himself *pro se*, the court reads its allegations liberally.  <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally

construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers")(internal citations and quotation marks omitted).

V.    Discussion

    A.    General Defenses to Plaintiff's Claims

As an initial matter, the defendants raise several general defenses that they say preclude some of the plaintiff's claims as a matter of law.  The court will address these before turning to plaintiff's substantive claims.

    1.    Exhaustion

The defendants move for summary judgment as to certain claims on the ground that the plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a).  (Defs' Mem., doc. #148 at 33-34.)

Section 1997e(a) "mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions." Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2008 U.S. Dist. LEXIS 59098 (S.D.N.Y. Aug. 5, 2008) (citing Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001)).

The plaintiff does not dispute that he failed to exhaust his remedies as to certain of his claims prior to filing suit. Instead, he contends that the defendants waived this defense because the special defense set forth in their answer did not specify which claims were unexhausted.

Plaintiff is correct that failure to exhaust is an affirmative

defense that may be waived if not raised.  See Johnson v. Testman,
380 F.3d 691, 695 (2d Cir. 2004).  However, the defendants did
plead the defense in their Answer.  (See Doc. # 30.)  The plaintiff
offers no authority in support of his argument that the defendants
were required to specify which claims were unexhausted in order to
preserve the defense.

The defendants' motion for summary judgment is granted as to
the following unexhausted claims: untimely prayer at the end of
Ramadan in 2002, lack of adequate nutrition in the Ramadan meals,
and lack of access to leather socks, a prayer clock, hygiene items
and an Islamic silver ring.

            2.   Physical Injury Requirement

The defendants move for summary judgment as to all of
plaintiff's damages claims on the grounds that he has not alleged a
physical injury.  They rely on 42 U.S.C. §1997e(e), which provides
that

> [n]o federal civil action may be brought by a prisoner
> confined in a jail, prison, or other correctional
> facility, for mental or emotional injury suffered while
> in custody without a prior showing of physical injury.

This provision bars prisoner claims for compensatory damages "for
mental or emotional injury for a constitutional violation in the
absence of a showing of actual physical injury."  Thompson v.
Carter, 284 F.3d 411, 417 (2d Cir. 2002).  However, the provision
"does not limit the availability of nominal damages for the
violation of a constitutional right or of punitive damages."  Id.

8

at 418.   Therefore, the defendants are not entitled to summary
judgment as to plaintiff's damages claims on these grounds.[8]

> 3.   <u>Money Damages Under RLUIPA</u>

The defendants next argue that RLUIPA does not allow the
plaintiff to seek money damages against a state official in his or
her individual capacity.[9]

The statutory text permits a plaintiff to "obtain appropriate
relief against a government."  42 U.S.C. §2000cc-2(a).  The term
"government" is defined as: "(i) a State, county, municipality, or
other governmental entity created under the authority of a State;
(ii) any branch, department, agency, instrumentality, or official
of an entity listed in clause (i); and (iii) any other person
acting under color of State law."  42 U.S.C. § 2000cc-5(4).  The
Second Circuit has not considered whether this language permits for
money damages against defendants in their individual capacities.
However, other circuit courts that have considered this issue have
held that it does not.  <u>Smith v. Allen</u>, 502 F.3d 1255 (11th Cir
2007); <u>Sossamon v. Lone Star State of Tex.</u>, 560 F.3d 316 (5th Cir.

---

[8]The plaintiff argues that Section 1997e(e) does not apply to
compensatory damages in First Amendment cases.  Having found that
the plaintiff is entitled to seek at least nominal damages, the
court need not decide at this time whether he may also seek
compensatory damages.

[9]The court previously dismissed plaintiff's claims for damages
against defendants in their official capacities.  (Doc. #95 at 22-
23.)  The plaintiff's claims for injunctive and declaratory relief
against defendants in their official capacities survived that
ruling.

2009).  See also El Badrawi v. Dep't of Homeland Sec., 579 F. Supp.
2d 249, 261 (D. Conn. 2008); Pugh v. Goord, No. 00 Civ. 7279(RJS),
2008 WL 2967904 at *22 (S.D.N.Y. July 31, 2008); Sweeper v. Taylor,
No. 9:06-CV-379(NAM/GJD), 2009 U.S. Dist. LEXIS 27318 at *27
(N.D.N.Y. March 27, 2009).  The Fifth Circuit recently relied on a
Spending Clause analysis in holding that RLUIPA does not create a
cause of action for damages against defendants in their individual
capacities:

> RLUIPA was enacted pursuant to Congress's Spending
> Clause power, not pursuant to the Section 5 power of
> the Fourteenth Amendment. Accordingly, only the grant
> recipient -- the state -- may be liable for its
> violation. Spending Clause legislation is not
> legislation in its operation; instead, it operates like
> a contract, and individual RLUIPA defendants are not
> parties to the contract in their individual capacities.

