# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA, | : | CIVIL NO. 3:04CV1215 (DFM) |
| Plaintiff, | : | |
| v. | : | |
| THERESA LANTZ, ET AL., | : | |
| Defendants. | : | APRIL 16, 2013 |

### JOINT TRIAL MEMORANDUM

**I.    TRIAL COUNSEL**

Plaintiff's Trial Counsel:

Charles D. Ray, Esq.
McCarter & English
185 Asylum Street
Hartford, CT 06103

Jordan Abbott, Esq.
McCarter & English
185 Asylum Street
Hartford, CT 06103

Defendant's Trial Counsel:

Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
(860) 808-5450

Edward Wilson, Jr.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
(860) 808- 5450

**II.    JURISDICTION**

Plaintiff invokes the Court's Jurisdiction under 42 U.S.C. § 1983, alleging violations of

his rights under the Free Exercise Clause of the First Amendment and the Equal Protection

Clause of the Fourteenth Amendment.  He also alleges violations of the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  Venue is appropriate in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in Connecticut.

## III.   <u>JURY TRIAL</u>

This case will be tried to the Court.

## IV.   <u>NATURE OF CASE</u>

Plaintiff, a practicing Muslim, commenced this action in July 2004, claiming that defendants violated his right to exercise his religion under the first amendment and RLUIPA.  On September 25, 2009, the court granted defendants motion for summary judgment in part. (Doc. #188).  On October 4, 2009, the defendants timely filed a motion for reconsideration.  (Doc. #190).  On November 16, 2012, the court issued its ruling, granting defendants reconsideration motion, granting the requested relief, dismissing any and all money damage claims, and dismissing the claims against all defendants in their individual capacities. Presently, there are three claims against the remaining defendants, former Commissioner Lantz and Reverend Bruno in their official capacity for injunctive and declaratory relief.   These claims allege that the defendants unlawfully (1) denied the plaintiff's request to be circumcised, (2) denied him access to suitable Islamic prayer oils, and (3) frequently canceled Friday congregate prayer (Jumu'ah). These claims allege that the defendants unlawfully (1) denied Plaintiff's request to be circumcised in violation of the First Amendment, the Equal Protection Clause and the Religious Land Use and Institutional Persons Act (RLUIPA); (2) denied Plaintiff access to suitable Islamic prayer oils in violation of the First Amendment, the Equal Protection Clause and the Religious Land Use and Institutional Persons Act (RLUIPA); and (3) frequently canceled Friday

2

congregate prayer (Jumu'ah) in violation of the First Amendment, the Equal Protection Clause and the Religious Land Use and Institutional Persons Act (RLUIPA).

## V.  STIPULATIONS OF FACT AND LAW

### FACT

1.     Plaintiff, Joe Burgos Vega is a Connecticut state prisoner and is currently serving a 60 year total effective sentence.

2.     Plaintiff's incarceration began on January 9, 1996 at the age of 28.

3.     Plaintiff converted to Islam around 1993.

4.     Plaintiff has reaffirmed his Muslim faith on at least six occasions since then by way of completing the Department of Corrections' Request for Religious Affiliation.

5.     Plaintiff is currently incarcerated at Cheshire Correctional Institution and has been since June 9, 2010.

6.     DOC policy requires that collective religious activity be conducted and supervised by a department authorized Chaplin or religious volunteer who professes the same religion as the group gathering together. A.D. 10.8¶ 6(B).

7.     DOC policy requires that inmates are not permitted to lead collective religious activities and can never exercise any authority over any other inmate. A.D. 10.8 ¶¶6 (B), 6(D).

8.     DOC policy requires that inmates may not engage in "demonstrative public individual prayer that would disrupt the orderly operation of the institution, such as in the work or school area, recreation area, day room, etc." A.D. 10.8 ¶6 (E).

9.     DOC policy requires that "opportunities for collective religious activities shall be made available on an equitable basis at least once a week, to the various religious denominations." A.D. ¶6 (A).

3

10.     DOC policy defines "Religious Articles" as "[a]ny inmate property, other than authorized published materials (i.e., written, audio or video), having spiritual significance, which is used in individual or congregate religious activity." A.D.  ¶3 (I).

11.     DOC policy requires that inmates "requesting to purchase religious articles not available through the Commissary must receive prior written permission of the Director of Programs and Treatment or designee.  Items ordered without permission shall be considered unauthorized and may be deemed contraband." A.D. ¶5 (H).

12.     Religious Oils are available for purchase at the Commissary at Cheshire Correctional Institution.

13.     These oils have been reviewed and approved for Muslim use by Imam Abdul Majid Karim Hasan and have been reviewed and approved by the D.O.C.

14.     Since August of 2001, Plaintiff has made numerous requests to be circumcised and each of those requests has been denied by the Department of Corrections.

15.     Circumcision is not a medically necessary surgery for Plaintiff.

## LAW

### First Amendment

1.     Under the First Amendment, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, at 89 (1987).  Turner sets forth four factors to be considered in determining whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there

4

are "alternative means of exercising the right that remain open to prison inmates"; (3) whether accommodation of the asserted constitutional right will "impact . . . guards and other inmates, and . . . the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives." Turner, 482 U.S. at 89-91.

**RLUIPA**

2.      "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)).

3.      "Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest." Jova v. Smith, 582 F.3d 410, 415 (2d Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)).

**Equal Protection**

4.      The Second Circuit has determined that the Turner standard of reasonableness (set forth above) applies to equal protection claims involving a prisoner's religious exercise. *See* Benjamin v. Coughlin, 905 F.2d 571, 575 (2d Cir. 1990); see also Griffin v. Coughlin, 743 F.Supp. 1006, 1010–11 (N.D.N.Y.1990) (following the Second Circuit's directive and applying *Turner's* four factor reasonableness test to equal protection claims arising in the prison context).

5

## VI.   PLAINTIFF'S CONTENTIONS

Mr. Vega brought the claims that form the basis of this case in the First Amended Complaint, filed November 8, 2005 ("Amended Complaint").   As a result of settlement and motion practice, three claims remain in the Amended Complaint wherein, Plaintiff alleges violations of the Free Exercise Clause of the First Amendment and Equal Protection Clause under the United States Constitution, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  Mr. Vega, a studied and practicing Muslim, has asserted claims based on the allegations that Defendants:  (a) regularly cancelled or otherwise deprived him of the weekly Muslim congregate Friday prayer service, the Jumu'ah, (third count); (b) unjustifiably denied Plaintiff's religiously-motivated request to be circumcised as required for adult male convert to Islam (ninth count); and (c) effectively denied the purchase of prayer oils that would conform to Islamic requirements (sixth count).  Defendants' actions substantially burden Mr. Vega's exercise of Islam under the free Exercise Clause of the First Amendment and Equal Protection Clause under the United States Constitution, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.

The first claim involves the repeated and unjustified cancellation of the Friday Jumu'ah Congregational Prayer during the period of 2003 through 2011.  In the Islamic faith, Jumu'ah Friday prayer plays an essential role in the necessary rites for forgiveness of sins.  In the Islamic faith, Friday Jumu'ah prayer results in the expiration of the sins committed.  In the early part of this lawsuit Jumu'ah was cancelled frequently and although the frequency with which it is held has improved in recent years at Plaintiff's facility, the manner in which it is currently conducted does not comport with Mr. Vega's practice of his Islamic faith.  Plaintiff requests an order from

6

this Court mandating Jumu'ah absent emergency circumstances at any facility in which Plaintiff resides.

The second claim involves the denial of Plaintiff's right to undergo circumcision. Plaintiff has studied Islam extensively and contends that circumcision is one of the signs of a true Muslim, and like the other signs, it is obligatory for the Muslim male to be circumcised at birth or upon conversion.

The third claim involves denying Plaintiff (and other Muslims) the right to purchase essential Halal Islamic Prayer Oils for adorning the body in preparation for the Friday Jumu'ah Congregational Prayer.   Prior to initiating this lawsuit Plaintiff was allowed to order prayer oils of his choosing that complied with his religious beliefs.   However, at present, the vendor that currently supplies these prayer oils at the correctional institution's commissary does not comply with Plaintiff's Islamic beliefs because they contain chemical ingredients that would violate the Islamic faith if brought in contact with Plaintiff's body.   DOC policy permits inmates to request the purchase of items not available to them in the prison commissary and Mr. Vega has made a number of such requests in regard to prayer oils. All of his requests have been denied.

As to each claim, Plaintiff seeks declaratory and injunctive relief. Defendants have denied the allegations of the Complaint.

## VII.   **DEFENDANT'S CONTENTIONS**

The defendants respectfully contend that the only issues which are relevant are those issues which pertain to plaintiff's present confinement at Cheshire CI, in light of the present procedural posture of the case, which only seeks injunctive relief. Defendants object to plaintiff's attempt to broaden the scope of this case to issues which existed in 2006 – 2007, at MacDougall-Walker CI, or at Garner CI in 2008-2009, or while plaintiff was briefly at Corrigan CI and also at Northern

7

CI in 2010, prior to plaintiff's June 9, 2010, transfer to Cheshire CI.  In the defendants' view, going into such past history would unnecessarily broaden the scope of the evidence and lengthen the trial, and would embroil the Court in a variety of collateral issues related to plaintiff's disciplinary reports, and behaviors which led to his transfer to Northern CI, for example, or his disciplinary history while at MacDougall-Walker CI, and would not be helpful to the Court in deciding the issues as they pertain to today's present circumstances.

