UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA, | : | CIVIL ACTION NO.: |
| | : | 3:04CV1215 (DFM) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THERESA LANTZ, ET AL., | : | |
| | : | |
| Defendants. | : | June 7, 2013 |

## PLAINTIFF'S POST-TRIAL MEMORANDUM

**I.      INTRODUCTION**

The question before this Court is whether Plaintiff Joe Burgos Vega ("Mr. Vega") is entitled to practice his sincerely held Islamic beliefs within the confines of imprisonment in the Connecticut Department of Corrections ("DOC").   The answer to this question should be "yes" and Mr. Vega should be entitled to 1) practice weekly Jumu'ah services that comport with his sincerely held religious beliefs; 2) receive a religious circumcision; and 3) order prayer oils that adhere to his sincerely held religious beliefs.  The evidence adduced at trial shows that defendants former Commissioner of the DOC Theresa Lantz and DOC Director of Religious Services Reverend Anthony Bruno ("Defendants"), in their official capacities, acknowledge that they denied Mr. Vega the ability to practice his sincerely held religious beliefs throughout his incarceration in the DOC.  For that reason and the reasons set forth in this memorandum of law, Mr. Vega is entitled to the above-requested relief.

**II.      NATURE OF THE PROCEEDINGS**

Plaintiff brought this action against Defendants under the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment and the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, alleging that Defendants restricted him from practicing his religion.

Plaintiff commenced this action in July 2004, representing himself *pro se*.  On November 8, 2005, he filed the operative Amended Complaint.  (Doc. #62.)  In September 2006, the Court partially granted Defendants' Motion for Judgment on the Pleadings, dismissing claims as to several defendants and reducing the scope of claims as to the remaining defendants.  (Doc. #95.)  In November 2006, the court appointed McCarter & English, LLP as counsel for Mr. Vega.

Defendants filed a Motion for Summary Judgment, after which the Court reduced the claims to those regarding (1) cancellation of Jumu'ah; (2) denial of Mr. Vega's circumcision request; (3) mishandling of Qurans; (4) availability of toothsticks; and (5) nonconforming prayer oils.  (Doc. #188)  The claims regarding the mishandling of Qurans and availability of toothsticks were resolved via settlement in 2011, leaving claims (1), (2) and (5) remaining.

In October 2009, Defendants filed a Motion for Reconsideration with respect to the issue of qualified immunity (Doc. #222), which the Court granted in November 2012, concluding that Defendants were entitled to qualified immunity and  also granting summary judgment in their favor as to the remaining claims for money damages in their individual capacities.  (Doc. #235.)

Trial took place April 23, 2013 through April 25, 2013.  Mr. Vega seeks injunctive and declaratory relief from Defendants based on his claim that Defendants (in their official capacities) unlawfully (1) frequently cancelled Jumu'ah in violation of the First Amendment, the Equal Protection Clause and RLUIPA; (2) denied Mr. Vega's request to be circumcised in violation of the First Amendment, the Equal Protection Clause and RLUIPA; and (3) denied Mr. Vega access to religiously permissible Islamic prayer oils in violation of the First Amendment, the Equal Protection Clause and RLUIPA.

2

III.     **FACTS ESTABLISHED AT TRIAL**

> a.   **Relevant background facts for all claims**

Mr. Vega has been imprisoned for the majority of his adult life and is currently serving a

sixty year sentence that began running in 1996.   (Transcript, April 23, 2013 ("Tr. 1") 182:4-14.)

He has practiced and studied Islam for the entirety of the more than seventeen years that he has

been imprisoned in the DOC.  (Tr. 1 189:15-21.)

Mr. Vega's religious studies began only after he commenced his secular studies and

demonstrated a commitment to learning.  (*See* Tr. 1 184:18-24, 185:3-14, 186:5-19.)  Mr. Vega

first took vocational training in welding and small engine repair during his incarceration at

Manson Youth Institution, where his welding instructor recognized his aptitude and enrolled him

in classes where he obtained certificates in both fields.  (Tr. 1 185:3-14; 186:5-19.)  He then

received his General Education Development certificate in 1985 while incarcerated at Bridgeport

Correctional Facility.  (Tr. 1 184:18-24.)  Mr. Vega also began paralegal studies  in 1997 while

incarcerated at Garner Correctional Institution, and eventually obtained a paralegal studies

certificate.  (Tr. 1 188:6-18.)  Additionally, he took college-level courses through Ashnuntuck

Community College at MacDougall Correctional Institution and won various writing awards at

Garner Correctional Institution.  (Tr. 1 188:21-24, 189:4-8.)

Mr. Vega's religious education began in his youth as a Catholic altar boy at Saint James

Cathedral in Brooklyn, New York.  (Tr. 1 189:22-25.)  In his mid-twenties while incarcerated in

Pennsylvania, Mr. Vega began to investigate the Muslim faith and became interested in the

religion:

> I began by being curious about what Islam was or is, and I began studying Islam.
> And I – it was something that I found in my heart.  I felt in my heart that I found
> something that I never thought would exist as far as a religion, faith, belief in one

God, belief in the angels, the books of God, the messengers and the prophets, to believe in good and bad, to believe in Devine preordainment.

(Tr. 1 190:10-17.)  Mr. Vega learned that before one takes his *shahada*, or declaration of Muslim faith, he must have a basic understanding of the five pillars of Islam and the six articles of faith. (Tr. 1 191:12-14.)  After thoroughly studying the basics of Islam , Mr. Vega took his *shahada* around 1992 or 1993.  (Tr. 1 189:19-21.)  However, in 1995 when Mr. Vega was free for less than a year, he was still considered a "newborn Muslim," as he had not yet learned many of the essential requirements of Islam.  (Transcript, April 24, 2013 ("Tr. 2") 274:18-24.)

In the years since Mr. Vega took his *shahada*, he has demonstrated his commitment to Islamic study and faith by devoting countless hours to the examination of Islamic texts, including the Quar'an, Sahih Sittah, and the Hasidic Hasan.  (Tr. 2 224:13-19.)  He has taken advantage of opportunities to enroll in formal DOC Islamic classes, typically called Taleem classes, including salat and wudu.  (Tr. 2 226:15-227:2, 227:13-25.)  Mr. Vega has taken his desire for Islamic knowledge past the confines of the DOC by corresponding with Islamic scholars via letters (Tr. 2 225:13-25) and has taught himself how to read, write and speak Arabic.  (Tr. 2 233:12-234:1.)

**b.  Jumu'ah**

**i.  Mr. Vega's beliefs regarding Jumu'ah**

Jumu'ah is an Islamic weekly prayer that must be conducted each Friday during a limited time frame in the afternoon.  (Transcript, April 25, 2013 ("Tr. 3") 407:6-12, 414:1-10.) According to DOC Islamic expert Abdul Majid Karim Hasan ("Imam Hasan"), the Friday religious worship service of Jumu'ah is "the only congregational prayer that is called for in the Quoran ordained by God."  (Tr. 3 407:13-14.)   Mr. Vega follows Imam Hasan's belief as to the obligatory nature of Jumu'ah.  (Tr. 2 229:14 -17.)  Imam Hasan explained that during a DOC Jumu'ah service, an imam leads by calling the prayer and the inmates line up behind the imam to

4

follow the prayer.  (Tr. 3 408:6-12, 411:10-19.)  Imam Hasan also recognizes that Jumu'ah is a collective religious activity and cannot be done alone.  (Tr. 2 365:25-366:2.)  Mr. Vega agrees and also believes that Jumu'ah may not be made up with any other prayer.  (Tr. 2 232:13-25.)

Mr. Vega adheres to the belief that if he misses three Jumu'ah services in a row, he falls outside the fold of Islam.  (Tr. 2 230:14-19.)  This is a belief with which Imam Hasan is familiar.  (Tr. 3 417:8-12.)   Imam Hasan also stated that if there is no lockdown he is required to conduct Jumu'ah.  (Tr. 3 438:25-439:1.)   However, Jumu'ah has been cancelled for reasons other than lockdown, including illness of imams and weather.  (*See, e.g.*, Trial Ex. 515.)

