UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA | : | CIVIL NO. 3:04CV01215 (DFM)(JGM) |
| v. | : | |
| THERESA LANTZ, ET AL. | : | JUNE 7, 2013 |

## DEFENDANTS' POST-TRIAL BRIEF AND  CONCLUSIONS OF LAW

Pursuant to Rule 52 Fed. R. Civ. P., the defendants respectfully submit the following proposed conclusions of law, and post-trial brief, in support of their claim that judgment should enter for the defendants.  As to the plaintiff's first amendment and equal protection claims, at all times throughout the trial he bears the burden of both proof and persuasion, and he failed to demonstrate that there was no rational basis for the defendants' policies and practices with regard to Jumah, religious oils and circumcision. Plaintiff had the burden of demonstrating that there is no legitimate penological interest in providing Jumah as it is presently done, providing oils as presently offered, and in denying plaintiff's request for elective surgery for circumcision. Benjamin v. Coughlin, 905 F.2d 571, 575 (2d Cir.) cert. denied. 498 U.S. 951 (1990)(While the Turner / Shabazz standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting.) Careful review of the record compels the determination that all of the practices challenged by the plaintiff promote the defendants' legitimate penological interests in maintaining institutional safety, security, and order, and therefore withstand the plaintiff's free exercise and equal protection challenges.  See O'Lone, 482 U.S. at 349, 107 S.Ct. 2400; Ford v. McGinnis, 352 F.3d 582, 595-96 (2d Cir.2003).  Jova v. Smith, 346 F.

App'x 741, 744 (2d Cir. 2009).  As explained below, plaintiff's claims under RLUIPA are also meritless, and therefore judgment should enter for the defendants.

## I.  __THE PLAINTIFF WAS NEITHER CREDIBLE NOR SINCERE__

"[I]n a bench trial such as this, [ ] it is [the Court's] job to weigh the evidence[,] assess credibility, [and] rule on the facts as they are presented." *Johnson–McClean Techs. v. Millennium Info. Tech. Group,* No. 02 Civ. 244, 2003 U.S. Dist. LEXIS 1092, at *24 (S.D.N.Y. Jan. 27, 2003); *see also Mathie v. Fries,* 121 F.3d 808, 811-12 (2d Cir.1997). The Court was "in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says." *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 634 (2d Cir.1996); *see also Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").

Bahrami v. Ketabchi, 05CIV.3829(RMB), 2009 WL 513790 (S.D.N.Y. Feb. 27, 2009) aff'd, 365 F. App'x 266 (2d Cir. 2010).

When the Court assesses the credibility of the plaintiff, it is important to bear in mind that the plaintiff on several occasions during the trial was completely lacking in honesty. For example, with regard to the issue of oils, plaintiff had been instructed by Imam Jawad Ashraf, that oils are not essential to the practice of Islam.  Plaintiff's Exhibit 32; T. 4/24, 309:2-9.   Defendants' Exhibit 517; T. 4/24 309:15-20;  T. 4/25, 446:12-25. (Hasan). Thereafter, in 2002, plaintiff was urged that if he wanted to buy oils, he should buy them in commissary.  T. 4/24, 319:10-13.  Thereafter, on more than one occasion plaintiff was told in writing that the only oils which are allowed are those which are purchased in commissary.   Nevertheless, in 2008, plaintiff wrote a letter to his mother in an effort to conspire to convey contraband oils into the MacDougall correctional facility, for which plaintiff received a disciplinary report for conspiracy to convey contraband.  T. 4/24, 319:19-25; 320:5-7.  Plaintiff wrote a letter to his mother instructing her to purchase one pound of

oil. T. 4/24, 320:5-7.  In the same letter plaintiff instructed his mother to buy 16 one ounce plastic bottles.  T. 4/24, 320:8-10.  When confronted with the letter at trial the plaintiff became rattled, and was evasive, stating, with regard to his own handwritten letter, "I need to see the letter."  T. 4/24, 320:16-19.  Upon seeing the letter, plaintiff admitted it was his own handwriting.  Id. 320:23-24.  Plaintiff was issued the disciplinary report because it was an attempt and conspiracy to convey contraband into a correctional facility and after a due process hearing, plaintiff was found guilty.  T. 4/24, 322:7-10.

In addition, plaintiff admitted that the reason he had been confined in the county jail in Pennsylvania, is that he was convicted of a crime of dishonesty, for giving falsified information.  T. 4/24, 322:22-25; 323:1.  With regard to the oils, plaintiff repeatedly had made requests to purchase oils from a company called Exotic Fragrances, and in fact, prior to the DOC rule that all oils must be purchased only from commissary, plaintiff had purchased oil, when he was at Corrigan from Exotic Fragrances.  T. 4/24, 325:3-9, 17-19, 23-25; 326:1-3.  Then, at trial plaintiff was afforded an opportunity to review the Exotic Fragrances oils catalog (Plaintiff's Exhibit 40), and there is absolutely no mention in the catalog of the oils having an intended purpose for religious use.  T. 4/24, 326:13-17. Indeed, with regard to the DOC oils committee, and the bidding process, Exotic Oils did not ever provide an affidavit of purity from an Islamic clergy person certifying that the oils produced or provided by Exotic Fragrances were acceptable for religious use by Muslims. T. 4/24, 329:10-13; 18-24.

The Court was able to observe the demeanor of the plaintiff, and the plaintiff's tone of voice, when he was trying to evade giving a straight answer to the question concerning whether or not the oils that he preferred had been certified as being pure or whether there

was an affidavit of purity from a Muslim authority.  T. 4/24, 328:8-25; 329:1-8.  It is quite revealing as to plaintiff's lack of religious sincerity that he ordered and used oils as to which the manufacturer refused to provide the list of  ingredients and also refused to certify as being acceptable for religious use.  T. 4/24, 331:1-16.  Thus, despite the fact that there is no evidence that Exotic Fragrances oils are certified as acceptable for religious use by Muslims, plaintiff nevertheless purchased such oils for himself.  T. 4/24, 331:1-16.

Another example of the plaintiff being caught in a lie was when he testified on direct examination with regard to the oils that he had Imam Askia sign a form to purchase oils from outside of DOC, not from commissary, and he gave the form to Captain Gonzalez.  T. 4/24, 288: 11-25; 289:1-8.  Plaintiff knew that only the oils that were in commissary were permissible, but nevertheless, he used Imam Askia to help to dupe Captain Gonzalez. When asked on direct examination whether he had ever gotten the opportunity to order the oils, and whether or not he had an opportunity to order the oils, under oath at trial plaintiff testified, "No, not on this form."  T. 4/24, 289:20-25; 290:1-4.

On cross examination, plaintiff was confronted with his deposition, at which time, he also raised his hand and took and oath and swore to tell the truth.  T. 4/24, 314:20-25; 315:1-5.   At his deposition, under oath, plaintiff testified that after Imam Askia had confirmed the "approval," then he sent the form to his father, and his father purchased the oils for the plaintiff.  T. 4/24, 317:1-5.  Plaintiff confirmed that was his answer.  Id.  Plaintiff testified in his deposition that he had purchased four bottles of oil, not the small one ounce size, but instead bigger bottles, at least several ounces in size, each bottle. T. 4/24, 317:6-23.  When confronted with his obvious lie under oath, plaintiff feigned confusion, stating on at least three occasions to follow-up questions, "I'm confused."  T. 4/24, 318: 1-21.  When

asked if plaintiff had circumvented the proper procedure for the purchase of oils, he again answered with a complete lack of candor when he asserted, "Absolutely not."   T. 4/24, 319:14-18.

The plaintiff's level of disregard and disrespect for Imam Hasan was not only obvious, but was clearly palpable.  When plaintiff was questioned about his request for a circumcision, he was asked if Imam Hasan had gone to visit him, to inquire about the request and to provide an Islamic consultation, plaintiff's disdainful answer was "You mean Mr. Hasan.  Yes." T. 4/24, 335:3-6.  When defendants' counsel clearly identified the witness as "Dr. Imam Hasan, the Islamic consultant to the Department of Correction, he personally went and visited with you, isn't that true?"   T. 4/24, 335:7-9.   The plaintiff answered dishonestly, stating "I don't know.  You talking about the gentleman in the back over there?" Id. 335:10-11.  Imam Hasan clearly testified about his visits to the plaintiff, twice at Corrigan CI. T. 4/24, 456:16-20.  Imam Hasan discussed with plaintiff the plaintiff's request to be circumcised, and whether the DOC would pay for it and whether it was legal or not.  Id. 456:21-25.   Imam Hasan explained that circumcision is optional, and that the denial of circumcision does not place any substantial burden on the practice of the Muslim religion. Id. 458:2-4; 9-13; 15-21.

