UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOE BURGOS VEGA,                          :
                                          :
        Plaintiff,                        :
                                          :
        v.                                :     CASE NO. 3:04CV1215(DFM)
                                          :
THERESA LANTZ ET AL.,                     :
                                          :
        Defendants.                       :

<u>MEMORANDUM OF DECISION</u>

The plaintiff, a state prisoner, brings this action against
officials of the Connecticut Department of Corrections ("DOC")
pursuant to 42 U.S.C. § 1983 alleging violations of his rights
under the Free Exercise Clause of the First Amendment and the
Equal Protection Clause of the Fourteenth Amendment.  He also
alleges violations of the Religious Land Use and
Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et
seq.  Several claims were resolved and defendants dismissed by
dispositive motions and settlement.  (<u>See</u> docs. #95, #188, #223
and #235.)  The remaining defendants are former DOC Commissioner
Theresa Lantz and DOC Director of Religious Services Reverend
Anthony J. Bruno.  The remaining claims are that defendants, in
their official capacities, violated plaintiff's rights by
canceling weekly collective prayer, denying his request to
purchase prayer oils from an outside vendor and denying his

request for circumcision surgery.  Plaintiff has been represented ably by appointed counsel since November 2006.

In April 2013, the court held a three-day nonjury trial. Having considering the evidence presented at trial and the briefing submitted since, the Court concludes that plaintiff has failed to prove his claims that defendants violated his rights under the Free Exercise Clause, Equal Protection Clause or RLUIPA.

I.   Findings of Fact

Based on the credible testimony, the exhibits and the entire record developed during trial, and pursuant to Fed. R. Civ. P. 52(a), the court finds the following facts.

Parties

1. Defendant Theresa Lantz is the former Commissioner of the DOC.  (Tr. 6.)[1]

2. Defendant Rev. Anthony Bruno began working in the DOC in 1987.  Since 1999, he has been the DOC's Director of Religious Services.  (Tr. 12, 14.)

3. Plaintiff Joe Burgos Vega is a state prisoner and a Muslim.  He was convicted in 1997 of two counts of assault in the first degree and one count of kidnapping.  He was sentenced to 60 years of incarceration.  (Tr. 302-307.)  During the 17

---

[1]The court cites pages within the trial transcript as "Tr. __."

years since his January 1996 arrest, plaintiff has been transferred numerous times within the DOC.  Since 2006 he has been confined at MacDougall-Walker CI, Garner CI, Corrigan CI, Northern CI and Cheshire CI, where he has remained since 2009. (Tr. 238-43.)

4. Plaintiff believes himself to be a Muslim in good standing.  (Tr. 353.)  He first took the Islamic oath of faith in 1993.  (Tr. 306.)  He has availed himself of opportunities for Islamic study and learned to read and write Arabic.  (Tr. 233-37.)

### Jumu'ah

5. Administrative Directive 10.8 ¶ 6 requires that "[t]o the extent that institutional space, staff and resources permit, opportunities for collective religious activity shall be made available on an equitable basis at least once a week, to the various religious denominations to which inmates designate membership."  Collective religious activity must be "conducted and supervised by a Department authorized Chaplain or religious volunteer who professes the same religion as the group gathering together."  Inmates are not permitted to lead collective religious activities and "can never exercise any authority over any other inmate."  (Pl.'s Ex. 2.)

6. Plaintiff believes that Muslims must attend collective prayer ("Jumu'ah") once a week.  (Tr. 192, 229.)  Jumu'ah may be

conducted within a three-and-a-half hour window after the sun has reached its zenith on Fridays.  (Trial Tr. 244-45.) Plaintiff believes that Muslims must not miss Jumu'ah for three consecutive weeks.  (Tr. 230.)