Sossamon, 560 F.3d at 328.[10]  This court is persuaded by the logic
of Sossamon and Smith and concludes that RLUIPA provides no cause
of action for damages against state officials in their individual
capacities.  Therefore, the court grants the defendants' motion for
summary judgment as to plaintiff's RLUIPA claims insofar as the
plaintiff seeks money damages.

----

[10]Sossamon also held that official-capacity damages claims are
barred by the doctrine of sovereign immunity, because RLUIPA did
not unambiguously put states on notice that their acceptance of
federal funds was conditioned on a waiver of immunity. Id. at 329-
31.  See also Van Wyhe v. Reisch, No. 08-1409, 2009 U.S. App. LEXIS
20235, *27-28 (8th Cir. Sept. 10, 2009); Nelson v. Miller, 570 F.3d
868, 884-85 (7th Cir. 2009); Cardinal v. Metrish, 564 F.3d 794, 801
(6th Cir. 2009).  Because the plaintiff's official-capacity damages
claims were previously dismissed, the court need not consider this
issue.

4.   <u>Lack of Personal Involvement</u>

Defendant Hasan moves for summary judgment based on his lack of personal involvement.[11]  It is settled law in this circuit that in a civil rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation.  <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).  Where a defendant did not personally commit a wrong, courts have recognized that personal involvement can also be shown through evidence that the defendant failed to remedy a known wrong, that the defendant created a policy or custom under which unconstitutional practices occurred or continued, or that the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.  <u>See</u> <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).[12]

_____

[11]Defendant DeVeau also moves for summary judgment as to all claims based on lack of personal involvement.  However, because the court grants the defendants' motion for summary judgment as to plaintiff's Halal meat claim, <u>see infra</u>, the only claim directed to DeVeau, it need not address his personal involvement argument.

[12]The <u>Colon</u> factors have recently been thrown into some doubt by the Supreme Court's ruling in <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S.Ct. 1937, 1948 (2009), which discussed issues of supervisory liability.  <u>See</u> <u>Bellamy v. Mount Vernon Hosp.</u>, No. 07 Civ. 1801(SAS), 2009 U.S. Dist. LEXIS 54141 (S.D.N.Y. June 26, 2009)(under <u>Iqbal</u>, "a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.  The other <u>Colon</u> categories impose the exact types of supervisory liability that <u>Iqbal</u> eliminated -- situations where the supervisor knew of and

Imam Hasan was formerly employed as a chaplain with the DOC, and, since his retirement in 2001, he has served as a contract chaplain.  (Hasan Dep. Vol. I, Pl's Opp., doc. #162 ex. M at 74.) He has no authority to make DOC policy.  (Hasan Dep. Vol. II, Defs' Mem., doc. #149 ex. L at 95.)  The DOC's Director of Religious Services, Reverend Bruno, described Imam Hasan as "our Islamic religious expert who is my right hand man" and "the go-to person for Islamic issues."  (Bruno Dep., Pl's Opp., doc. #162 ex. F at 32.)  The plaintiff's complaint does not allege that Imam Hasan personally acted to limit the plaintiff's rights; rather, it alleges that he acted as an advisor to the other defendants.  In opposition to the motion for summary judgment, the plaintiff argues that "[a]s the lead Islamic voice in the DOC, Imam Hasan has created the customs and supported the policies under which the constitutional violations occurred in this case.  Moreover, Imam Hasan has failed to remedy, or even advocate a remedy, to the constitution[al] violations alleged by Mr. Vega."  (Pl's Mem., doc. #161 at 65-66.)

In response to the summary judgment motion, the plaintiff has pointed to no evidence indicating that Hasan personally deprived the plaintiff of any rights, or that he personally had the power or

_____

acquiesced to a constitutional violation committed by a subordinate"); Estate of Young v. N.Y. Office of Mental Retardation & Developmental Disabilities, No. 07Civ.6241(LAK), 2009 U.S. Dist. LEXIS 78049 (S.D.N.Y. Aug. 27, 2009).  The court need not reach this unbriefed issue in this matter.

authority either to deprive the plaintiff of any rights or to remedy any violation by others.  The court concludes that the reliance on his advice by the other defendants or other DOC employees is insufficient to constitute personal involvement for purposes of constitutional liability.  See, e.g., Tafari v. Annetts, 06 Civ. 11360 (GBD)(AJP), 2008 U.S. Dist. LEXIS 45901, *35-42 (S.D.N.Y. June 12, 2008) (granting summary judgment for lack of personal involvement by a prison rabbi who was alleged to have influenced the denial of plaintiff's transfer request).  The summary judgment motion is granted as to all claims against Imam Hasan. ___

That completes the discussion of the general defenses.  The court now turns to the merits of the plaintiff's religious exercise claims under RLUIPA, the First Amendment and the Equal Protection clause.  The remaining legal claims are those involving Halal meat, congregate prayer, cancellation of Jumah, circumcision, mishandling of Qurans, availability of toothsticks, and nonconforming prayer oils.