The defendants respectfully contend that any cancellations of Jumah, are relatively infrequent, and were related to the compelling interests of safety and security and were the only option available to the defendants with regard to safely providing congregate worship services. To the extent there are any burdens or obligations imposed on Muslims by virtue of circumstances beyond their control, and Muslims cannot go to Jumah, for whatever reasons, the prayer obligation can be made up by individual prayer. The cancellations which may have occurred were beyond the control of the defendants, and were applied in a completely content neutral fashion, and apply equally and evenhandedly to all religious faith groups who have collective activity. In addition there are other abundant opportunities to practice one's Muslim faith while incarcerated.

With regard to Islamic prayer oils, the defendants contend that they are completely optional. Even if no oils were allowed, there would be no significant burden on the practice of one's Muslim faith. The denial of oils is a de minimis burden on the practice of religion. However, the oils which are provided are acceptable for use as religious oils by Muslims. Indeed, they have recently received Halal certification.

Lastly, plaintiff's claim to be circumcised is not only unprecedented, but its denial is not a significant burden on the practice of the Muslim religion. As the evidence will show,

circumcision is completely optional, and to allow such a procedure would open the floodgates to a variety of elective, non-medically necessary procedures based on an inmates alleged "religious" belief, for example, a religiously motivated request to get a particular tattoo or body part pierced for religious reasons. There is no authority under the first amendment or RLUIPA for the taxpayers to shoulder such costly affirmative obligations, even if the court were to credit plaintiff's belief as being sincerely religiously motivated.

## VIII.   LEGAL ISSUES

### 1.   Jumu'ah

Whether the frequent cancellation of Jumu'ah from 2003 to the present and/or the manner in which Jumu'ah is currently conducted at Cheshire violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA", 42 U.S.C. § 2000cc), the First Amendment, and/or the Equal Protection clause and entitles Plaintiff to declaratory and/or injunctive relief.

### 2.   Circumcision

Whether Defendants' denial of Plaintiff's request to be circumcised for religious reasons violate the Religious Land Use and Institutionalized Persons Act ("RLUIPA", 42 U.S.C. § 2000cc), the First Amendment, and/or the Equal Protection clause and entitles Plaintiff to declaratory and/or injunctive relief.

### 3.   Prayer Oils

Whether the Department of Correction's failure to allow Plaintiff to obtain oils that conform to his religious beliefs violates his rights under RLUIPA, the First Amendment and/or the Equal Protection clause and entitles Plaintiff to declaratory and/or injunctive relief.

## IX.   VOIR DIRE QUESTIONS

Not applicable.

ME1 15461463v.1

**X.**   **LIST OF WITNESSES**

   **A.**   **PLAINTIFF**

   1.   **Joe Burgos Vega**, Cheshire Correctional Institution, 900 Highland Avenue, Cheshire, CT 06410.  Mr. Vega will testify as to the facts that form the basis of his claim.

   2.   **Father Anthony Bruno**, Director of Religious Services, 24 Wolcott Hill Road, Wethersfield, CT.  Father Bruno is expected to testify as a fact witness in this case.  He is expected to testify as to events and policies surrounding Plaintiff's claims in this case, as well as his own efforts to obtain adequate staffing to attend to the religious needs of Islamic inmates.

   3.   **Dr. Imam Hasan**, 870 Dixwell Ave., Hamden, CT. Dr. Iman Hasan will testify as a fact witness based on his experience in the Department of Correction.  He will testify about the facts of this case as they relate to his position and duties as a consultant to the DOC, and the policies and procedures of DOC as they relate to the inmates incarcerated at Cheshire, and specifically the plaintiff.

   4.   **Abdullah Antepli**, Muslim Chaplain, Duke University.  Imam Abdullah will testify by way of deposition transcript.  He will describe his background as head of the chaplain program at Hartford Seminary and efforts made by himself and organizations to which he belonged to reach out to the DOC to attempt to alleviate shortages of Islamic chaplains within the DOC.  Imam Antepli will testify that he did not feel that those outreach efforts were welcomed by the DOC.  Imam Antepli will also testify about his own volunteer services in the DOC.

   5.   **Bilal Ansari**, Former Islamic chaplain for the Connecticut Department of Correction and currently Muslim Chaplain at Williams College.  Imam Ansari is a former chaplain for the DOC and will testify regarding his experiences in that role and regarding the

10

frequency and reasons for the cancellation of Jumu'ah during the pendency of this matter. Imam Ansari will also testify regarding the shortage of Islamic chaplains within the DOC and efforts made by the DOC to alleviate those problems. Imam Ansari will also testify about the conditions within the DOC related to the treatment of Muslims and lack of accommodations for the practice of the essential elements of the Islamic faith.

6. **Imam Glen Sullivan (a/k/a Askia Muhammad)** [retired] [contact information was last used in 2007], 86 St. James Ave., Springfield, Mass. 01109 Phone: (413) 736-8874; Email: saifuhuda@aol.com. Imam Sullivan will offer testimony regarding the lack of staffing for Jumu'ah which has been an issue that has plagued the DOC for many years. He will also authenticate his signature on two exhibits.

7. **Daniel Markle**, Markle Investigations, Inc., P.O. Box 502, North Haven, CT 06473. Mr. Markle is a private investigator who will testify, if at all, concerning his efforts to locate and serve subpoenas on potential witnesses for Mr. Vega, including Abdullah Antepli, Bilal Ansari, and Glen Sullivan.

## B. DEFENDANTS

1. **Brian K. Murphy**, retired Acting Commissioner of the Connecticut Department of Correction, current Warden at the Wyatt Detention Facility, 950 High Street, Central Falls, RI 02863. Mr. Murphy is expected to testify as both a fact and expert witness. Mr. Murphy has been disclosed as an expert witness in this case, under date, April 20, 2007. An expert disclosure and report were filed on this same date. Mr. Murphy will offer factual and expert testimony consistent with this aforementioned disclosure and events occurring since report.

2. **Father Anthony Bruno**, Director of Religious Services, 24 Wolcott Hill Road, Wethersfield, CT. Father Bruno is expected to testify as both a fact and expert witness in this

case. Father Bruno has been disclosed as an expert in this case, under date of May 18, 2007. Father Bruno will offer factual and expert testimony consistent with the aforementioned disclosure as well as events occurring after report and the present day circumstances pertaining to the Plaintiff. Father Bruno will testify to his background, training and experience in the Department of Correction (DOC); he will testify as to the legitimate penological purposes of the regulations, directives, policies and practices at issue in this case; and he will testify as to the facts relating to the claims alleged by the plaintiff. He will deny and defend against any and all allegations of wrongdoing.

3. **James Dzurenda**, Deputy Commissioner, 24 Wolcott Hill Rd., Wethersfield, CT. Deputy Dzurenda is expected to testify as both a fact and expert witness in this case. Deputy Commissioner Dzurenda will testify to his background, training and experience in the Department of Correction (DOC); he will testify as to the legitimate penological purposes of the regulations, directives, policies and practices at issue in this case as well as the facts relating to the issues before the court. In addition to his knowledge and experience, he will also rely and offer testimony consistent with the previous disclosed expert reports of Brian Murphy. He will deny and defend against any and all allegations of wrongdoing.

4. **Chaplain Rene Keida**, present Religious Facility Coordinator at Cheshire CI, 900 Highland Ave., Cheshire, CT. Chaplin Keida will testify to his background, training and experience in the Department of Correction (DOC); he will testify as to the legitimate penological purposes of the regulations, directives, policies and practices at issue in this case; he will deny and defend against any and all allegations of wrong doing.

5. **Imam Wali Rushdan Sr.**; Muslim Center of Wilmington, 550 S. DuPont Highway, New castle, DE 19720. Imam Rushdan will testify as to his background training and

experience. He will testify along the lines of his affidavit that all manufacturing and products for Prime Products, the oils available in the DOC commissary, have been approved and the oils are considered Halal. The oils do not contain any alcohol or animal by-products and are approved for use during Muslim religious services. Imam Rushdan will also testify that the oils are optional and that the denial of oils is not a significant burden on the practice of the Muslim religion.

6.    **Dr. Imam Hasan**, 870 Dixwell Ave., Hamden, CT. Dr. Iman Hasan will testify as an expert, based on his more than 30 years of delivering Islamic services to inmates in prison; he will testify to his background, training and experience, both in the study of Islam, as a resident Imam of the Abdul Majid Karim Hasan Islamic Center, and his experience in the Department of Correction as well as other correctional systems; he will testify as to the legitimate penological purposes of the regulations, directives, policies and practices at issue in this case, and how they relate to the Islamic practices at issue in this case. He will testify about the facts of this case as they relate to his position and duties as an expert consultant to the DOC, the policies and procedures of DOC as they relate to the inmates incarcerated at Cheshire, and specifically the plaintiff. He will deny and defend against any and all allegations of wrongdoing. His opinions will include, but are not limited to the opinions expressed in his expert report dated July 25, 2007 (Defendants' Exhibit 503) previously disclosed to the plaintiff. Dr. Imam Hasan was deposed in this case and his opinions will amply demonstrate that there is no burden on plaintiff's practice of religion and that Islam is a flexible religion that can adapt to the rules, policies and procedures of the DOC. He will further testify that none of the defendants in any way infringed on plaintiff's free exercise of his religion without legitimate and reasonable objectives in the prison setting.

ME1 15461463v.1

7.     **Aly Ghanim,** Islamic Society of the Washington Area (ISWA), Halal

Certification Department, 1712 Eye Street, NW Suite 602, Washington, DC 20006, USA.  Mr.

Ghanim will testify as to the Halal certification process and will authenticate the Islamic (Halal)

Certificate issued in regards to Prime Products USA, Inc. certifying that the oils do not contain

any haram (impermissible) items (pork or alcohol) and are suitable for Muslim use.