### ii.   The DOC has failed to allow Mr. Vega's practice of Jumu'ah

#### 1.   The DOC has entirely denied Jumu'ah services to Mr. Vega

Beginning in about 2003, Mr. Vega began filing grievances and complaint letters regarding the frequent cancellation of weekly Jumu'ah.  (*See* Trial Ex. 5, 7, 8, 11-13, 15.)  While incarcerated at MacDougall Correctional Institution from 2004 to 2008, he recalls receiving Jumu'ah every *six to eight weeks* rather than weekly.  (Tr. 2 240:4-12.)  Reverend Rene Keida , the Religious Services Facilitator currently located at Cheshire Correctional Institution, testified that when he supervised religious services at MacDougall, he alternated imams providing Jumu'ah between the Q-unit (a disciplinary unit where Mr. Vega was housed for an extensive period of time) and the R-unit (an unsentenced, high bond unit), so inmates in either unit were not receiving Jumu'ah every week.  (Tr. 3 486:13-23; *see also* Tr. 1 97:6-12 (Bruno).)  Reverend Keida further testified that expansion units at MacDougall other than Q-unit received even less frequent religious services.  (Tr. 3 497:4-6; Trial Ex. 11.)  In addition to his negative experiences with Jumu'ah cancellation at MacDougall, Mr. Vega recalls having similar experiences at other facilities in which he was incarcerated.  (Tr. 2 242:21-243:4.)  Mr. Vega is distraught over his

inability to attend this *mandatory* collective prayer session: "[w]hen Jumu'ah is cancelled and I happen to be among three or more Muslims, I have to now juggle between obeying my Lord, or obeying the [sic] rules and policies of the DOC". (Tr. 2 232:22-25.) In order to practice Islam and adhere to his beliefs, Mr. Vega is entitled to attend weekly Jumu'ah on an equitable basis with other religious groups. (Tr. 2 266:21-267:5.)

Defendants acknowledge that they do not adequately provide Jumu'ah, and Reverend Bruno has cited lack of volunteers as one basis for their inadequacy.

> Q.   Has a shortage of Islamic volunteers been a consistent issue during your years as director of religious services?
>
> A.   Yes, it has.

(Tr. 1 72:8-11.)

Reverend Bruno agrees that staffing for Islamic religious services has been a consistent problem and an "absolute challenge." (Tr. 1 74:11-16.) Imams were rotated when possible to be able to give inmates some services every few weeks, but Reverend Bruno testified that "You can't give what you don't have." (Tr. 1 80:3.) At trial, extensive documentation was admitted of Reverend Bruno asking for assistance from higher authorities in obtaining imams to help get Jumu'ah conducted on a weekly basis. (*See* Trial Ex. 16-18, 20, 21, 23-25.) Reverend Bruno's pleas began in 2006, but the frequent cancellations of Jumu'ah continued for Mr. Vega until 2010, when he was transferred to Cheshire Correctional Institution, a facility that conducted Jumu'ah more frequently, even in 2006. (*See* Trial Ex. 11; Tr. 3 497:18-24 (Keida).) In fact, Defendants have conceded that DOC facilities do not currently receive Jumu'ah with the same frequency, with institutions such as MacDougall-Walker's expansion units and Carl Robinson Correctional Institution not receiving it on a regular basis, and Corrigan currently having difficulty because an

imam is out on sick leave.  (Tr. 1 152:23-153:17, 155:6-10, 156:13-15 (Bruno); Tr. 3 498:16-25 (Keida).)

## 2.   When Jumu'ah services are offered the quality is deficient

In addition to unjustified cancellations of Jumu'ah, the quality of the service continues to hinder Mr. Vega's ability to practice Islam.  (Tr. 2 246:10-16, 266:1-20.)

First, Mr. Vega believes it is forbidden for an imam to conduct more than one Jumu'ah service per day.  (Tr. 2 246:10-16.)  Specifically,  Mr. Vega believes that the messenger never instructed two Jumu'ahs and it makes him question the faith and sincerity of the imam conducting the service.  (Tr. 2 269:8, 270:12-18.)  Imam Hasan acknowledges that this belief is shared by a number of other imams.  (Tr. 3 440:7-18.)  In fact, the DOC contract for contract imams specifically *requires* an imam to conduct two Jumu'ahs each Friday because some imams believe that they should only conduct one Jumu'ah per day.  (Tr. 1 86:8-20 (Bruno).)

Another issue Mr. Vega has with the current Jumu'ah services being offered is that the length is fifteen to twenty minutes, as compared to a typical hour long service.  (Tr. 2 266:1-20.)  Mr. Vega equates the current level of Jumu'ah service with a McDonalds drive-thru, explaining that when he attends Jumu'ah now he feels a void and it makes him feel empty… "as if I'm not receiving anything out of the service, because it's more here, take this and get out of here."  (Tr. 2 266:13-20.)  Imam Hasan testified that the typical service he gives at a mosque in Hamden, Connecticut lasts roughly thirty to forty-five minutes.  (Tr. 3 460:6-12.)

### iii.   Defendants have conceded that their cancellations of Jumu'ah violate the First Amendment, Equal Protection and RLUIPA

Reverend Bruno concedes that weekly Jumu'ah is required for all Islamic inmates who desire to attend the service.  (Tr. 1 108:16-23.)  Defendants are well aware that the failure to provide Jumu'ah to Islamic inmates violates the First Amendment, Equal Protection and

RLUIPA and in their owns words, "puts the DOC at great risk for litigation." (Trial Ex. 21; *see also* Trial Ex. 23, 24.) In fact, Defendants' awareness of this litigation risk caused them to document their efforts regarding trying to solve the problem, posting job vacancies so they would have "a defense in court." (Trial Ex. 23.)

### iv.  Defendants' have taken inadequate steps to ensure that Muslim inmates can practice their faith

Defendants claim that Jumu'ah has been inconsistent for a number of reasons. The DOC employs chaplains, contract chaplains and volunteers to conduct Jumu'ah. (Tr. 1 68:16-23 (Bruno).) Reverend Bruno complains that obtaining staff and contract chaplains is difficult because their positions are directly tied to the DOC's limited financial resources. (Tr. 1 74:17-75:3.) Further, many of the advertised contract chaplain positions have limited hours and pay meager compensation of roughly $100.00 per week (Tr. 1 122:6-15), thereby making them unattractive to applicants. The religious services budget has also continued to be cut over the years. (*See* Trial Ex. 22.)

Defendants also place blame for their deficiencies on the difficulty of recruiting Islamic volunteers. (Trial Ex. 17 p. 1; Tr. 1 92:12-17 (Bruno).) However, the extent of Reverend Bruno's recruitment efforts amount to mailing form letters to mosques around the state in search of volunteers, rather than visiting any of these mosques in person. (Trial Ex. 17, p. 4-6; Tr. 1 94:18-96:5.) One former DOC volunteer, Imam Abdullah Antepli, former Associate Director of the Islamic Chaplaincy program at the Hartford Seminary (*see* Antepli Dep. 5:19-24 (Trial Ex. 39)) testified that he applied to be a volunteer with the DOC at Cheshire Correctional Institution, but never heard back from the DOC. (Antepli Dep. 25:5-9 (Trial Ex. 39).) He further noted that he "personally never felt welcome from the system" (Antepli Dep. 28:8-9 (Trial Ex. 39)) and that he had "been told that they are all set in terms of Islamic advice…[t]hey didn't want any advice

or any enrollment, or they didn't necessarily see that there is an area of growth in terms of providing Islamic services." (Antepli Dep. 29:7-13 (Trial Ex. 39).) Reverend Bruno indicated that the positions have been created but they have not been filled. (Tr. 1 122:17-20.) While Reverend Bruno focused on the lack of applicants (*see* Trial Ex. 17, p. 1; Tr. 1 93:4-12), Imam Hasan indicated that there are plenty of volunteers and applicants for contract positions, but the quality of applicants is low and they do not know their prayers well. (Tr. 3 430:4-15.)