Plaintiff's testimony to the contrary is simply neither credible nor sincere.   Prison officials are still free, even after RLUIPA to question the sincerity of an inmate's religious beliefs.  Cutter v. Wilkinson, 544 U.S. 709, 725, 125 S. Ct. 2113, 2124, 161 L. Ed. 2d 1020 (2005).

> It bears repetition, however, that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area. See supra, at 2123. Further, **prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested**

> **accommodation, is authentic**. Although RLUIPA bars inquiry into whether a particular belief or practice is "central" to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), **the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity**. Cf. Gillette v. United States, 401 U.S. 437, 457, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) ("'[T]he "truth" of a belief is not open to question'; rather, the question is whether the objector's beliefs are 'truly held.' " (quoting United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965))).

<u>Cutter v. Wilkinson</u>, 544 U.S. 709, 725, 125 S. Ct. 2113, 2124(2005).  (emphasis added). Plaintiff's lack of sincerity is demonstrated, not only with the lack of due care and recklessness as to his use of unverified, and uncertified oils, as discussed above, but also his willful disobedience to the rules of the institution, and his criminal and institutional misconduct, which belies his claim that he is a devout and religious person, by virtue of his daily conduct and demeanor.

Imam Hasan testified credibly that an observant Muslim is a person who, as a Muslim, must follow the rules of the institution.  T. 4/24. 360:4-9 (obeying the rules of the institution is part of the religion).  Muslims are also required to follow nor merely the rules of the institution, but also the laws of the country we live in.   T. 4/25, 406:1-2. Islam commands that one should be a good citizen, because one should obey not only God, but also the laws of the government, city laws, institutional laws, all laws that affect people.  T. 4/25, 406:3-7.  Nevertheless, it is undisputed that plaintiff allegedly took his Islamic "oath of faith" or "shahada" in 1993.  T. 4/23 189:15-21; T 4/23 191: 22-24. (Vega).  On cross-examination plaintiff again stated he took his oath of faith or "shahada" in 1993. T 4/24 306 21-24.  This oath of faith was taken prior to plaintiff's release from jail in the spring of 1995 while he was incarcerated at a county jail in Allenwood, PA in 1993. T.4/24 306:25; 307:1-2.  Plaintiff's "oath of faith" was taken prior to his committing crimes in 1995-1996 which resulted in his January 6, 1996 arrest and 1997 conviction and sentencing.  T. 4/24 307:3-

6.  Although plaintiff had taken his "oath of faith," he only remained out of jail for less than one year, from the spring of 1995 to January 6, 1996. T. 4/24, 306:10-18 (upon questioning from the Court, plaintiff admitted he was only out of jail for less than one year.)

Plaintiff's conduct should be considered when determining whether his verbal assertions that he is a "religious" person are sincere or credible.  In <u>James v. Tilghman</u>, the court addressed Rule 403 and the probative value of past convictions:

> As the Seventh Circuit reasoned in *Gora v. Costa,* 971 F.2d 1325, 1330 (7th Cir.1992): "The idea underlying Rule 609, whether right or wrong, is that criminals are more likely to testify untruthfully." (citation omitted). *See also Young v. Calhoun,* 85 CIV. 7584(SWK), 1995 WL 169020, at *4 (S.D.N.Y. Apr. 10, 1995) ("In the case at bar [§ 1983 action by prisoner against correctional officer], plaintiff's murder conviction is probative of his credibility since it removes any misperceptions that plaintiff is a model citizen.") (*citing Gora*).

<u>James v. Tilghman</u>, 194 F.R.D. 402, 405 (D. Conn. 1999).  See also <u>Martino v. Korch</u>, 131 F. Supp. 2d 313, 315 (D. Conn. 2000).  In <u>Martino</u>, the court allowed impeachment of the prisoner plaintiff not only by his prior felony convictions, but also because he was convicted, as the plaintiff in this case was, for crimes of dishonesty.  In <u>Martino</u>, the specific charge was a witness tampering charge, covered by Rule 609(a)(2).  In this case, plaintiff admitted that his conviction and incarceration in Pennsylvania was for giving a false statement, which conviction allows the defendants to attack the credibility of the plaintiff using his conviction of crimes involving dishonesty or false statements.  <u>Martino v. Korch</u>, 131 F. Supp. 2d 313, 315 (D. Conn. 2000).  T. 4/24, 322:22-25; 323:1.

The phrase that is used every so often in the context of reviewing an Immigration Judge (IJ) who makes findings of fact based on the demeanor and credibility of the witness applies with equal force in this case, where the Court had ample opportunity to observe the plaintiff's demeanor.  The Second Circuit has that that it has "'frequently ... held [that] an

IJ's application of the maxim *falsus in uno, falsus in omnibus* [false in one thing, false in everything] may at times be appropriate.' Zhong v. U.S. Dep't of Justice, 461 F.3d 101, 123 (2d Cir.2006)." Siewe v. Gonzales, 480 F.3d 160, 170 (2d Cir. 2007).  Thus, the Court may rely on this maxim, either expressly or implicitly to find that plaintiff's testimony in all material respects is not credible.

For example, plaintiff testified, inaccurately and with great exaggeration, that when he was in Q-Unit at MacDougall CI, in 2006,  he only received Jumah every six to eight weeks.   T. 4/24, 240:10-12.   The defendants deny the truth of this assertion.[1]  Indeed, Deacon Keida, who was the facility religious coordinator at MacDougall at the time, credibly testified, that he arranged for additional coverage for the expansion units, and enlisted the services of Imam Avci, Imam Abdullah, Imam Sufu and Imam Boz, and that for the expansion units Q and R, Deacon Keida would balance it, alternating week by week, and that the statement that they missed eight weeks of Jumah, in fact, "never happened."  T. 4/25, 487:8-10.

Plaintiff's demeanor, tone of voice and attitude completely contradicted his claim of being a sincerely religious person and cast a shadow of great doubt over all of his claims in this case.  Plaintiff exemplified one of the inmates described by Imam Hasan who puts the DOC Islamic chaplain at risk, because he is so confrontational: Imam Hasan explained, T. 4/25, 433:19-25; 434: 1-6, as follows:

> They [the inmates] hear what they want to hear, just to be able to say something to belittle you in front of the congregation. Some of them use

---

[1] As explained infra, the defendants also claim that such allegations of what might have happened at MacDougall in 2006, were caused solely by virtue of plaintiff's own misconduct, and the subsequent disciplinary action imposed due to plaintiff's misconduct, and are wholly irrelevant as to the Court's present pending determination which solely involves prospective injunctive relief.

> Islamic terms and they don't pronounce it right, but they use it to impress people, to try and make people think that they're knowledgeable.  You find also people who want to impress others try and use Islamic terms or Arabic just to show how knowledgeable they may be, but half the time their grammar is incorrect.  But a lot of the people who don't know the language will say yes, yes.

Imam Hasan further explained, as he tried to explain to plaintiff, for example, with regard to circumcisions, that they are optional, but plaintiff simply asserted his own misguided and insincere views.  At times these contrary views may threaten the safety of the Imam, who stated as follows:

> Well, this is my risk, and the risk is he did the same thing, he interrupted me, and because he was saying some things that others didn't know, they sided with him, and it disrupted the prayer, the whole prayer.  So we had to stop the prayer and dismiss the meeting, because others were grumbling and they had their mind off the prayer, and we had to close the meeting and call a CO in, and he dismissed everybody.

T. 4/25 at 434:17-25.  Lastly, plaintiff's incorrect testimony on rebuttal that the word "circumcision" contained in the commentary to the Quran, in an English language footnote, was actually in the Quranic Arabic text, was a deliberate effort to mislead the Court, and demonstrates plaintiff is not credible.  T. 4/25, 533:23-25; 534:1-4; 535:7-11.

## II.    PLAINTIFF FAILED TO MEET HIS BURDEN FOR INJUNCTIVE RELIEF

### A.    Law on Permanent Injunctions – Caselaw Standard

1.    "Permanent injunctive relief is appropriate when a plaintiff (1) shows that an inadequate remedy is available at law, such as by showing that irreparable harm would result if an injunction were not granted, and (2) succeeds on the merits of his claim.  See Weizmann Institute of Science v. Neschis, 229 F.Supp.2d 234, 258 (S.D.N.Y.2002). Thus, the standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d

542 (1987); <u>Sierra Club v. Hennessy</u>, 695 F.2d 643, 647 (2d Cir.1982); <u>Neschis</u>, 229 F.Supp.2d at 258." <u>Dodge v. County of Orange</u>, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003).