7. When plaintiff was incarcerated at Macdougall-Walker CI in 2006, collective prayer was provided in so-called expansion units on a rotating basis to plaintiff and other inmates who were segregated in small groups for security reasons.  (Tr. 495-97.)  Due to the number of segregated groups, 64 separate religious services were held at Macdougall-Walker in a single week.  (Tr. 481-83.)  There were instances in which Muslim prisoners in the expansion units went three or four weeks without being offered Jumu'ah.  (Tr. 496, 487.)  Currently, two Jumu'ahs are provided to the general population at Macdougall-Walker every week, and Jumu'ahs are offered to the expansion units on a rotating basis.  (Tr. 152-57.)  Rev. Bruno is optimistic that his request to create another chaplain position at Macdougall-Walker will be approved despite a current hiring freeze.  (Tr. 153-54.)

8. At Cheshire CI, where plaintiff is currently incarcerated, two Jumu'ah services are provided weekly.  (Tr. 152.)  On one occasion in 2013, plaintiff voluntarily skipped Jumu'ah to see a visitor.  (Tr. 480.)

9. Currently, there are weeks in which no Jumu'ah is offered in one of the DOC institutions either because no Islamic chaplain is available or because of a security lockdown.  (Tr. 61-72, 416, 479, 496.)  There are 28 separate inmate populations in 18 facilities.  (Pl.'s Ex. 19).  Jumu'ah is provided on a rotating basis to the general population at two facilities and weekly to all other general populations.  (Tr. 152-57.)

10. Defendant Rev. Bruno, who supervises the chaplains, has had ongoing difficulty finding paid Islamic chaplains and Muslim volunteers to provide weekly Jumu'ah to every separate inmate population within the DOC.  This task is daunting not only because chaplains and volunteers must work with a challenging clientele in a volatile environment but also because most of the paid positions are part-time, pay little (or nothing, in the case of volunteers) and require chaplains and volunteers to be available during the normal workweek.  Chaplains and volunteers must pass background checks, submit to DOC training and regulation, and be knowledgeable in Islamic matters.  The DOC may hire chaplains only if authorized by the Department of Administrative Services, which must first obtain authorization from the Office of Policy and Management.  There is some turnover.  In recent years there have been statewide hiring freezes.  (Tr. 61-75, 111-122, 428-439, 510-514.)

11. To attract volunteers from any faith group, the DOC relies heavily on recruitment by its chaplains at their free-world houses of worship.  Little such recruitment has been achieved in the Islamic community.  The DOC made two unsuccessful letter campaigns to regional Islamic centers seeking volunteers.  (Tr. 149-50; Pl.'s Ex. 17.)

12. In 2007, the number of paid Islamic chaplain hours per Muslim inmate in the DOC was markedly higher than the hours per inmate of any other faith group, although volunteer hours were more plentiful in other faith groups.  In 2012, there was one full-time Islamic chaplain for every 142 Muslim inmates, which was more favorable than the chaplain-to-inmate ratio of any other faith group in the DOC.  (Tr. 160-164.)

13. Most of the DOC's Islamic chaplains have agreed that each will conduct two Jumu'ahs every Friday.  (Tr. 99-101; Pl.'s Ex. 18.)  Plaintiff would prefer that each imam lead only one Jumu'ah because the imam would have time to conduct a longer service and because he believes it is inappropriate for an imam to conduct Jumu'ah more than once per week.  (Tr. 268-71.)

14. Besides Jumu'ah, the Islamic chaplains provide opportunities for Islamic and Arabic study, process inmate requests and visit inmates of any faith.  Muslim inmates have access to books and other study materials and may purchase eight different devotional accessories in the commissary such as

prayer rugs, prayer beads, medals and headwear, more than any
other faith group.  (Tr. 157-159, 419; Pl.'s Ex. 30.)

<u>Oils</u>

15. It is common practice for Muslims to apply scented oil
before praying. (Tr. 276-77, 446-48.)

16. Until late 2000, inmates were permitted to obtain oils
from outside vendors with prior written permission from staff
chaplains. (Tr. 28-30.)  The DOC decided to curtail the practice
because it turned chaplains into merchants, because some
prisoners had been buying large quantities to repackage and
merchandise to other prisoners and because strong scents could
mask contraband. (Tr. 33, 132-33.)  Plaintiff's requests for
oils were denied on the basis that oil would soon be available
in the commissary. (Tr. 28-30; Pl.'s Ex. 28.)