B.  Claims Regarding Halal Meat

The plaintiff alleges that the defendants' failure to include Halal meat in the Common Fare diet deprives him of a diet consistent with his religious beliefs.[13]  The Common Fare diet is

_____

[13]The plaintiff's complaint alleges that the defendants permit cross-contamination between regular prison meals and the Common Fare meals. However, the plaintiff has abandoned this claim. In response to the summary judgment motion, plaintiff makes no

vegetarian.   The plaintiff claims that his religion does not permit vegetarianism and requires him to eat Halal meat occasionally.[14] Plaintiff alleges that the lack of Halal meat is violative of the First Amendment, RLUIPA, and the Equal Protection Clause.

      1.   First Amendment

The court begins with the plaintiff's First Amendment claim. "[A]lthough prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."   Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."   Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990).[15]   "[W]hen a prison regulation

argument about, and does not point the court to evidence of, such cross-contamination.

    [14]The plaintiff adds that vegetarian meals have caused him gastrointestinal problems.  He cites Shakur v. Schriro, 514 F.3d 878, 888 (9th Cir. 2008) and suggests that his medical condition should be a part of the religious analysis.  Shakur is distinguishable because it involved a prisoner's claims that the severe medical effects of the vegetarian diet impacted his ability to achieve the ritual purity required for Muslim prayer.  There are no such allegations in this case.

    [15]A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.  Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006).  The defendants' motion does not challenge the sincerity of plaintiff's belief.  Their argument that

impinges on inmates' constitutional rights, the regulation is valid
if it is reasonably related to legitimate penological interests."
Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme
Court identified the four factors to be considered in determining
the reasonableness of a prison regulation: 1) whether there is a
rational relationship between the regulation and the legitimate
government interests asserted; 2) whether the inmate has
alternative means to exercise the right; 3) the impact that
accommodation of the right will have on the prison system; and 4)
whether ready alternatives exist which accommodate the right and
satisfy the governmental interest.  Benjamin v. Coughlin, 905 F.2d
571, 574 (2d Cir. 1990)(citing Turner v. Safley, 482 U.S. 78
(1987).

     The defendants bear the "relatively limited burden of
identifying the legitimate penological interests that justify the
impinging conduct; the burden remains with the prisoner to show
that these articulated concerns were irrational."  Salahuddin v.
Goord, 467 F.3d 263, 274-275 (2d Cir. 2006)(internal citations and
quotation marks omitted).  In this analysis, courts must give
deference to the defendants because "prison administrators . . .
and not the courts, [are] to make the difficult judgments

---

the plaintiff has a flawed understanding of the requirements of
Islam is irrelevant to the question of his sincerity.  See Ford v.
McGinnis, 352 F.3d 582, 588 (2d Cir. 2003).  For purposes of this
motion the court will assume, without deciding, that the
plaintiff's sincere religious belief has been substantially
burdened.

concerning institutional operations in situations such as this."
Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 128
(1977). See also Beard v. Banks, 548 U.S. 521, 530 (2006)(while
court must draw inferences in favor of non-moving party at summary
judgment stage as to disputed facts, the court's "inferences must
accord deference to the views of prison authorities" as to
"disputed matters of professional judgment.") "The burden [] is
not on the State to prove the validity of prison regulations but on
the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126,
132 (2003). Defendants need not show evidence of actual past
disruptions. See, e.g., Dixon v. Woodruff-Fibley, No. 1:04-cv-
1374-DFH-VSS, 2006 U.S. Dist. LEXIS 65911 (S.D. Ind. Sept. 14,
2006) (rejecting plaintiff's argument that there was no evidence
that his prayer outside his cell had caused disturbances in the
past).

      The defendants argue that they are entitled to summary
judgment because the DOC's policy of not including Halal meat in
the Common Fare diet is reasonably related to legitimate
penological interests of security, cost and administrative burden.

      First, the defendants argue that their policy serves the
interest of prison security. Brian Murphy, Deputy Commissioner of
the DOC, explains in his expert disclosure that perceptions of
favoritism are a sensitive issue in a prison, and the dining hall
is a particularly volatile environment due to inmates' relative
freedom of movement and relatively low staff to inmate ratios.

(Murphy expert report, doc. #149, Ex. S at 7.)