XI.    **EXHIBITS**

   A.     **PLAINTIFF**

| DESCRIPTION | PARTIES AGREE TO ADMISSION | OBJECTION | BASIS FOR ADMISSION | BASIS OF OBJECTION |
|---|---|---|---|---|
| JUMU'AH | | | | |
| 1.    State of Connecticut Department of Correction Administrative Directives 10.8 effective 1/31/2005 | JOINT | | | |
| 2.    State of Connecticut Department of Correction Administrative Directives 10.8 effective 6/15/2011 | JOINT | | | |
| 3.    Dates of No Jumah Services (December 2006 through June 2011) Handwritten by Plaintiff | | X | Relevant to Jumu'ah claim | Hearsay, lack of foundation, unreliable, irrelevant |
| 4.    Dates of No Jumah Services (December 2006 through June 2011) Typed by Plaintiff's Counsel | | X | Relevant to Jumu'ah claim | Double hearsay, lack of foundation, unreliable, irrelevant |
| 5.    J. Vega Inmate Grievance Form A, Level 1 dated January 27, 2003 (Corrigan) and attached | | X | Relevant to Jumu'ah claim | Hearsay, unreliable, irrelevant |

ME1 15461463v.1

| letter to Deputy Warden | | | | |
|---|---|---|---|---|
| 6.    Fax dated January 28, 2003 from Rev. Elder to Rev. Bruno  with memo attached; fax dated January 29, 2003 from Bruno to Hasan forwarding same materials. | | X | Relevant to Jumu'ah claim | Hearsay, unreliable, irrelevant |
| 7.    J. Vega Inmate Request Form dated November 11, 2003 (Garner) and response from Rev. Calabrese | | X | Relevant to Jumu'ah claim | Hearsay, unreliable, irrelevant |
| 8.    J. Vega Inmate Request Form dated January 6, 2004 (Garner) and response from Islamic coordinator Kenneth Muhammed | | X | Relevant to Jumu'ah claim | Hearsay, unreliable, irrelevant |
| 9.    J. Vega Inmate Grievance Form A, Level 1 dated September 28, 2004 (Corrigan) | | X | Relevant to Jumu'ah claim | Hearsay, unreliable, irrelevant |
| 10.    January 11, 2006 email from Maria Gugliemli to Bruno | | X | Relevant to Jumu'ah claim | Hearsay, irrelevant |
| 11.    Fax dated October 17, 2006 from Keida to Bruno containing J. Vega Inmate Request Form dated October 16, 2006 | | X | Relevant to Jumu'ah claim | Hearsay, irrelevant |
| 12.    October 26, 2006 Fax containing J. Vega Inmate Request Form dated October 22, 2006 and Response from Capt. S. Frey dated October 25, 2006 | | X | Relevant to Jumu'ah claim | Hearsay, irrelevant |
| 13.    Correspondence dated November 2, 2006 from | | X | Relevant to Jumu'ah | Vega letter is hearsay, |

15

| | | | |
|---|---|---|---|
| Rev. Bruno to J. Vega responding to attached correspondence from J. Vega to T. Lantz dated October 8, 2006 and from J. Vega to Rev. Bruno dated October 22, 2006 | | claim | irrelevant |
| 14.   Email dated November 8, 2006 from Bruno to J. Vega | X | Relevant to Jumu'ah claim | Irrelevant, immaterial |
| 15.   J. Vega Inmate Grievance Form A, Level 1 dated received by DOC on October 31, 2006, with attached Grievance Routing Slip dated November 16, 2006 | X | Relevant to Jumu'ah claim | Hearsay, irrelevant |
| 16.   November 9, 2006 memo from Bruno to Mary Marcial | X | Relevant to Jumu'ah claim | Irrelevant |
| 17.   April 16, 2007 email from  Bruno to Lantz re: volunteers | X | Relevant to Jumu'ah claim | Irrelevant |
| 18.   May 2, 2007 memo from Bruno to Marcial | X | Relevant to Jumu'ah claim | Irrelevant |
| 19.   May 9, 2007 memo from Bruno to Mary Marcial re: number of jumuahs needed per facility | X | Relevant to Jumu'ah claim | Irrelevant |
| 20.   June 1, 2007 memo from Bruno to Marcial | X | Relevant to Jumu'ah claim | Irrelevant |
| 21.   August 4, 2008 Memorandum from Rev. Bruno to M. Marcial Re: Increased Islamic Chaplain Hours | X | Relevant to Jumu'ah claim | Irrelevant |

ME1 15461463v.1

| | | | |
|---|---|---|---|
| 22.   January 16, 2009 Memorandum from Rev. Bruno to M. Marcial Re: Reduction in Religious Services Budget | X | Relevant to Jumu'ah claim | Irrelevant |
| 23.   June 2, 2009 Memorandum from Rev. Bruno to M. Marcial Re: Three Chaplain Positions | X | Relevant to Jumu'ah claim | Irrelevant |
| 24.   February 17, 2010 Request for Exception to an Administrative Directive signed by Rev. Bruno | X | Relevant to Jumu'ah claim | Irrelevant |
| 25.   March 30, 2010 letter from Bruno to Dan Callahan | X | Relevant to Jumu'ah claim | Irrelevant |
| **CIRCUMCISION** | | | |
| none | | | |
| **PRAYER OILS** | | | |
| 26.   Plaintiff's Handwritten List of Vendors Of Muslim Prayer Oils | X | Relevant to prayer oil claim | Hearsay, unreliable, irrelevant |
| 27.   Plaintiff's Handwritten List of Vendors Of Muslim Prayer Oils Transcribed by Plaintiff's Attorney | X | Relevant to prayer oil claim | Double hearsay, unreliable, irrelevant |
| 28.   November 3, 2000 letter from Bruno to Vega | X | Relevant to prayer oil claim | Irrelevant |
| 29.   March 16, 2001 letter from Deputy Commissioner Tokarz to J. Vega | X | Relevant to prayer oil claim | Irrelevant |
| 30.   April 19, 2001 Memorandum from Rev. Bruno Re: Religious | X | Relevant to prayer oil claim | Irrelevant |

ME1 15461463v.1

| Articles in Commissary | | | | |
|---|---|---|---|---|
| 31.   March 8, 2002 letter from Deputy Commissioner Tokarz to J. Vega | | X | Relevant to prayer oil claim | Irrelevant, incomplete (missing affidavit) |
| 32.   J. Vega Inmate Grievance Form A, Level 1 dated January 12, 2004 with attachments and response | | X | Relevant to prayer oil claim | Hearsay, unreliable, irrelevant |
| 33.   J. Vega Inmate Grievance Form B, Levels 2 and 3 dated January 27, 2004 and February 3, 2004 response thereto | | X | Relevant to prayer oil claim | Hearsay, unreliable, irrelevant |
| 34.   January 1, 2006 J. Vega Request approval to purchase a non-commissary religious item | | X | Relevant to prayer oil claim | Hearsay, irrelevant |
| 35.   J. Vega Inmate Request Form dated April 13, 2006 | | X | Relevant to prayer oil claim | Hearsay, irrelevant, inadmissible opinion from non expert |
| 36.   October 26, 2006 correspondence from Rev. Bruno to J. Vega with attached J. Vega October 22, 2006 Request to purchase religious items | | X | Relevant to prayer oil claim | Hearsay |
| 37.   Bid Proposal of Prime Products, USA, Inc. dated February 28, 2011 | JOINT | | Relevant to prayer oil claim | |
| 38.   Contract Between the State of Connecticut and Prime Products USA, Inc. dated April 1, 2011 | JOINT | | Relevant to prayer oil claim | |

MEI 15461463v.1

**B.**      **DEFENDANT**

501          Administrative Directive 10.8; Religious Services.

- Admitted without objection.

502          CV and Biographical Summary for Dr. Abdul Majid Karim Hasan

- Admitted without objection.

503          Expert report of Dr. Imam Hasan; (to the extent those portions relate to the
remaining issues in the case re: Jumah, oils, and circumcision).

- Admitted without objection as to portions relevant to issues remaining in the
case.

504          CV of former Commissioner Brian K. Murphy

- Admitted without objection.

505          Expert report of Brian K. Murphy

- Admitted without objection as to portions relevant to issues remaining in the
case.

506          CV of Rev. Anthony J. Bruno

- Admitted without objection.

507          Expert report of Anthony Bruno

- Plaintiff is filing a motion in limine to object to the content involving opinions
on Islam.

508          CV of James E. Dzurenda-Admitted without objection.

509          February 21, 2001, letter from Iman Wali W. Rushdan to Correctional Officials

- Plaintiff objects on the grounds of hearsay and lack of foundation if Iman
Wali W. Rushdan is not available to testify at trial.

19

- Defendant's will be calling Iman Wali W. Rushdan as a witness.

510    April 28, 2006, letter from Iman Wali W. Rushdan to Correctional Officials

- Plaintiff objects on the grounds of hearsay and lack of foundation if Iman Wali W. Rushdan is not available to testify at trial.

- Defendant's will be calling Iman Wali W. Rushdan as a witness.

511    2009, letter from Iman Wali W. Rushdan to Correctional Officials

- Plaintiff objects on the grounds of hearsay and lack of foundation if Iman Wali W. Rushdan is not available to testify at trial.

- Defendants will be calling Iman Wali W. Rushdan as a witness.

512    2012, letter from Iman Wali W. Rushdan

- Plaintiff objects on the grounds of hearsay and lack of foundation if Iman Wali W. Rushdan is not available to testify at trial.

- Defendant's will be calling Iman Wali W. Rushdan as a witness.