### c.   The DOC has failed to allow Mr. Vega to obtain a religious circumcision

Mr. Vega is uncircumcised. (Tr. 2 271:16-18.) Mr. Vega took his "shahada", thereby declaring his Muslim faith in 1992 or 1993 while incarcerated in a Pennsylvania prison. (Tr. 1 189:19-21.) He was released in the Spring of 1995 and was incarcerated in Connecticut beginning in January 1996. (Tr. 2 306:12-15.) Mr. Vega was sentenced to sixty years in the Connecticut DOC and is scheduled to be released when he is almost ninety years old. (Tr. 1 182:2-14.) When Mr. Vega was briefly free in 1995, he had not yet learned of the requirement that Muslims must be circumcised. (Tr. 2 274:18-24.)

When Mr. Vega became more learned in his study of the Muslim faith, he was incarcerated in the Connecticut DOC. (*See* Tr. 2 225:13-25, 226:15-227:2, 227:13-25, 233:12-234:1.) Mr. Vega learned of the necessity of circumcision from his studies of the Quar'an, a learned text relied upon by both scholars and followers of the Muslim faith. (Tr. 2 271:19-272:6; Tr. 3 526:14-15 (Vega); *see also* Tr. 3 407:14 (Hasan).) Specifically, he believes that the fitra, which is a part of the Islamic covenant, mandates circumcision. (Tr. 2 273:7-8.) Understanding the gravity of his sixty year sentence, around the year 2000 Mr. Vega requested a circumcision by filing grievances through the ordinary administrative channels of the DOC. (Tr. 2 273:17-274:6.)

9

The process for approval of a medical request involves a committee from the medical department at the facility reviewing the request and sending it to a utilization review committee consisting of employees and physicians from the University of Connecticut and employees from the DOC, who determine whether the procedure is medically necessary.  (Tr. 3 505:10-17 (James Dzurenda ).)  The contract with the University of Connecticut Health Center does not provide for elective surgery.  (Tr. 3 505:3-5.)  However, when Mr. Vega made his requests, they were rerouted to the medical department, who then sent the requests back to DOC administration.  (Tr. 2 273:22-274:11.)  Those requests were ultimately denied.  (Tr. 2 274:13.)

Administrative Directive 10.8 (Trial Ex. 2) lists the duties of Reverend Bruno in his official capacity as Director of Religious Services.  Those duties include: "Recommend to the Commissioner or designee each new request for current religious service or program for approval or denial" and to "serve as a resource person for all matters pertaining to religion".  (Trial Ex. 2, p. 5.)  However, Reverend Bruno is not aware of who has the authority to deny or approve a request for religious circumcision and does not know who the appropriate approving party would be.  (Tr. 1 60:18-21.)

In terms of payment for a religiously motivated circumcision, Mr. Vega has testified that if the state is unwilling or unable to pay for the procedure, he does not want to burden taxpayers and is willing to come up with a payment plan out of his own funds.  (Tr. 2 275:5-24.)

**d.  The DOC has not allowed Mr. Vega to obtain adequate Islamic prayer oils**

**i.  Background**

Mr. Vega's studies of Islam have taught him that Islamic prayer requires him to use Islamic prayer oils.  (Tr. 2 276:9-11.)  Prayer oils were not available in the prison Commissary where Vega was housed until May of 2001.  (*See* Trial Ex. 30.)  Religious directive 10.8 states,

10

"Inmates requesting to purchase religious articles not available through the Commissary must receive prior written permission of the Director of  Programs and Treatment or designee."  (Trial Ex. 2, p. 3-4.)  A "Religious article" is currently defined in administrative directive 10.8 as "[a]ny inmate property, other than authorized published materials (i.e. written, audio or video), having spiritual significance, which is used in individual or congregate religious activity."  (Trial Ex. 2, p. 2.)  Reverend Bruno was and is the designee of the Director of Treatment and Programs, so all requests for religious articles go through him.  (Tr. 1 21:20-24.)  In his role as designee, Reverend Bruno has granted many different kinds of religious article requests in the past, including Native American prayer rugs, Rastafarian "tam" caps, tarot cards for inmates who practice Santaria and Wiccan, and Hindu mala beads.  (Tr. 1 23:14-24:14 (Bruno).)

Between October 2000 and March of 2001, Mr. Vega made numerous requests for prayer oils.  (*See* Trial Ex. 28, 29, 31-33, 36.)  Each of those requests was denied by Reverend Bruno, based on his assertion that he was working to get oils in the Commissary.  (Tr. 1 29:8-14.)  Sometime around May of 2001, certain oils were made available in the Commissary.  (*See* Trial Ex. 30.)

### ii.  **Oil Ordering Process**

In preparation for the Commissary stocking oils in 2001, the DOC formed an oils committee, of which both Reverend Bruno and Imam Hasan were members, to weigh various factors and select the optimal oil vendor.  (Tr. 1 131:19-23 (Bruno); Tr. 3 443:13-17 (Hasan).)  The committee evaluated criteria, including whether the vendor submitted an affidavit of purity from an imam, the oil's flash point, size of the container, packaging, ingredients, volume, viscosity and strength of odor.  (Tr. 1 38:18-22, 39:15-40:12, 133:11-16 (Bruno).)  The affidavit of purity is signed by an imam, which the DOC requires to "specifically state that the oils do not

contain alcohol or animal by-products, and that although these oils contain both natural and chemical ingredients they meet religious requirements." (Trial Ex. 37, p. 12; Tr. 1 56:3-57:12 (Bruno).) The DOC had further safety and security concerns regarding inmates re-selling oils that they order. (Tr. 3 503:15-504:2 (Dzurenda).) The DOC has purchased oils from the same vendor since 2002. (Tr. 1 37:25-38:7 (Bruno).) As a result, the various affidavits that have been submitted by Imam Wali Rushdan with that vendor all adhere to the DOC affidavit requirement and state that the oils contain natural and chemical ingredients and that the oils do not contain alcohol or animal byproducts. (*See* Trial Ex. 509.)

### iii.  Purity of Oils

An important component of Mr. Vega's belief regarding oils is that they must be "pure," meaning free of any chemicals. (Tr. 2 277:17-21.) This idea as to purity relies on Mr. Vega's belief that "chemicals take[] its religious aspect out. Makes it haram." (Tr. 2 277:20-21.) Imam Hasan agrees with Mr. Vega's issues with chemicals in oils; when asked whether the fact that the oils may contain chemicals is a concern to him he replied: "Yes, it is a concern. If the oils contains chemicals, and it was on the bottle that there were chemicals in it, it would be a concern to me, and I would recommend not using them." (Tr. 3 469:14-17.) Mr. Vega studied the oils that became available in the Commissary and quickly drew the conclusion that they contained chemicals and were therefore unacceptable for practicing his religion. (Tr. 2 277:22-278:1.) Since that time, Mr. Vega has filed grievances seeking to order oils appropriate for practicing his religion, but each request has been denied. (*See* Trial Ex. 28, 29, 31-33, 36.) Reverend Bruno, in denying these requests, takes the position that because prayer oils are available in the Commissary, Administrative Directive 10.8 precludes him from approving any request for different oils, even those without chemicals. (Tr. 1 27:2-20.) Reverend Bruno's justification for

12

denying these requests is, therefore, that he had no permission to grant any oils request because oils were already available in the Commissary.  (Tr. 1 26:8-11, 49:11-21.)

### iv.   The DOC basis for opinions regarding oils

Although DOC officials including Reverend Bruno and Commissioner Dzurenda made major decisions regarding the approval of oils, they all relied on Imam Hasan's expertise in Islam.  (Tr. 1 22:10-19 (Bruno); Tr. 3 516:6-14 (Dzurenda).)   Notwithstanding this reliance, Imam Hasan's opinion regarding not recommending prayer oils with chemicals in them was not followed by Reverend Bruno or Commissioner Dzurenda when Mr. Vega's requests were rejected (*See* Trial Ex. 28, 29, 31-33, 36.)