2.      In addition, where, as here, "'public consequences' are implicated, it is incumbent upon a district court in exercising its discretion to 'balance [ ] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.'" <u>Sierra Club v. Hennessy</u>, 695 F.2d 643, 649 (2d Cir.1982) (quoting <u>Weinberger v. Romero–Barcelo</u>, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).  <u>Dodge v. County of Orange</u>, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003).

3.      This Court is familiar with the well established standard for the issuance of a preliminary injunction, especially here, where the alleged harm is remote and speculative. The Supreme Court has long held that injunctive relief is an "extraordinary remedy". <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 311-12 (1982).   In order to grant a preliminary injunction the plaintiff must demonstrate:

> [N]ot only that he is likely to suffer irreparable injury if relief is denied but that there is either (1) a likelihood of success on the merits or (2) a sufficiently serious question going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the plaintiff's favor.

<u>Proctor & Gamble Co. v. Cheesborough-Pond's, Inc.</u>, 747 F.2d 114, 118 (2d Cir. 1984).

4.      Generally, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." <u>Winter v. Natural Res. Defense Council Inc.</u>, 555 U.S. 7, 32, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In seeking an injunction, "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation...." <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); <u>see also</u> <u>Equal Emp't</u>

Opportunity Comm'n v. Everdry Mktg. and Mgmt., 348 Fed.Appx. 677, 679 (2d Cir.2009) (summary order) (no abuse of discretion in denying injunctive relief where the entity that violated Title VII "no longer exists").  "The factors ... [that] are pertinent in assessing the propriety of injunctive relief" are "the balance of equities and consideration of the public interest." Winter, 555 U.S. at 32, 129 S.Ct. 365. E.E.O.C. v. KarenKim, Inc., 698 F.3d 92, 100 (2d Cir. 2012).

     5.     In this case, Vega v. Lantz, 3:04-CV-1215(DFM) Ruling and Order (Doc. #73)(D.Conn. March 21, 2006) this Court stated as follows:

> The court construes the plaintiff's request as one requesting interim injunctive relief. "[I]nterim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.'" Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (quoting Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977)). In addition, a federal court should grant injunctive relief against a state or municipal official "only in situations of most compelling necessity." Vorbeck v. McNeal, 407 F. Supp. 733, 739 (E.D. Mo.), aff'd, 426 U.S. 943 (1976). In this circuit the standard for injunctive relief is well established. To warrant preliminary injunctive relief, the moving party "must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Brewer v. West Irondequoit Central Sch. Dist., 212 F.3d 738, 743-44 (2d Cir. 2000). Although a hearing is generally required on a properly supported motion for preliminary injunction, oral argument and testimony are not required in all cases. See Drywall Tapers &Pointers Local 1974 v. Local 530, 954 F.2d 69, 76-77 (2d Cir.1992). Where, as here, "the record before a district court permits it to conclude that there is no factual dispute which must be resolved by an evidentiary hearing, a preliminary injunction may be granted or denied without hearing oral testimony." 7 James W. Moore, et al., Moore's Federal Practice ¶ 65.04[3] (2d ed.1995). Upon review of the record, the court determines that oral testimony and argument are not necessary in this case.

6. Where, as here, plaintiff seeks a mandatory injunction, e.g. compelling the defendant Commissioner of Correction to arrange for elective surgery for plaintiff's circumcision at the expense of the state's taxpayers,

> a greater showing is required of the moving party. *See Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2d Cir.1977). In these circumstances, we have held that an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested," *Flintkote Co. v. Blumenthal,* 469 F.Supp. 115, 125–26 (N.D.N.Y.), *aff'd,* 596 F.2d 51 (2d Cir.1979), or where "extreme or very serious damage will result" from a denial of preliminary relief, *Clune v. Publishers' Ass'n,* 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd,* 314 F.2d 343 (2d Cir.1963). In sum, we have shown "greater reluctance to issue a mandatory injunction than a prohibitory injunction." *Hurley v. Toia,* 432 F.Supp. 1170, 1175 (S.D.N.Y.), *aff'd mem.,* 573 F.2d 1291 (2d Cir.1977).

Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).

7. With regard to plaintiff's claims concerning alleged Jumah cancellation, the injury is remote and speculative and cannot form the basis for a permanent injunction.

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. *Los Angeles v. Lyons,* 461 U.S. 95, 103, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); see also 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed.1995) (hereinafter Wright & Miller) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered"); *id.,* at 155, 94 S.Ct. 669 ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury"). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization  of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*).

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 375-76, 172 L. Ed. 2d 249 (2008).

8.      To establish irreparable harm, plaintiff must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." Consolidated Brands, Inc. v. Mondi, 638 F.Supp. 152, 155 (E.D.N.Y.1986); accord Kaplan v. Board of Educ. of the City School Dist., 759 F.2d 256, 259 (2d Cir.1985); Salant Acquisition Corp. v. Manhattan Indus., 682 F.Supp. 199, 202 (S.D.N.Y.1988).  Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)

### B.      Law on Permanent Injunctions – PLRA Standard

9.      The Prison Litigation Reform Act (PLRA) limits the Court in regard to ordering injunctive relief. See 18 U.S.C. § 3626(a)(1)(A). Section 802 of the  PLRA,  18 U.S.C. § 3626(a)(1)(A), provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  Handberry v. Thompson, 446 F.3d 335 (2nd Cir. 2006)(injunction was evaluated as necessary to ensure the PLRA's "need-narrowness-intrusiveness" requirements were satisfied.) With respect to remedies of federal law violations, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. §3626(a)(1); see also Benjamin v. Fraser, 343 F.3d 35, 56 (2d Cir. 2003).

10.     Congress codified this weighing of the hardships in the PLRA, which directs courts to give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the prospective injunctive relief. 18 U.S.C. § 3626(a)(2); see Smith v. Arkansas Dep't of Correction, 103 F.3d 637, 646–47 (8th

Cir.1996) (finding that the PLRA "codifies existing law and does not change the standards for determining whether to grant an injunction"); <u>Gomez v. Vernon</u>, 255 F.3d 1118, 1129 (9th Cir.2001) (agreeing with <u>Smith</u>).  <u>Dodge v. County of Orange</u>, 282 F. Supp. 2d 41, 71-72 (S.D.N.Y. 2003).

11.    Even if the plaintiff meets his burden of proof on these issues, which he failed to do, the PLRA limits the type and scope of prospective injunctive relief that the Court may award plaintiffs.  18 U.S.C. § 3626(a)(2) states that no injunction shall issue unless the court finds that the relief is narrowly drawn, extends no further than is necessary to correct the constitutional harm found, and is the least intrusive means necessary to correct that harm.  In a similar vein, the PLRA requires a court to apply principles of comity in fashioning relief that requires or permits a government official to exceed his or her authority under state or local law.  <u>See also</u> <u>Rizzo v. Goode</u>, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'") (quoting <u>Stefanelli v. Minard</u>, 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951)). <u>Dodge v. County of Orange</u>, 282 F. Supp. 2d 41, 72 (S.D.N.Y. 2003).

12.    18 U.S.C. § 3626 (a) Provides: **a) Requirements for relief.--**
**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--
**i)** Federal law requires such relief to be ordered in violation of State or local law;
**(ii)** the relief is necessary to correct the violation of a Federal right; and
**(iii)** no other relief will correct the violation of the Federal right.
**C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

18 U.S.C. § 3626 (a)

13.    With respect to remedies of federal law violations, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1); see also Benjamin v. Fraser, 343 F.3d 35, 56 (2d Cir.2003) ( "[T]he PLRA requires the court to make particular findings ... when it identifies [federal] violations."). Handberry v. Thompson, 446 F.3d 335, 346 (2d Cir. 2006).

14.    The Court is required to make "need-narrowness-intrusiveness" findings under the PLRA. See Handberry II, 219 F.Supp.2d at 533.  Handberry v. Thompson, 446 F.3d 335, 347 (2d Cir. 2006).