17. In April 2001, the DOC approved one religious oil (in
two fragrances) for sale in commissary, taking into
consideration religious and security criteria including strength
of scent, viscosity, flashpoint, toxicity, container fragility,
container size and purity.  (Tr. 164-66, 441-43, 501-04; Pl.'s
Ex. 37.)  The vendor selected by the DOC was supported by an
affidavit of purity from a Muslim imam.  (Def.'s Ex. 509-14.)

18.  In 2007, the DOC formed a committee to solicit and
review bids on religious oil for sale in the commissary.  Based
on the above religious and security criteria, the committee

7

approved a product distributed by Prime Products, Inc.  That vendor supplied an affidavit of purity signed by a Muslim imam affirming that the product has natural and chemical ingredients but no animal byproducts or alcohol and is suitable for devotional use. (Tr. 134-39; Pl.'s Ex. 37.)

19.  Plaintiff believes that the oil available in the commissary is unsuitable for Islamic devotions because it contains chemicals.  He would prefer to purchase oil from Exotic Fragrances, Inc. and/or other outside vendors endorsed by Islamic sources that plaintiff trusts.  (Tr. 277, 280.)  The Exotic Fragrances catalog indicates that it sells some oils that are 100 percent natural such as jojoba oil, sesame oil, grapeseed oil, argan oil and hemp oil.  (Pl.'s Ex. 40.)  There is no indication in the catalog that the oils purchased by plaintiff in 2001 (Arabian Knights, Red Egyptian Musk and Janat Mawa) and requested by plaintiff in 2006 (Platinum and E. Superior Musk) are 100 percent natural.  (Pl.'s Ex. 32, 34, 40.) In 2007, the DOC rejected a bid from Exotic Fragrances because the vendor refused to disclose ingredients and did not submit a supporting affidavit of purity.  (Tr. 142-43.)

20.  A DOC imam advised plaintiff that oil is not necessary to Islamic prayer.  (Tr. 309.)  Plaintiff rejects this advice but believes that if he cannot obtain oils, he should pray without them.  (Tr. 311.)

<u>Circumcision</u>

21. Plaintiff believes that it is mandatory for Muslim men to be circumcised.  He requested circumcision surgery for religious reasons, not medical reasons.  (Tr. 271, 332.)

22. The DOC denied plaintiff's requests for circumcision surgery.  The DOC's contract with its medical provider does not allow for elective surgery.  Elective surgery would enable prisoners to alter identifying characteristics.  Permitting wealthier prisoners to purchase surgery would sow discord by emphasizing class distinctions.  (Tr. 504-506.)

II.  <u>Conclusions of Law</u>

Plaintiff claims that defendants' failure to offer weekly Jumu'ah to all inmates, rejection of his request to obtain oils from an outside vendor and rejection of his request to be circumcised violates his constitutional rights under the Free Exercise clause of the First Amendment and the Equal Protection clause of the Fourteenth Amendment and violates his statutory rights under RLUIPA.[2]

---

[2]In his trial memorandum, plaintiff claimed for the first time that the quality of Jumu'ah services in the DOC is constitutionally infirm because they are too brief and because they become tainted when the Islamic prayer leader conducts more than one service. Because the claim was not timely raised, it is not before the court.