> Tensions brewing in the housing unit are often released
> in the group atmosphere of the dining hall, and there
> is greater potential for inmate violence.  Such
> simmering inmate tensions can be ignited by feelings
> that the inmate is being deprived of food items he/she
> sees other inmates eating . . . So long as some inmates
> were receiving cuts of meat that others were not, there
> is the strong potential for inmate unrest.

(Id.  See also Robert E. Frank Deposition ("Frank Dep."), doc.
#149, Ex. O at 231-32 (opining as to tensions that might arise if
Halal meat precisely equivalent to regular menu items could not be
supplied) and Brian Murphy expert report, doc. #149, Ex. S at 7-8
(stating that increasing the complexity of the Common Fare diet
could lead to delays in serving meals, which could spark inmate
unrest).)

The defendants also offer evidence that Halal meat would be
more expensive than equivalent food items on the regular or Common
Fare menus.  (See Robert E. Frank Expert Report ("Frank Report"),
doc. #149, Ex. C.)  Because Halal meat would have to be offered to
all Muslim inmates systemwide[16], the extra cost would not be limited
to the facility in which the plaintiff is incarcerated but would be

---

[16]DOC strives to ensure that all inmates in all facilities
receive comparable foods in order to avoid resentment among inmates
or the appearance of favoritism.  (Frank Report at 7.)  Therefore,
if Halal meat were offered to Muslim inmates at one institution, it
would have to be offered to all Muslim inmates systemwide.  The
defendants report that as of March 15, 2007, there were 1541 Muslim
inmates within the DOC.  (Bruno Expert Report, Doc. #149 Ex. D at
1.)

17

incurred statewide.[17]   (See Frank Report at 7.)   In addition,
because not all facilities have sufficient storage space (including
freezers) to devote exclusively to Halal food, DOC would require
expensive facility improvements in order to separately handle,
store and prepare Halal meat in the quantities required.  (Id.,
Frank Dep., doc. #149 Ex. P at 93; Frank Report, doc. #149, Ex. C
at 2.)  The defendants contend that the only way to guarantee that
Halal meat is consistently kept separate from other foods would be
to use– and in some cases construct– separate kitchens.  (Id. at
230-31.)  Because Halal meat looks the same as regular meat, and
the prison kitchen staffs are made up primarily of inmates with
limited training, having both Halal meat and regular meat in the
same kitchen could lead to improper substitution of food items.[18]
(Id. at 88-90.)

     The defendants also identify additional administrative
burdens.  Halal meat would have to be ordered separately, brought
in on different trucks, unloaded, handled and stored separately in
the kitchens, and served separately.   (Id. at 32-33, 91, 102, 120;
Frank expert report, doc. #149, Ex. C at 2.)

---

     [17]Although the plaintiff indicates that he would be satisfied
with meat only once or twice a week, even that additional cost
would be significant when considered in the context of more than
1500 Muslim prisoners statewide.  This is particularly true in
light of evidence that DOC's low food costs are a result of volume
pricing.  (Frank 4/4/07 Dep., doc. #149, Ex. P at 26.)

     [18]In addition to accidental substitutions, Mr. Frank notes that
intentional sabotage is always a concern with inmate workers.  (Id.
at 90.)

Applying the first Turner factor, the defendants have
demonstrated that there is a rational relationship between the
policy of not providing Halal meat and the asserted penological
interests of security, cost and reducing administrative burden.  As
to the second factor, alternative means of exercising the right,
the record reflects that Halal meat sausage is available in the
commissary, so the plaintiff has the ability to supplement his
otherwise vegetarian diet with some Halal meat.  See Majid v.
Fischer, 07Civ.4584(NRB), 2009 U.S. Dist. LEXIS 71616 at *19
(S.D.N.Y. July 31, 2009)(second Turner factor supports defendant
prison officials' position where plaintiffs had option to, and did,
supplement their diet with Halal commissary items).  In addition,
the plaintiff has other opportunities to exercise his religious
beliefs, such as Jumah services, accommodations for Ramadan, Arabic
class and religion classes.  See O'Lone v. Estate of Shabazz, 482
U.S. 342, 352 (1987) (where prisoners on outside work details were
not able to attend Jumah services, Supreme Court found it
significant for the second Turner factor that they were given other
means of expression such as dietary accommodations and arrangements
for Ramadan fasts).  As to the third factor, the impact that
accommodation of the right will have on the prison system, the
defendants have demonstrated that accommodation of the right would
have significant impact on the prison in terms of cost,
administration and security.  Finally, there are no ready
alternatives to accomodate both the prisoner's religious needs and

the prison's legitimate penological interests.[19]

The defendants have discharged their burden of demonstrating that the policy is reasonably related to legitimate penological interests.  The plaintiff has not made a showing that the defendants' proffered reasons are irrational or that the policy is not reasonably related to legitimate penological interests. Therefore, summary judgment is granted as to the plaintiff's free exercise claim relating to Halal meat.[20]