513    Islamic (Halal) Certificate (Valid April 2013 through April 2014)

- Plaintiff objects on the grounds of hearsay and lack of foundation.

- Defendant asserts that this proposed evidence is relevant to the oils claim.

514    Fax correspondence from Prime Products to Father Anthony Bruno dated January 17, 2013.

- Plaintiff objects on the grounds of hearsay and lack of foundation.

- Defendant asserts this proposed evidence is relevant to the oils claim and formed part of the basis by which the individuals on the religious oil committee at D.O.C. reached a conclusion that the proposed oils were appropriate for religious use.

20

515        Jumah Schedule June 25, 2010, through March 29, 2013.

- Plaintiff objects on the grounds of hearsay.

- Defendant asserts that this proposed evidence is relevant to the Jumah claim.

## XII.   DEPOSITION TESTIMONY

### A.   PLAINTIFF

1.     Deposition of Imam Abdullah Antepli – Imam Antepli is expected to testify by deposition at trial.  Plaintiff proposes to read the following portions of Imam Antepli's deposition at trial:  p.5 (14-25); p.6 (1-6); p.7 (2-4 & 23-25); p.8 (1-2); p.9 (4-19); p.10 (9-15); p.11 (21-25); p.12 (1-6); p.15 (8-13); p.16 (13-25); p.17 (1-3, 14-15 & 19-25); p.18 (1-25); p.19 (1-17); p.22 (21-25); p23 (1-12); p.24 (5-11 & 14-25); p.25 (1-2 & 5-19); p. 26 (11-23); p.27 (24-25); p.28 (1-9 & 15-25); p.29 (1-25); p.30 (1-25); p.31 (1-6 & 18-25); page 32 (1-10); p.46 (5-25); p.47 (1-2); p.55 (1-25); p.56 (1-5, 7-11 & 19-25); p.57 (1-2 & 4-6); p.58 (4-7); p.60 (24-25); p.61 (1-12 & 15-21); p.63 (10-16); p.65 (2-25); p.66 (1); p.77 (17-25); p.78 (1-25); p.79 (1-3 & 6-9); p.80 (6-15); p.85 (25); p.86 (1-15); p.89 (10-25); p.90 (1-11); p.91 (16-25); and p.92 (1-20).

Defendants object to all of the designated testimony from Imam Antepli and are filing a motion to preclude such testimony.

### B.   DEFENDANT

Not applicable

## XIII.   REQUESTS FOR JURY INSTRUCTIONS

Not applicable.

## XIV.   ANTICIPATED EVIDENTIARY PROBLEMS

### A.   PLAINTIFF

ME1 15461463v.1

Scope of testimony pending resolution of motions in limine.

**B.      DEFENDANT**

Scope of testimony pending resolution of motions in limine. Defendants object to a vast

number of plaintiff's proposed exhibits as hearsay, and as being irrelevant.

**XV.    PROPOSED FINDINGS AND CONCLUSIONS**

**A.      Plaintiff's Proposed Findings of Fact**

1.      Plaintiff has been a religiously observant Muslim since his conversion in 1993.  In

1993, Mr. Vega declared his "shahada" signifying his conversion to the Islamic faith.   The

shahada is a declaration of faith to become a Muslim.

2.      Mr. Vega derives his sincerely-held religious beliefs from the Quran, Hadiths, and

the Sunnah.  Hadiths are writings that explain the Quran and contain the "approvals, the denials,

the instructions, the example, of" the Prophet Muhammad.  The Sunnah refers specifically to the

life example of the Prophet Muhammad.  Following the Sunnah is essential to the practice of

Islam.

3.      Plaintiff is able to read and write in Arabic.

4.      Plaintiff holds sincere religious beliefs that requires all Muslim males to be

circumcised; that requires all Muslims to attend a Friday Jumu'ah  congregant prayer service;

and that requires all Muslims to adorn themselves with Halal prayer oils to participate in the

Jumu'ah  prayer service.

5.      Plaintiff's beliefs are consistent with widespread Islamic practices.

**Cancellation of Jumu'ah**

1.      Between 2003 and 2006, Plaintiff filed numerous grievances regarding the

cancellation - without cause - of the weekly Jumu'ah  service.

ME1 15461463v.1

Case 3:04-cv-01215-DFM   Document 246   Filed 04/16/13   Page 23 of 29

6.      A Jumu'ah  is a Muslim collective prayer service that occurs each Friday and typically last about one hour.

7.      Jumu'ah  is an obligatory practice in Islam.

8.      The Jumu'ah  prayer cannot not be done or made up for by praying individually.

9.      The Islamic faith prohibits a Muslim from missing three consecutive Jumu'ahs.

10.     If a Muslim misses three consecutive Jumu'ahs, he or she is taken out of the "fold of Islam" and is required to retake the declaration of faith or the shahada.  Put another way, missing three Jumu'ahs in a row is a "huge major sin."

11.     Mr. Vega has missed three consecutive Jumu'ahs on more than one occasion.

12.     There are simply not enough Islamic chaplains and volunteers in the DOC to allow for consistent Jumu'ah services.  In Islam, chaplains are not allowed to perform more than one Jumu'ah on the same day.  If the chaplain has to for some reason, the performance of more than one Jumu'ah can only be temporary.

13.     In July 2007, there only were approximately 12 approved Muslim volunteers.

14.     By contrast there were approximately 300 Protestant volunteers in 2007.

15.     Chaplain Ashraf had to perform multiple Jumu'ahs for <u>five years</u> due to the shortage of approved Islamic leaders.  Further, the DOC was in a state of Islamic "emergency coverage" for at least six months wherein Jumu'ahs were missed with regularity.  Defendants have made the Islamic requirement that a Muslim cannot miss more than three consecutive Jumu'ahs the norm because of the lack of staffing.

16.     The shortage of chaplains and volunteers is not due to the availability of qualified individuals; rather the DOC has failed to hire those qualified individuals.

ME1 15461463v.1

17.    For the period of 2002-2006, Islamic volunteers and chaplains never felt the welcome from the system to establish a stronger relationship between the Muslim volunteer community and the DOC.

18.    There are currently no measures in place to prevent the facility where Plaintiff resides from cancelling three or more Jumu'ahs in a row.

**Restriction of Ability to Obtain Islamic Prayer Oils**

1.    The use of oils for religious prayer is part of the Sunnah.

2.    It is Plaintiff's belief that his religion obligates him to use prayer oils that do not contain chemicals.

3.    At certain times, Plaintiff was allowed to purchase Islamic prayer oils of his choosing that were in conformity with his religious beliefs.

4.    The oils currently sold in the commissary are sold by one vendor.

5.    These oils are not approved Islamic oils because they contain chemicals which are prohibited for use by Muslims.

**Denial of Islamically Mandated Circumcision**

1.    Mr. Vega has made a religiously-based request for a circumcision.

2.    Mr. Vega believes in the obligation of circumcision for adult male converts to the Islamic faith.

3.    Circumcision is an essential practice for every Muslim.

4.    Imam Hasan, and others, have recognized the legitimacy of Mr. Vega's request for a circumcision within the context of the Islamic faith.

5.    Mr. Vega believes that failure to obtain a circumcision is a major sin in Islam.

**B.      Plaintiff's Proposed Conclusions of Law**

ME1 15461463v.1

**Religious Land Use and Institutionalized Persons Act ("RLUIPA")**

1.      RLUIPA guarantees a right to engage in religious practices that includes "any exercise of religion, *whether or not compelled by, or central to,* a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added); see also Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 347 (2d Cir. 2007) (stating "[t]o remove any remaining doubt regarding how broadly Congress aimed to define religious exercise, RLUIPA goes on to state that the Act's aim of protecting religious exercise is to be construed broadly and to the maximum extent permitted by the terms of this chapter and the Constitution").

2.      RLUIPA prohibits the government from "impos[ing] a substantial burden on the *religious exercise* of a person residing in or confined to an institution."  42 U.S.C. § 2000cc-1(a)(1)-(2) (emphasis added).

3.      If a policy substantially burdens an inmate's religious exercise, RLUIPA requires that the burden be applied in furtherance of a compelling governmental interest and that the burden be the least restrictive means of meeting that interest. 42 U.S.C. § 2000cc-1(a).

4.      The establishment of a RLUIPA claim involves the consideration of four elements. Spratt v. Rhode Island Dept. of Corrections, 482 F.3d 33, 38 (1st Cir. 2007).  Mr. Vega has the burden of demonstrating the first two elements:  "(1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial." Id.  After Mr. Vega establishes these two elements, "the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest." Id.

25

5.      A substantial burden exists where substantial pressure is placed on an adherent to modify his behavior and to violate his beliefs. Spratt v. Rhode Island Dept. of Corrections, 482 F.3d 33, 38 (1st Cir. 2007).

6.      A substantial burden exists where an individual is forced by the state to choose between abandoning his religion and forfeiting benefits. Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007).

**First Amendment**

1.      Under the First Amendment, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. 78, at 89 (1987). Turner sets forth four factors to be considered in determining whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) whether accommodation of the asserted constitutional right will "impact . . . guards and other inmates, and . . . the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives." Turner, 482 U.S. at 89-91.

2.      A burdened practice need not be mandated by an inmate's religion in order to sustain her free exercise claim. McEachin v. McGinnis, 357 F.3d 197, 203 (2d Cir. 2004).

3.      Under Second Circuit jurisprudence, when considering a First Amendment claim, the court should examine whether the practice is religious in nature and whether the person's religious belief is sincerely held; whether the challenged practice of prison officials impinge on

26

this belief; and whether the challenged practice furthers some legitimate penological objective. Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988).