### v.  Alternative Oils

Mr. Vega conducted research as to alternative oils available by talking with imams and consulting an Islamic directory, leading him to the conclusion that there were other oils available that might meet his religious purity requirements.  (Tr. 2 279:24-280:17, 292:5-13; Trial Ex. 35.) At one point in 2006, DOC Imam Askia Muhammed, agreeing with Mr. Vega regarding the necessity of pure oils, granted his request to order from a company called Exotic Fragrances, which was selected from the Islamic directory.  (Tr. 2 288:24-289:13; Trial Ex. 34.)  Exotic Fragrances answered the DOC's request for proposals in 2007, but the bid was awarded to the same vendor that had been supplying the DOC since 2002.   (Tr. 1 37:25-38:7 (Bruno).)  As a basis for rejecting Exotic Fragrances, the DOC expressed concerns regarding the company's failure to disclose ingredients due to trade secrets, the fact that the oils were an eye irritant and the company's failure to provide an affidavit from an imam.  (Tr. 1 140:1-15 (Bruno).) However, in its 2011 bid, Prime Products, the company that has provided oils since 2002, also failed to disclose their ingredients on the disclosure sheet and its bid stated that its oils "may

cause eye irritation." (Tr. 1 170:6-18 (Bruno); Trial Ex. 37, p. 14.) Further, there was nothing disclosed in the Prime Products bid regarding the viscosity of the oil, which was listed by the DOC as a factor in their oils committee discussions. (Tr. 1 171:23-172:2, 40:6-12 (Bruno).)

The DOC has purchased oils from the same vendor since 2002. (Tr. 1 37:25-38:7 (Bruno).) Mr. Vega has complained about the purity of the oils since that time. (*See* Trial Ex. 28, 29, 31-36.) With little burden and risk to the DOC, Mr. Vega asks the Court to consider allowing him to purchase oils that conjunctively satisfy all DOC requirements and enable him to practice Islam in accordance with his sincerely held beliefs. (Tr. 2 297:16-298:8.)

## IV.   <u>LAW GOVERNING ALL THE CLAIMS</u>

### a.   <u>First Amendment</u>

Under the First Amendment, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, at 89 (1987). *Turner* sets forth four factors to be considered in determining whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) whether accommodation of the asserted constitutional right will "impact . . . guards and other inmates, and . . . the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

In order to sustain a free exercise claim, the religious practice that is burdened need not be mandated by an inmate's religion. *McEachin v. McGinnis*, 357 F.3d 197, 203 (2d Cir. 2004).

Instead, when considering a First Amendment claim, the court should examine whether the practice is religious in nature and whether the person's religious belief is sincerely held; whether the challenged practice of prison officials impinge on this belief; and whether the challenged practice furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988). If a prison official's practice infringes upon an inmate's religious exercise, the First Amendment requires that a valid, rational connection exist between that practice and a legitimate penological interest. *Ford v. McGinnis*, 352 F.3d 582, 594 (2d Cir. 2004).

If an inmate claimant can point to a reasonable alternative that accommodates her rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Covino v. Patrissi*, 967 F.2d 73, 78-80 (2d Cir. 1992).

**b.  Equal Protection**

Under the Equal Protection Clause, "all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The Second Circuit has determined that the *Turner* standard of reasonableness (set forth above) applies to equal protection claims involving a prisoner's religious exercise. *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir. 1990). "As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." *Id. See also Griffin v. Coughlin,* 743 F.Supp. 1006, 1010-11 (N.D.N.Y. 1990) (following the Second Circuit's directive and applying *Turner's* four factor reasonableness test to equal protection claims arising in the prison context).

### c.  **RLUIPA**

"RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)).

The establishment of a RLUIPA violation involves the consideration of four elements. *Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33, 38 (1st Cir. 2007).  The plaintiff has the burden of demonstrating the first two elements:  "(1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial." *Id.*  After the plaintiff establishes these two elements, "the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest." *Id.  See also Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)).

RLUIPA guarantees a right to engage in religious practices that includes "any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A) (emphasis added); *see also Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 347 (2d Cir. 2007) ("[t]o remove any remaining doubt regarding how broadly Congress aimed to define religious exercise, RLUIPA goes on to state that the Act's aim of protecting religious exercise is to be construed broadly and to the maximum extent permitted by the terms of this chapter and the Constitution").  A substantial burden exists where substantial pressure is placed on an adherent to modify his behavior and to violate his beliefs. *Spratt*, 482 F.3d at 38.  This burden also exists where an individual is forced by the state to choose between

16

abandoning his religion and forfeiting benefits.  *Westchester Day School*, 504 F.3d at 348.  In order "to demonstrate a substantial burden on exercise of religion, a governmental policy or action must significantly inhibit or constrain religious conduct or religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Van Wyhe v. Reisch*, 581 F.3d 639, at 656 (8th Cir. 2009) (citations and quotations omitted).   However, "while mere inconvenience to the adherent is insufficient to establish a substantial burden, demonstrating a substantial burden is not an onerous task for the plaintiff."  *Singh v. Goord*, 520 F.Supp.2d 487, 498 (S.D.N.Y. 2007) (internal citations and quotation marks omitted).

## V.   ARGUMENT

### a.   Jumu'ah

The law requires the DOC to take reasonable steps to provide Muslim inmates with weekly jumu'ah.  *See, e.g.*, *Young v. Coughlin*, 866 F.2d 567 (2d Cir. 1989)(inmates must be afforded "every reasonable opportunity to attend religious services" and the defendants must offer an explanation for the denial); *Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate prayer" and explaining that a plaintiff may be able to prevail on a claim if he can present evidence of a reasonable alternative).

#### i.   Analysis Under First Amendment

##### 1.   There is a not a valid, rational connection between the cancellation and poor quality of Jumu'ah and the DOC interest put forward to justify it.

The first prong of the *Turner* test requires a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.  *Turner*, 482 U.S. at 89.  The main prison regulation set forth by the DOC is that Jumu'ah shall be limited or

cancelled  "[w]hen it is considered necessary for the security and order of the

institution…provided that any such limitation, prohibition,  discontinuation or disapproval is in

furtherance of a compelling governmental interest and is the least restrictive means of furthering

that interest."  (Trial Ex. 2, p. 5).  The DOC has gone beyond this directive and has cancelled

Jumu'ah in circumstances other than "for the security and order of the institution," including

when there are not enough staff, contract or volunteer chaplains, when there is inclement weather

and whenever the DOC does not have the resources to hold it. (*See, e.g.*, Trial Ex. 515.)

     Mr. Vega does not object to the fact that when there is an unforeseen security lockdown

on a Friday afternoon, Jumu'ah may have to be postponed or cancelled.  (*See* Tr. 2 242:8-19.)

However, the biggest problem that has caused the DOC to cancel the service over the past

decade at various facilities is lack of staff, contract and volunteer chaplains.  (Tr. 1 63:17-23;

72:8-11, 74:11-16 (Bruno).)  Lack of staff is not a legitimate governmental interest and does not

justify the cancellation of a mandatory weekly prayer session.  Indeed, as Imam Hasan testified,

"If there's no lockdown, or anything, we are required to have Jumah."  (Tr. 3 438:25-439:1

(Hasan).)

     When Jumu'ah is actually conducted, there have been deficiencies with the quality that

do not have a valid, rational connection to DOC interests.  Mr. Vega believes it is forbidden for

an imam to conduct more than one Jumu'ah service per day, a belief of which Imam Hasan is

familiar.  (Tr. 2 246:10-16 (Vega); Tr. 3 440:16-18 (Hasan).)  However, the DOC contract for

imams specifically *requires* an imam to conduct two Jumu'ahs each Friday because some imams

believe that they should only conduct one Jumu'ah per day.  (Tr. 1 86:8-20 (Bruno).)  The DOC

interest in having imams conduct two jumu'ahs per day is monetary (*see* Tr. 1 74:17-75:3

(Bruno)), which is not a legitimate reason to burden Mr. Vega's sincere practice of Islam.