**C.**    **Deference To Prison Officials, Even Under RLUIPA**

15.    When considering all of the claims in this case, they must be considered in light of the highly volatile and dangerous environment of managing a high security prison facility.  The United States Supreme Court reversed the Third Circuit Court of Appeals which had denied summary judgment to prison officials.  Beard v. Banks, 548 U.S. 521, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)(finding ban of publications in highest security

prison reasonable and constitutional).  The Supreme Court admonished the Third Circuit for substituting its judgment for the experienced professional opinions of correctional administrators.  As the Seventh Circuit  noted, in <u>George v. Smith</u>, 507 F.3d 605 (7th Cir. Nov. 9, 2007), "The Supreme Court has told us that prisons' legitimate concerns about security and administration deserve respect, even when the subject is the printed word. <u>See, e.g</u>., <u>Beard v. Banks</u>, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)." Thus, even when it comes to core First Amendment issues in prisons, the Court must defer to the experienced professional judgments of correctional administrators.

16.    <u>Turner v. Safley</u>, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and <u>Overton v. Bazzetta</u>, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), contain the basic substantive legal standards governing this case. This Court recognized in <u>Turner</u> that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment.  482 U.S., at 93, 107 S.Ct. 2254; <u>see also O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).  <u>Beard v. Banks</u>, 548 U.S. 521, 528, 126 S. Ct. 2572, 2577, 165 L. Ed. 2d 697 (2006).

17.    "Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, *e.g.,* 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin.News 1993, pp. 1892,

1899, 1900)." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 723, 125 S. Ct. 2113, 2123, 161 L. Ed. 2d 1020 (2005).

**III.   PLAINTIFF'S CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF WITH REGARD TO JUMAH AND OILS ARE MOOT**

As a preliminary matter, the Court must decide, based on all the evidence presented, whether mootness deprives this Court of jurisdiction over any or all of plaintiff's claims. In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.  <u>See</u> <u>Prins v. Coughlin</u>, 76 F.3d 504, 506 (2d Cir.1996) (per curiam); <u>Young v. Coughlin</u>, 866 F.2d 567, 568 n. 1 (2d Cir.1989); <u>Mawhinney v. Henderson</u>, 542 F.2d 1, 2 (2d Cir.1976). <u>Salahuddin v. Goord</u>, 467 F.3d 263, 272 (2d Cir. 2006).   Plaintiff's claims with regard to Jumah arose when he received disciplinary reports for fighting and having a razor blade, and he landed in the disciplinary progression units, starting in Q-pod.  See T. 4/24, 346: 9-24; Plaintiff is now at Cheshire CI, and thus his transfer out of MacDougall, and the evidence demonstrating a continuous and consistent record of weekly Jumahs at Cheshire CI renders plaintiff's Jumah claim, moot.

Plaintiff's oils claim is also moot, especially in light of a bona fide, certificate of Halal certification for the oils in commissary issued by the Islamic Society of the Washington Area (ISWA).   (Defendants' Exhibit 513**)**   In this regard, all plaintiff offered was incompetent assertions of alleged "chemicals" without any competent witness or evidence, and nothing but his own conclusory and bald assertion that such oils were not acceptable to him.

With regard to Jumah, as stated above, it has been a solid, complete three years that plaintiff has remained at Cheshire CI with extremely regular, weekly services, and thus, his remote and speculative claim that he might, in the future, be transferred, and that at

some time in the future he might be at a facility that does not have regular weekly Jumah, is insufficient under the injunction standards discussed above, and herein below, to warrant the extraordinary measure of an injunction.   The possibility of a transfer was held insufficient reason to grant an injunction in <u>Zajrael v. Harmon</u>, 677 F.3d 353, 355 (8th Cir. 2012), where the Eighth Circuit stated:

18.    "[Plaintiff's] claim for injunctive relief under RLUIPA is moot.  He complains about policies or practices at the [East Arkansas Regional Unit], but he was transferred out of that facility in 2006, and is now housed at the Varner facility.  Because [plaintiff] is no longer subject to the policies that he challenges, there is no live case or controversy.  The exception to the mootness doctrine for claims capable of repetition yet evading review is not applicable, because [plaintiff] made no showing that a retransfer to the EARU is likely. Although this court might exercise jurisdiction after a transfer if there were proof that officials moved an inmate for the purposes of mooting his claim, there is no evidence of such motivation in this case." <u>Zajrael v. Harmon</u>, 677 F.3d 353, 355 (8th Cir. 2012).

<u>Shidler v. Moore</u>, 446 F.Supp.2d 942, 945-46 (N.D.IN 2006) held that an inmate's transfer to another prison rendered his allegations about the first prison moot.  "When 'a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred.' <u>Higgason v. Farley</u>, 83 F.3d 807, 811 (7th Cir. 1996) (Quotation marks and citations omitted).  It is certainly possible that he could be transferred back to the Miami Correctional Facility, since an inmate can be relocated at any time.  <u>See</u> <u>Sandin v. Conner</u>, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).  But the mere possibility of retransfer is insufficient.  The standard to be applied here is whether he is 'likely to be retransferred.'

There is no reasonable basis that he is 'likely to be retransferred' to the Miami Correctional Facility, therefore the injunctive relief claims will be dismissed." Shidler, at 945-46.

In City of Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983), the Supreme Court reversed the lower court's order that enjoined the municipality from applying "choke holds" when apprehending suspects who did not threaten death or bodily injury.  The Court found that federal courts did not have jurisdiction to provide injunctive relief in these circumstances.  The Court determined that to invoke jurisdiction, there must be a showing of immediate danger of irreparable injury.  The existence of a past injury or speculation that there might be a future injury is insufficient, it held, to establish the case or controversy element necessary for jurisdiction.  The rationale of Los Angeles v. Lyons requires that plaintiff's claims for declaratory and injunctive relief, with regard to Jumah and oils, be denied as they are moot, and plaintiff failed to make any showing that his transfer is anything more than a mere possibility.

## IV.   PLAINTIFF CANNOT PREVAIL ON ANY OF HIS FIRST AMENDMENT CLAIMS

### A.   Jumah

The prisoner in O'Lone v. Shabazz, had no Jumah any Friday, as he was required to work outside the walls of the New Jersey's Leesburg  State Prison, Monday to Friday 9 AM to 5 PM. O'Lone v. Estate of Shabazz, 482 U.S. 342, 353, 107 S. Ct. 2400, 2407, 96 L. Ed. 2d 282 (1987).

> Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. See Koran 62:9-10; Brief for Imam Jamil Abdullah Al-Amin et al. as *Amici Curiae* 18-31.

O'Lone v. Estate of Shabazz, 482 U.S. 342, 345, 107 S. Ct. 2400, 2402, 96 L. Ed. 2d 282 (1987).  Because Jumah is held Friday afternoons, plaintiff's work assignment made it

impossible for him to attend Jumah.   The Supreme Court found that the policy which resulted in a complete prohibition on attending Jumah was constitutional.   The Court relied in part on the following legitimate reasons for denying Jumah:

> Prison officials testified that the returns from outside work details generated congestion and delays at the main gate, a high risk area in any event. Return requests also placed pressure on guards supervising outside details, who previously were required to "evaluate each reason possibly justifying a return to the facilities and either accept or reject that reason." *Id.,* at 931. Rehabilitative concerns further supported the policy; corrections officials sought a simulation of working conditions and responsibilities  in society. Chief Deputy Ucci testified: "One of the things that society demands or expects is that when you have a job, you show up on time, you put in your eight hours, or whatever hours you are supposed to put in, and you don't get off.... If we can show inmates that they're supposed to show up for work and work a full day, then when they get out at least we've done something." Tr. 89. These legitimate goals were advanced by the prohibition on returns; it cannot seriously be maintained that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner v. Safley,* 482 U.S., at 89-90, 107 S.Ct., at 2262.

O'Lone v. Estate of Shabazz, 482 U.S. 342, 351, 107 S. Ct. 2400, 2405-06, 96 L. Ed. 2d 282 (1987).

1. The Supreme Court applied the <u>Turner</u> standard to a prisoner's free exercise claim in <u>O'Lone</u>, upholding a prison regulation that prevented Muslim prisoners from attending Friday Jumu'ah even though the Jumu'ah was claimed to be mandatory weekly congregational religious services.   <u>O'Lone</u>, 482 U.S. at 350-53.

2. We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to "substitute our judgment on ... difficult and sensitive matters of institutional administration," <u>Block v. Rutherford</u>, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison.   <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 353, 107 S. Ct. 2400, 2407, 96 L. Ed. 2d 282 (1987).