A.  Free Exercise

The court begins with the plaintiff's First Amendment claims.  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).  However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."  Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990).  To achieve this balance, a prisoner's free exercise claims are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  Ford, 352 F.3d at 588 (citations omitted).  Under the reasonableness test, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme Court supplied four factors to aid a court in determining the reasonableness of a particular prison regulation:

> First, there must be a valid and rational connection
> between the regulation and the legitimate government
> interest justifying it.  Second, the claimed

10

> infringement is to be evaluated in light of the
> prisoners' other available means of exercising the
> right.  Third, the consequences of requiring
> accommodation of the right on prison staff, other
> prisoners and the allocation of prison resources
> generally should be considered.  Finally, the court
> should consider whether available, low-cost
> alternatives exist that would accommodate the right
> without compromising valid penological interests.

Ford, 352 F.3d at 595 (citing Turner, 482 U.S. at 89-91).

The prisoner asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006).  "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational."  Id. at 275 (citations and quotation marks omitted).  In this analysis, courts must give deference to the defendants because "prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations in situations such as this."  Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 128 (1977).

1. Sincerely-Held Belief

The test of whether plaintiff holds sincere religious beliefs is broadly subjective.  Ford v. McGinnis, 352 F.3d 582, 590 (2d Cir. 2003).  So long as the asserted belief is not "so

11

bizarre, so clearly nonreligious in motivation, as not to be entitled to protection," the court's "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." Id. (citations and quotation marks omitted).  "The opinions of the [DOC's] religious authorities cannot trump the plaintiff's sincere and religious belief." Id. (quoting Frazee v. Illinois Dept. of Empl. Sec., 489 U.S. 829, 834 n.2 (1989)).  Here, plaintiff has carried his initial burden of establishing his sincere beliefs that weekly Jumu'ah, chemical-free prayer oils and circumcision are critical to his observance as a practicing Muslim and that defendant's conduct infringes on those beliefs.

### 2.  Reasonableness of Regulations

#### a.  Jumu'ah

Turning to plaintiff's Jumu'ah claim, it is "well-established that prisoners have a constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993).  Despite plaintiff's assertion that the DOC has not acted diligently to ensure access to congregate prayer, the DOC has devoted considerable resources to providing weekly Jumu'ah to 28 separate inmate populations.

The DOC's policy of canceling Jumu'ahs when staff is unavailable[3] is reasonably related to legitimate penological interests including security, cost and administrative burden.  Prison security justifies the DOC's rejection of plaintiff's alternative proposal that inmates be permitted to lead prayer. Security also requires a rigorous screening process for potential chaplains and volunteers.  Significant resources have been allocated to recruiting and retaining Islamic prayer leaders despite turnover, budget constraints and a shortage of interest.  The ratio of Islamic full-time chaplains to Muslim inmates is higher than the chaplain-to-inmate ratio of any other faith group in the DOC.  In addition, there are other available means for Islamic observance such as study sessions, study materials, private prayer and approved devotional accessories. Under these circumstances, there is no violation of the Free Exercise Clause.  See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) (given administrative exigencies and other opportunities for Islamic observance, prison officials not required to excuse Muslim inmates from work details that prevented them from attending Friday collective prayer); Benjamin v. Coughlin, 905 F.2d 571, 573-74 (2d Cir. 1990) (failure to provide collective Rastafarian prayer was justified

---

[3]In addition, Jumu'ah occasionally is canceled due to unscheduled security lockdowns.  Plaintiff does not contest the reasonableness of this measure.

where defendants' good faith efforts to retain Rastafarian chaplain were unsuccessful); Persad v. Savage, No. 02cv0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004), adopted, 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004) (no free exercise violation where prison canceled Jumu'ah when regular chaplain was on vacation and prohibited inmates from leading Jumu'ah).

### b. Oils

Likewise, the DOC's decision to deny plaintiff's request to purchase oil from an outside vendor is reasonably related to legitimate security interests.  In response to potential hazards including slipperiness, flammability, toxicity, contraband-masking odor, fragility of containers and inmate merchandising, the DOC formed an oils committee to solicit and review bids. The DOC consulted with its Islamic chaplains and obtained an affidavit of purity from a third-party imam to ensure that the selected oil was suitable for Islamic devotions.  The DOC-approved oil is available in the commissary.  Restricting inmates to the commissary oil relieves DOC chaplains from becoming de facto merchants of devotional accessories. Plaintiff would prefer to buy oil from a vendor whose bid was rejected for failure to address the DOC's criteria.  The lack of the preferred oil has not prevented plaintiff from praying or taking advantage of other opportunities for religious exercise

available in the DOC.  For these reasons, the restriction does
not violate the Free Exercise Clause.