    2.   <u>RLUIPA</u>

The analysis under RLUIPA is slightly different.  RLUIPA provides in relevant part that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from

---

[19]The plaintiff argues that the defendants could accept donations of Halal food, but he has not borne his burden of demonstrating that this would be a workable alternative. The defendants present evidence that accepting donated food is not feasible because of the DOC's strict guidelines for food storage and temperature and the risk of serious illness if food has not been properly stored. (Bruno Report, doc. #149, Ex. D at 6-7; Frank Dep., doc. #149 Ex. O at 196-99; Ex. P at 49-52.)  In fact, Reverend Bruno indicates in his expert report that DOC would accept donations of food in some limited circumstances; "[t]here must, however, be enough donated Halal meat for every Muslim inmate, and the meat must comply with all state health and safety codes." (Bruno Expert Report, doc. #149, Ex. D at 9.)

[20]This ruling is consistent with decisions by many other courts nationwide that have considered similar prisoner claims.  <u>See, e.g.</u>, <u>Williams v. Morton</u>, 343 F.3d 212 (3d Cir. 2003); <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807 (8th Cir. 2008); <u>Phipps v. Morgan</u>, CV-04-5108, 2006 WL 543896 (E.D. Wash. Mar. 6, 2006); <u>Spruel v. Clarke</u>, No. C06-5021RJB, 2007 WL 1577729 (W.D. Wash. May 31, 2007).  <u>But see</u> <u>Hudson v. Dennehy</u>, 538 F. Supp. 2d 400 (D. Mass. 2008)(policy of providing non-Halal vegetarian meals violated plaintiffs' religious rights).

a rule of general applicability, unless the government
demonstrates that imposition of the burden on that
person—

　　(1) is in furtherance of a compelling governmental
interest; and

　　(2) is the least restrictive means of furthering
that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). RLUIPA "imposes a more exacting standard
on prison officials" than does the First Amendment analysis,
"requiring that any substantial burden on an inmate's exercise of
religion be warranted by a compelling governmental interest, and be
the least restrictive means of accomplishing that interest."
Rahman v. Goord, No. 04-CV-6368 CJS, 2007 U.S. Dist. LEXIS 32680,
*15 (W.D.N.Y. May 3, 2007)(internal quotation marks omitted).
However, RLUIPA does not "elevate accommodation of religious
observances over an institution's need to maintain order and
safety." Cutter, 544 U.S. at 722. Moreover, courts should accord
"due deference to the experience and expertise of prison and jail
administrators in establishing necessary regulations and procedures
to maintain good order, security and discipline, consistent with
consideration of costs and limited resources." Id.

　　Even assuming that the plaintiff can show a substantial burden
on his religious belief, the defendants have demonstrated, as
discussed in Section V(B)(1) *supra*, that the regulation is in
furtherance of compelling governmental interests including prison
security, controlling costs and maintaining workable administrative
procedures. See also Spruel v. Clarke, No. C06-5021RJB, 2007 WL

1577729 (W.D. Wash. May 31, 2007);  <u>Phipps v. Morgan</u>, CV-04-5108, 2006 WL 543896 (E.D. Wash. Mar. 6, 2006).  The court is persuaded that the defendants' policies represent the least restrictive means of furthering those compelling governmental interests.  The plaintiff receives nutritious vegetarian meals that include fish, cheese and other non-meat protein sources, and it is undisputed that these meals do not include items forbidden by his religion. Moreover, he is able to supplement his meals with many Halal items from the commissary, including Halal sausage.  Therefore, summary judgment is granted as to the plaintiff's RLUIPA claim relating to Halal meat.

       3.  <u>Equal Protection</u>

Construing plaintiff's Amended Complaint liberally, he also alleges that the denial of Halal meat is an Equal Protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  To prove an equal protection violation, a plaintiff "must demonstrate that he was treated differently than others similarly situated as a result of the intentional or purposeful discrimination." <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005).  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects

alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992).  However, it is not the case that "every religious sect or group within a prison - however few in number - must have identical facilities or personnel." <u>Graham v. Mahmood</u>, No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008), citing <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n. 2 (1972).  The Second Circuit has determined that the <u>Turner</u> standard applies to equal protection claims involving prisoner religious exercise.  <u>See</u> <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 575 (2d Cir. 1990).  Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests." <u>Benjamin</u>, 905 F.2d at 574.

The plaintiff has not presented any evidence that members of other religions are treated differently with regard to diet.  All inmates receive either the regular diet or the Common Fare diet. The plaintiff argues that Common Fare accomodates the religious scruples of inmates whose religions do not require meat, while failing to accomodate the plaintiff's religious need for Halal meat.  Even if this could be viewed as evidence of different treatment of similarly situated groups, the defendants have demonstrated that their decision to offer a vegetarian Common Fare diet but not to offer Halal meat is reasonably related to legitimate penological interests.  The defendants are therefore entitled to summary judgment as to this equal protection claim.