4.      If a prison official's practice infringes upon an inmate's religious exercise, the First Amendment requires that a valid, rational connection exist between that practice and a legitimate penological interest.  Ford v. McGinnis, 352 F.3d 582, 594 (2d Cir. 2004).

5.      If an inmate claimant can point to a reasonable alternative that accommodates her rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. Covino v. Patrissi, 967 F.2d 73, 78-80 (2d Cir. 1992).

**Equal Protection**

1.      The Second Circuit has applied the First Amendment standard found in Turner to "the assessment of equal protection claims in the prison setting."  Benjamin v. Coughlin, 905 F.2d 571, 575 (2d Cir. 1990).  "As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." Id.

**DEFENDANTS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ARE ATTACHED TO THIS MEMORANDUM**

**XVI.   TRIAL TIME**

April 23, 2013 to April 25, 2013.

**XVII. FURTHER PROCEEDINGS**

1.      Defendants have filed a motion to preclude Plaintiff from offering improper opinion testimony from lay witnesses.

2.      Defendants have filed a motion to preclude Plaintiff from offering deposition testimony of Abdullah Antepli.

27

3.      Defendants have filed a motion to preclude any evidence sought to be offered that pre-dates Plaintiffs transfer to Cheshire Correctional as it pertains to his Jumah claim.

4.      Plaintiff previously filed a motion to preclude the expert opinions of Theresa Lantz and Anthony Bruno in connection with the Islamic faith and security, document #169, dated April 7, 2008.  The Court previously ruled that such motion should be re-filed at the time of trial.  This motion has been re-filed and oral argument is requested.

5.      Plaintiff will further file a motion to preclude expert witnesses disclosed late or not at all.

6.      These motions are attached hereto and will need to be decided in advance of trial. A pre-trial conference is scheduled to be held on April 19, 2013.

## XVIII.      **ELECTION FOR TRIAL BY MAGISTRATE**

The parties have agreed to have this case tried by a United States Magistrate Judge.  The parties have also elected to have any appeal heard by the Court of Appeals.

MEI 15461463v.1

## CERTIFICATION

Pursuant to paragraph 3 of this Court's Pretrial Order, counsel for the parties have conferred with each other and represent that this Joint Trial Memorandum is the product of consultation between the lawyers who will be trying the case.

| PLAINTIFF | DEFENDANTS |
|---|---|
| Joe Burgos Vega, #130135 | Theresa Lantz, et. al. |
| McCarter & English, LLP | GEORGE JEPSEN<br>ATTORNEY GENERAL |
| By:/s/ Charles D. Ray | By: /s/ Edward Wilson, Jr. |
| Charles D. Ray, Fed. Bar #CT13211<br>Jordan D. Abbott, Fed. Bar #CT28618<br>McCarter & English<br>185 Asylum St.<br>Hartford, CT 06103-3495<br>860-275-6700<br>Email: cray@mccarter.com<br>Jabbott@mccarter.com | Edward Wilson, Fed Bar # ct29119<br>Steven R. Strom, Fed Bar # ct01211<br>Assistant Attorneys General<br>110 Sherman St.<br>Hartford, Ct 06105<br>Email: e.wilson@ct.gov<br>steven.strom@ct.gov |

MEI 15461463v.1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA, | : | CIVIL NO. 3:04CV01215 (DFM)(JGM) |
| Plaintiff, | : | |
| v. | : | |
| THERESA LANTZ, ET AL., | : | |
| Defendants. | : | APRIL 16, 2013 |

### DEFENDANTS' PROPOSED FINDINGS OF FACTS

In accordance with Paragraph 15 of this Court's Standing Orders, the Defendants respectfully submit the following proposed findings of fact:

I. **BACKGROUND**

A. **Plaintiff**

1. Plaintiff, Joe Burgos Vega, is an inmate currently in the custody of the Connecticut Department of Correction ("DOC").

2. Plaintiff is serving a sixty year sentence of incarceration as the result of his conviction for two counts of assault in the first degree in violation of Conn. Gen. Stat. section 53a-59 and one count of kidnapping in the second degree in violation of Conn. Gen. Stat. section 53a-94.

3. Plaintiff's convictions arose from acts he committed against a sixteen year old girl with whom he had a sexual relationship when Plaintiff was twenty-nine years old.

In 1995, Plaintiff committed his first acts of violence against the victim; hitting her, tearing her clothes and forbidding her to attend school.

4. In late 1995, Plaintiff stabbed the victim, burned her with a cigarette and carved "Joey" on her chest with a piece of glass.

1

5.      In early 1996, Plaintiff locked the victim in a bedroom with her infant son.

6.      On January 7, 1996, plaintiff entered the bedroom, stabbed the victim, beat her, cut the nipple off her right breast and forced her to swallow it.  See State v. Vega, 259 Conn. 374, 376-77; 788 A.2d 1221 (2202); Vega v. Commissioner or Correction, 103 Conn. App. 732; 930 A.2d 75 (2007).[1]

7.      Plaintiff currently is incarcerated at Cheshire Correctional Institution, 900 Highland Avenue, Cheshire, CT 06410.  He has been housed at Cheshire C.I. since June 9, 2010.

**B.      Defendants**

8.      Theresa Lantz, former Commissioner of the DOC.  Former Commissioner Lantz served as Commissioner of the DOC from 2003 until the time of her retirement in 2009.  Former Commissioner Lantz has had over 34 years of experience in the field of corrections.  She was a training development specialist for the U.S. Department of Justice, National Institute of Corrections Academy, and joined the DOC in 1989 as director of training and staff development.  She became a deputy commissioner in 1991 and served as the warden of several correctional institutions before her appointment to Commissioner.  She presently serves as a national criminal justice consultant.

9.      Rev. Anthony J. Bruno is the DOC Director of Religious Services.  Father Bruno has been the Director of Religious Services since 1999.

---

[1]  See also Vega v. Lantz, 596 F.3d 77, 79 (2d Cir. 2010).

**C.**     **Witnesses**

10.     Brian K. Murphy retired Acting Commissioner of the DOC, current Warden at the Wyatt Detention Facility, 950 High Street, Central Falls, RI 02863.  Warden Murphy began his employment with the DOC as a Correction Officer in 1984 and rose through the ranks, serving as Correctional Lieutenant (1986), Captain (1989), Director of Security (1991), District Administrator (1995), Warden (in varied capacities, from 1996-2003), and Deputy Commissioner of Operations (2003).   He was named the Interim Commissioner of the DOC on July 1, 2009.  He is an expert on the operations of the DOC and the operations of corrections systems at large.   Warden Murphy was disclosed as an expert witness in this case on April 20, 2007.

11.     Rev.  Anthony  J. Bruno, DOC Director of Religious Services (see above), 24 Wolcott Hill Road, Wethersfield, CT  06109.  Since 1999, Father Bruno has served as the DOC Director of Religious Services.   As such, Father Bruno is the chaplain responsible for the facilitation and oversight of religious programming within the Department.    Since  1993, he has been a member of the American Correctional Chaplains Association and, from 2006-2010, Father Bruno was the president of that professional organization. In 2008, Father Bruno was the recipient of the E.R. Cass Correctional Achievement Award from the American Correctional Association. Father Bruno is an expert in religious services in corrections systems.   He was disclosed as an expert witness in this case on May 18, 2007.

12.     James Dzurenda, Interim Commissioner of the DOC, 24 Wolcott Hill Road, Wethersfield, CT 06109.  Commissioner Dzurenda joined the DOC in 1987 as a

Corrections Officer and rose up the ranks to Lieutenant (1991), Captain (1993), Major (1995), Warden (2002), District Administrator (2009), Deputy Commissioner for Operations (2010), and Interim Commissioner (effective April 1, 2013).

13.    Chaplain Rene Keida, Religious Coordinator at Cheshire C.I., 900 Highland Avenue, Cheshire, CT  06410.  Chaplain Keida has been employed by the DOC at all times relevant to this case as a supervising chaplain and presently serves as the Religious Coordinator at Cheshire C.I.

14.    Imam Wali W. Rushdan, Sr., Muslim Center of Wilmington, 550 S. DuPont Highway, New Castle, DE  19720.  Imam Rushdan has worked with the Pennsylvania and Delaware corrections departments for more than twenty-five (25) years.  He has reviewed manufacturing procedures and ingredients of oil products since 2001.

15.    Dr. Abdul-Majid Karim Hasan, 870 Dixwell Avenue, Hamden, CT  06514. He is the Resident Imam of Muhammad Islamic Center and Director of Education of the Clara Muhammad School in Hamden, CT.  He has held these positions since 1971. From 1980 to 1989, Dr. Hasan was the Director of Islamic Services for the DOC and, since 2001, has served as the Islamic Advisor to the DOC Director of Religious Services.

II.    **JUMAH**

16.    DOC Administrative Directive 10.8, "Religious Services," ("A.D. 10.8") sets forth the DOC policies that govern and control the practices at issue in this case.

17.    A.D. 10.8 provides that "[t]he practice of religion by inmates in accordance with the provisions of this directive shall be consistent with the compelling governmental

4

interest of preventing inmate conduct which threatens security, safety and order."  A.D. 10.8(1).

18.    A.D. 10.8 provides that "[a]ll collective religious activity shall be conducted and supervised by a Department authorized Chaplain or religious volunteer who professes the same religion as the group gathering together.  An inmate may not conduct a collective religious activity under any circumstances."  A.D. 10.8(6)(B).

19.    Pursuant to A.D. 10.8, an inmate may assist a department authorized Chaplain or religious volunteer who is conducting a collective religious activity.