A second deficiency with current Jumu'ah services is that the length is fifteen to twenty minutes, as compared to a typical hour long service.  (Tr. 2 266:1-20.)  Mr. Vega equates the current level of Jumu'ah service with a McDonalds drive-thru, explaining that when he attends Jumu'ah now he feels a void and it makes him feel empty… "as if I'm not receiving anything out of the service, because it's more here, take this and get out of here."  (Tr. 1 66:13-20.)  In comparison, Imam Hasan testified that the typical service he gives at a mosque in Hamden, Connecticut lasts roughly thirty to forty-five minutes.  (Tr. 3 460:6-12.)  The DOC has failed to even address this argument, a clear sign that they are aware of the deficiency and have no legitimate justification.

## 2.  <u>There are no alternative means of exercising Jumu'ah that remain available to Mr. Vega.</u>

Mr. Vega has no alternative way to perform mandatory weekly Jumu'ah other than attending the service because Jumu'ah is a *collective* prayer and cannot be done alone.  (Tr. 2 365:25-366:2 (Hasan).)  Mr. Vega does not follow the same Islamic school as Imam Hasan and does not believe that Jumu'ah can be substituted with the individual Zuhr prayer.  (Tr. 2 232:13-25; Tr. 3 517:21-518:5, 521:24-522:10, *see* Tr. 3 415:17-416:15 (Hasan).)  Further, Mr. Vega believes that he falls outside the fold of Islam if he misses three Jumu'ah services in a row.  (Tr. 2 230:14-19.)  Mr. Vega is being forced to abandon his religion when he misses Jumu'ah, while being told by Imam Hasan that it is acceptable to miss a mandatory prayer if it is based on prison rules.  (Tr. 3 462:11-23 (Hasan).)  Under Imam Hasan's school of thought, there could never be an impermissible burden on an inmate's exercise of his relgion, because prison rules must always take precedence over religious practices.  (*See* Tr. 3 462:11-23 (Hasan).)  Thus, while the DOC relies on Imam Hasan to counsel them on Islamic issues, that counsel amounts to nothing more than the inmates being required to conform their religious practices to DOC rules.  This belief

promotes an unconstitutional basis for running a prison system, particularly where inmates have sentences that will prevent them from ever practicing their religion outside of prison.

### 3. Allowing Mr. Vega to practice weekly Jumu'ah in the absence of an emergency will not will not impact other parties in the prison or the allocation of prison resources.

Other prisoners will only be positively affected by the DOC's recruiting and hiring imams and conducting Jumu'ah weekly.  Mr. Vega is not demanding that Islam be treated preferentially to other religions; only that it be treated equitably with other religious groups.  (Tr. 2 266:21-267:5.)  Nor does Mr. Vega suggest a re-allocation of prison resources.  He simply wants the DOC to take whatever means are required to ensure that there are enough imams to conduct services.  Reverend Bruno has indicated that the positions have been created and if the DOC can fill them then weekly Jumu'ah will be held for all DOC institutions on a regular basis.  (Tr. 1 122:17-20.)  Mr. Vega needs the DOC to act on the solutions it has already contemplated in order to ensure that he and all other Muslims can practice their religion.

### 4. There are no ready alternatives to Mr. Vega's request for Jumu'ah services.

As indicated under the second prong of the *Turner* test, Mr. Vega has no alternatives and his claim is dire.  He is serving a sixty year sentence, which sets him for release when he is almost ninety years old.  (Tr. 1 182:1-14.)  In order for Mr. Vega to practice his religion it must therefore be under the supervision of the DOC.  There is no alternative to collective prayer other than holding a collective prayer.  (*See* Tr. 2 232:13-25.)

### 5. Conclusion

The four *Turner* factors demonstrate that the DOC's frequent cancellation of Jumu'ah is unconstitutional because it is not reasonably related to legitimate penological interests.  Further, this Court should consider that Jumu'ah is religious in nature and Mr. Vega's beliefs are

sincerely held, based on almost two decades of intense study of the Islamic faith.  (Tr. 1 190:18-195:21; Tr. 2 223:18-228:10.)

### ii.  Analysis Under Equal Protection

The DOC has consistently had a shortage of *Islamic* chaplains, which has negatively impacted Muslim inmates.  (Tr. 1 63:17-23, 72:8-11, 74:11-16 (Bruno).)  Mr. Vega requests that the Court order Defendants to offer him Jumu'ah on an equitable basis with other religious groups.  (Tr. 2 266:21-267:5.)

As the Second Circuit has determined that the four-factor *Turner* standard of reasonableness applies to equal protection claims involving a prisoner's religious exercise as well as First Amendment claims, the same analysis as set forth in section V.a.i applies.  The DOC's rules and practices regarding cancellation of Jumu'ah prevent Muslim prisoners, particularly Mr. Vega, from practicing his sincerely held religious beliefs.  The DOC has failed to present any penological interests which justify this unequal treatment of Muslims.  Accordingly, this Court  should determine that the Defendants' frequent cancellation of Jumu'ah and the manner in which Jumu'ah is currently conducted violate Mr. Vega's  rights under the Equal Protection clause.

### iii.  Defendants Have Not Demonstrated That The Burden Imposed Upon Mr. Vega's Religious Exercise Is The Least Restrictive Means of Furthering a Compelling Government Interest Under RLUIPA.

In denying Mr. Vega his mandatory weekly Jumu'ah, shortening the service and using the same imam to conduct multiple services, Defendants have imposed a substantial burden on his religious exercise and have failed to prove that the burden furthers a compelling government interest by the least restrictive means, both in violation of RLUIPA and of the DOC's own administrative directive 10.8.  RLUIPA, 42 U.S.C. § 2000cc-1(a); Trial Ex. 2, p. 5.

1. **Mr. Vega's religious exercise has been burdened by the frequent cancellation of Jumu'ah and the manner in which Jumu'ah is currently conducted.**

Defendants have conceded that weekly Jumu'ah prayer is mandatory, a belief which Mr. Vega strongly follows.  (Tr. 1 108:16-23 (Bruno); Tr. 3 407:13-14 (Hasan); Tr. 2 229:14 -17 (Vega).)  Mr. Vega has discussed his beliefs regarding the religious consequences of missing three Jumu'ahs in a row, particularly that he falls outside the fold of Islam.  (Tr. 2 230:14-19.)  Although Mr. Vega's exercise of religion does not have to be compelled by or central to a system of religious belief, Imam Hasan is familiar with Mr. Vega's belief regarding the consequences of missing Jumu'ah.  (Tr. 3 417:8-12 (Hasan).)  Defendants have also conceded that Jumu'ah has been cancelled on many occasions since 1999.  (*See* Tr. 1 63:17-23, 72:8-11, 74:11-16 (Bruno).)  Since the Jumu'ah prayer is a collective religious activity  (*see* Tr. 2 365:25-366:2 (Hasan)) and can only be done during a limited time frame on Fridays (Tr. 3 407:6-12, 414:1-10 (Hasan)), when it is cancelled Mr. Vega is unable to collectively pray and his ability to practice Islam is burdened.

2. **Mr. Vega's religious exercise has been burdened by the quality of Jumu'ah.**

On the occasions when Jumu'ah has not been cancelled, the quality of the services have hindered Mr. Vega's ability to practice Islam.  (*See* Tr. 2 246:10-16, 266:1-20.)

Mr. Vega is unable to fully practice Islam if he receives Jumu'ah from an imam who conducts more than one Jumu'ah service per day.  (Tr. 2 246:10-16.)  Specifically,  Mr. Vega believes that the messenger never instructed two Jumu'ahs and it makes him question the faith and sincerity of the imam conducting the service.  (Tr. 2 269:8, 270:12-18.)  Imam Hasan acknowledges that this belief is shared by a number of other imams.  (Tr. 3 440:17-18.)  In fact,

the DOC also acknowledges this common belief by specifying in its imam contract that imams are required to conduct two Jumu'ahs each Friday.  (Tr. 1 86:8-20 (Bruno).)