3.      "The Court must consider four factors for assessing reasonableness of a regulation: (1) whether a valid, rational connection between the prison regulation and the legitimate governmental interest exists; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the challenged regulation in relation to proposed alternatives.  Johnson v. Goord, 445 F.3d 532, 535 (2d Cir.2006)." Klimas v. Lantz, 3:08CV694 WWE, 2012 WL 3611018 (D. Conn. Aug. 21, 2012). affirmed Klimas v. Lantz, 12-3791-CV, 2013 WL 1830862 (2d Cir. May 1, 2013)( applying four part Turner test).

4.      "The burden is on the inmate to disprove the validity of the regulation at issue. Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2008)." Klimas v. Lantz, 3:08CV694 WWE, 2012 WL 3611018 (D. Conn. Aug. 21, 2012), affirmed Klimas v. Lantz, 12-3791-CV, 2013 WL 1830862 (2d Cir. May 1, 2013).

5.      "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' "Graham v. Mahmood, 2008 WL 1849167 at *12; see also, e.g., Fromer v. Scully, 874 F.2d 69, 73 (2d Cir.1989); Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); Byrd v. Goord, 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug.29, 2005) (Daniels, D.J.)." Mitchell v. New York State Dept. of Corr. Services, 06-CV-6278CJS, 2009 WL 185757 (W.D.N.Y. Jan. 26, 2009).

6.    The Second Circuit has already ruled on First Amendment grounds that the requirement to have a "outside sponsor," an authorized chaplain or approved volunteer present to monitor and supervise a religious group, is a rational requirement which has a legitimate penological interest, and meets first amendment scrutiny.

> The sponsor requirement is said to be intended to ensure that the meeting is convened for religious purposes and not to hold kangaroo courts, foster extortion, or *578 provide a venue for the dissemination of conspiratorial information. As well, the use of sponsors is thought to minimize conflicts among inmates as to the nature and content of the service. Other circuits have given their imprimatur to the requirement of free-world sponsors based upon similar security concerns. *See, e.g., Johnson–Bey v. Lane,* 863 F.2d 1308, 1310–11 (7th Cir.1988); *Cooper v. Tard,* 855 F.2d 125, 129–30 (3d Cir.1988); *Hadi v. Horn,* 830 F.2d 779, 784–86 (7th Cir.1987); *Tisdale v. Dobbs,* 807 F.2d 734, 736, 740 (8th Cir.1986). We also are satisfied that the sponsor requirement meets the rational relationship and impact of accommodation prongs of the *Turner* standard.

Benjamin v. Coughlin, 905 F.2d 571, 577-78 (2d Cir. 1990) cert. denied 498 U.S. 951 (1990).

**OILS**

In Young v. Saunders, 169 F. Supp. 2d 553 (W.D. Va. 2001), the court considered the prison regulation that limited the inmate's prayer oils to those sold in the commissary and does not permit inmates to order from outside vendors.  Finding that such restriction was rationally related to a legitimate penological interest, the court granted defendants' motion for summary judgment.  In this case, defendants claimed that the oils sold in the commissary were nonflammable and that the inmate "has failed to demonstrate that the prayer oil he seeks is nonflammable." Young, at 557. Relying in part on the United States Supreme Court's decision in Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 110 S. Ct. 1595. 108  L. Ed. 2d 282 (1990) (finding that a "generally applicable

regulation" is constitutional even if it has an incidental effect on religious practice)[2], the court determined that this 'does not offend free exercise principles because the <u>Smith</u> and <u>O'Lone</u> tests are satisfied.  First, denying plaintiff access to prayer oil satisfies the <u>Smith</u> test because it is a generally applicable policy, which applies to all inmates.  Second, [defendants'] prohibition of prayer oil [from an unapproved vendor] . . . satisfies the <u>O'Lone</u> test because it is rationally related to a legitimate penological interest.  Similar to [defendants'] goals in preventing the use of candles, herbs, rocks and incense, the [defendants] deny access [to] nonflammable oil to ensure the safety and security of the prison and to reduce the flow of contraband." <u>Id.</u>[3]

The Tenth Circuit upheld on first amendment grounds the ban on possessing oils within the inmate's cell, a ban more restrictive than the Connecticut DOC policy at issue in this case. Like this case, one of the reasons cited, was that strong smelling oils can interfere with the ability of the canines to detect drugs or cell phones (testimony of Commissioner Dzurenda).  <u>Hammons v. Saffle</u>, 348 F.3d 1250, 1255 (10th Cir. 2003)( affirming grant of summary judgment to prison officials; the prison administration nevertheless determined that such prayer oils can mask the scent of drugs).[4]  In this case,

_____

[2] <u>Smith</u> was superseded in part by RLUIPA, as explained in <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 723, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005) (upholding the constitutionality of RLUIPA, in part, because "RLUIPA does not differentiate among bona fide faiths"). Accordingly, <u>Smith</u>'s finding of constitutionality of general application of regulations effecting religion, was not overruled.

[3] The <u>Young v. Saunders</u> case mistakenly refers to the "defendant" as the one seeking prayer oil.  In context, it must be a mistake because it then goes on to grant summary judgment in favor of defendants.  <u>See  id.</u>  169 F. Supp. 2d 553 at 557.

[4] <u>McCray v. McElvogue</u>, CA 1:10-1615-TLW-SVH, 2011 WL 3880950 (D.S.C. July 20, 2011) <u>report and recommendation adopted</u>, CA 1:10-1615-TLW-SVH, 2011 WL 3880586 (D.S.C. Sept. 1, 2011( ban on religious oils is related to legitimate penological interests,

the unrefuted evidence is that oils which come from outside of the DOC can be flammable and indeed, in at least one instance known to Commissioner Dzurenda, were used as a weapon to make a napalm bomb, to throw and seriously injure another inmate, staff or cause a serious arson fire within the prison.   Avoiding the proliferation of unknown potentially hazardous oils is obviously a legitimate penological, indeed, a compelling state interest. See also Davis v. Flores, 484 F. App'x 108 (9th Cir. 2012)(prison's seven-month prohibition against using prayer oil in cells did not violate inmate's rights under Free Exercise Clause of First Amendment or RLUIPA);

In Joseph v. Campbell, 10 F. App'x 264, 266 (6th Cir. 2001) the Sixth Circuit affirmed the grant of summary judgment to prison officials' restriction on the use of oils and incense and determined that such restriction was rationally related to a legitimate penological interest in security because these items are flammable and can be used to mask the odor of marijuana. See Mustafaa v. Dutton, No. 91-6292, 1992 WL 51473, at *2 (6th Cir. Mar. 18, 1992); Dettmer v. Landon, 799 F.2d 929, 933-34 (4th Cir.1986).

### CIRCUMCISION

This is not the first case raising a claim about circumcision for a prisoner.   Prison officials' failure to provide a prisoner with a circumcision for religious purposes failed to state a claim under the first amendment and RLUIPA in Neyman v. Clark, 1:08-CV-01514-SMS PC, 2009 WL 1035348 (E.D. Cal. Apr. 17, 2009) where plaintiff provided a conclusory one sentence statement of his legal claims, and neglected to link any acts or omissions to

---

based on security concerns related to religious oils, including the use of oils to thwart officers' attempts to enter cells and restrain inmates and use of containers can be used as weapons).

Defendant Clark or anyone else.  Neyman v. Clark, 1:08-CV-01514-SMS PC, 2009 WL 1035348 (E.D. Cal. Apr. 17, 2009).[5]

In Muhammad v. Crosby, 4:05CV193-WS, 2009 WL 2913412 (N.D. Fla. Sept. 3, 2009) aff'd sub nom. Muhammad v. Sapp, 388 F. App'x 892 (11th Cir. 2010) the court rejected a claim that having 16 gold crowns removed was required by the Muslim religion. "Even if there were evidence that Plaintiff will bear the cost, the claim fails." Id. The court considered the plaintiff's allegation that the presence of 16 gold crowns in his teeth, "installed in his youth . . . . violates a tenet of his religion." Muhammad, at *5.  "He seeks an injunction to require Defendant to arrange for the removal of Plaintiff's gold crowns, either by using prison dentists or by allowing a dentist chosen by Plaintiff to come into the institution to remove the crowns, all at Plaintiff's expense." Id.  In granting the defendant summary judgment on this claim, the court held, inter alia, that "other prisoners would perceive that Plaintiff had received preferential dental treatment, receiving a cosmetic procedure ahead of prisoners with serious dental needs, and inmate morale and security would be impaired.  This could lead to demands from other prisoners to obtain other kinds of cosmetic surgery at their own expense, such as orthodontics, teeth whitening, and tattoo removal, or perhaps other cosmetic surgery related to religious beliefs, such as circumcision.  Defendant has shown that the Department has a compelling state interest to

---

[5] There is at least one eighth amendment case involving a claim for circumcision by an inmate.  "Persons who are incarcerated do not have a constitutional right to whatever medical procedures they desire.  Petitioner seemingly believed that a circumcision was the solution for his penile pain, but that does not automatically entitle him to a circumcision. What the Eighth Amendment bestows upon petitioner is the right to receive medical attention for his serious medical needs; not the right to particular medical procedures. If the Department of Corrections has a policy that denies inmates the right to have a free circumcision, such a policy, on its face, does not violate petitioner's Eighth Amendment rights." Adsit v. Kaplan, 410 F.Supp.2d 776, 782 (W.D. Wis. 2006.

deny Plaintiff's request to have his gold crowns removed." Id., at **30-31.  "Defendant has also shown without dispute that denial of Plaintiff's request to have all of his gold crowns removed is the least restrictive means to secure this compelling government interest. Either the crowns will be removed or they will not.  There is no middle ground." Id., at *31.