### c.  Circumcision

Nor has the DOC violated plaintiff's right to free exercise
by denying his request for circumcision.  Plaintiff concedes
that circumcision is not medically necessary.  The DOC's
preclusion of elective surgeries for prisoners is reasonably
related to legitimate penological interests.  Elective surgery
could alter a prisoner's identifying characteristics.  It would
be eminently unreasonable to allocate taxpayer money to elective
surgeries for prisoners, and permitting prisoners with means to
purchase elective surgery would sow discord by emphasizing
wealth disparities.  Finally, remaining uncircumcised does not
prevent plaintiff from taking advantage of other available means
of religious exercise such as prayer and study.

### B.  Equal Protection

The court turns next to plaintiff's claim of religious
discrimination.  To prove an equal protection violation, a
plaintiff "must demonstrate that he was treated differently than
others similarly situated as a result of the intentional or
purposeful discrimination."  Phillips v. Girdich, 408 F.3d 124,
129 (2d Cir. 2005).  The Second Circuit has determined that the
Turner reasonableness standard applies to equal protection
claims involving prisoner religious exercise.  See Benjamin v.

Coughlin, 905 F.2d 571, 575 (2d Cir. 1990) (citing Turner v. Safley, 482 U.S. 78, 89-90 (1987)).  Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are "reasonably related to legitimate penological interests."  Id. at 574.

Here, there is a paucity of evidence as to differences in the DOC's treatment of similarly situated groups.  The record does not indicate the frequency with which the DOC cancels collective prayer of other faith groups, permits elective surgery or permits non-Muslim inmates to purchase religious accessories from outside vendors in lieu of the accessories approved for sale in the commissary.  The record does reveal that beginning in 2001, more Islamic accessories were available for sale in the commissary than those of any other faith group. When calculated in 2006 and 2012, the ratio of Islamic full-time chaplains to Muslim inmates was more favorable than the chaplain-to-inmate ratio of any other faith group in the DOC. In light of the foregoing, plaintiff has not proved religious discrimination.

   C.  RLUIPA

   The analysis of plaintiff's claims under RLUIPA is more rigorous than the reasonableness analysis that applies to plaintiff's constitutional claims.  Redd v. Wright, 597 F.3d

16

532, 537 n.3 (2d Cir. 2010).  RLUIPA provides in relevant part
that

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined
> to an institution . . . even if the burden results
> from a rule of general applicability, unless the
> government demonstrates that imposition of the burden
> on that person —
>
> > (1) is in furtherance of a compelling
> > governmental interest; and
> >
> > (2) is the least restrictive means of furthering
> > that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Despite this heightened protection,

RLUIPA does not "elevate accommodation of religious observances

over an institution's need to maintain order and safety."

Cutter v. Wilkinson, 544 U.S. 709, 722 (2005).  Courts apply the

standard with "due deference to the experience and expertise of

prison and jail administrators in establishing necessary

regulations and procedures to maintain good order, security and

discipline, consistent with consideration of costs and limited

resources."  Id. at 723 (citation and quotation marks omitted).

    1.  Substantial Burden

    A substantial burden is one that places "substantial

pressure on an adherent to modify his behavior and to violate

his beliefs."  Singh v. Goord, 520 F. Supp. 2d 487, 498

(S.D.N.Y. 2007) (citing Jolly v. Coughlin, 76 F.3d 468, 477 (2d

Cir. 1996)).  The relevant question is whether the particular

activity is "considered central or important" to the plaintiff's religious practice, not whether it is mandated by his religion. Ford v. McGinnis, 352 F.3d 582, 593-94 (2d Cir. 2003); 42 U.S.C. § 2000cc-5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.").[4]  The test presupposes that there will be cases in which a belief or practice is so peripheral to the plaintiff's religion that any burden would be de minimis.  Ford, 352 F.3d at 593.