C.   <u>Daily Congregate Prayer</u>

The plaintiff alleges that the defendants impermissibly bar him from engaging in daily congregate prayer.  He believes that his religion requires him to congregate with other Muslims five times daily for prayer.[21]  Relatedly, he also contends that the defendants should permit inmates to lead prayer when a chaplain is not available, which would make it possible for congregate prayer to occur more often.  Once again, he claims violations of the First Amendment, RLUIPA and the Equal Protection Clause.

1.   <u>First Amendment</u>

The defendants argue that they are entitled to summary judgment as to plaintiff's First Amendment claim on this issue because the DOC's policy supports the penological interests of prison security and administration.

As for chaplain-led prayer, the defendants contend that DOC cannot provide sufficient chaplains to lead prayer five times daily in every housing unit.  (Murphy Expert Report, Doc. #149, Ex. S at 1-2.)  In addition, DOC cannot provide sufficient custody staff to supervise such prayer. (<u>Id.</u> at 1.)  Permitting daily congregate

_____

[21]The defendants dispute plaintiff's understanding of Islam, arguing that it permits individual prayer as a substitute for congregate prayer when a Muslim is prevented by certain circumstances (such as incarceration) from attending congregate prayer.  The defendants do not challenge the sincerity of the plaintiff's belief.  <u>See</u> <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003)(plaintiff bringing a free exercise claim need not show that the practice is required by a particular religion, but only that the beliefs professed are sincerely held and, in the individual's own scheme of things, religious.)

24

prayer would also endanger security by creating a perception of
favoritism, which can create strife among inmates, because Muslim
inmates would be out of their cells more frequently than other
inmates.  (<u>Id.</u> at 3.)  In addition, the defendants present evidence
that congregate prayer "would critically interfere with daily
operations, denying others use of common rooms and other areas."
(<u>Id.</u>)  It would burden prison administration because programs such
as meals, work, school, recreation and visits all would have to be
scheduled around congregate prayer.  (<u>Id.</u>)

       As to plaintiff's claim that more frequent congregate prayer
would be possible if inmates were permitted to lead it in the
absence of a chaplain, the defendants submit evidence that the
policy of forbidding inmates from leading group prayer is necessary
for prison security, because inmate leadership of any sort tends to
create "an alternate authority structure within the prison system."
(Murphy Expert Report, Doc. #149, Ex. #S at 2-3.)  The DOC cites
its experience of inmate religious groups being overtaken by gangs
and being used as covers for gangs.  (<u>Id.</u> at 3-4.)  In addition,
they point to evidence of violent incidents among DOC inmates
belonging to different Muslim sects.  (<u>Id.</u>; <u>see also</u> DOC incident
reports, Doc. #149, ex. T.)[22]  The DOC's decision to combine all
Muslim collective activity in one Jumah instead of permitting

_____

       [22]As an example, defendants cite an incident at Osborn
Correctional Institute. A Muslim inmate was trying to enter the
dining hall during Ramadan, and other Muslim inmates claiming to be
"gatekeepers" attempted to keep him out.  In the ensuing violence,
a correctional officer was seriously injured.  (<u>Id.</u>)

collective activities by various different sects has led to "significantly improved security conditions and enormous reductions in violence amongst Muslim groups." (Id. at 5.)

Applying the first Turner factor– whether there is a rational relationship between the regulation and the legitimate government interests asserted– the defendants have pointed to serious and legitimate penological concerns associated with unsupervised inmate religious activities and daily congregational prayer.  Their policies are logically related to those penological concerns of security and administration.  In this vein, the Second Circuit has broadly upheld a so-called "free-world sponsor" requirement requiring that a chaplain or volunteer be present for congregate religious activities "to ensure that the meeting is convened for religious purposes and not to hold kangaroo courts, foster extortion, or provide a venue for the dissemination of conspiratorial information." Benjamin v. Coughlin, 905 F.2d 571, 577-578 (2d Cir. 1990).

The second Turner factor– whether the inmate has alternative means to exercise the right– also supports the defendants' position.  The plaintiff is free to pray individually in his cell, and, as discussed above, he has many other opportunities to practice his religion.  Applying the third factor, the impact that accommodation would have on the prison, the defendants have submitted adequate evidence that daily congregate prayer would have a substantial effect on the administration and management of the

26

prison and on security arrangements.