20.    Because an inmate can never exercise any authority over another inmate, an inmate can never be authorized to serve as a Chaplain or religious leader. A.D. 10.8.

21.    Collective religious activities are held pursuant to an established schedule which is controlled by the availability of a Department authorized Chaplain or religious volunteer, the necessary accommodations to safety and security, and other circumstances which, in the opinion of correctional authorities, preclude the holding of such services.

22.    When, for any reason, a scheduled collective religious activity must be cancelled, an inmate may conduct individual religious practices (i.e., prayer) in his or her cell.

23.    Muslim religious practice requires five (5) prayers per day.

24.    Pursuant to Muslim religious practice, the five (5) daily prayers need not be communal.

5

25.     Muslim religious practice requires a weekly Jumah prayer, a congregate service to be held every Friday.

26.     If it is not possible for an individual to attend a congregate Jumah service for reasons over which he or she has no control (or, as here, due to an inmate's discipline status, facility lock-downs, the lack of a Department authorized Chaplain or religious volunteer, or other extenuating circumstances which lead to the necessary cancellation of the Jumah service), Islamic law permits the individual to conduct Jumah prayer individually.

27.     At Cheshire C.I., two (2) Jumah services are provided to the inmate population every Friday.

28.     At Cheshire C.I., between June 25, 2010 (shortly after Plaintiff was transferred to Cheshire C.I.) and March 29, 2013, only eight (8) Jumah services had to be cancelled.

29.     The eight (8) cancellations of Jumah in this time frame were due to administrative exigencies and were related to legitimate penological interests. Indeed, the need to cancel such Jumah services was due to compelling governmental interests, there was no less burdensome way to provide for safety and security, no other available options, and the burden on the plaintiff's practice of religion was not substantial.

30.     Between June 25, 2010 and March 29, 2013, Plaintiff attended Jumah approximately 101 times.

31.     During that time period, attendance was not recorded 22 times.

6

### III.   CIRCUMCISION

32.   There is no constitutional right to elective surgery.[2]

33.   The DOC has a written Memorandum of Agreement (MOA) or contract with the University of Connecticut Health Center for the provision of medically necessary care to inmates.

34.   The contract between the University of Connecticut Health Center, Correctional Managed Health Care (CMHC) and the DOC does not provide for elective surgery.

35.   Circumcision is not in this case a medically required procedure. The only medical indications for a circumcision are balantis (chronic inflammation of the head of the penis, usually caused by sugar in the urine) or phimosis (the inability to retract the foreskin).

36.   All other circumcisions are elective medical procedures.

37.   Plaintiff does not suffer from either balantis or phimosis.

38.   There is no medical indication requiring that Plaintiff be circumcised.

39.   Circumcision is not a necessary or fundamental tenet of Islam.  It is not a Muslim religious requirement to be circumcised.

40.   For adult male converts to Islam, circumcision is optional, and the denial of a circumcision is not a substantial burden on the practice of plaintiff's religion.

41.   Plaintiff has requested elective surgery on multiple occasions.

---

[2] Prisoners do not have a constitutional or statutory right to a surgery that is not medically necessary.  Cf. Estelle v. Gamble, 429 US 97, 104-105 (1976).

42.     Defendants' denial of Plaintiff's requests is consistent with other inmates' requests for elective surgery.

43.     To allow plaintiff's request for elective surgery for alleged religious reasons would open the floodgates to a whole hoist of requests for elective procedures for a wide variety of allegedly "sincerely held " religious beliefs, to include but not limited to religious tattoos, and body piercings.

44.     The denial of such surgery, not only fails to present a substantial burden on the practice of plaintiff's religion, but also is reasonably related to the compelling interest of avoiding unnecessary surgery, with the attendant risks of infection and complications, potentially unlimited excessive costs and burdens to the DOC, especially with the potential "ripple effect' which a precedent of this nature would cause.

IV.   **OILS**

45.     It is an optional Muslim religious practice to wear oils on one's body.

46.     The denial of oils is not a substantial burden on the practice of the Muslim religion.

47.     Prior to 2001, DOC Muslim inmates requested to buy oils as they were not in the commissary that they could use for this optional practice.

48.     Inmates bought oils from a variety of vendors and it became a bona fide security issue within the DOC as there were no controls on the oils which were not only potentially hazardous, but also were coming from a variety of sources, with no assurance they were safe for inmate use.

8

49.    Since 2001, the DOC has offered appropriate oils, approved for religious use by Muslims, for sale in the commissary.

50.    The oils offered for sale in the DOC commissary are certified as halal; i.e., they are pure (do not contain, inter alia, animal products or alcohol) and may be used for this optional Muslim religious practice.

51.    From 2001 to 2012, the oils were certified by Imam Wali Rushdan. See ¶14, supra.

52.    In 2013, the Islamic Society of the Washington Area (ISWA) inspected and certified as Halal the oils provided to the DOC commissary.  See Defendants' Proposed Exhibit 513.

53.    Plaintiff has purchased approximately eighteen (18) vials of oils at the DOC commissary at Cheshire C.I.  These include sandalwood, myrrh, and musk oils.

54.    The provision of Halal certified oils in commissary for optional purchase by any inmate (one does not have to be a Muslim to purchase the oil), is a courtesy to accommodate this optional religious practice, and even if the commissary and DOC allowed no oils at all, such a prohibition would not be a substantial burden on the practice of plaintiff's religion.

55.    The provision of a limited number of fragrances and a controlled sources is reasonably related to the compelling interest of safety and security and there is no other option or alternative which can meet the safety needs of avoiding flammable materials, avoiding toxic or intoxicating substances, which would be the case if other unregulated oils were allowed.

9

56.    Additionally, to allow one inmate to purchase oils would open the floodgates to a myriad of requests from other inmates to purchase oils from vendors in the community, outside of DOC, which would lead to the chaotic, and unregulated, dangerous situation which existed in DOC with regard to oils prior to 2001.

## V.    EQUAL PROTECTION

57.    With regard to all of plaintiff's demands, cancellation of collective religious services, circumcision, and oils, plaintiff and plaintiff's chosen religious group, Muslim inmates are treated no differently than any other group.

58.    For example, when there is a lockdown, all activities are cancelled. If there is a Protestant or Catholic collective service scheduled during a period of lockdowns, such Christian services are similarly cancelled.

59.    No inmate may demand elective medical procedures for a religiously motivated reason and all faith groups are treated in the same manner for purposes of circumcision.

60.    No inmate, of any faith group, or an inmate with no religious affiliation whatsoever, may purchase oils from outside vendors. All oils must be purchased from commissary.

10

DEFENDANTS
Theresa Lantz, Et Al.

GEORGE JEPSEN
ATTORNEY GENERAL


BY:      /s/ Steven R. Strom
         Steven R. Strom
         Assistant Attorney General
         110 Sherman Street
         Hartford, CT 06105
         Federal Bar #ct01211
         E-mail:  steven.strom@ct.gov
         Tel.:  860-808-5450
         Fax:  860-808-5591


## CERTIFICATION

I hereby certify that on April 16, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


         /s/ Steven R. Strom
         Steven R. Strom
         Assistant Attorney General
         110 Sherman Street
         Hartford, CT 06105
         Federal Bar #ct01211
         E-Mail:  steven.strom@ct.gov
         Tel.:  (860) 808-5450
         Fax:  (860) 808-5591

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA | : | CIVIL NO. 3:04CV01215 (DFM)(JGM) |
| v. | : | |
| THERESA LANTZ, ET AL. | : | APRIL 16, 2013 |

**DEFENDANTS' PROPOSED CONCLUSIONS OF LAW**

Pursuant to paragraph 15 of this Court's Standing Order, and this Court Trial Order (Doc. #242), the defendants respectfully submit the following proposed conclusions of law:

**A.   Law on Permanent Injunctions – Caselaw Standard**

1.      "Permanent injunctive relief is appropriate when a plaintiff (1) shows that an inadequate remedy is available at law, such as by showing that irreparable harm would result if an injunction were not granted, and (2) succeeds on the merits of his claim. See Weizmann Institute of Science v. Neschis, 229 F.Supp.2d 234, 258 (S.D.N.Y.2002). Thus, the standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); Sierra Club v. Hennessy, 695 F.2d 643, 647 (2d Cir.1982); Neschis, 229 F.Supp.2d at 258."

Dodge v. County of Orange, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003).

2.      In addition, where, as here, "'public consequences' are implicated, it is incumbent upon a district court in exercising its discretion to 'balance [ ] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.' " Sierra Club v. Hennessy, 695 F.2d 643, 649 (2d Cir.1982) (quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

Dodge v. County of Orange, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003).

3.      This Court is familiar with the well established standard for the issuance of a preliminary injunction, especially here, where the alleged harm is remote and speculative. The Supreme Court has long held that injunctive relief is an "extraordinary remedy".   Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982).   In order to grant a preliminary  injunction,  the plaintiff must demonstrate:

> [N]ot only that he is likely to suffer irreparable injury if relief is denied but that there is either (1) a likelihood of success on the merits or (2) a sufficiently serious question going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the plaintiff's favor.

Proctor & Gamble Co. v. Cheesborough-Pond's, Inc., 747 F.2d 114, 118 (2d Cir. 1984).

4.      Generally, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."   Winter v. Natural Res. Defense Council Inc., 555 U.S. 7, 32, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In seeking an injunction, "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation...." United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed.

1303 (1953); *see also* Equal Emp't Opportunity Comm'n v. Everdry Mktg. and Mgmt.,

348 Fed.Appx. 677, 679 (2d Cir.2009) (summary order) (no abuse of discretion in

denying injunctive relief where the entity that violated Title VII "no longer exists"). "The

factors ... [that] are pertinent in assessing the propriety of injunctive relief" are "the

balance of equities and consideration of the public interest." Winter, 555 U.S. at 32, 129

S.Ct. 365.