The short duration of the service has also hindered Mr. Vega's ability to practice Islam. (Tr. 2 266:1-20.)  His practice is burdened because the quick service makes him feel like he has not received the benefits of the service.  (Tr. 2 266:13-20.)  The services Mr. Vega receives are about twenty minutes, as compared to a typical thirty to forty five minutes service that Imam Hasan gives outside of prison.  (Tr. 2 266:1-20 (Vega); Tr. 3 460:6-12 (Hasan).)

### 3.  Mr. Vega has demonstrated that this burden is substantial.

Other than stating the religious consequences Mr. Vega believes befall him when he misses three Jumu'ahs, he has also demonstrated the substantial nature of his burden by following administrative complaint procedures regarding Jumu'ah cancellation numerous times before and after initiating this lawsuit.  (*See* Trial Ex. 5, 7, 8, 11-13, 15.)

Mr. Vega has been receiving Jumu'ah on a more regular basis since he entered Cheshire Correctional Facility in 2010.  (*See* Trial Ex. 515.)  However, the quality of those services has substantially burdened his practice as well.  (Tr. 2 246:10-16, 266:1-20 (Vega).)  Further,  as demonstrated by the number of facilities he has been transferred between in the past seventeen years, it is highly probable that he will enter another facility in the future.  Mr. Vega recollects insufficient Jumu'ah services at multiple facilities in the DOC (Tr. 2 242:21-243:4) and Defendants have admitted that various facilities within the DOC receive Jumu'ah on varying bases.  (Tr. 1 152:23-153:17, 155:6-10, 156:13-15 (Bruno); Tr. 3 498:16-25 (Keida).)

Mr. Vega is distraught over his inability to attend this mandatory collective prayer session on a consistent and regular basis.  (*See* Tr. 2 232:22-25.)  The cancellation of Jumu'ah

requires Mr. Vega to modify his behavior and violate his beliefs and thus substantially burdens his practice of Islam.

### 4.   Defendants have failed to prove that the burden furthers a compelling governmental interest.[1]

Defendants justify the burden created by cancelling Jumu'ah so frequently by giving an array of excuses regarding the DOC budget and staffing issues, as well as ensuring the safety and security of the DOC.  (Tr. 1 63:17-23, 72:8-11, 74:11-75:3 (Bruno); Trial Ex. 2 p. 5.)  It is therefore unclear what the government interest is that they seek to further, let alone whether that interest is compelling.  In terms of the staffing issues, Reverend Bruno presented documentation regarding his asking for assistance from higher authorities regarding Islamic chaplains.  (*See* Trial Ex. 16-18, 20, 21, 23-25.)  However, complain as he may, nothing changed in the system and Reverend Bruno's calls for help were unanswered until Mr. Vega was transferred to a facility in 2010 which offered Jumu'ah with more frequency.  (*See* Trial Ex. 11.)  Regarding budget issues, although imam positions have been created in the DOC, they are currently still unfilled.  (Tr. 1 122:17-20 (Bruno).)  It is this administrative backlog that has infringed on Mr. Vega's religious rights in the first place.

Defendants acknowledge that the failure to provide Jumu'ah to Islamic inmates violates RLUIPA and  "puts the DOC at great risk for litigation."  (Trial Ex. 21; *see also* Trial Ex. 23, 24.)  In recognition that the burden does not further a government interest, Defendants have

---

[1] DOC Administrative Directive 10.8 follows that same standard as RLUIPA, first defining "collective religious activity" as a "[r]eligious activity which involves two (2) or more inmates and which generally, but not necessarily requires the commitment of specifically designated Department of Correction facilities or staff for the religious activity to take place."  (Trial Ex. 2 p. 1.)  "When it is considered necessary for the security and order of the institution, the Facility Unit Administrator may limit or prohibit attendance at…provided that any such limitation, prohibition,  discontinuation or disapproval is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest."  (Trial Ex. 2 p. 5.)

attempted to cover their tracks by posting job vacancies so they would have "a defense in court." (Trial Ex. 23.)

### 5. Defendants have failed to prove that the burden is the least restrictive means of achieving their interest in the safety and security of the DOC.

The Defendants' claim an interest in maintaining the safety and security of the DOC. (*see* Trial Ex. 2, p. 5; Trial Ex. 505, p. 6.)  Cancelling Jumu'ah as a first solution when an imam is not available is not the least restrictive means of furthering the safety and security of the DOC. Less restrictive alternatives exist, including strengthening efforts to obtain volunteers or paid staff.  Defendants claim that it is difficult to recruit Islamic volunteers.  (Trial Ex. 17, p. 1; Tr. 1 92:12-17 (Bruno)), but the efforts to obtain these volunteers have consisted of a weak and unaggressive letter writing campaign.  (Trial Ex. 17, pg. 4-6; Tr. 1 94:18-96:5 (Bruno).)  Further, volunteers have felt unwelcome by the DOC when they did inquire as to a need for their services. (Antepli Dep. 28:8-9, 29:7-13 (Trial Ex. 39).)  There is also discord within the DOC, whereby Imam Hasan, the Islamic authority in the DOC insists that there are plenty of volunteers and applicants for contract positions, but the quality of applicants is low and they do not know their prayers well, whereas Reverend Bruno says there are not enough volunteers.  (Tr. 3 430:4-15 (Hasan); Tr. 1 92:12-17 (Bruno).)  It is clear that if the DOC cannot resolve its staffing issues due to budgetary concerns, they have the option of conducting an aggressive volunteer recruitment campaign.

### b. Circumcision

#### i. Analysis Under First Amendment

The DOC's denial of Mr. Vega's circumcision request is not reasonably related to a legitimate penological interest.  Under the *Turner* four-factor test, Mr. Vega's request is

25

reasonable.  First, there is not a rational connection between the denial of a religiously requested circumcision and the reasons put forward by the DOC to justify the denial.  The DOC argues that elective surgery would allow inmates to physically alter their appearances and thus evade detection by investigators for sex crimes.  (Tr. 3 505:21-506:5 (Dzurenda).)  This argument does not apply to Mr. Vega's request to become circumcised in adherence to the Muslim faith.  He has been incarcerated in the Connecticut DOC since 1996 and is serving a sixty year sentence (Tr. 1 182:4-14), so there is no risk of him disguising a sex crime.  The DOC further justifies the denial of elective procedures by stating that it would create tension within the inmate population based on who could pay for surgery.  (Tr. 3 506:6-14 (Dzurenda).)  However, this argument does not contemplate the DOC paying for the procedure.  Further, as Mr. Vega has made clear, he is willing to pay for the procedure from his prison funds (Tr. 2 275:5-24) , which he earns like any other inmate.  The ability for all inmates to earn this money would not create controversy any more than if inmates decided to buy different items at the Commissary with their own earnings, which they are allowed to do.

Secondly, there are no alternative means by which Mr. Vega can obtain a circumcision.  He is sentenced to remain in prison until he is almost ninety years old (Tr. 1 182:4-14), an age that far exceeds the average male life expectancy.  Realistically, Mr. Vega's only opportunity to obtain a religious circumcision will be if it is provided through the DOC.

Mr. Vega meets the third *Turner* factor, because his ability to obtain a circumcision will not impacts guards and other inmates.  As indicated above, Mr. Vega is willing to pay for the circumcision with his own earned prison funds, however long it may take him to repay the money (Tr. 2 275:5-24.)  This will alleviate any tension that the ability to obtain such a surgery could potentially cause other inmates.  Further, it will not detract from state or prison resources.

ME1 15656462v.3

Finally, there are no alternatives to the requested procedure.  For all intents and purposes Mr. Vega has a life sentence and will not be able to obtain this procedure within his lifetime.

Mr. Vega's circumcision request is motivated by the religious essential commands from the fitra and not for any secular reason.  (Tr. 2 273:7-9.)  Mr. Vega sincerely believes that circumcision is necessary to the practice of Islam, a religion he devoutly practices and studies.  (Tr. 2 271:19-272:6; Tr. 3 526:14-15.)  Defendants' denial of Mr. Vega's circumcision request hinders his ability to practice Islam.  Further, Defendants have failed to present compelling reasons regarding how the denial furthers their penological objectives.  Mr. Vega has created a reasonable solution that will accommodate his request at a *de minimus* cost to Defendants' penological interests, including offering to pay for the circumcision with his own funds (Tr. 2 275:5-24.)  Therefore, this Court should weigh Mr. Vega's request for religiously motivated circumcision against the weak justifications for denial provided by the DOC and accordingly determine that the denial impinges on Mr. Vega's First Amendment rights.