The  Eleventh Circuit affirmed, stating in part, relevant to plaintiff's circumcision claim here, "RLUIPA requires governments to refrain from substantially burdening religion, not to affirmatively subsidize religion" citing  Abdulhaseeb v. Calbone, 600 F.3d 1301, 1320 (10th Cir.2010). Muhammad v. Sapp, 388 F. App'x 892, 896 (11th Cir. 2010).  The Eleventh Circuit relied on Cutter, 544 U.S. at 720 n. 8, 125 S.Ct. 2113 ("Directed at obstructions institutional arrangements place on religious observances, RLUIPA does not require a State to pay for an inmate's devotional accessories."); Mayweathers v. Newland, 314 F.3d 1062, 1068-69 (9th Cir.2002) (holding RLUIPA constitutional under the Establishment Clause because "[i]t does not impose affirmative duties on states that would require them to facilitate or subsidize the exercise of religion"); Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010).

Plaintiff's extremely weak claim at trial, made for the first time at trial, that the state could deduct PLRA deductions from his inmate pay or from deposits he might receive in the future from family and friends to his inmate account, to pay for the circumcision, do not carry the day.  As the court noted in Muhammad v. Crosby, "if Plaintiff were to have his gold crowns removed, other prisoners would perceive that Plaintiff had received preferential dental treatment, receiving a cosmetic procedure ahead of prisoners with serious dental needs, and inmate morale and security would be impaired. This could lead to demands from other prisoners to obtain other kinds of cosmetic services at their own expense, such

as orthodontics, teeth whitening, and tattoo removal, or perhaps other cosmetic surgery related to religious beliefs, such as circumcision. Defendant has shown that the Department has a compelling state interest to deny Plaintiff's request to have his gold crowns removed." Muhammad v. Crosby, 4:05CV193-WS, 2009 WL 2913412 (N.D. Fla. Sept. 3, 2009) aff'd sub nom. Muhammad v. Sapp, 388 F. App'x 892 (11th Cir. 2010).  The same compelling state interests apply here and require that the Court find that the denial of circumcision did not violate plaintiff's rights under either the first amendment or RLUIPA.

## V.   PLAINTIFF'S CLAIMS FARE NO BETTER UNDER  RLUIPA

With regard to all of plaintiff's claims under RLUIPA, the defendants respectfully suggest that plaintiff failed to meet his initial burden of demonstrating that any policy or procedure of the DOC as applied to plaintiff imposed a substantial burden on his religion. Although plaintiff alleges in conclusory terms that everything he does to exercise his faith is "essential" there are obvious substantial burdens, and then, again, there are less than substantial or inconsequential burdens.[6] Since plaintiff admitted in his testimony that if he misses Jumah prayer due to circumstances over which he has no control, he can make up such missed  Jumah by making four individual rakats  (units of prayer) as part of the Zuhr, or late afternoon/ evening prayer, he in effect, admitted there is no substantial burden on his religion. T. 4/24, 352:1-25, 353:1-8; T. 4/25, 415:17-25; 416: 1-25; 417 1-22. Imam Hasan in both his expert report and his live testimony explained that individual prayers can be substituted for the Jumah prayer, and that if one misses the prayer because one is subjected, for example to a lockdown, or a cancellation due to a chaplain being in a car

---

[6] "In addition, the Court notes that although the substantial burden test pre-supposes that some infringements will be *de minimis,  see Ford v. McGinnis,* 352 F.3d 582, 593 (2d Cir.2003) , the centrality of a practice to a religion is not subject to judicial inquiry. *Id.* at 590;…" Singh v. Goord, 520 F. Supp. 2d 487, 498-99 (S.D.N.Y. 2007).

accident or otherwise unavailable, it is not an individual sin.  T. 4/25, 462: 18-23.  One is obligated then to make individual prayers.  In addition, for the last three years there has been no substantial burden on plaintiff's practice of Jumah prayer as Jumah prayer is being provided regularly on a weekly basis.

Plaintiff's invocation of the Religious Land Use and Institutional Persons Act (RLUIPA), does not change the analysis or alter the balance in favor of safety, security and order. In <u>Cutter v. Wilkinson</u>, 544 U.S. 709 (2005).  The Supreme Court  acknowledged and emphasized that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" <u>Id.</u> 544 U.S. at 722-723. (citation omitted). Thus, the Court did "**not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety**." <u>Id</u>. at 722. <u>See</u> <u>Clark v. Levesque</u>, 3:03CV 795 (DFM)(D.Conn. March 17, 2006) Ruling on Motion for Summary Judgment, slip op. (Doc. #31) at 13, ("inmates' rights to freely exercise their religious beliefs do not supersede prison officials' interests in safety and security") <u>Clark v. Levesque</u>, 3:03CV795 (DFM), 2006 WL 691999 (D. Conn. Mar. 17, 2006) <u>aff'd</u>, 336 F. App'x 93 (2d Cir. 2009)(emphasis added).

This Court has previously held in this case: "RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.' <u>Cutter</u>, 544 U.S. at 722. Moreover, courts should accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary

regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' Id.

Vega v. Lantz, 3-04-CV-1215(DFM), 2009 WL 3157586 (D. Conn. Sept. 25, 2009) on reconsideration, 3:04-CV-1215 (DFM), 2012 WL 5831202 (D. Conn. Nov. 16, 2012).

"RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir.2006) (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)). Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest. See 42 U.S.C. § 2000cc-2(b)."

Jova v. Smith, 582 F.3d 410, 415 (2d Cir. 2009).

In order "to demonstrate a substantial burden on exercise of religion, a governmental policy or action must significantly inhibit or constrain religious conduct or religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." Van Wyhe, 581 F.3d at 656 [citations and quotations omitted].

Jihad v. Fabian, CIV. 09-1604 SRN LIB, 2011 WL 1641885 (D. Minn. Feb. 17, 2011) report and recommendation adopted, CIV. 09-CV-1604 SRN, 2011 WL 1641767 (D. Minn. May 2, 2011).

"[A] plaintiff alleging a RLUIPA violation must first show that defendants substantially burdened his sincerely-held religious beliefs.  See Singh, 520 F.Supp.2d at 498.  'In order to establish that a plaintiff's exercise was substantially burdened [under RLUIPA], a plaintiff

must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith.' <u>Graham</u>, 2008 WL 1849167, at *14 (quoting <u>Muhammad</u>, 904 F.Supp. at 189). The interference 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.' <u>Id</u>. However, 'while mere inconvenience to the adherent is insufficient to establish a substantial burden, demonstrating a substantial burden is not an onerous task for the plaintiff.' <u>Singh v. Goord</u>, 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (internal citations and quotation marks omitted)." <u>Pugh v. Goord</u>, 571 F. Supp. 2d 477, 504-05 (S.D.N.Y. 2008).

"In addition, the Court notes that although the substantial burden test pre-supposes that some infringements will be *de minimis*, see <u>Ford v. McGinnis</u>, 352 F.3d 582, 593 (2d Cir.2003) , the centrality of a practice to a religion is not subject to judicial inquiry. *Id.* at 590;…" <u>Singh v. Goord</u>, 520 F. Supp. 2d 487, 498-99 (S.D.N.Y. 2007).