Here, plaintiff's willingness to use oils of unknown origin demonstrates that the use of chemical-free oil is not central or important to his religious exercise.  Plaintiff requests oils from Exotic Fragrances, Inc. or other outside vendors with no assurance that the oils are chemical-free.  In fact, Exotic Fragrances refused to disclose its ingredients to the DOC. Despite the lack of his preferred oil, plaintiff believes that his prayer is efficacious.

---

[4]But see Pugh v. Goord, 571 F. Supp. 2d 477, 504-505 (S.D.N.Y. 2008) ("In order to establish that a plaintiff's exercise was substantially burdened [under RLUIPA], a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. . . .  The interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.") (citations and quotation marks omitted).

In contrast, apart from the fact that plaintiff chose to skip Jumu'ah one Friday, the evidence indicates that Jumu'ah and circumcision are central to his religious practice.  The DOC's cancelation of Jumu'ah and denial of plaintiff's request for circumcision substantially burden his religious exercise.

### 2.  Least Restrictive Means of Furthering Compelling Government Interest

Where plaintiff demonstrates that a government practice substantially burdens his religious exercise, the onus shifts to the government to demonstrate that the practice is the least restrictive means of achieving a compelling government interest. Jova v. Smith, 582 F.3d 410, 415 (2d Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)).  The DOC has met its burden with respect to cancellations of Jumu'ah and denial of circumcision.

### a.  Jumu'ah

Plaintiff does not contest the occasional need to cancel Jumu'ah for unscheduled security lockdowns.  As for staffing issues, the compelling penological interests of security, cost and administrative burden make some cancelations of Jumu'ah unavoidable, especially given the narrow three-and-a-half hour window of time in which Jumu'ah may be accomplished each week. Security requires the DOC to carefully screen applicants and to accept only capable and confident Islamic leaders who will not be intimidated by inmates and the environment.  The DOC has

allocated money to paid Islamic chaplain positions such that the
ratio of Islamic full-time chaplains to Muslim inmates is higher
than the chaplain-to-inmate ratio of any other faith group in
the DOC.  The DOC's Islamic chaplains have not found volunteers
at their free-world houses of worship to the extent achieved by
other faith groups.  The DOC's two letter campaigns directed to
regional Islamic centers failed to produce additional volunteer
recruits.  Nor is there a less restrictive means other than
cancelation if DOC personnel are unavailable to offer Jumu'ah to
a particular inmate population.  Legitimate security concerns
justify the DOC's prohibition against inmate-led prayer, and
Jumu'ah cannot be rescheduled to a different day or time.  For
these reasons, and particularly in view of the considerable
resources the DOC has devoted to recruitment and retention of
Islamic chaplains and volunteers, the occasional cancelations of
Jumu'ah do not violate RLUIPA.

### b.  Circumcision

Likewise, the DOC's denial of plaintiff's request for
elective circumcision surgery furthers compelling government
interests.  Elective surgery could alter a prisoner's
identifying characteristics.  It would be unreasonable to
allocate taxpayer money to elective surgeries for prisoners, and
allowing prisoners with means to purchase elective surgery would
sow discord by emphasizing wealth disparities.  There is no less

restrictive means for plaintiff to exercise his religious desire for circumcision.  The DOC's refusal to provide circumcision surgery does not violate RLUIPA.

III. <u>Conclusion</u>

In light of the foregoing, judgment shall enter in favor of defendants.

This is not a recommended ruling.  The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.  (Doc. #27.)

SO ORDERED at Hartford, Connecticut this 26th day of November, 2013.

```
_____/s/_____
Donna F. Martinez
United States Magistrate Judge
```