The fourth factor is the existence of ready alternatives which accommodate the right and satisfy the governmental interest.  The plaintiff offers several alternatives.  For example, he argues that he would be satisfied with just one congregate prayer per day.  Plaintiff also argues that if an Islamic chaplain is at the prison during a time when Muslim inmates are out of their cells, and it is time to pray, then the chaplain should go to the common room to lead prayers.[23]  Both of these proposals would necessitate the presence of security guards and/or chaplains, as well as the administrative burdens associated with scheduling and the use of prison facilities, and they do not address the defendants' security concerns about other inmates' perception of favoritism.[24]  The defendants' governmental interest is not satisfied by these alternatives.  The defendants' motion for summary judgment is therefore granted as to this First Amendment claim.

2.   RLUIPA

The court next considers the plaintiff's demand for daily congregate prayer under RLUIPA.  Assuming for purposes of this

---

[23]Plaintiff's other suggestion, that inmates who happen to be out of their cells at the same time could simply gather to pray together, does not address the security concerns backing the prison's policy that prisoners cannot gather to pray unless a chaplain is present.

[24]Moreover, despite plaintiff's willingness to accept congregate prayer only once per day or whenever a chaplain happens to be present, the availability of congregate prayer necessarily impacts other Muslim prisoners, who might have stricter views.

motion that the plaintiff's religious exercise is substantially burdened, <u>see</u> <u>supra</u> section V(B)(2), the court concludes that the regulation is in furtherance of compelling government interests of prison security and order and is the least restrictive means of furthering that compelling government interest.  The defendants permit the plaintiff to pray in his cell, and their policy provides that weekly congregate prayer be held for each religion.  RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security concerns that the defendants identify.  The defendants' motion for summary judgment is granted as to this RLUIPA claim.

> 3.  <u>Equal Protection</u>

Construed liberally, the plaintiff's complaint alleges that the defendants' refusal to permit congregate prayer is an Equal Protection violation.  In particular, his complaint alleges that "[t]he Plaintiff has witnessed inmates of other Religions leading their Religious congregations in prayers all throughout the Connecticut Department of Corrections" and that the policy against inmate leadership of prayer is applied only to Muslims. (Am. Compl., doc. #62-2, ¶130.)  The defendants move for summary judgment as to this claim.

In response to the motion, the burden is on the plaintiff to present evidence of different treatment of similarly situated religious groups with regard to daily congregate prayer.  This he

has not done.  Despite the allegations made in his complaint, the plaintiff has submitted no evidence that the defendants permit inmates of other religions to lead prayer or that any religious group has daily congregate prayer.[25]  Therefore, the defendants are entitled to summary judgment as to plaintiff's equal protection claim.

> D.   Cancellation of Jumah

The plaintiff's complaint alleges that Friday Jumah services are frequently cancelled due to the unavailability of a chaplain to lead the services.  He believes that participating in a weekly Jumah is a requirement of his religion.  He points to evidence that lack of staffing for Jumah has been a regular problem for more than four years.  (Pl's Opp., Doc. #161 at 54.)  The plaintiff alleges that this practice violates the First Amendment, RLUIPA and the Equal Protection Clause.

The defendants seem to concede that Jumah is frequently cancelled but say that cancellation is necessary when there is no chaplain available or in case of a security lockdown.[26]  In opposing

---

[25]The only example plaintiff identifies is the DOC's accommodation of the daily Native American "smudging" ceremony. The record demonstrates that this is not an example of congregate prayer but an example of individual prayer. Participating Native American inmates are taken outdoors as a group because the ceremony involves fire that would be dangerous to use in a cell, but they pray individually.

[26]The defendants argue that Jumah must sometimes be cancelled due to a lockdown or other security issue, but there is no evidence that this security concern explains all cancellations. The parties have not directed the court's attention to any evidence in the record regarding cancellation on any particular dates.

the plaintiff's request for daily prayer, the defendants argue that every religion is provided with a weekly congregate prayer, and that the plaintiff's need for congregate prayer is satisfied by the offering of Jumah.  DOC policy expressly provides that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations."[27] (A.D. 10.8 ¶6(B), ¶6(A).)  The defendants also present evidence touting the involvement and attentiveness of their Islamic chaplains.  Yet they provide no explanation for the alleged frequent cancellation of Jumah, or for the insufficient and unequal staffing that allegedly underlies it.

The defendants have failed to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest (under the First Amendment and Equal Protection Clause) or in furtherance of a compelling governmental interest (under RLUIPA).  Therefore, the defendants' motion for summary judgment is denied as to these claims.