E.E.O.C. v. KarenKim, Inc., 698 F.3d 92, 100 (2d Cir. 2012).

     5.     In this case, Vega v. Lantz, 3:04-CV-1215(DFM) Ruling and Order (Doc.

#73) (D.Conn. March 21, 2006), this Court stated as follows:

> The court construes the plaintiff's request as one requesting interim
> injunctive relief. "[I]nterim injunctive relief is an 'extraordinary and drastic
> remedy which should not be routinely granted.'" Buffalo Forge Co. v.
> Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (quoting
> Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977)). In
> addition, a federal court should grant injunctive relief against a state or
> municipal official "only in situations of most compelling necessity."
> Vorbeck v. McNeal, 407 F. Supp. 733, 739 (E.D. Mo.), aff'd, 426 U.S. 943
> (1976). In this circuit the standard for injunctive relief is well established.
> To warrant preliminary injunctive relief, the moving party "must
> demonstrate (1) that it will be irreparably harmed in the absence of an
> injunction, and (2) either (a) a likelihood of success on the merits or (b)
> sufficiently serious questions going to the merits of the case to make them
> a fair ground for litigation, and a balance of hardships tipping decidedly in
> its favor." Brewer v. West Irondequoit Central Sch. Dist., 212 F.3d 738,
> 743-44 (2d Cir. 2000). Although a hearing is generally required on a
> properly supported motion for preliminary injunction, oral argument and
> testimony are not required in all cases. See Drywall Tapers &Pointers
> Local 1974 v. Local 530, 954 F.2d 69, 76-77 (2d Cir.1992). Where, as
> here, "the record before a district court permits it to conclude that there is
> no factual dispute which must be resolved by an evidentiary hearing, a
> preliminary injunction may be granted or denied without hearing oral
> testimony." 7 James W. Moore, et al., Moore's Federal Practice ¶ 65.04[3]
> (2d ed.1995). Upon review of the record, the court determines that oral
> testimony and argument are not necessary in this case.

6.     Where, as here, plaintiff seeks a mandatory injunction, e.g. compelling the defendant Commissioner of Correction to arrange for elective surgery for plaintiff's circumcision at the expense of the state's taxpayers,

> a greater showing is required of the moving party. *See* Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 441 (2d Cir.1977). In these circumstances, we have held that an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested," Flintkote Co. v. Blumenthal, 469 F.Supp. 115, 125–26 (N.D.N.Y.), *aff'd*, 596 F.2d 51 (2d Cir.1979), or where "extreme or very serious damage will result" from a denial of preliminary relief, Clune v. Publishers' Ass'n, 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd*, 314 F.2d 343 (2d Cir.1963). In sum, we have shown "greater reluctance to issue a mandatory injunction than a prohibitory injunction." Hurley v. Toia, 432 F.Supp. 1170, 1175 (S.D.N.Y.), *aff'd mem.*, 573 F.2d 1291 (2d Cir.1977).

Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).

7.     With regard to plaintiff's claims concerning alleged Jumah cancellation, the injury is remote and speculative and cannot form the basis for a permanent injunction.

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. Los Angeles v. Lyons, 461 U.S. 95, 103, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); O'Shea v. Littleton, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed.1995) (hereinafter Wright & Miller) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered"); *id.*, at 155, 94 S.Ct. 669 ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury"). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*).

4

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 375-76, 172 L. Ed. 2d 249 (2008).

      9.    To establish irreparable harm, plaintiff must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." Consolidated Brands, Inc. v. Mondi, 638 F.Supp. 152, 155 (E.D.N.Y.1986); accord Kaplan v. Board of Educ. of the City School Dist., 759 F.2d 256, 259 (2d Cir.1985); Salant Acquisition Corp. v. Manhattan Indus., 682 F.Supp. 199, 202 (S.D.N.Y.1988).

Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)

**B.**    **Law on Permanent Injunctions – PLRA Standard**

      10.    The Prison Litigation Reform Act (PLRA) limits the Court in regard to ordering injunctive relief. See 18 U.S.C. § 3626(a)(1)(A). Section 802 of the PLRA, 18 U.S.C. § 3626(a)(1)(A), provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." Handberry v. Thompson, 446 F.3d 335 (2nd Cir. 2006) (injunction was evaluated as necessary to ensure the PLRA's "need-narrowness-intrusiveness" requirements were satisfied.) With respect to remedies of federal law violations, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. §3626(a)(1); see also, Benjamin v. Fraser, 343 F.3d 35, 56 (2d Cir. 2003).

11.  Congress codified this weighing of the hardships in the PLRA, which directs courts to give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the prospective injunctive relief. 18 U.S.C. § 3626(a)(2); *see* Smith v. Arkansas Dep't of Correction, 103 F.3d 637, 646–47 (8th Cir.1996) (finding that the PLRA "codifies existing law and does not change the standards for determining whether to grant an injunction"); Gomez  v. Vernon, 255 F.3d 1118, 1129 (9th Cir.2001) (agreeing with Smith).

Dodge v. County of Orange, 282 F. Supp. 2d 41, 71-72 (S.D.N.Y. 2003).

12.  Even if the plaintiff meets  his burden of proof on these issues, the PLRA limits the type and scope of prospective injunctive relief that the Court may award plaintiffs. 18 U.S.C. § 3626(a)(2) states that no injunction shall issue unless the court finds that the relief is narrowly drawn, extends no further than is necessary to correct the constitutional harm found, and is the least intrusive means necessary to correct that harm. In a similar vein, the PLRA requires a court to apply principles of comity in fashioning relief that requires or permits a government official to exceed his or her authority under state or local law. *See also* Rizzo v. Goode, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'") (quoting Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951)).

Dodge v. County of Orange, 282 F. Supp. 2d 41, 72 (S.D.N.Y. 2003).

6

13.    18 U.S.C. § 3626 (a) Provides: **a) Requirements for relief.--
(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.
**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--
**i)** Federal law requires such relief to be ordered in violation of State or local law;
**(ii)** the relief is necessary to correct the violation of a Federal right; and
**(iii)** no other relief will correct the violation of the Federal right.
**C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

18 U.S.C. § 3626 (a)

14.    With respect to remedies of federal law violations, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1); *see also*, <u>Benjamin v. Fraser</u>, 343 F.3d 35, 56 (2d Cir.2003) ( "[T]he PLRA requires the court to make particular findings ... when it identifies [federal] violations.").

<u>Handberry v. Thompson</u>, 446 F.3d 335, 346 (2d Cir. 2006).

15.    The Court is required to make "need-narrowness-intrusiveness" findings under the PLRA. *See* <u>Handberry II</u>, 219 F.Supp.2d at 533.

<u>Handberry v. Thompson</u>, 446 F.3d 335, 347 (2d Cir. 2006).

7

**C.**    <u>Deference To Prison Officials</u>

16.    When considering all of the claims in this case, they must be considered in light of the highly volatile and dangerous environment of managing a high security prison facility. The United States Supreme Court reversed the Third Circuit Court of Appeals which had denied summary judgment to prison officials. <u>Beard v. Banks</u>, 548 U.S. 521,  126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006) (finding ban of publications in highest security prison reasonable and constitutional). The Supreme Court admonished the Third Circuit for substituting its judgment for the experienced professional opinions of correctional administrators. Similarly, the Seventh Circuit noted in <u>George v. Smith</u>, 507 F.3d 605 (7th Cir. Nov. 9, 2007), that "[t]he Supreme Court has told us that prisons' legitimate concerns about security and administration deserve respect, even when the subject is the printed word. *See, e.g.,* <u>Beard v. Banks</u>, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)." Thus, even when it comes to core First Amendment issues in prisons, the Court must defer to the experienced professional judgments of correctional administrators.

17.    <u>Turner v. Safley</u>, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and <u>Overton v. Bazzetta</u>, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), contain the basic substantive legal standards governing this case.  This Court recognized in <u>Turner</u> that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. 482 U.S., at 93, 107 S.Ct. 2254; *see also* <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

Beard v. Banks, 548 U.S. 521, 528, 126 S. Ct. 2572, 2577, 165 L. Ed. 2d 697 (2006).

18.     "Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  See, *e.g.*, 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin.News 1993, pp. 1892, 1899, 1900)."

Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S. Ct. 2113, 2123, 161 L. Ed. 2d 1020 (2005).

**D.     First Amendment**

19.     The Supreme Court applied the Turner standard to a prisoner's free exercise claim in O'Lone, upholding a prison regulation that prevented Muslim prisoners from attending Friday Jumu'ah even though the Jumu'ah was claimed to be mandatory weekly congregational religious services.  O'Lone, 482 U.S. at 350-53.

20.     We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to "substitute our judgment on ... difficult and sensitive matters of institutional administration," Block v. Rutherford, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison.

O'Lone v. Estate of Shabazz, 482 U.S. 342, 353, 107 S. Ct. 2400, 2407, 96 L. Ed. 2d 282 (1987).

   21.    "The Court must consider four factors for assessing reasonableness of a regulation: (1) whether a valid, rational connection between the prison regulation and the legitimate governmental interest exists; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the challenged regulation in relation to proposed alternatives. *Johnson v. Goord,* 445 F.3d 532, 535 (2d Cir.2006)." Klimas v. Lantz, 3:08CV694 WWE, 2012 WL 3611018 (D. Conn. Aug. 21, 2012).

   22.    "The burden is on the inmate to disprove the validity of the regulation at issue. Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2008)."

Klimas v. Lantz, 3:08CV694 WWE, 2012 WL 3611018 (D. Conn. Aug. 21, 2012).

   23.    "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' "Graham v. Mahmood, 2008 WL 1849167 at *12; *see also, e.g.,* Fromer v. Scully, 874 F.2d 69, 73 (2d Cir.1989); Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); Byrd v. Goord, 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug.29, 2005) (Daniels, D.J.)."

Mitchell v. New York State Dept. of Corr. Services, 06-CV-6278CJS, 2009 WL 185757 (W.D.N.Y. Jan. 26, 2009).

**E.      Religious Land Use and Institutional Persons Act RLUIPA**

24.     Plaintiff's invocation of the Religious Land Use and Institutional Persons Act (RLUIPA) does not change the analysis or alter the balance in favor of safety, security and order.  In Cutter v. Wilkinson, 544 U.S. 709 (2005).  The Supreme Court acknowledged and emphasized that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Id. 544 U.S. at 722-723. (citation omitted). Thus, the Court did "**not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.**" Id. at 722. See Clark v. Levesque, 3:03CV 795 (DFM) (D.Conn. March 17, 2006) Ruling on Motion for Summary Judgment, slip op. (Doc. #31) at 13, ("inmates' rights to freely exercise their religious beliefs do not supersede prison officials' interests in safety and security") Clark v. Levesque, 3:03CV795 (DFM), 2006 WL 691999 (D. Conn. Mar. 17, 2006) aff'd, 336 F. App'x 93 (2d Cir. 2009) (emphasis added).

25.     This Court has previously held in this case: "RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.' Cutter, 544 U.S. at 722. Moreover, this Court stated that courts should accord 'due deference to the experience and expertise of prison and jail administrators

in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' Id.

Vega v. Lantz, 3-04-CV-1215(DFM), 2009 WL 3157586 (D. Conn. Sept. 25, 2009) *on reconsideration,* 3:04-CV-1215 (DFM), 2012 WL 5831202 (D. Conn. Nov. 16, 2012).

26.    "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir.2006) (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)). Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest. *See* 42 U.S.C. § 2000cc-2(b)."

Jova v. Smith, 582 F.3d 410, 415 (2d Cir. 2009).

27.    In order "to demonstrate a substantial burden on exercise of religion, a governmental policy or action must significantly inhibit or constrain religious conduct or religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." Van Wyhe, 581 F.3d at 656 [citations and quotations omitted].

Jihad v. Fabian, CIV. 09-1604 SRN LIB, 2011 WL 1641885 (D. Minn. Feb. 17, 2011) *report and recommendation adopted,* CIV. 09-CV-1604 SRN, 2011 WL 1641767 (D. Minn. May 2, 2011).

28.    "[A] plaintiff alleging a RLUIPA violation must first show that defendants substantially burdened his sincerely-held religious beliefs. *See* Singh, 520 F.Supp.2d at 498. 'In order to establish that a plaintiff's exercise was substantially burdened [under RLUIPA], a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith.' Graham, 2008 WL 1849167, at *14 (quoting Muhammad, 904 F.Supp. at 189). The interference 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.' Id. However, 'while mere inconvenience to the adherent is insufficient to establish a substantial burden, demonstrating a substantial burden is not an onerous task for the plaintiff.' Singh v. Goord, 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (internal citations and quotation marks omitted)." Pugh v. Goord, 571 F. Supp. 2d 477, 504-05 (S.D.N.Y. 2008).

29.   "In addition, the Court notes that although the substantial burden test pre-supposes that some infringements will be *de minimis,  see* Ford v. McGinnis, 352 F.3d 582, 593 (2d Cir.2003) , the centrality of a practice to a religion is not subject to judicial inquiry. Id. at 590..." Singh v. Goord, 520 F. Supp. 2d 487, 498-99 (S.D.N.Y. 2007).

13

**F.**     **First Amendment Abstention**

30. Plaintiff, for the first time in the lengthy history of this case, and without

further amending his Amended Complaint, asserts in his portion of the Joint Trial

Memorandum (Section VI, Plaintiff's Contentions) that "the manner in which [Jumah] is

currently conducted does not comport with Mr. Vega's practice of his Islamic faith."

Without exactly specifying what he means, plaintiff appears to be inviting the Court to

delve into an ecclesiastical or doctrinal intra-faith dispute, over which this Court has no

jurisdiction, and which the Court should decline to entertain under first amendment

abstention.

> The District of Columbia Court of Appeals discussed the rubric of first
> amendment abstention, including the proposition that secular courts may
> decide issues amenable to resolution by application of neutral principles of
> law, at least where property disputes and secular employment and
> business contracts are at issue; the court noted that the " 'fraud, collusion
> or arbitrariness' " exception enunciated as dictum in <u>Gonzalez v. Roman
> Catholic Archbishop</u>, *supra*, 280 U.S. at 1, 50 S.Ct. 5, had ***682** been
> narrowed almost beyond recognition by the later case of <u>Serbian Eastern
> Orthodox Diocese v. Milivojevich</u>, *supra*, 426 U.S. at 696, 96 S.Ct. 2372.
> <u>Heard v. Johnson</u>, *supra*, 810 A.2d at 881-82. *Citing, inter alia,* <u>Serbian
> Eastern Orthodox Diocese</u>, the court stated that **the first amendment
> generally prohibits "judicial encroachment into church decisions
> where those decisions turn on church policy or on religious doctrine
> or practice.** Except for contractual disputes, this prohibition includes
> church decisions concerning the employment of ministers because
> selection and termination of clergy is a core matter of ecclesiastical self-
> governance not subject to interference by a state." <u>Heard v. Johnson</u>,
> *supra*, at 882.

<u>Thibodeau v. Am. Baptist Churches of Conn.</u>, 120 Conn. App. 666, 681-82, 994 A.2d

212, 223 (2010) (emphasis added).

31.     "The United States Supreme Court, in a line of cases stretching back to

1871 (<u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871)), has consistently

interpreted the Free Exercise Clause as a 'constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization ... on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.' Serbian Eastern Orthodox Diocese for the United States of America and & Canada v. Milivojevich, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976)." Heard v. Johnson, 810 A.2d 871, 879 (D.C. 2002).

32.    This Court should exercise first amendment abstention because plaintiff seeks to assert a purely doctrinal claim in this case.  It is clear that "civil courts may resolve property disputes and other secular issues that arise with respect to a religious entity, but only when inquiry 'into religious law and polity' is not required.  Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich, 426 U.S. at 709, 96 S.Ct. 2372." Ram v. Lal, 84 Fed. R. Serv. 3d 187 (E.D.N.Y. 2012).

33.    "However, civil courts may not entertain claims that in effect require religious determinations that are ecclesiastical, regardless of the nature of the underlying dispute.  See Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich, 426 U.S. at 708–10, 96 S.Ct. 2372; Little v. First Baptist Church, Crestwood, 475 U.S. at 1149, 106 S.Ct. 1802 (stating that 'where the use of property or the terms of a contract necessitate reference to ecclesiastical principles or authority, courts must exercise extreme care to avoid taking sides on matters of religious belief')." Ram v. Lal, 84 Fed. R. Serv. 3d 187 (E.D.N.Y. 2012).

33.    "Since at least the turn of the century, courts have declined to "interfere [ ] with ecclesiastical hierarchies, church administration, and appointment of clergy."

Minker v. Balt. Annual Conference of the United Methodist Church, 894 F.2d 1354, 1357 (D.C.Cir.1990) (internal quotation marks omitted)" Rweyemamu v. Cote, 520 F.3d 198, 204-05 (2d Cir. 2008), aff'd, 347 Fed.Appx. 654 (2d Cir.2009), cert. denied, —— U.S. ——, 130 S.Ct. 1714, 176 L.Ed.2d 184 (2010).

Dayner v. Archdiocese of Hartford, 301 Conn. 759, 770, 23 A.3d 1192, 1199 (2011).

34.     "The Establishment Clause forbids 'excessive government entanglement with religion.' Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (internal quotation marks and citation omitted). 'Entanglement may be substantive-where the government is placed in the position of deciding between competing religious views-or procedural-where the state and church are pitted against one another in a protracted legal battle.' Petruska, 462 F.3d at 311." Rweyemamu v. Cote, 520 F.3d 198, 208 (2d Cir. 2008).

**G.     Equal Protection**

35. The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).  However, it is not the case that "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." Graham v. Mahmood, No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *14 (S.D.N.Y. Apr.22, 2008), citing Cruz v. Beto, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The Second Circuit has determined that the Turner standard applies to equal protection claims involving prisoner religious exercise. See Benjamin v. Coughlin, 905 F.2d 571,

575 (2d Cir.1990).   Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests." Benjamin, 905 F.2d at 574.

Vega v. Lantz, 304CV1215DFM, 2009 WL 3157586 (D. Conn. Sept. 25, 2009) on reconsideration, 3:04CV1215 DFM, 2012 WL 5831202 (D. Conn. Nov. 16, 2012).

```
                              DEFENDANTS
                              Theresa Lantz, Et Al.

                              GEORGE JEPSEN
                              ATTORNEY GENERAL


                       BY:     /s/ Steven R. Strom
                              Steven R. Strom
                              Assistant Attorney General
                              110 Sherman Street
                              Hartford, CT 06105
                              Federal Bar #ct01211
                              E-Mail: steven.strom@ct.gov
                              Tel.: 860-808-5450
                              Fax: 860-808-5591
```

## CERTIFICATION

I hereby certify that on April 16, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

        /s/ Steven R. Strom
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct01211
E-Mail:  steven.strom@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5591