### ii.  Analysis Under Equal Protection

As the Second Circuit has determined that the four-factor *Turner* standard of reasonableness applies to equal protection claims involving a prisoner's religious exercise as well as first amendment claims, the same analysis as set forth in section V.b.i applies.  The DOC's rules regarding denial of religiously motivated circumcision treat Muslim prisoners in a way that prevents them from exercising Islam.  Defendants are unable to justify this discrepancy in treatment with a legitimate penological interest.  Accordingly, this Court  should determine that the Defendants' denial of Mr. Vega's circumcision request violates his rights under the Equal Protection clause.

ME1 15656462v.3

### iii.  **Analysis Under RLUIPA**

The inquiry under RLUIPA is to determine whether the government imposes a substantial burden on an inmate's free exercise of religion.  Here, Mr. Vega has testified that the DOC's denial of his requests for circumcision burdens his religious exercise, as it is a required element of his practice of Islam.  (*See* Tr. 2 271:19-272:6; Tr. 3 526:14-15.)  The burden is substantial because the DOC's denial has pressured Mr. Vega to modify his behavior by not allowing him to obtain a circumcision, which violates his beliefs.  Therefore, it is the Defendants' burden to demonstrate that the denial of this request furthers a compelling government interest and that the burden imposed on Mr. Vega's religious practice is the least restrictive means of achieving that interest.

Defendants' argue that the compelling government interest they seek to preserve is the prevention of inmates from obtaining any "elective surgery" in which they could hide their identities.  (Tr. 3 505:21-506:5 (Dzurenda).)  However, Mr. Vega obtaining a religiously motivated circumcision does not threaten to hide his identity.  His request is a particular one that is specific to a highly studied Muslim who believes that he needs this procedure in order to truly practice his religion.  Allowing Mr. Vega this procedure does not open the door for tattoos and other non-religiously motivated elective procedures.  The DOC also argues that allowing the request would further create problems amongst the inmates by enabling them to target inmates who are able to pay for elective surgeries.  (Tr. 3 506:6-14 (Dzurenda).)   As stated previously, this would not be a concern if either the State paid for the procedure or Mr. Vega paid for it out of his own prison funds.  The burden that the DOC places on Mr. Vega is not the least restrictive means of furthering their interest in avoiding unnecessary surgery, potentially excessive costs and a possible ripple effect to other prisoners requesting elective surgery.

ME1 15656462v.3

Defendants attempt to poke holes in Mr. Vega's religious belief regarding the necessity of circumcision by questioning him regarding whether the Quar'an on which he relies as *one* source of his beliefs discusses circumcision in the text or in a footnote.  (Tr. 3 533:9-12.) Defendants questioning of Mr. Vega on the Quar'anic origins of his belief is misplaced, as RLUIPA's guarantee of religious practice includes *any* practice of religion, even those that are not central to a system of religious belief.  *See* 42 U.S.C. § 2000cc-5(7)(A).   Further, Defendants maintain that circumcision is not an essential part of the practice of Islam and insist that the denial of circumcision is not a burden on the practice of Islam.  (Tr. 3 458:2-21 (Hasan).)[2] However, Mr. Vega does not follow the same Islamic school as Imam Hasan  (Tr. 3 517:21-518:5, 521:24-522:10) and circumcision is essential to Mr. Vega's beliefs.

Mr. Vega has demonstrated that the DOC's denial of circumcision substantially burdens his practice of Islam and the DOC has failed to rebut his argument by presenting a compelling interest and the least restrictive means of furthering that interest.  Therefore, the Court should order Defendants to allow Mr. Vega to obtain a circumcision through the University of Connecticut Health Center.

   c.   **Prayer Oils**

      i.   **Analysis Under First Amendment**

         1.   **There is a not a valid, rational connection between the DOC's denial of chemical free prayer oil to Mr. Vega and the safety and security of the DOC.**

Defendants have denied Mr. Vega the opportunity to obtain prayer oils that meet his sincerely held religious beliefs based on safety and security concerns. (*See, e.g.*, Tr. 1 140:1-18 (Bruno).)  While safety and security may be legitimate government interests, Defendants have

---

[2] Note that Imam Hasan's beliefs regarding circumcision are largely based on informal observations of Muslim acquaintances.   (Tr. 3 458:22-459:1 (Hasan).)

failed to present any rational connection between the denial of chemical free prayer oils to Mr.

Vega and the safety and security of the DOC.  The oils committee was formed to evaluate

criteria including whether the vendor submitted an affidavit of purity from an imam, the flash

point, size of the container, packaging, ingredients, volume, viscosity and strength of odor.  (Tr.

1 38:18-22, 39:15-40:12, 133:11-16 (Bruno).)  The DOC has further safety and security concerns

regarding inmates re-selling oils that they order.  (Tr. 3 503:15-504:2 (Dzurenda).)  However, as

Mr. Vega has stated that he is perfectly willing to have his oils go through the same security

process as the oils that are currently stocked in the Commissary (Tr. 2 297:16-22), there is not a

rational connection between denying Mr. Vega a choice of oils and the safety and security of the

DOC.  Further, Mr. Vega has stated that he is willing to order bottles in small sizes so that re-

selling the oils would not be a concern.  (Tr. 2 297:23-298:8.)  Defendants have also claimed that

failure to disclose ingredients and oils that may irritate eyes are factors in excluding vendors.

(Tr. 1 140:1-15 (Bruno).)  However, Defendants do not police these factors with their current

vendor  (Tr. 1 40:6-12, 170:6-18, 171:23-172:2  (Bruno); *see* Trial Ex. 37, p. 14.)

### 2.  Mr. Vega does not have alternative means of exercising his belief that prayer oils must be chemical free.

Because of Reverend Bruno's interpretation of Administrative Directive 10.8,  Mr. Vega

is only able to obtain prayer oils that are currently available through  the Commissary.  (*See*

Trial. Ex. 2.)  Thus, the only way that he can exercise his belief that prayer requires chemical

free oils is through the DOC allowing him to order them, either through the Commissary or

special ordered individually.

### 3.   Allowing Mr. Vega to order chemical free prayer oils will not impact other parties in the prison or the allocation of prison resources.

There are some solutions available for Mr. Vega's request that will not require any additional resources from the DOC and some that will require minimal resources.  If the DOC revises its request for proposal language in its next proposal request to require vendors to "specifically state that the oils do not contain alcohol or animal by-products or chemicals and that although these oils contain natural ingredients they meet religious requirements", rather than the current language requesting that they "specifically state that the oils do not contain alcohol or animal by-products, and that although these oils contain both natural and chemical ingredients they meet religious requirements"  (Trial Ex. 37, p. 12; Tr. 1 56:3-57:12 (Bruno)),  the DOC will only receive chemical free bids.  Until that time however, if Mr. Vega is allowed to order oils identified as chemical free, they can go through the same inspection process as other inmates receive when they order Native American prayer rugs, Rastafarian "tam" caps, tarot cards for inmates who practice Santaria and Wiccan, and Hindu mala beads.  (*See* Tr. 1 23:14-24:14.) This may require some prison resources the first time Mr. Vega orders, but will require less if he is mandated to order from the same vendor going forward.  Either option requires minimal additional DOC resources to be expended.

### 4.   There are no ready alternatives to Mr. Vega's request for chemical free prayer oils.

As stated previously, Mr. Vega has no options to obtain chemical free prayer oils and there are no alternative ways for him to adhere to his Islamic belief regarding prayer oils other than being able to obtain these oils through the DOC.

5. **Conclusion**

The four *Turner* factors demonstrate that the DOC's denial of Mr. Vega's oils request is unconstitutional because the denial is not reasonably related to legitimate penological interests. Further, this Court should consider that Mr. Vega's beliefs regarding prayer oils are based on almost two decades of intense study of the Islamic faith.  (Tr. 1 190:18-195:21; Tr. 2 223:18-228:10.)

ii. **Analysis Under Equal Protection**

The Equal Protection Clause requires that "all persons similarly situated should be treated alike."  *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  However, the DOC has failed to treat prisoners of different faiths the same when it comes to ordering religious articles under administrative directive 10.8.  Reverend Bruno has allowed religious article requests, including Native American prayer rugs, Rastafarian "tam" caps, tarot cards for inmates who practice Santaria and Wiccan, and Hindu mala beads.  (Tr. 1 23:14-24:14.) Defendants justify their denials of Mr. Vega's requests for chemical-free prayer oils because they stock some version of prayer oils in the commissary.  (Tr. 1 26:8-11, 49:11-21 (Bruno).) Reverend Bruno restricts his interpretation of  administrative directive 10.8 to mean that if any version of an item is available in the Commissary any variation on that item cannot be ordered individually.  (Tr. 1 27:2-20.)  Reverend Bruno's belief disregards Mr. Vega's extensive study of Islam and belief that in order to fully adhere to his religion he must use prayer oils devoid of chemicals.

ME1 15656462v.3

### iii.  **Analysis Under RLUIPA**

#### 1.  **Mr. Vega has demonstrated that his religious exercise has been burdened by his inability to use chemical free prayer oils.**

Mr. Vega believes that his practice of Islam requires the use of  "pure" oils, which means oils that are free of any chemicals.  (Tr. 2 277:17-21.)  He believes that if there are chemicals present then the religious aspect of the oils is removed and they are haram, or forbidden.  (Tr. 2 277:20-21.)   Imam Hasan, a central DOC witness and expert, has validated the burden imposed on Mr. Vega by stating: "Yes, it is a concern.  If the oils contains chemicals, and it was on the bottle that there were chemicals in it, it would be a concern to me, and I would recommend not using them."  (Tr. 3 469:14-17.)

#### 2.  **Mr. Vega has demonstrated that this burden is substantial.**

Since the time Mr. Vega determined that the oils have chemicals in them, he has continued to file grievances seeking to order oils appropriate for practicing his religion, but each request was denied (*See* Trial Ex. 28, 29, 31-33, 36), demonstrating the heavy burden imposed on him by the DOC.

The DOC attempts to disregard Mr. Vega's claim by stating that oils are optional to the practice of Islam.  (Tr. 3 446:12-22 (Hasan).)  However, RLUIPA guarantees a right to engage in religious practices that includes "any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A) (emphasis added).  Although Mr. Vega believes chemical free prayer oils are essential, even if they are optional in Islam, Mr. Vega may still succeed under a RLUIPA claim.  Denying Mr. Vega the opportunity to use chemical free oils has placed substantial pressure on Mr. Vega to modify his behavior and use oils that violate his beliefs or no oils at all, also in violation of his sincerely held religious beliefs.

### 3. __Defendants have failed to prove that the burden furthers a__ __compelling governmental interest.__

Defendants' interests include safety and security, and avoiding flammable or toxic materials. (*See* Tr. 1 38:18-22, 39:15-40:12, 133:11-16 (Bruno).) To prevent safety and security hazards, an oils committee was formed which evaluated criteria including whether the vendor submitted an affidavit of purity from an imam, the flash point, size of the container, packaging, ingredients, volume, viscosity and strength of odor. (Tr. 1 38:18-22, 39:15-40:12, 133:11-16 (Bruno).) The DOC had further safety and security concerns regarding inmates re-selling oils that they order. (Tr. 3 503:15-504:2 (Dzurenda).) Mr. Vega does not disagree that safety and security is important in a prison. (Tr. 2 239:15-18.) However, safety and security does not justify barring Mr. Vega from obtaining oils that allow him to practice Islam, as he is perfectly willing to have his oils go through the same process as the oils that are currently stocked in the commissary. (Tr. 2 297:16-22.) The interest of safety and security may be compelling, but the burden imposed on Mr. Vega simply does not further that interest. Moreover, Defendants' stated security concerns regarding eye irritants and failure to disclose ingredients are simply ignored in practice with currently available oils. (Tr. 1 40:6-12, 140:1-15, 170:6-18, 171:23-172:2 (Bruno); Trial Ex. 37, p. 14.)

Further, DOC officials have presented a circular argument where no one official takes responsibility for the denial of chemical free prayer oils. First, Imam Hasan gives contradictory opinions regarding oils, saying both that if the oils are certified by an imam then they are acceptable (Tr. 3 452:13-17, 455:7-16), but also that if the oils contain chemicals he would not recommend using them. (Tr. 3 469:14-17.) Reverend Bruno and Commissioner Dzurenda have each relied on Imam Hasan's expertise in Islam. (Tr. 1 22:10-19 (Bruno); Tr. 3 516:6-14 (Dzurenda).) Imam Hasan in turn believes that he must adapt his opinions and beliefs to all

safety and security rules of the prison, which come before religion.  (Tr. 2 364:2-11.)  The DOC's experts are relying on each other (and not on a compelling interest) to deny Mr. Vega's religious oils request.

### 4. <u>Defendants have failed to prove that the burden they imposed on Mr. Vega is the least restrictive means of achieving an interest in safety and security.</u>

While the safety and security of DOC facilities is clearly an important interest, Mr. Vega does not propose forgoing safety in order to allow him to use chemical-free oils.  (*See* Tr. 2 297:16-22.)  Alternatives exist, including the DOC changing its request for proposal language to say that vendors are required to "specifically state that the oils do not contain alcohol or animal by-products or chemicals and that although these oils contain natural ingredients they meet religious requirements", rather than the current language requesting that they "specifically state that the oils do not contain alcohol or animal by-products, and that although these oils contain both natural and chemical ingredients they meet religious requirements."  (Trial Ex. 37, p. 12; Tr. 1 56:3-57:12 (Bruno).)  Another alternative would be for the DOC to allow Mr. Vega to order his oils and have them undergo the same inspection process that the oils committee puts other oils through.  Both of these solutions would support the DOC's safety and security concerns while allowing Mr. Vega the opportunity to practice his religion.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Joe Burgos Vega respectfully requests that this Court order the following relief:

### a. <u>Jumu'ah</u>

Mr. Vega requests an order from this Court mandating Jumu'ah absent emergency circumstances at any facility in which Mr. Vega resides.  He also requests that the Court require

ME1 15656462v.3

that the services provided be a reasonable length (between forty-five and sixty minutes from the

time Mr. Vega is released from his cell) and that the imam conducting the service only conduct

one Jumu'ah per day.

### b.  Circumcision

Mr. Vega requests an order from this Court allowing him to be circumcised, either paid

for by the state or with his own prison funds.

### c.  Prayer Oils

Mr. Vega requests an order from this Court mandating the DOC to make chemical free

prayer oils available for Mr. Vega's purchase.

### d.  Filing Fees and Expenses

Mr. Vega requests that the Court order the Defendants to reimburse him for his

personally paid filing fees and expenses in this action.

Dated: June 7, 2013                                THE PLAINTIFF,

      Hartford, Connecticut                        JOE BURGOS VEGA

                                   By: /s/ Charles D. Ray
                                     Charles D. Ray
                                     Federal Bar No.: ct 13211
                                     Jordan D. Abbott
                                     Federal Bar No.: ct 28618
                                     McCarter & English, LLP
                                     CityPlace I
                                     185 Asylum Street
                                     Hartford, Connecticut 06103
                                     Tel.:  (860) 275-6700
                                     Fax:  (860) 724-3397

ME1 15656462v.3

## CERTIFICATION

This is to certify that on the 7th day of June, 2013, a copy of the foregoing was hereby

sent electronically to:


Steven R. Strom
Edward Wilson, Jr.
Office of the Attorney General
110 Sherman Street
Hartford, Connecticut 06105

*Attorney for the defendants.*




                                        /s/ Charles D. Ray
                                        Charles D. Ray

ME1 15656462v.3