### <u>JUMAH</u>

 The evidence showed that: 1) there is no substantial burden as individual prayers can be made in the event that Jumah is cancelled for any reason.  The evidence also showed, 2) that rather than simply cancel Jumah, other alternatives were considered, and were attempted.  The option of allowing inmates to lead the prayer was considered and rejected, as there is no acceptable way that such leadership and authority can be given an inmate without jeopardizing the compelling goal of order, safety and security.  There was a significant history of violent episodes testified to by former Commissioner Murphy that would likely arise if inmates were allowed to be leaders.  Next, the defendants attempted to increase volunteers and get additional volunteers.  Both Father Bruno and Imam Hasan

testified as to the efforts being made to increase the level of volunteer participation. On repeated occasions, Fr. Bruno has mailed numerous letters seeking additional volunteers, and he received no positive responses.  T.4/23, 93:15-22; T. 4/23, 149: 5-18 (45 letters sent in 2002, seeking volunteers, no responses); T. 4/23, 149: 19-23 (50 -60 letters sent out in 2013 seeking volunteers, again with no results). See also T. 4/23, 151:18-25 (neither Imam Antepli nor the Hartford Seminary provided any offer of volunteers, nor actual, consistent and long term volunteer participation). Both Fr. Bruno and Imam Hasan described the various reasons why there are difficulties in getting a qualified Islamic chaplain for Friday Jumah, one of which is that many of these same Imams must be in their own community mosques at that time providing Jumah to their own congregations.

Other obstacles beyond the control of the defendants include the difficulties of a person giving up a half day of pay, to be present in a prison or the possible confrontation with inmates who might not accept a person from the outside.  Lastly, Commissioner Dzurenda attested to the efforts made to get authorization from the budget office of the state, the Office of Policy and Management (OPM) to get approval to hire state prison chaplains, even though there was a complete freeze on all hiring. At the time of trial, April 25, 2013, Commissioner Dzurenda was pleased to testify that the DOC had fought through the bureaucratic entanglement and had obtained approval and permission to post (i.e. publicize and announce) job opening for two Islamic chaplains.) (Tr. 4/25/13 at 511: 9-25; 513:16-20; See also Tr. 4/23/13 at 154: 7-14.(Bruno testimony)).   Thus, there is no evidence of deliberate indifference to the claim that there is a need for more Islamic chaplains to perform more Jumahs.  In this regard, the ability to hire more chaplains in not within the authority or control of the defendants.  See e.g. Larry v. Goetz, 575 F. Supp. 2d

965, 970 (W.D. Wis. 2007)(plaintiff failed to offer any admissible evidence to prove that

defendant was personally responsible for the jail's failure to offer Jumah services, rejecting

claim under first amendment and RLUIPA).

**OILS**

As discussed above, and as amply explained by Imam Hasan in his expert

testimony, the denial of oils of plaintiff's own choosing, even if it were a complete denial, is

a de minimis burden on the practice of the Muslim religion.   At least one court, in dealing

with a similar claim, found as follows:

> Plaintiff, however, alleges that he is concerned that the prayer oil from Union
> Supply may be contaminated, but he can trust that the oil from his vendor is
> not. (Second Am. Compl. 10, ECF No. 29.) Nevertheless, a conclusory
> allegation of contamination is insufficient. *See Ashcroft v. Iqbal,* 556 U.S. at
> 683, 129 S.Ct. 1937 (concluding that "complaint does not contain any factual
> allegation sufficient to plausibly suggest [officials'] discriminatory state of
> mind[ ] ); *Kensu,* 1996 U.S. Dist. LEXIS 5468, at *45–47 (discussing failure to
> establish any meaningful religious differences between Muslim or Buddhist
> oil). **Davis cannot allege that ordering prayer oil from his vendor of
> choice is a constitutionally protected activity**. *See Thomas v. Little,* No.
> 07–1117–BRE/egb, 2009 WL 1938973, at *5, 2009 U.S. Dist. LEXIS 57568,
> at *15–18 (W.D.Tenn. July 6, 2009) (discussing approved-vendor policy and
> determining that because the prayer oil that plaintiff could buy from Union
> Supply was not alleged to be "unfit for his religious ritual," the desire to order
> from his preferred vendor was inconsequential under RLUIPA).

Davis v. Powell, 901 F. Supp. 2d 1196, 1215 (S.D. Cal. 2012)(emphasis added).   Similarly

here, plaintiff's desire to order from his preferred vendor is totally inconsequential under

RLUIPA, and judgment should enter for the defendants on this claim.

Another District Court has also dealt with the issue of a Muslim inmate who did not

like the scent or variety of available Muslim oils and the RLUIPA standard.   Charles v.

Verhagen, 01-C-253-C, 2004 WL 420148 (W.D. Wis. Feb. 27, 2004).   According to the

inmate's complaint in Charles v. Verhagen, "a new administrator has 'taken away plaintiff['s]

ability to use vendors and types of fragrance Oil, reducing it to Oils in which plaintiff finds

repugnant and because of it['s] scent has left plaintiff without access to the Islamic Prayer Oil.'" Charles v. Verhagen, 01-C-253-C, 2004 WL 420148 (W.D. Wis. Feb. 27, 2004).  This complaint is nearly on point on all fours with the complaint that Inmate Vega makes in this case.  The District Court in Verhagen stated:

> The Religious Land Use and Institutionalized Persons Act protects plaintiff's right to exercise his religion; it does not give him the right to dictate the precise terms under which defendants must accommodate his religious beliefs. In his motion, plaintiff does not suggest that there is any religious significance to the particular fragrance of a prayer oil. Thus, the new restriction on plaintiff's choice of oils cannot be a considered a "substantial burden" on his religious exercise within the meaning of the act. So long as plaintiff is provided with a reasonable quantity of prayer oil that allows him to practice his faith, defendants are not violating the injunction or the act simply because they do not provide plaintiff with the oil of his choosing.

Charles v. Verhagen, 01-C-253-C, 2004 WL 420148 (W.D. Wis. Feb. 27, 2004).

Commissioner Dzurenda testified as to the security concerns inherent to the provision of prayer oils and emphasized the need for the DOC to have control over the purchase of oils.  T. 4/25, 501:23-25, 502:1-25; 503:1-13.  Security concerns specific to oils have been found to be compelling and, therefore, deference is due to defendants' expertise on the subject.  In Hammons v. Jones, 00-CV-143 GKFSAJ, 2007 WL 2219521 (N.D. Okla. July 27, 2007) the Court rejected the inmate's first amendment and RLUIPA claims and held that DOC's policy of forbidding Hammons' in-cell possession of prayer oils does not violate Hammons' rights under RLUIPA because (1) DOC has demonstrated that the compelling state interest in maintaining security and order in a hostile penal system outweighs Hammons' interest in having the prayer oils in his cell, and (2) reasonably limiting access to prayer oils stored at a religious facility is the least restrictive means of furthering the state's compelling interest.  The court cited the Department of Corrections' security concerns:  "oils can be used by inmates to (1) mask the scent of drugs to prevent

detection by drug dogs, (2) serve as personal lubricants for illicit sexual activity, (3) thwart attempts by correctional officers to enter cells and restrain inmates, and (4) barter with other inmates who are unable to obtain oils. Thus, the DOC argues that its policy restricting access to prayer oils serves to promote compelling governmental interests of preventing the use and possession of illegal drugs, maintaining prison order and safety, and deterring crime within DOC facilities.  The Court is required to afford deference to the views of prison administrators and officials regarding RLUIPA issues."  Hammons, at *10-11.  The court agreed with the DOC.   "The concerns cited by DOC directly relate to the special characteristics of the oils: they are scented and can be used to mask the scent of contraband; they are lubricants and can be used in prohibited sex acts and to avoid or escape restraints.   Those characteristics make the oils valuable to the general inmate population.  Because they have value separate from their religious value, they give rise to the security concerns outlined by the DOC."  Id., at *12.

Here, the provision of Halal certified oils in commissary, and the Connecticut DOC's policy allowing inmates to have such small amounts of oil in their cells, is more liberal than the restrictive policy sustained under RLUIPA in Hammons.

## THE COURT SHOULD DECLINE TO CONSIDER PLAINTIFF'S DOCTRINAL CLAIMS ABOUT ONE OR TWO JUMAHS

### First Amendment Abstention

1. Plaintiff, for the first time in the lengthy history of this case, and without further amending his Amended Complaint, asserts in his portion of the Joint Trial Memorandum (Section VI, Plaintiff's Contentions) that "the manner in which [Jumah] is currently conducted does not comport with Mr. Vega's practice of his Islamic faith."  With exactly specifying what he means, plaintiff appears to be inviting the Court to delve into an

ecclesiastical or doctrinal intra-faith dispute, over which this Court has no jurisdiction, and which the Court should decline to entertain under first amendment abstention.

2.     The District of Columbia Court of Appeals discussed the rubric of first amendment abstention, including the proposition that secular courts may decide issues amenable to resolution by application of neutral principles of law, at least where property disputes and secular employment and business contracts are at issue; the court noted that the "'fraud, collusion or arbitrariness'" exception enunciated as dictum in Gonzalez v. Roman Catholic Archbishop, supra, 280 U.S. at 1, 50 S.Ct. 5, had **682** been narrowed almost beyond recognition by the later case of Serbian Eastern Orthodox Diocese v. Milivojevich, supra, 426 U.S. at 696, 96 S.Ct. 2372. Heard v. Johnson, supra, 810 A.2d at 881-82. Citing, inter alia, Serbian Eastern Orthodox Diocese, the court stated that **the first amendment generally prohibits "judicial encroachment into church decisions where those decisions turn on church policy or on religious doctrine or practice.** Except for contractual disputes, this prohibition includes church decisions concerning the employment of ministers because selection and termination of clergy is a core matter of ecclesiastical self-governance not subject to interference by a state." *Heard v. Johnson,* supra, at 882. Thibodeau v. Am. Baptist Churches of Conn., 120 Conn. App. 666, 681-82, 994 A.2d 212, 223 (2010)(emphasis added).

3.     "The United States Supreme Court, in a line of cases stretching back to 1871 (Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871)), has consistently interpreted the Free Exercise Clause as a 'constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization ... on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.'

Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976)." Heard v. Johnson, 810 A.2d 871, 879 (D.C. 2002).

4. This Court should exercise first amendment abstention because plaintiff seeks to assert a purely doctrinal claim in this case. It is clear that "civil courts may resolve property disputes and other secular issues that arise with respect to a religious entity, but only when inquiry 'into religious law and polity' is not required. Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich, 426 U.S. at 709, 96 S.Ct. 2372." Ram v. Lal, 84 Fed. R. Serv. 3d 187 (E.D.N.Y. 2012).

5. "However, civil courts may not entertain claims that in effect require religious determinations that are ecclesiastical, regardless of the nature of the underlying dispute. See Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich, 426 U.S. at 708–10, 96 S.Ct. 2372; Little v. First Baptist Church, Crestwood, 475 U.S. at 1149, 106 S.Ct. 1802 (stating that 'where the use of property or the terms of a contract necessitate reference to ecclesiastical principles or authority, courts must exercise extreme care to avoid taking sides on matters of religious belief')." Ram v. Lal, 84 Fed. R. Serv. 3d 187 (E.D.N.Y. 2012).

6. "Since at least the turn of the century, courts have declined to "interfere [ ] with ecclesiastical hierarchies, church administration, and appointment of clergy." Minker v. Balt. Annual Conference of the United Methodist Church, 894 F.2d 1354, 1357 (D.C.Cir.1990) (internal quotation marks omitted)" Rweyemamu v. Cote, 520 F.3d 198, 204-05 (2d Cir. 2008), aff'd, 347 Fed.Appx. 654 (2d Cir.2009), cert. denied, —— U.S. ——, 130 S.Ct. 1714, 176 L.Ed.2d 184 (2010). Dayner v. Archdiocese of Hartford, 301 Conn. 759, 770, 23 A.3d 1192, 1199 (2011).

7.      "The Establishment Clause forbids 'excessive government entanglement with religion.' Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (internal quotation marks and citation omitted). 'Entanglement may be substantive-where the government is placed in the position of deciding between competing religious views-or procedural-where the state and church are pitted against one another in a protracted legal battle.'   Petruska, 462 F.3d at 311." Rweyemamu v. Cote, 520 F.3d 198, 208 (2d Cir. 2008).

8.      Declining to inquire into whether a practice is central to an adherent's religion avoids the greater harm, identified in Lyng and in the text of the Smith opinion, of having courts presume to determine the place of a particular belief in a religion.  These precedents instruct that, like determinations regarding the importance of ideas in the free speech field, judges are ill-suited to resolve issues of theology in myriad faiths.  Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004).

**PLAINTIFF UTTERLY FAILED TO ADDUCE ANY EVIDENCE OF INVIDIOUS DISCRIMINATION OR UNEQUAL TREATMENT TO MEET HIS BURDEN UNDER THE EQUAL PROTECTION CLAUSE**

"The Equal Protection Clause requires the State to treat all similarly situated people equally.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).  This does not mean, however, that all prisoners must receive identical treatment and resources." Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1123-24 (9th Cir. 2013). "To succeed on their equal protection claim, the class must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated." Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992) (citing McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).  Plaintiff has produced no evidence of discriminatory treatment or purposeful discrimination.  The evidence irrefutably

shows that all faith groups are treated in the same manner.  If the DOC facility chaplain is not available and there is no approved volunteer coverage, the collective religious service, whether it be Catholic mass, Protestant services, Jewish services, Native American services or Islamic services, they are all treated in the same manner and they are all canceled in the absence of appropriate staff  or volunteer chaplain coverage.  T. 4/23, 148: 17-25; 149:1-4.  The oils are the same for all faith groups.  Any inmate, whether he is Jewish, Muslim, Catholic, Protestant or even an atheist, can buy oils in commissary.  One does not have to be a Muslim to buy oil.  With regard to oils, plaintiff does not want equal treatment, he demand, instead, preferential treatment.  Lastly, with regard to circumcision, this Court heard evidence that no inmate can get elective surgery, and there is no inmate who can pay for his own preferred surgical procedure, whether it be tattoo removal, extraction of gold teeth, body piercings, or circumcision.   Only medically necessary procedures are provided, and all inmates are treated in the same, identical manner.  There is no evidence of any equal protection violation

"However, the Fourteenth Amendment does not demand 'that every religious sect or group within a prison – however few in number – must have identical facilities or personnel.' Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 1082 n. 2, 31 L. Ed. 2d 263 (1972).  Instead, prison administrators must provide inmates with 'reasonable opportunities . . . to exercise the religious freedoms guaranteed by the First and Fourteenth Amendments.' Id.  Turner applies with corresponding force to equal protection claims. Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)." Freeman v. TCDJ, 369 F.3d 854, 862-63 (5th Cir. 2004) (finding that the TCDJ's policy satisfies Turner's neutrality requirement and that there was "little or no evidence that similarly situated faiths are

afforded superior treatment, or that TCDJ's policy was the product of purposeful discrimination."  Id., at 863.)

This Court, in Ruling on defendants' summary judgment motion correctly stated the standard and explained as follows:

> The Second Circuit has determined that the *Turner* standard applies to equal protection claims involving prisoner religious exercise. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 574.  The plaintiff has not presented any evidence that members of other religions are treated differently with regard to diet. All inmates receive either the regular diet or the Common Fare diet. The plaintiff argues that Common Fare accomodates the religious scruples of inmates whose religions do not require meat, while failing to accomodate the plaintiff's religious need for Halal meat.

Vega v. Lantz, 304CV1215DFM, 2009 WL 3157586 (D. Conn. Sept. 25, 2009) on reconsideration, 3:04CV1215 DFM, 2012 WL 5831202 (D. Conn. Nov. 16, 2012).  There were legitimate penological reasons for the defendants' decision regarding how the Common Fare diet was implemented, and this Court correctly granted summary judgment to defendants with regard to plaintiff's equal protection claims on that point.  The same determinations can be made here, after trial, with regard to plaintiff's equal protection claims.  He has simply not presented any evidence that members of other religions are treated differently with regard to collective services, oils or requests for circumcision.  Accordingly, judgment should enter for the defendants on all of the plaintiff's equal protection claims.

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth in the defendants' proposed findings of fact, which are incorporated by reference herein, the plaintiff's claims should be rejected in their totality, and judgment should enter for the defendants.

DEFENDANTS
Theresa Lantz, Et Al.

GEORGE JEPSEN
ATTORNEY GENERAL

BY:    /s/ Steven R. Strom_____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct01211
E-mail:  steven.strom@ct.gov
Tel.:  860-808-5450
Fax:  860-808-5591

## CERTIFICATION

I hereby certify that a copy of the foregoing was filed electronically on this 7th day of June 2013, and served by mail on anyone not able to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

 /s/ Steven R. Strom_____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct01211
E-Mail:  steven.strom@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5591