E.   Other Religious Exercise Claims

1.   Mishandling of Quran

The plaintiff alleges that DOC employees regularly mishandle the Quran.  He gives evidence of Qurans being thrown on the floor and handled roughly, and says his own Quran was damaged due to

---

[27]The plaintiff argues there is a disparity in staffing. "Protestants have over 300 approved volunteers while Muslim[s] have 12 approved volunteers."  (Pl's Mem., doc. #161 at 61.)

mishandling.  (Pl's Opp., doc. #161 at 59; Pl's Aff., doc. #163,
¶110-11.)  The plaintiff concedes that Qurans must sometimes be
searched but alleges that the disrespectful handling is a violation
of the First Amendment and RLUIPA.  Plaintiff also claims that it
is an Equal Protection violation, because other inmates' religious
items are more respectfully handled.[28]

The defendants have failed to address this claim in any way in
their motion for summary judgment or to direct the court's
attention to evidence about DOC policies for handling of inmates'
religious materials.  The defendants have not borne their burden of
demonstrating that they are entitled to summary judgment on this
claim.

### 2.   Circumcision

The plaintiff alleges that the defendants' denial of his
request to be circumcised for religious reasons violates the First
Amendment and RLUIPA.  He believes that Islam requires male
converts to be circumcised.[29]  The defendants' motion does not
explain why they denied plaintiff's request, nor does it provide
any analysis of the plaintiff's First Amendment and RLUIPA claims.

---

[28]The plaintiff points to evidence that the medicine bags of
Native American inmates are searched in a more respectful manner.
(Pl's Opp., doc. #161 at 29.)  DOC officials are not permitted to
touch the bags or the contents and instead have the inmates empty
the bags themselves.  (Id.)

[29]The complaint alleges that, in response to plaintiff's
grievance on this issue, defendant Bruno wrote that it was being
denied based on advice from Imam Hasan "that circumcision is
optional for adult male Islamic converts" and because circumcision
"is not done by an Imam."  (Am. Compl., doc. #62, ¶87.)

The defendants have failed to provide the court with any
explanation of their decision.  The defendants have not borne their
burden of demonstrating that they are entitled to summary judgment
on this claim.

        3.   <u>Purchase of Toothstick</u>

     The plaintiff claims that the DOC restricts him from
purchasing a miswak, or toothstick.  The plaintiff claims to have a
sincere belief that miswaks are required for the practice of Islam
and alleges that this restriction violates the First Amendment and
RLUIPA.  The defendants' motion fails to address this issue in any
way and is therefore denied as to this claim.

        4.   <u>Commissary Prayer Oils</u>

     Although it is undisputed that the DOC's commissary offers
certain prayer oils, the plaintiff points to evidence that the
prayer oils sold in the DOC commissary contain chemicals that are
prohibited by Islam.  (Pl's Opp, doc. #161 at 31.)  He alleges that
the failure to offer prayer oils conforming with Islamic
requirements is a violation of the First Amendment and RLUIPA.

     Reverend Bruno's expert report represents that "the DOC has
obtained affidavits of purity and acceptance with regards to the
oils sold in commissary."  (Bruno Report, doc. #149, Ex. D at 10.)
A copy of such a certificate has been submitted.  (Doc. #149, Ex.
I.)  However, the defendants' motion does not otherwise address the
plaintiff's claim that the oils contain improper chemicals.  There
appears to be a dispute of material fact as to the contents of

these oils, and the defendants' motion is therefore denied as to this claim.

VI.   <u>Conclusion</u>

For all the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part.

The motion is granted as to all claims against defendants DeVeau and Hasan.  The motion is granted as to any claim under RLUIPA for money damages against the remaining defendants, Bruno and Lantz.

Summary judgment is also granted as to plaintiff's claims regarding Halal meat and daily congregate prayer.  In addition, the defendants' motion is granted as to plaintiff's claims of untimely prayer at the end of Ramadan in 2002, lack of adequate nutrition in the Ramadan meals, lack of access to leather socks, lack of access to a prayer clock, lack of access to hygiene items and the confiscation of a silver ring.  The plaintiff's claim that he was physically and psychologically abused because of his faith in violation of the Equal Protection Clause is dismissed.  <u>See</u> <u>supra</u>, n. 7.

The motion is denied as to the following claims, all of which are directed to defendants Bruno and Lantz in their official capacities for injunctive and declaratory relief under RLUIPA, the First Amendment and the Equal Protection clause and in their individual capacities for damages and injunctive and declaratory relief under the First Amendment and the Equal Protection clause:

33

(1) claims regarding cancellation of Jumah;

(2) claims regarding denial of circumcision request;

(3) claims regarding mishandling of Qurans;

(4) claims regarding availability of toothsticks; and

(5) claims regarding nonconforming prayer oils.

The four pending Motions *in limine* (docs. #150, 154, 169, 171) are denied without prejudice to refiling at the time of trial.  As to those motions that seek to preclude only certain statements or opinions rather than an entire witness or report, if the motions are refiled they should specify in detail (and with pinpoint citations) the statements or opinions that the moving party seeks to preclude.

SO ORDERED at Hartford, Connecticut this 25th day of September, 2009.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge